# 13-2784-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

CHEVRON CORPORATION,

PLAINTIFF-APPELLEE,

V.

NON-PARTY JOHN DOE SIMEONTEGEL@HOTMAIL.COM, NON-PARTY JOHN DOE MEY_1802@HOTMAIL.COM, NON-PARTY JOHN DOE PIRANCHA@HOTMAIL.COM, NON-PARTY JOHN DOE DURUTI@HOTMAIL.COM,

MOVANTS-APPELLANTS,

V.

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, DONZIGER & ASSOCIATES, PLLC, JAVIER PIAGUAJE, HUGO GERARDO, CAMACHO NARANJO,

DEFENDANTS.

On Appeal from the United States District Court
for the Northern District of New York
Honorable Lewis A. Kaplan, U.S. District Judge

### APPELLANTS' OPENING BRIEF

Nathan Cardozo
nate@eff.org
Cindy Cohn
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333

Richard Herz
rick@earthrights.org
Michelle Harrison
Marco Simons
EARTHRIGHTS, INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC 20006
Tel: (202) 466-5188

*Counsel for Non-Party John Doe Movants/Appellants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ..........................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............3

STATEMENT OF THE CASE ..................................................................3

STATEMENT OF FACTS.........................................................................5

    A.    Chevron's September 19, 2012 Subpoenas to Google, and Yahoo!, and Microsoft ........................................................................7

    B.    The Non-Party Appellants ...........................................................10

SUMMARY OF THE ARUGMENT .......................................................12

STANDARD OF REVIEW ......................................................................15

ARGUMENT ...........................................................................................15

    I.    All Appellants have First Amendment Standing to Challenge Chevron's Subpoena and May Challenge it as a Whole....................15

        A.    The District Court Incorrectly Held that Litigants Must Affirmatively Aver Their Citizenship. .....................................16

        B.    The First Amendment Protects Appellants, Including Both U.S. and Non-U.S. Citizens ......................................................16

        C.    Appellants Have Standing to Challenge the Validity of the Subpoena as Applied to Them and as a Whole .......................21

            1.    Practical Obstacles Exist for Holders of Email Accounts to Challenge the Subpoena ...........................23

            2.    Appellants Have Suffered Injuries in Fact. ...................24

3.    Appellants Have Handled the Case Appropriately on Behalf of All of the Email Customers ............................ 25

II.    Chevron's Subpoena Impermissibly Burdens Appellants' First Amendment Rights to Anonymous Speech and Association. ............ 25

A.    The Subpoena Burdens the Appellants' First Amendment Rights to Anonymous Speech ..................................................... 25

1.    The Right to Engage in Anonymous Speech is Protected By the First Amendment ................................. 27

2.    One Does Not Lose His First Amendment Rights Because He Has Associated with Others Who May Have Acted Unlawfully ................................................ 28

3.    Anonymous Speakers Enjoy a Qualified Privilege Under the First Amendment ............................................ 31

4.    As Chevron's Subpoena Demand for Identity Information Cannot Survive the Scrutiny Required By the First Amendment, it Must Be Quashed Under Federal Rule of Civil Procedure 45 ................................ 34

i.    Chevron Did Not Issue These Subpoenas in Good Faith or for Any Proper Purpose ................ 34

ii.    Chevron Has Made No Showing that the Information Sought Relates to a Core Claim or that it Is Directly and Materially Relevant to that Claim .................................................................... 35

iii.    Chevron Has Made No Showing that the Information Sought Is Unavailable from Any Other Source ....................................................... 37

B.    The Subpoena Burdens the Appellants' First Amendment Rights to Association ................................................................. 38

1.      The Appellants Enjoy a First Amendment Right to Political Association and to Advocate Controversial Views as a Group ...........................................................39

2.      The Appellants Have a Qualified First Amendment Privilege Subject to Heightened Scrutiny That Can Only be Overcome by a Compelling Interest..........................42

      i.      The Appellants' Right to Association Will be Harmed if Their Identities and Email Usage Information is Disclosed ......................................44

      ii.      Disclosure of the Appellants' Information Does Not Serve a Compelling Interest and Is Not the Least Restrictive Means of Furthering a Compelling Interest.............................................45

III.     Chevron's Subpoena is Overbroad. ....................................................47

IV.     This Court Should Reverse the District Court and Reject Chevron's Subpoena in the First Instance ........................................................49

CONCLUSION ....................................................................50

CERTIFICATE OF COMPLIANCE ....................................................51

# TABLE OF AUTHORITIES

## Federal Cases

*Babbitt v. United Farm Workers Nat'l Union,*
   442 U.S. 289 (1979) ...................................................................... 24

*Bada Co. v. Montgomery Ward & Co.,*
   32 F.R.D. 208 (S.D. Cal. 1963) .................................................... 37

*Bates v. City of Little Rock,*
   361 U.S. 516 (1960) ........................................................... 38, 39, 44

*Booking v. Gen. Star Mgmt. Co.,*
   254 F.3d 414 (2d Cir. 2001) ......................................................... 15

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ...................................................................... 17

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ...................................................................... 15

*Broome v. Simon,*
   255 F. Supp. 434 (W.D. La. 1965) ............................................... 47

*Buckley v. Am Constitutional Law Found., Inc.,*
   525 U.S. 182 (1999) ...................................................................... 31

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ............................................................... 38, 43, 44

*Campbell v. Louisiana,*
   523 U.S. 392 (1998) ............................................................... 21, 22

*Chevron Corp. v. Donziger, et al.,*
   No. 11-cv-0691 (LAK) (S.D.N.Y. Feb. 1, 2011) ....................... 6, 7

*Chevron Corp. v. Donziger,*
   No. 1:12-mc-00065-LAK-CFH, (N.D.N.Y. July 29, 2013) ........... 4

*Chevron v. Donziger*,
    No. 13-16920 (9th Cir. October 25, 2013) .................................................. 7

*Church of the Am. Knights of the KKK v. Kerik*,
    356 F.3d 197 (2d Cir. 2004) ....................................................... 49

*Columbia Ins. Co. v. seescandy.com*,
    185 F.R.D. 573 (N.D. Cal. 1999) ................................................. 32

*Craig v. Boren*,
    429 U.S. 190 (1976) ................................................................. 22

*DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*,
    887 F.2d 275 (D.C. Cir. 1989) ............................................... 19, 20

*Doe v. 2theMart.com*,
    140 F. Supp. 2d 1088 (W.D. Wash. 2001) ......................................... *passim*

*Enterline v. Pocono Med. Ctr.*,
    751 F. Supp. 2d 782 (M.D. Pa. 2008) ........................................... 22, 33

*FEC v. LaRouche Campaign, Inc.*,
    817 F.2d 233 (2d Cir. 1987) ....................................................... 43

*Fund for Animals v. Babbitt*,
    89 F.3d 128 (2d Cir. 1996) ......................................................... 15

*Gibson v. Fla. Legislative Investigation Comm.*,
    372 U.S. 539 (1963) ................................................................. 39

*Gilmore v. City of Montgomery*,
    417 U.S. 556 (1974) ................................................................. 42

*Grandbouche v. Clancy*,
    825 F.2d 1463 (10th Cir. 1987) ................................................... 32

*Gregg v. Clerk of U.S. Dist. Court*,
    160 F.R.D. 653 (N.D. Fla. 1995) ................................................. 47

*Hartford Courant Co. v. Pellegrino*,
    380 F.3d 83 (2d Cir. 2004)................................................... 15, 49

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013) ...................................................... 19

*Ibrahim v. Dep't of Homeland Sec.*,
    669 F.3d 983 (9th Cir. 2012)................................................ 17, 18

*In re Air Crash at Belle Harbor, New York on November 12, 2001*,
    490 F.3d 99 (2d Cir. 2007)......................................................... 3

*In re Grand Jury Proceedings*,
    776 F.2d 1099 (2d Cir. 1985)........................................ 43, 44, 45

*In re Motor Fuel Temperature Sales Practices Litig.*,
    641 F.3d 470 (10th Cir. 2011).................................................. 42

*Int'l Longshoremen's Assoc. v. Waterfront Comm'n*,
    667 F.2d 267 (2d Cir. 1981)................................................ 44, 45

*Knox v. SEIU, Local 1000*,
    132 S. Ct. 2277 (2012) ............................................................ 42

*Lerman v. Bd. of Elections*,
    232 F.3d 135 (2d Cir. 2000)..................................................... 22

*Local 1814, Int'l Longshoremen's Assoc. AFL-CIO v. Waterfront Comm'n. of*
    *New York Harbor,* 667 F.2d 267 (2d Cir. 1981) ......................... 43

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ................................................................ 28

*McMann v. SEC*,
    87 F.2d 377 (2d Cir. 1937)....................................................... 47

*McVicker v. King*,
    266 F.R.D. 92 (W.D. Pa. 2010).................................................. 23

*Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*,
    336 F.3d 185 (2d Cir. 2003) ........................................................................ 15

*Meyer v. Grant*,
    486 U.S. 414 (1988) ........................................................................ 31

*N.Y. State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) ........................................................................ 43

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ........................................................................ 38, 39, 42

*NAACP v. Button*,
    371 U.S. 415 (1963) ........................................................................ 34, 42

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ........................................................................ 29, 30

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) ........................................................................ 31

*Nova Biomedical Corp. v. i-STAT Corp.*,
    182 F.R.D. 419 (S.D.N.Y. 1998) ........................................................................ 36

*Perry v. Schwarzenegger*,
    591 F.3d 1126 (9th Cir. 2011) ........................................................................ 42, 43, 45, 46

*Powers v. Ohio*,
    499 U.S. 400 (1991) ........................................................................ 21

*Reno v. ACLU*,
    521 U.S. 844 (1997) ........................................................................ 28

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ........................................................................ 42

*Sec'y of State Md. v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) ........................................................................ 22

*Shelley v. Kraemer*,
    334 U.S. 1 (1948) ................................................................. 31

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ......................................................... 38, 40

*Sherwin-Williams Co. v. Spitzer*,
    No. 1:04-cv-00185 (DNH/RFT), 2005 WL 2128939
    (N.D.N.Y. Aug. 25, 2005) ....................................................... 43

*Sony Music Entm't Inc. v. Does 1-40*,
    326 F. Supp. 2d 556 (S.D.N.Y. 2004) ......................................... 32

*Talley v. California*,
    362 U.S. 60 (1960) ............................................................... 28

*Thomas v. Collins*,
    323 U.S. 516 (1945) ......................................................... 35, 42

*Thompson v. Cnty. of Franklin*,
    15 F.3d 245 (2d Cir. 1994) ..................................................... 15

*United States v. IBM*,
    83 F.R.D. 97 (S.D.N.Y. 1979) ................................................. 47

*United States v. Jones*,
    132 S. Ct. 945 (2012) ....................................................... 39, 40

*United States v. Maynard*,
    615 F.3d 544 (D.C. Cir. 2010),
    *aff'd sub nom. Jones*, 132 S. Ct. 945 ....................................... 40

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ..................................................... 17, 18, 20

*USA Technologies, Inc. v. Doe*,
    713 F. Supp. 2d 901 (N.D. Cal. 2010) ....................................... 33

*Watchtower Bible & Tract Soc. of NY, Inc. v. Village of Stratton*,
    536 U.S. 150 (2002) ............................................................. 27

*Windsor v. Martindale*,
175 F.R.D. 665 (D. Colo. 1997).................................................. 47

## State Cases

*Dendrite Int'l, Inc. v. Doe No. 3*,
775 A.2d 756 (N.J. Super. Ct. App. Div. 2001).......................... 31

*Doe v. Cahill*,
884 A.2d 451 (Del. 2005) ........................................................ 32

*In re Ind. Newspapers Inc.*,
963 N.E.2d 534 (Ind. Ct. App. 2012)........................................ 23

*Mobilisa, Inc. v. Doe*,
170 P.3d 712 (Ariz. Ct. App. 2007) .......................................... 33

## Federal Statutes

28 U.S.C. § 1291 ............................................................................. 2

28 U.S.C. § 1331 ............................................................................. 2

28 U.S.C. § 1782 ............................................................................. 6

## Federal Rules

Federal Rule of Civil Procedure 26 ........................................... 36, 47

Federal Rule of Civil Procedure 45 ................................ 2, 13, 20, 34

## Constitutional Provisions

U.S. Const. amend. I.................................................................. *passim*

U.S. Const. amend. IV ..................................................................... 17

U.S. Const. amend. V ......................................................... 17, 18, 19

## Legislative Materials

National Defense Authorization Act for Fiscal Year 2012,
    Pub. L. No. 112-81, 125 Stat. 1298........................................................... 19

## Other Authorities

Microsoft Services Agreement (Oct. 19, 2012)..................................................... 18

## INTRODUCTION

This appeal represents a new and disturbing by-product of the long-running "Chevron-Ecuador" litigation: an incursion into the First Amendment rights of individuals who are not parties to that litigation. And indeed, the district court's order challenged here, requiring Microsoft to disclose nine-years worth of email data, including the true identities of those who have spoken critically of Chevron, as well as data that would allow Chevron to discover their movements and associations, is a threat not only to the Appellants subject to Chevron's harassing subpoena, but also to the rights of all email users in the United States and abroad. Should the district court's order be permitted to stand, a litigant like Chevron can use a civil, third-party subpoena to Internet providers to rob non-parties of their anonymity, locational, and associational privacy based not on some showing that the targets have done anything wrong, but merely upon a claim that *other people* with whom who they associated engaged in an illegal civil conspiracy.

Email is a tremendously powerful tool that allows people around the world to communicate privately and organize for political causes. The strict tests developed by the Supreme Court that apply when civil discovery implicates the First Amendment rights of political organizers to both speak anonymously and associate apply to email communications in full force. Those tests allow

production of material that is actually needed for a party to present his case, while preventing the use of civil discovery to intimidate and create chilling effects.

This appeal arises from a Federal Rule of Civil Procedure 45 subpoena issued by Chevron Corporation ("Chevron") to Microsoft Corporation ("Microsoft") in the Northern District of New York. Chevron seeks documents identifying thirty non-party Hotmail email account holders, as well as the computer usage information associated with the creation of their accounts and every subsequent login to each account, over a nine-year period. In addition to linking the non-parties' identities to their speech, the information sought by Chevron could reveal the movements and the personal and political associations of these thirty non-parties over those same nine years. The subpoena thus clearly violates the First Amendment.

Appellants, four of the non-parties targeted by Chevron, have moved to quash the subpoena on behalf of themselves and the other twenty-six email users, asserting their First Amendment rights to anonymous speech and association and challenging the subpoena's scope.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. *See also In re Air Crash at Belle Harbor, New York on November 12, 2001*, 490 F.3d 99, 106 (2d

Cir. 2007) ("[T]he holder of an asserted privilege may immediately appeal the enforcement of a subpoena when the subpoena is directed at another person who does not object to providing the testimony or documents at issue.").

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The issues presented by this appeal are:

1.     Whether Appellants have standing to challenge Chevron's subpoena on their own behalf and on behalf of those who lack the knowledge, resources, or wherewithal to assert their own interests.

2.     Whether by seeking the identities, movements, and associations of these non-parties over the course of nine years, Chevron's subpoena to Microsoft violates the non-parties' First Amendment right to anonymous speech and association.

3.     Whether Chevron's subpoena to Microsoft is facially overbroad.

## STATEMENT OF THE CASE

Non-Party John Doe Movants' (the "Appellants") appeal from Judge Lewis A. Kaplan's Orders of June 25, 2013 and July 29, 2013, substantially denying Appellants' motion to quash the subpoena issued by Chevron to Microsoft,

*Chevron Corp. v. Donziger,* No. 1:12-MC-00065-LAK-CFH, (N.D.N.Y. July 29, 2013), Joint Appendix ("JA") 234-45 and JA 252-55.

On September 18, 2012, Chevron issued a sweeping subpoena to Microsoft, demanding identity and email usage information associated with 30 Hotmail email accounts, including four belonging to Appellants. On October 22, 2012, Appellants moved to quash the subpoena in its entirety, on the grounds that the subpoena violated Appellants' First Amendment rights, was facially overbroad, and sought a large amount of wholly irrelevant information. JA 1-3. On January 23, 2013, the district court issued an order to show cause why the Appellants should not be required to submit to the Court a declaration revealing their true identities. JA 212-13. On February 13, 2013, the district court ordered the Appellants to submit to the court the original signed declarations filed by Appellants and a declaration identifying each individual on behalf of which the motion to quash was made. JA 218-24.

By Memorandum Opinion, on June 25, 2013, the district court denied the Appellants' motion to quash Chevron's subpoena, concluding that none of the Appellants had demonstrated they were entitled to First Amendment protection because they were not United States citizens or legal residents and concluding that the Appellants lacked standing to move to quash on First Amendment grounds. JA 234-45.

4

Appellants timely appealed the district court's opinion. JA 248-51.

On July 9, 2013, the Appellants filed a Motion for Reconsideration, arguing that the district court had erred by assuming that none of the Appellants were citizens or U.S. residents and by giving inadequate consideration to third-party standing. On July 29, 2013, the district granted the motion for reconsideration with respect to one of the Appellants and denied the motion in all other respects. JA 252-55. With respect to the single Appellant, the district court narrowed the time period covered by the subpoena to 2005 to 2008 after concluding that Chevron had not demonstrated "any compelling need" for IP logs outside that timeframe. *Id.* The district court concluded that giving Chevron access to information beyond that three-year timeframe "could intrude upon certain protected activities" in which John Doe may have engaged. *Id.*

On August 17, 2013, Appellants timely filed an Amended Notice of Appeal to include the district court's July 29, 2013 Order. JA 256-59.

## STATEMENT OF FACTS

This case arises from contentious environmental litigation that has been ongoing for two decades. In 1993, a group of Ecuadorian citizens sued Texaco, Inc. in the United States for widespread pollution and other damage allegedly caused by Texaco in a previously pristine corner of the Amazon rainforest. Chevron Corporation acquired Texaco in 2001 and successfully fought to move the

5

litigation to Ecuador's judicial system in 2003. In 2011, an Ecuadorian court entered a judgment of approximately $19 billion against Chevron. That judgment was upheld on appeal.

On February 1, 2011, Chevron filed suit in the Southern District of New York against more than 50 lawyers, organizations, plaintiffs, and other individuals involved in the case in Ecuador, alleging that they obtained the judgment through fraud and other illegal means. Complaint, *Chevron Corp. v. Donziger, et al.*, No. 11-cv-0691 (LAK) (S.D.N.Y. Feb. 1, 2011). That case is the source of the subpoena at issue here. In that case, the trial court limited discovery to those five specific allegations for which Chevron had met its *prima facie* burden: Chevron's claims that (1) representatives of defendants bribed the Ecuadorian judge and, as part of the deal, wrote the judgment for the judge's signature; (2) at an earlier stage of the Ecuadorian litigation, the defendants had coerced the then-presiding Ecuadorian judge to terminate environmental inspections and replace that process with a single expert of defendants' choosing; (3) the report eventually submitted by that expert as his independent work was actually substantially written by defendants or their agents; (4) once the improprieties regarding that report surfaced, defendants submitted a deceptive account of their relationship with the expert in a Section 1782 proceeding in Colorado; and (5) at an even earlier stage of the Ecuadorian proceeding, defendants had submitted an environmental report to

the Ecuadorian court over the signature of their expert, which the expert neither adopted nor agreed with. *See Chevron Corp. v. Donziger*, Case No. 11-cv-691 (LAK), 2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013).[1]

## A.    Chevron's September 19, 2012 Subpoenas to Google, Yahoo!, and Microsoft.

On September 19, 2012, Chevron served subpoenas on Google, Yahoo!, and Microsoft demanding identity and email usage information associated with 101 email accounts from 2003 to the present. The subpoena to Microsoft was issued by the United States District Court for the Northern District of New York, and Appellants' motion to quash is the subject of this appeal.[2]

Microsoft attempted to notify the affected account holders about the subpoena by email, though it is unclear on the record considered by the district court how many received actual notice in time to challenge the subpoena. For example, the owner of the email account duruti@hotmail.com was only able to secure counsel and join the Appellants' motion to quash after it was filed and

---

[1] Chevron has not alleged any of these claims against the Appellants in the underlying action, nor has it claimed that the discovery sought here is needed to prove that Appellants participated in any of the five areas in which Judge Kaplan found Chevron met its *prima facie* burden.

[2] The subpoenas to Google and Yahoo! were issued by the District Court for the Northern District of California. A number of the targets of those subpoenas separately moved to quash them in that court. An appeal from that court's order is currently pending in the Ninth Circuit. That court has partially stayed production, citing "a substantial question on the merits under the First Amendment." Order at 2, *Chevron v. Donziger*, No. 13-16920 (9th Cir. October 25, 2013).

during the pendency of the motion. JA 214. In addition, at least five of the thirty addresses targeted by Chevron appear to be nonfunctional. JA 215.

The subpoena to Microsoft specifically seeks the identity of the owner of, and email usage records associated, with 30 email addresses, including all documents related to:

>(A)    identity of the users of all of the listed email addresses, including but not limited to documents that provide all names, mailing addresses, phone numbers, billing information, date of account creation, account information and all other identifying information associated with the email address under any and all names, aliases, identities or designations related to the email address; [and]

>(B)    the usage of all of the listed email addresses, including but not limited to documents that provide IP logs, IP address information at time of registration and subsequent usage, computer usage logs, or other means of recording information concerning the email or Internet usage of the email address[.][3]

An Internet Protocol address ("IP address"), logs of which are sought in part (B), is a unique numeric value used to identify every computer, or set of computers, on the Internet. JA 237-38. Portable devices such as tablets, smartphones, or laptops are often assigned different IP addresses depending on the location of the device. *Id.*

---

[3] Despite the broad wording of category (B), Chevron's attorneys have clarified that this description was not intended to include any contents of communications or email header information, which would reveal the names and IP (Internet Protocol) addresses of senders and recipients of messages.

Many websites, such as Microsoft Hotmail, maintain logs of the IP addresses associated with every login to the site, including data such as the time and date of the login. *Id*. IP addresses are assigned to Internet Service Providers ("ISPs") in blocks of addresses. *Id*. Because of the way they are assigned, an investigator can use an online service to obtain information about the assignee of any IP address. *Id*. In some cases, an IP address can be associated with an exact physical location, although in most instances, it is only possible to associate an IP address with an ISP's regional office. *Id*. Where exact correlation to a physical address is not apparent, a litigant may subpoena the corresponding ISP to develop a detailed picture of a person's location and movements. *Id*.

> To summarize, if Microsoft still has and were to produce the requested information, Chevron would learn the IP address associated with every login for every account over a nine-year period. Chevron could identify the countries, states, or even cities where the users logged into the accounts, and perhaps, in some instances, could determine the actual building addresses.

*Id*. at 4-5. When collected in bulk, IP logs would also indicate when two users are physically together, as their computers will likely have the same IP addresses at the same time. By reviewing the IP address information from multiple people, one can often determine whether they are together at a particular point in time. JA 8-9.[4]

---

[4] Appellants note that Microsoft has not confirmed on the record whether it actually has a full nine-years worth of IP addresses for each of the 30 individuals and has indicated that it will not know exactly what information it has until it is under an order to produce. Based upon Microsoft's normal practices, it seems

9

### B.    The Non-Party Appellants.

The four Appellants are individuals who have had some connection to the litigation against Chevron in Ecuador or related environmental advocacy. Some individuals have direct connections and others are quite indirect. None is a defendant in the underlying New York action.

The first declaration submitted to the district court in support of Appellants' motion is from Appellant John Doe (the owner of the email account simeontegel@hotmail.com) who had only an indirect connection with the litigation against Chevron. From 2005 to 2008, he worked for a non-profit advocacy organization and engaged in broader advocacy efforts concerning the environmental impact of Chevron's former oil concession in the Amazon.[5] JA 11. John Doe almost never used his Hotmail account in connection with his advocacy work and instead maintained a separate email account for correspondence related to that campaign. *Id*.

John Doe is now a full-time professional journalist based in Latin America, and his articles have been published in a number of prominent international media outlets. *Id*. He has used his Hotmail account for personal and professional communications for about 13 years. *Id*. Ensuring the privacy of this account is

likely that it does not have nine years for the non-party Appellants. Nonetheless, Chevron has refused to narrow its subpoena; it still seeks the full nine years.

[5] This brief's use of masculine pronouns to refer to Appellants is generic and should not be construed as an admission of gender.

particularly important to him because he uses it to communicate with sources, and maintaining the confidentiality of that account is an important part of his job. *Id*. As a reporter in Latin America, he works on many stories where his personal security, and the security of his confidential sources, is an issue of great concern. *Id*. John Doe declares that his use of his email account to communicate with his sources would be chilled if Chevron obtained details about his account. JA 12.

John Doe feels harassed by Chevron's attempt to obtain information about his identity and past involvement in his advocacy work. *Id*. John Doe is no longer engaged in that activity, but if Chevron gains access to information about his account, John Doe would be intimidated and deterred from engaging in activism or litigation against Chevron in the future. *Id*. His participation in other political and activism campaigns would be chilled more generally as well. *Id*.

John Doe 2 (the owner of the email account pirancha@hotmail.com) is a full-time environmental journalist. John Doe 2 provided professional public relations services to environmental activists and lawyers working on the Chevron-Ecuador litigation from 2005 to 2010 and continues to perform those functions occasionally on a volunteer basis. JA 217. John Doe 2 has used his Hotmail email account to engage in personal and professional speech since 2005. *Id*. As a professional journalist, John Doe 2 finds it crucial to keep his Hotmail account, location information, and communications times confidential. *Id*. John Doe 2 has

11

been personally subjected to physical threats during the course of his environmental work in Ecuador. *Id*. He believes that his personal safety, as well as the safety of his family, has been endangered due to his work and that the threats against him were specifically due to his work in opposition to Chevron. *Id*.

The district court held that "[i]n order to establish that they were protected by the First Amendment, it was [Appellants'] burden to demonstrate that those on behalf of whom the argument was made were entitled to its protection." JA 253. Because they "have not claimed that they are U.S. citizens," they "failed entirely" in their burden. *Id*.

## SUMMARY OF THE ARGUMENT

Chevron seeks to identify Appellants, as well as to track their movements and associations over a nine-year span. The district court made two types of errors in its First Amendment decisions below: it erred in declining to find standing as to most of the Appellants, and it erred in failing to apply the appropriate First Amendment tests even after it found standing as to one of the Appellants.

On standing, the district court erred in holding that only U.S. citizens could have standing to challenge Chevron's subpoena. The First Amendment protects Appellants, including non-U.S. citizens where, as here, they have substantial connections to this country; Appellants have been brought into this litigation based on their speech and associational activities aimed at Chevron, a U.S. corporation,

12

and Appellants used a U.S.-based email service located in the United States and subject to U.S. law and legal process. Indeed, Chevron seeks access to records that are located in the United States. Appellants have standing to challenge the constitutionality of an American Rule 45 subpoena, issued to an American corporation, to be enforced in the United States, under the authority of an American court.

The district court also erred in holding, that Appellants, even the one the district court ultimately found was entitled to First Amendment protections, lacked standing to assert the rights of the other non-parties. That holding was contrary to settled First Amendment standing law, which allows third-party standing where, as here, the plaintiff and the third party share a common interest in enforcing the right, the litigant has an incentive to advocate effectively and practical obstacles prevent a party from asserting rights on behalf of itself.

The district court also erred, after granting one Appellant standing, by failing to apply the proper tests under the First Amendment to protect anonymity and the right of association. The speech at issue here – the identities and private associations of individuals sought as a result of their political speech about environmental pollution – is core political speech. To overcome Appellants' First Amendment rights to anonymous speech, the burden was on Chevron to show the subpoena (1) was issued in good faith and not for an improper purpose, (2) the

information sought relates to a core claim or defense, (3) is directly and materially relevant to that claim or defense, and (4) is unavailable from another source. The district court erred in holding this test did not apply "because the First Amendment does not shield fraud." Chevron has alleged no cause of action for fraud or any other cause of action against Appellants, nor have they shown, as they are required to do, that Appellants themselves have committed any fraud; First Amendment rights are not lost simply by associating with others alleged to have acted unlawfully.

Appellants made a prima facie showing that disclosure would chill their constitutionally protected associational rights. The burden was thus shifted to Chevron to demonstrate the information sought serves a compelling interest and is the least restrictive means of obtaining the desired information. While Chevron cannot meet this test, the district court erred by failing to even apply it as to any Appellant.

Finally, the district court erred in failing to quash the subpoena as overbroad after it found Chevron had not justified its breadth.  Chevron's subpoena manifestly seeks irrelevant information, in that it would allow Chevron to learn Appellants' associations and movements not just with respect to the speech about Chevron, but also with respect to every aspect of Appellants' personal lives.

All are reversible errors.

## STANDARD OF REVIEW

The Court reviews dismissals for lack of standing *de novo*. *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994); *Fund for Animals v. Babbitt*, 89 F.3d 128, 132 (2d Cir. 1996) ("we review questions of mootness and standing *de novo* because they are questions of law"). Additionally, the Court reviews issues of constitutional importance *de novo*. *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 198 (2d Cir. 2003) ("because this case involves constitutional issues, our review is *de novo*") (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648–49 (2000)). Finally, the Court has the "authority to decide issues that were argued before but not reached by the district court." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90 (2d Cir. 2004); *see also Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418-19 (2d Cir. 2001).

## ARGUMENT

### I.   All Appellants Have First Amendment Standing to Challenge Chevron's Subpoena and May Challenge it as a Whole.

The district court's standing analysis is wrong in three ways. First, the court, *sua sponte*, imposed a requirement that the litigants assert their national citizenship in seeking to quash the subpoena, a requirement found nowhere in the law. The court then misapplied this requirement to one Appellant, who is in fact an American citizen, only reversing this summary dismissal upon reconsideration. Second, the court found that the three noncitizen Appellants had no First

15

Amendment standing despite their substantial connections to this country, evident by their involvement in this American dispute with an American company and their use of a U.S.-based email service subject to U.S. law and legal process. Third, the district court erred in preventing the four Appellants from challenging the subpoena as a whole even though they meet the standards for third-party standing under the First Amendment.

### A. The District Court Incorrectly Held that Litigants Must Affirmatively Aver Their Citizenship.

The district court erred by requiring the Appellants to aver their U.S. citizenship in order to have standing to raise their First Amendment claims. But there is no such pleading requirement, and no substantive rule that limits First Amendment protections to U.S. Citizens.[6]

### B. The First Amendment Protects Appellants, Including Both U.S. and Non-U.S. Citizens.

The three noncitizen Appellants are entitled to the same First Amendment protections as the Appellant who is a U.S. citizen. The district court erred in holding that only U.S. citizens are entitled to First Amendment protection.

Even as to the noncitizens, "[t]he Supreme Court has held in a series of cases that the border of the United States is not a clear line that separates aliens who may

---

[6] Chevron did not raise this issue and even conceded that the Appellants had standing to challenge the subpoena to Microsoft with respect to their own accounts.

16

bring constitutional challenges from those who may not." *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 995 (9th Cir. 2012). In *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990), the Supreme Court noted that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271. More recently, in *Boumediene v. Bush,* 553 U.S. 723, 764 (2008), the Court held that the right of an alien outside the United States to assert constitutional claims is based on "objective factors and practical concerns" rather than "formalism." In determining the constitutional rights of aliens outside the United States, courts apply a "functional approach" rather than a bright-line rule. *Id.*

In *Boumediene,* the Court held that aliens held as enemy combatants outside the *de jure* sovereign territory of the United States may petition for habeas corpus to challenge the constitutionality of their detention. 553 U.S. at 732. In *Verdugo-Urquidez*, the Court held that the Defendant could not claim the protection of the Fourth Amendment for a search of his property in Mexico because he was "an alien who has had no previous significant voluntary connection with the United States." 494 U.S. at 260.

The Ninth Circuit recently applied this functional test in *Ibrahim*, holding that a sufficient voluntary connection existed to allow First and Fifth Amendment claims by an alien living abroad when she had conducted "her Ph.D. studies at a

distinguished American university, and wishe[d] to maintain that connection." 669 F.3d at 996. The student alleged that she had mistakenly been placed on a government watch list, and the court rejected the government's argument that the fact that she had left the country voluntarily meant that she no longer had standing to raise her First and Fifth Amendment claims. *Id*. at 996-97.

Here, all of the Appellants are being brought into this litigation based upon their speech and associational activities aimed at Chevron, an American corporation. All of them used an email provider located in the United States. Appellants were bound by Microsoft's terms of use, which provide that that, for customers that live in the United States or North and South America, they are contracting with Microsoft Corporation, One Microsoft Way, Redmond, WA 98052. For customers in North and South America, outside the United States, the terms specifically provide that "Washington state law governs the interpretation of this agreement and applies to claims for breach of it, regardless of choice of law principles."[7] And Chevron is seeking information located in the United States; thus, this case is akin to the question that would have been presented in *Verdugo-Urquidez* if the defendant's property had been located in the United States. As in *Ibrahim*, the Appellants here have significant voluntary connections with the

---

[7] Microsoft Services Agreement (Oct. 19, 2012), http://windows.microsoft.com/en-us/windows-live/microsoft-services-agreement.

United States that are specific to this action. These are sufficient for them to raise their First Amendment challenge.

*Hedges v. Obama*, 724 F.3d 170 (2d Cir. 2013), the case relied on by the district court, does not suggest a different result. In *Hedges,* two Americans and two non-resident aliens challenged on First and Fifth Amendment grounds Section 1021 of the National Defense Authorization Act for Fiscal Year 2012. That law "appear[ed] to permit the President to detain anyone who was part of, or has substantially supported, al-Qaeda, the Taliban, or associated forces." *Id*. at 173. In that case, this Court held that neither the citizens nor the aliens could challenge the law – the citizens because they were not in fact subject to detention under Section 1021, *id*. at 193, and the noncitizens because they had not shown their fear that the government might hold them in indefinite detention under Section 1021 was even remotely likely, *id.* at 202. Neither analysis rested on the citizenship status of the plaintiffs.

The District Court also mistakenly relied on *DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275 (D.C. Cir. 1989); nothing in the case suggests that a noncitizen lacks standing to assert First Amendment claims with respect to information located *in the United States*. JA 253. In that case, the D.C. Circuit affirmed the dismissal of a lawsuit challenging the State Department's anti-abortion policy by a number of U.S. and foreign family planning groups. That

court upheld the district court's determination that "the interests in free speech and freedom of association of foreign nationals acting outside the borders, jurisdiction, and control of the United States do not fall within the interests protected by the First Amendment." *Id*. at 283. Yet in doing so, the court was careful to note that its holding did *not* mean "that an alien beyond the bounds of the United States never has standing to assert a constitutional claim." *Id*. at 285.

Unlike in *DKT* and *Verdugo-Urquidez,* the noncitizen Appellants before this Court do not argue for the extraterritorial application of the Bill of Rights. Appellants challenge the constitutionality of an American Rule 45 subpoena issued to an American corporation, to be enforced here in the United States, under the authority of an American court. Furthermore, unlike the defendant in *Verdugo-Urquidez*, the three noncitizen Appellants here are not foreigners with no "previous significant voluntary connection with the United States." *See Verdugo-Urquidez*, 494 U.S. at 271. Rather, they are environmental activists engaged in a campaign specifically targeting an American corporation who chose to use an email service located in the United States.

Indeed, Appellants and the other non-parties are being targeted by Chevron specifically *because of* their previous significant voluntary connection with the United States. And Chevron can seek their information only *because of* their connection with the American company Microsoft. Chevron's own example of

20

how the information could be relevant confirms as much; it sought location information precisely because it might help Chevron determine what actions were taken *in the United States*, which Chevron asserts may be relevant to determine whether Chevron is seeking an extraterritorial application of RICO.[8] JA 28.

### C.    Appellants Have Standing to Challenge the Validity of the Subpoena as Applied to Them and as a Whole.

The District Court also erred in failing to allow the Appellants, even the one who it found to be protected by the First Amendment, to assert the rights of the other non-parties for whom the subpoena was also improper. Settled First Amendment standing law permits the Appellants to quash the subpoena on behalf of all of those subject to it.

As a general matter, two factors determine whether a litigant may, as prudential matter, assert the rights of another: the relationship between the litigant and the third person and the ability of the third party to assert his own right. *Campbell v. Louisiana,* 523 U.S. 392, 397-98 (1998), *citing Powers v. Ohio*, 499 U.S. 400, 411, 413 (1991). The first requirement is met where the plaintiff and the

---

[8] To the extent communications occurred outside the United States, that would simply serve to undermine Chevron's argument that the location information is relevant.

third party share a common interest in enforcing the right and the litigant has an incentive to advocate effectively. *Campbell,* 523 U.S. at 398.[9]

Specific to this context, the Supreme Court has long recognized that a third party has standing to assert another's First Amendment rights "[w]here practical obstacles prevent a party from asserting rights on behalf of itself." *Sec'y of State Md. v. Joseph H. Munson Co*., 467 U.S. 947, 956 (1984); *see also Lerman v. Bd. of Elections*, 232 F.3d 135, 143-44 (2d Cir. 2000). Such standing is appropriate when the third party has suffered injury in fact, and when the third party "can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Joseph H. Munson*, 467 U.S. at 956 (citing *Craig v. Boren*, 429 U.S. 190, 193-94 (1976)).

Courts have applied this doctrine to recognize the standing of third parties to move to quash subpoenas seeking the identities of anonymous online speakers who have not directly asserted their own First Amendment rights. *See*, *e.g.*, *Enterline v. Pocono Med. Ctr.*, 751 F. Supp. 2d 782, 786 (M.D. Pa. 2008) (finding media company had standing to assert First Amendment rights of anonymous commenters on its website); *In re Ind. Newspapers Inc.*, 963 N.E.2d 534, 549 (Ind.

---

[9] There need not be any personal relationship between the litigant and the third party. Thus, in *Campbell*, a white criminal defendant had standing to assert the equal protection right of a person excluded from a grand jury on racial grounds.

Ct. App. 2012) (same); *McVicker v. King,* 266 F.R.D. 92, 95-96 (W.D. Pa. 2010) (same).

### 1. Practical Obstacles Exist for Holders of Email Accounts to Challenge the Subpoena.

Practical obstacles plainly existed for the individuals who did not appear. First, they were not served with, or otherwise effectively notified of, the subpoenas. Microsoft only sent email to their addresses, in English, informing them about the subpoena. While Microsoft's voluntary efforts are commendable, they are a far cry from effective legal service of process. Even if the non-movants received the email, some of the email account holders may live or work abroad, which may make it difficult for them to find counsel to challenge these subpoenas in federal court in New York. Some may not read English, or may not read it sufficiently to understand the formal language of a subpoena, and therefore may not have understood the notice. Indeed, as discussed above, John Doe 2 and several of the non-parties in the California cases only realized that their email addresses were involved after the case began and had to be added later, demonstrating that the Microsoft email process was not a substitute for actual notice.

The district court's rejection of standing was based on a mistaken factual assumption. It asserted that "owners of at least some of these accounts have opposed these subpoenas in the Southern District of New York and the Northern District of California." JA 244. Not so. As far as counsel is aware, none of the

23

email address holders who did participate in the California action involving Google and Yahoo! have not participated here. And there was no evidence in the record to suggest that the district court's assumption was correct.

### 2. Appellants Have Suffered Injuries in Fact.

In a First Amendment challenge, a party may establish injury in fact by "demonstrat[ing] a realistic danger of sustaining a direct injury" as a result of the challenged action. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

All of the Appellants have suffered an injury in fact; indeed, their injuries are particularly acute here. As the declarations of John Doe and John Doe 2 make clear, they feel harassed by Chevron's attempt to obtain information about their past involvement in advocacy efforts against the company's oil extraction activities. JA 12; JA 217. John Doe 2 has already faced physical threats as a result of participating in environmental advocacy efforts against Chevron. JA 217. Moreover, John Doe 2 knows others who have stopped participating in or declined to participate in activism against Chevron because they fear harassment and retribution. *Id*. John Doe fears further harassment if Chevron actually gains access to the information it seeks and believes this result will chill his political expression in the future. JA 12.

24

### 3.    Appellants Have Handled the Case Appropriately on Behalf of All of the Email Customers.

Appellants framed the issues properly and presented them with adversarial zeal. The Appellants and the non-party owners of the other email accounts listed in the subpoena are similarly situated. Chevron seeks the same information about each of these individuals, and each account owner has First Amendment interests in the entirety of the information sought by Chevron. They have all been targeted because of their association with the Chevron-Ecuador litigation. The Appellants have presented the legal issues in a manner that applies to all the affected individuals and have retained counsel to litigate these questions vigorously.

For these reasons, Appellants have First Amendment standing to challenge the subpoena as a whole, not just as it applies to them individually.

## II.    Chevron's Subpoena Impermissibly Burdens Appellants' First Amendment Rights to Anonymous Speech and Association.

Chevron's subpoena here fails both the First Amendment tests for anonymous speech and the First Amendment tests protecting the right of association.

### A.    The Subpoena Burdens the Appellants' First Amendment Rights to Anonymous Speech.

The subpoena seeks to identify speakers from their email addresses and tie their speech to those identities, based upon their alleged participation in the advocacy and litigation campaign against Chevron. Under the broad protections of

the First Amendment, speakers have not only a right to organize and engage in political advocacy, but also the right to do so anonymously. It is not that identities can never be discovered, it is that much higher tests must be met than those applicable to ordinary discovery, especially when those individuals are not parties. Accordingly, the First Amendment requires that those who seek to discover the identities of their political critics (let alone track their movements over the course of nearly a decade), demonstrate a compelling need for such information before obtaining that discovery.

The district court rejected Appellants' anonymous speech claims solely because of the erroneous belief that Appellants had waived their anonymity "in light of the email addresses they chose and the publicity they have received." JA 222. But it is not true that each of the Appellants used his own name or initials in his email address. *See* JA 226 (unredacted version on file with the Court).

Contrary to both Chevron and the district court's assertions, email addresses that appear to reflect an individual's name are entitled to just as much protection as email addresses that do not. The appearance of absolute secrecy of a speaker's identity has never been a requirement for First Amendment protection. In the *McIntyre* case, for instance, which protected the right of Margaret McIntyre to pass out unsigned leaflets at a community meeting at a middle school in Westerville, Ohio, the fact that many of the attendees of the meeting likely knew who Mrs.

McIntyre was by sight made no difference to the Court's analysis. The same is true of the Jehovah's Witness members in Wellsville, Ohio, where the Supreme Court held: "The fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity." *Watchtower Bible & Tract Soc. of NY, Inc. v. Village of Stratton*, 536 U.S. 150, 167 (2002).

Even Chevron must concede that the email addresses do not sufficiently indicate the owner's identity. In fact, Chevron served this subpoena on Microsoft precisely because the email addresses alone did not sufficiently confirm the identity of each account holder. If the identity information was not actually needed by Chevron, this subpoena should be held to be improper as redundant and unnecessary, and the concern that it was issued solely to harass and intimidate becomes more pronounced. Regardless, Chevron's goal here is to tie identities to private speech, and that implicates the First Amendment even if it were true that the identities themselves were not protected.

### 1. The Right to Engage in Anonymous Speech is Protected By the First Amendment.

Nevertheless, even if the email addresses suggested certain identities of the accountholders, Chevron's subpoena – which seeks confirmation of the identities – still has to meet the First Amendment tests.

The Supreme Court has consistently defended the right to anonymous speech in a variety of contexts, noting that "[a]nonymity is a shield from the tyranny of the majority . . . [that] exemplifies the purpose [of the First Amendment] to protect unpopular individuals from retaliation . . . at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995); *see also Talley v. California*, 362 U.S. 60, 64 (1960) (finding a municipal ordinance requiring identification on hand-bills unconstitutional, noting that "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind"). Anonymity receives the same constitutional protection whether the message is conveyed by political leaflet, Internet message board, or email. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997); s*ee also*, *e.g.*, *Doe v. 2theMart.com*, 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001) ("The right to speak anonymously extends to speech via the Internet. Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas."). These fundamental rights protect anonymous speakers from forced identification, be they from overbroad statutes or unwarranted discovery requests.

### 2. One Does Not Lose His First Amendment Rights Because He Has Associated with Others Who May Have Acted Unlawfully.

Appellants are not denied their First Amendment rights simply because they have associated with others who might have acted unlawfully. *NAACP v.*

28

*Claiborne Hardware Co.*, 458 U.S. 886, 908, 915, 919–20, 934 (1982). In *Claiborne Hardware,* the Court addressed a boycott designed to promote racial equality that was enforced in part through violence, but that also included speeches, peaceful protests and the voluntary choice of many local residents not to use certain stores. *Id.* at 888-89, 903-4. The Court held that the non-violent elements of the campaign were protected by the First Amendment; individuals' First Amendment rights are not limited—and they could not be held liable—simply because their partners in expressive activity violated the law in furtherance of their joint campaign. *Id.* at 908, 915, 919-20, 934. First Amendment rights will be denied only to those who themselves had "a specific intent to further an unlawful aim." *Id.* at 925; *accord id.* at 920, 933. Without evidence of specific criminal intent—"judged according to the strictest law"—the exercise of First Amendment rights of association are not criminal and remain protected. *Id.* at 919 (internal quotation omitted). Speech itself cannot be evidence of illegality. *See id.* at 932-34. And Chevron's burden to show illegal intent was "heavy." *Id*. at 934. The district court was under "a special obligation" to examine Chevron's allegations "critically" and with "extreme care." *Id.* at 915, 926.

The district court also erred in holding that the First Amendment tests were "inapplicable because the First Amendment does not shield fraud." JA 254. But of course, Chevron has not alleged a cause of action for fraud, or any other cause of

action for that matter, against the Appellants or any other non-party targeted by this subpoena.

The district court's belief that "[W]hether and how the defendants in that action and co-conspirators engaged in a media campaign . . . is quite relevant to Chevron's RICO claims" (JA 254) *is in direct conflict with Claiborne Hardware.* That is, the district court merely concluded, in cursory fashion and without analysis, that there is evidence that the Ecuadorian litigation was tainted by fraud and that the Cabrera Report was not independent, and then found it sufficient that John Doe discussed those matters. Yet these observations, even if true, are not sufficient to find that the targets of the subpoena committed fraud. Thus, they cannot render the First Amendment inapplicable.

Moreover, neither Chevron nor the district court explained how discovery of the names and locations of *non-parties* are required, or even relevant, to prove the fraudulent conduct of others. For instance, Chevron suggested that that the IP logs are required to prove that certain RICO predicate acts occurred in the United States. Yet Chevron needs to prove that *the defendants* committed acts within the United States, not non-parties like Appellants.

Similarly, while the district court did not rely on it, Chevron has also claimed that some of the non-party email addresses may be owned, used, or controlled by the parties to the litigation. Yet, as described further below, the

30

proper vehicle for confirming that belief would have been a discovery request or deposition question directed to those parties, which apparently Chevron did not make.

The speech at issue here—the identities and associations of individuals that are being sought as a result of their political speech about pollution and other damage caused by oil exploration activities—is core political speech for which the First Amendment protection should be "at its zenith." *See e.g. Meyer v. Grant*, 486 U.S. 414, 425 (1988).

### 3.    Anonymous Speakers Enjoy a Qualified Privilege Under the First Amendment.

A court order, even if granted to a private party, is state action and hence subject to constitutional limitations. *See, e.g., New York Times v. Sullivan*, 376 U.S. 254, 265 (1964); *Shelley v. Kraemer*, 334 U.S. 1, 14 (1948). Because the First Amendment protects anonymous speech and association, efforts to use the power of the courts to pierce anonymity are subject to a qualified privilege. Courts must "be vigilant . . . [and] guard against undue hindrances to . . . the exchange of ideas." *Buckley v. Am Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999). This vigilant review "must be undertaken and analyzed on a case-by-case basis," where the court's "guiding principle is a result based on a meaningful analysis and a proper balancing of the equities and rights at issue." *Dendrite Int'l, Inc. v. Doe No. 3*, 775 A.2d 756, 761 (N.J. Super. Ct. App. Div. 2001). But here, the district

court did not undertake any of the required, case-by-case balancing of the rights and equities.

Just as in other cases in which litigants seek information that may be privileged, courts must consider the First Amendment privilege before authorizing discovery. *See*, *e.g.*, *Sony Music Entm't Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565 (S.D.N.Y. 2004) ("Against the backdrop of First Amendment protection for anonymous speech, courts have held that civil subpoenas seeking information regarding anonymous individuals raise First Amendment concerns."); *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987) ("[W]hen the subject of a discovery order claims a First Amendment privilege not to disclose certain information, the trial court must conduct a balancing test before ordering disclosure.").

To be sure, the constitutional privilege to remain anonymous is not absolute. Plaintiffs may properly seek information necessary to pursue meritorious litigation. *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999) (First Amendment does not protect anonymous Internet users from liability for tortious acts such as defamation); *Doe v. Cahill*, 884 A.2d 451, 456 (Del. 2005) ("Certain classes of speech, including defamatory and libelous speech, are entitled to no constitutional protection.").

Litigants may not use the discovery power to uncover the identities of people who have simply made statements the litigants dislike or who associate with those whom they dislike. Accordingly, courts evaluating attempts to unmask anonymous speakers in cases similar to the one at hand have adopted standards that balance one person's right to speak anonymously with a litigant's legitimate need to pursue a claim.

The seminal case setting forth First Amendment restrictions upon a litigant's ability to compel an online service provider to reveal an anonymous non-party's identity is *Doe v. 2theMart.com*, *supra*, which adopted a four-part test for protecting anonymous speakers that has been followed by courts around the country.[10] In order for the litigant to obtain the anonymous non-party's identity, he must show:

(1)     the subpoena seeking the information was issued in good faith and not for any improper purpose,

(2)     the information sought relates to a core claim or defense,

(3)     the identifying information is directly and materially relevant to that claim or defense, and

---

[10] *See, e.g., USA Technologies, Inc. v. Doe*, 713 F. Supp. 2d 901, 906 (N.D. Cal. 2010); *Enterline*, 751 F. Supp. 2d at 787; *Mobilisa, Inc. v. Doe*, 170 P.3d 712, 719 (Ariz. Ct. App. 2007).

(4)    information sufficient to establish or to disprove that claim or defense

is unavailable from any other source.

*Id.* at 1095 (line breaks added for clarity). That court further stated "non-party

disclosure is only appropriate in the exceptional case where the compelling need

for the discovery sought outweighs the First Amendment rights of the anonymous

speaker." *Id*. The district court failed entirely to apply, not just the *2theMart.com*

test, but any test to balance the First Amendment rights of the Appellants with

Chevron's purported need for the discovery.

### 4.    As Chevron's Subpoena Demand for Identity Information Cannot Survive the Scrutiny Required By the First Amendment, it Must Be Quashed Under Federal Rule of Civil Procedure 45.

#### i.    *Chevron Did Not Issue These Subpoenas in Good Faith or for Any Proper Purpose.*

Chevron has failed to explain the purpose of its subpoena for information

regarding individuals against whom it has not alleged any causes of action, much

less tie the information to its burdens of proof in the RICO action against others.

This concern that the information is not sought for litigation purposes is

exacerbated by the fact that Chevron has maintained its defense of this subpoena,

even beyond the commencement of trial.[11] Chevron simply wants to know the

---

[11] All of which is highly protected speech. *See, e.g., NAACP v. Button*, 371 U.S.
415, 429-31 (1963) (litigation is a form of political speech); *Thomas v. Collins*,

identity and track the movements of non-parties who have engaged in speech that Chevron vehemently dislikes and who have associated with or supported its opponents in its underlying lawsuit in New York. JA 31. As discussed in greater detail below, the risk that a political opponent or critic may have his or her identity, location, emailing habits, and other personal information over *nine years* revealed merely by dint of association with other activists critical of Chevron, even activists who might themselves be legitimately subject to litigation, will chill future political speech. Indeed, many of the non-parties named by Chevron in its subpoenas feel harassed and intimidated by Chevron's pursuit of their personal information. *See, e.g.,* JA 12, 217. The specter of an improper purpose is strong.

> ii.    *Chevron Has Made No Showing that the Information Sought Relates to a Core Claim or that it Is Directly and Materially Relevant to that Claim.*

Before Chevron may obtain the discovery it seeks, it must show that the information requested relates to a core claim or defense, *and* that the identity information is directly and materially relevant to that claim or defense. *See 2theMart.com*, 140 F. Supp. 2d at 1096. Chevron cannot do so. The subpoena at issue seeks the disclosure of the identity of as many as 30 individuals, along with IP logs reflecting locations and all other "usage logs" associated with the accounts, over the course of nine years. Even the district court recognized with respect to the

---

323 U.S. 516, 537 (1945) (First Amendment protects advocacy to "persuade to action").

one email address it considered that it is exceedingly unlikely that all this information, or even a sizeable percentage of it, is in any way relevant to Chevron's claims, much less directly and materially relevant to those claims. JA 254. As the district court found, "Chevron has offered no argument why it has any compelling need for" the full nine years of detailed email usage information which would provide a catalog of the account holder's daily movements since 2003 and that to do so could "intrude upon certain protected activities." *Id*.

The district court also found that Chevron cannot show that, aside from a narrow time frame, its request for information about even one Appellant could have the slightest relationship to any claim or defense it might have in the underlying litigation. *Id.* But the district court ignored the implication of its own finding; if the scope for one non-party must be narrowed, there is no possibility that nine years of IP logs for each of the other 29 non-parties targeted by Chevron are directly and materially relevant to its case. The district court's failure to conduct any inquiry regarding the remaining 29 non-parties' accounts targeted by Chevron was error.

Indeed, the district court's failure to narrow the temporal scope of the subpoenas requires reversal because relevance is a valid objection to discovery, wholly apart from the First Amendment. Fed. R. Civ. P. 26(c); *Nova Biomedical Corp. v. i-STAT Corp.*, 182 F.R.D. 419, 423 (S.D.N.Y. 1998) (a subpoena for

information in a timeframe not relevant to the litigation is overbroad on its face and should be quashed). The district court's conclusion that the Appellants lacked standing to raise First Amendment claims did not affect their ability to raise relevance objections, and it was error for the district court not to consider those objections.

       *iii.*     *Chevron Has Made No Showing that the Information Sought Is Unavailable from Any Other Source.*

     Litigants should undertake discovery from non-party witnesses only if party discovery has been exhausted: "These witnesses are not parties to the action, and they should not be burdened with the annoyance and expense of producing the documents sought unless the plaintiff is unable to discover them from the defendant." *Bada Co. v. Montgomery Ward & Co.*, 32 F.R.D. 208, 209-10 (S.D. Cal. 1963). Accordingly, in order for Chevron's subpoena to survive, it must have demonstrated that "the information it needs to establish its defense is unavailable from any other source." *See 2theMart.com*, 140 F. Supp. 2d at 1097. It failed to do so.

     Chevron already has in its possession a vast amount of emails from the parties and direct witnesses, including the entire computer hard drives of many of them. *See, e.g.,* JA 31, 42-81. If the question Chevron sought to answer with this subpoena were truly whether the owners of the email addresses acted in concert with the parties, or were in fact the parties, then Chevron should have asked the

parties directly in ordinary discovery. That evidence would be far superior–and far less intrusive–than IP logs that track all of the movements of non-parties over a nine-year period.

In sum, Chevron cannot satisfy the *2theMart.com* test, and its attempt to seek the identities of the non-parties must be quashed because it violates the Appellants' First Amendment right to anonymity. The district court's failure to apply the *2theMart.com* test, or *any* First Amendment test to Chevron's subpoena, was reversible error.

### B.    The Subpoena Burdens the Appellants' First Amendment Right to Association.

Independently of the right of anonymous speech, the First Amendment also protects the freedom to associate and express political views as a group. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460-62 (1958). "[L]ike free speech," the freedom of association "lies at the foundation of a free society." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (quoting *Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (internal quotation marks omitted)). This constitutional protection is critical because: "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association[.]" *NAACP v. Alabama*, 357 U.S. at 460; *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) (the Constitution protects freedom of association to encourage the "advancing ideas and airing grievances").

38

The Appellants' advocacy efforts on behalf of the victims of pollution are precisely the sort of expression the First Amendment protects.

1.  **The Appellants Enjoy a First Amendment Right to Political Association and to Advocate Controversial Views as a Group.**

The Supreme Court has repeatedly held that compelled disclosure of an advocacy group's membership lists harms freedom of association because "it may induce members to withdraw from the association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP v. Alabama*, 357 U.S. at 463. *See also Bates*, 361 U.S. at 523; *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539 (1963). "Inviolability of privacy in group association may in many circumstances be indispensible to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama,* 357 U.S. at 462.

This rule has an especially powerful application here where the subpoena seeks not only the Appellants' identities but a wealth of other information about their movements and interactions including their personal habits and day-to-day patterns, which are utterly irrelevant to the underlying litigation. *See United States v. Jones*, 132 S. Ct. 945, 955 (2012) (Sotomayor, J., concurring) (continual location monitoring over a prolonged period "reflects a wealth of detail about [a

person's] familial, political, professional, religious, and sexual associations."). As

the D.C. Circuit has noted, such observation of a person's movements

> reveals types of information not revealed by short-term surveillance,
> such as what a person does repeatedly, what he does not do, and what
> he does ensemble. . . . A person who knows all of another's travels
> can deduce whether he is a weekly church goer, a heavy drinker, a
> regular at the gym, an unfaithful husband, an outpatient receiving
> medical treatment, an associate of particular individuals or political
> groups—and not just one such fact about a person, but all such facts.

*United States v. Maynard,* 615 F.3d 544, 562 (D.C. Cir. 2010), *aff'd sub nom.*

*Jones*, 132 S. Ct. 945. The fact that Chevron's subpoena covers both political, and

at the same time intensely personal information, makes the subpoena radically

overbroad, especially since the district court conducted no balancing of interests.

In *Shelton v. Tucker*, the Supreme Court considered a similarly

indiscriminate collection of associational information, which required teachers to

provide all of their associational ties for a five-year period, even though many of

those ties, like the location information collected here, had nearly no reasonable

relationship to the government's legitimate interest in teacher fitness. The Supreme

Court noted that this requirement would gather in, "every conceivable kind of

associational tie—social, professional, political, avocational, or religious," and

noted that many such relationships could have no possible bearing upon the

teacher's occupational competence or fitness. *Shelton*, 364 U.S. at 488. The same is

true here.

Chevron's subpoenas are squarely aimed at not only identifying, but also mapping the movements of individuals it believes are involved in political expression: specifically, environmental advocacy against the oil company and related activism.[12] Among other things, the IP address information Chevron seeks could tell the company when the Non-Party Appellants were in the United States or Ecuador; when they were in a particular town, building, home or even a particular organization's office; and when each non-party was in the same place at the same time as other individuals whose email usage information is revealed, presumably meeting with each other. *See* JA 239.

And that mapping is not limited to the Appellants' advocacy activities. Allowing Chevron access to information about the Non-Party Appellants' identities and locations over time would reveal not only a wealth of details about their habits and patterns that are intimately tied to their political associational activities.

Chevron has also misconstrued the associational interest at issue here. Chevron repeatedly described the relevant association as the "involvement" between the non-party email account owners and the plaintiffs in the Lago Agrio litigation. JA 31, 39. The district court seems to have adopted Chevron's position without analysis. JA 254. In fact, the Appellants have asserted their right to

---

[12] All of which is highly protected speech. *See* note 10, *supra.*

associate with others engaged in environmental litigation against the oil company and more broadly to environmental activism, all of which is highly protected political speech reaching beyond the Lago Agrio litigation or any alleged RICO enterprise. *See, e.g.*, *NAACP v. Button*, 371 U.S. at 429-31; *Thomas*, 323 U.S. at 537. Chevron may not agree with the Appellants' viewpoints, but "[t]he freedom to associate applies to the beliefs we share, and to those we consider reprehensible." *Gilmore v. City of Montgomery*, 417 U.S. 556, 575 (1974).

## 2. The Appellants Have a Qualified First Amendment Privilege Subject to Heightened Scrutiny That Can Only be Overcome by a Compelling Interest.

Individuals may assert a qualified privilege to protect information when a civil discovery request threatens the freedom of association. *NAACP v. Alabama*, 357 U.S. at 460-63; *Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2011); *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 481 (10th Cir. 2011). The Supreme Court has made clear that infringements on freedom of association may survive constitutional scrutiny only when they "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *see also NAACP v. Button*, 371 U.S. at 341; *Knox v. SEIU, Local 1000*, 132 S. Ct. 2277, 2291 (2012) (burden on freedom of association "must serve a compelling interest and must not be

significantly broader than necessary to serve that interest."). Many courts frame this privilege as a heightened discovery standard: Whereas all subpoenas are confined to relevant information and cannot be overbroad, the First Amendment requires a more stringent relevance standard and less tolerance for overbroad subpoenas. *See FEC v. LaRouche Campaign, Inc.*, 817 F.2d 233, 234-35 (2d Cir. 1987) (requiring agency to demonstrate need beyond mere relevance to an investigation to justify compelling disclosure of the names of campaign contributors); *Perry,* 591 F.3d at 1140.

A party seeking to assert the associational privilege must first make a *prima facie* showing that there is "a reasonable probability that compelling disclosure will lead to some form or specter of harassment, threat, or reprisal of the organization and/or its members." *Sherwin-Williams Co. v. Spitzer*, No. 1:04CV185 (DNH/RFT), 2005 WL 2128939, at *4 (N.D.N.Y. Aug. 25, 2005) (citing *Buckley v. Valeo,* 424 U.S. at 74; *Local 1814, Int'l Longshoremen's Assoc. AFL-CIO v. Waterfront Comm'n. of New York Harbor,* 667 F.2d 267, 271-73 (2d Cir. 1981); *In re Grand Jury Proceedings,* 776 F.2d 1099, 1103 (2d Cir. 1985)). The Appellants' burden to make this showing is "light" due to the "crucial place speech and associational rights occupy under our constitution[.]" *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989).

Once the Appellants make this prima facie showing, the burden shifts to Chevron to demonstrate a "compelling [state] need" for the information that survives "exacting scrutiny." *In re Grand Jury Proceedings,* 776 F.2d at 1102-03 (citing *Bates,* 361 U.S. at 524 and *Buckley v. Valeo,* 424 U.S. at 64). The district court was not free to compel disclosure unless the information sought is "substantially related" to that compelling interest, and would not have an "unnecessary impact on protected rights of speech, press or association." *In re Grand Jury Proceedings,* 776 F.2d at 1103; *see also Int'l Longshoremen's Assoc. v. Waterfront Comm'n,* 667 F.2d 267, 271 (2d Cir. 1981); *Buckley v. Valeo,* 424 U.S. at 64.

   i.   *The Appellants' Right to Association Will be Harmed if Their Identities and Email Usage Information is Disclosed.*

Compliance with the subpoena is likely to create some form or specter of "threats, harassment, or reprisals" for the Appellants, chilling their freedom to associate. *Buckley v. Valeo*, 424 U.S. at 74. As discussed above, both Does' declarations make clear that they already feel harassed by Chevron's attempt to obtain the information about their past involvement in advocacy against the company and fear further harassment if Chevron actually gains access to the information it seeks. JA 12, JA 217. And this is hardly surprising; few would be willing to engage in political activism if they knew their opponents could track

their movements over the preceding decade and thus potentially glean the most personal of details about their lives.

Appellants thus made a *prima facie* showing that Microsoft's compliance with Chevron's subpoena will chill the Appellants' constitutionally protected associational rights. The district court's failure to address Appellants' showing and apply the law to it merits reversal.

> ii. *Disclosure of the Appellants' Information Does Not Serve a Compelling Interest and Is Not the Least Restrictive Means of Furthering a Compelling Interest.*

Even the district court recognized, with respect to the one Appellant it considered, that Chevron did not satisfy its burden of showing that all of the information it seeks serves a compelling interest and is the least restrictive means of obtaining the desired information. JA 254. *See Int'l Longshoremen's Assoc.,* 667 F.2d at 271; *In re Grand Jury Proceedings,* 776 F.2d at 1103. But even there, its analysis was inadequate. To determine whether Chevron should obtain the discovery it seeks, the district court was required to balance the "burdens imposed on individuals and associations against the . . . interest in disclosure" to determine whether the "interest in disclosure . . . outweighs the harm" to the Appellants' associational rights. *Perry,* 591 F.3d at 1140 (internal quotations and citations omitted). Critically, Chevron had the burden to demonstrate that the information sought is "highly relevant to the claims or defenses in the litigation," that the

subpoena was "carefully tailored to avoid unnecessary interference with protected activities," and that the information sought is "otherwise unavailable." *Id*. Despite finding that Chevron showed none of these things, JA 254, the district court nonetheless took no action to narrow Chevron's subpoena except as to a single Appellant; even then, it allowed three-years worth of location and associational information to be turned over.

The scope of Chevron's subpoenas far exceeds any interest it may have in receiving information necessary to its case. The company seeks a vast amount of information that is not "highly relevant" to the claims in the underlying litigation, nor has it demonstrated a compelling need.

Finally, as discussed above, the subpoena was not the least restrictive means of obtaining the information Chevron seeks. Chevron could have learned the information it desired by seeking discovery directly from the parties rather than issuing sweeping subpoenas to third-party service providers that implicate the First Amendment rights and personal privacy of scores of people who are not parties to the case.

Chevron's fishing expedition violates the Appellants' associational rights, and the subpoena should have been quashed in its entirety for this reason alone. The district court erred by failing to engage in even a token analysis of the Appellants' First Amendment right to association.

### III.   Chevron's Subpoena Is Overbroad.

Finally, the district court abused its discretion by failing to quash Chevron's subpoena under Federal Rule of Civil Procedure 26(c) after it found that Chevron offered no argument defending its nine-year scope.[13]

As drafted, Chevron's subpoena is overbroad on its face, and is therefore oppressive and unreasonable. *See, e.g., McMann v. SEC*, 87 F.2d 377, 379 (2d Cir. 1937) (L. Hand, J.) (a discovery request is unreasonable when "it is out of proportion to the end sought"); *United States v. IBM*, 83 F.R.D. 97, 106-07 (S.D.N.Y. 1979) ("To the extent a subpoena sweepingly pursues material with little apparent or likely relevance to the subject matter it runs the greater risk of being found overbroad and unreasonable.").

If the data sought by Chevron here were disclosed, it would not only constitute an invasion of the non-parties' personal privacy, but also include a tremendous amount of information wholly irrelevant to Chevron's claims and defenses and far beyond the scope of reasonable or fair discovery.

The district court recognized that the scope of Chevron's subpoena rendered it overbroad as applied to the single Appellant whose challenge that court

---

[13] *See Windsor v. Martindale*, 175 F.R.D. 665, 670 (D. Colo. 1997) (a court should quash a subpoena *sua sponte* as an exercise of its "inherent power to protect anyone from oppressive use of process") (citing *Gregg v. Clerk of U.S. Dist. Court*, 160 F.R.D. 653, 654 (N.D. Fla. 1995)); *Broome v. Simon*, 255 F. Supp. 434, 437 (W.D. La. 1965) (same).

considered. JA 254. However, the district court failed to require Chevron to justify or limit its request as to the other 29 email addresses it targeted. This was error even if the district court was correct that noncitizens lack standing under the First Amendment; there is no argument that noncitizens lack standing to challenge subpoenas that are overbroad under the Federal Rules. The district court's failure to quash or modify a subpoena of such breadth that even it recognized could "intrude upon certain protected activities" is plain error.

As also noted above, by maintaining its defense of this subpoena, even beyond the commencement of trial, Chevron has raised real concerns that its purpose in issuing it was to harass and intimidate the activists, interns, young lawyers, volunteers and journalists who have shown some sympathy for or supported the Ecuadoran plaintiffs who sought judicial recourse against Chevron. It was an abuse of discretion for the district court to permit Chevron to use the court's authority to intrude into these non-parties' day-to-day activities without Chevron first showing that each of the individuals it has targeted was in fact part of the conspiracy it alleges and that the full range of the information sought met the standard of "likely to lead to the discovery of admissible evidence." It did not, and could not, do so.

**IV.    This Court Should Reverse the District Court and Reject Chevron's Subpoena in the First Instance.**

The district court ultimately agreed that the First Amendment applied to one Appellant yet failed to conduct the required analysis of the non-parties' First Amendment rights of anonymous speech and association. And because the district court also erred in determining that the First Amendment did not apply to the noncitizen Does, it did not conduct the required analysis as to *any* Appellant. This Court may reverse and remand for that reason alone. *See, e.g.*, *Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 208 (2d Cir. 2004).

However, this Court should apply the First Amendment tests in the first instance. *Hartford Courant Co.*, 380 F.3d at 91 ("The existence of the First Amendment right—although not its application to this case [where there were disputed issues of fact]—is a matter of law suitable for determination by an appellate tribunal in the first instance."). Since much of the standing issue was raised by the district court *sua sponte*, the record on the First Amendment tests appears complete and there are no disputed issues of fact, Appellants urge that it do so.

49

## **CONCLUSION**

For the reasons stated above, the Appellants respectfully request that this Court reverse the order of the district court, and remand with instructions to apply First Amendment standing principles to the Appellants' motion to quash.

Dated:  October 31, 2013                    By:  /s/ Nathan D. Cardozo
                                                 Nathan D. Cardozo
                                                 nate@eff.org
                                                 Cindy Cohn
                                                 ELECTRONIC FRONTIER
                                                 FOUNDATION
                                                 815 Eddy Street
                                                 San Francisco, CA 94109
                                                 Tel: (415) 436-9333

                                                 Richard Herz
                                                 rick@earthrights.org
                                                 Michelle Harrison
                                                 Marco Simons
                                                 EARTHRIGHTS INTERNATIONAL
                                                 1612 K Street NW, Suite 401
                                                 Washington, DC 20006
                                                 Tel: (202) 466-5188

                                                 *Counsel for Non-Party John Doe*
                                                 *Movants/Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.    This Appellants' Opening Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,471 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 for Mac, the word processing system used to prepare the brief, in 14 point Times New Roman font.

Dated: October 31, 2103

By: /s/ Nathan D. Cardozo
Nathan D. Cardozo

*Counsel for Non-Party John Doe Movants-Appellants*