# 13-2784-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

CHEVRON CORPORATION,

PLAINTIFF-APPELLEE,

V.

NON-PARTY JOHN DOE simeontegel@hotmail.com, NON-PARTY JOHN DOE mey_1802@hotmail.com, NON-PARTY JOHN DOE pirancha@hotmail.com, NON-PARTY JOHN DOE duruti@hotmail.com,

MOVANTS-APPELLANTS,

V.

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, DONZIGER & ASSOCIATES, PLLC, JAVIER PIAGUAJE, HUGO GERARDO, CAMACHO NARANJO,

DEFENDANTS.

On Appeal from the United States District Court
for the Northern District of New York
Honorable Lewis A. Kaplan, U.S. District Judge

## JOINT APPENDIX

Nathan Cardozo
nate@eff.org
Cindy Cohn
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333

Richard Herz
rick@earthrights.org
Michelle Harrison
Marco Simons
EARTHRIGHTS, INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC 20006
Tel: (202) 466-5188

*Counsel for Non-Party John Doe Movants/Appellants*

## TABLE OF CONTENTS

| ECF No. | Title | Page Nos. |
|---------|-------|-----------|
| 2 | John Doe's Notice of Motion to Quash | JA0001-JA0003 |
| 2-3 | Declaration of Seth Schoen | JA0004-JA0009 |
| 2-4 | Declaration of John Doe | JA0010-JA0012 |
| 35 | Chevron's Opposition to Doe's Motion to Quash | JA0013-JA0041 |
| 37 | Declaration of Rebecca Gray | JA0042-JA0047 |
| 37-1 | Exhibit A, a transcription of a voice message from Larry R. Veselka to Christopher Joralemon on October 2, 2012 | JA0048-JA0049 |
| 37-2 | Exhibit B, an email from H. Hogan to L. Veselka dated October 3, 2012 | JA0050-JA0051 |
| 37-3 | Exhibit C, a letter from M. Robertson toR. Gray dated October 12, 2012 regarding the email addressjohn.wotowicz@gmail.com | JA0052-JA0053 |
| 37-4 | Exhibit D, a letter from R. Gray to C. Nguyen dated October 15, 2012 regarding the email address john.wotowicz@gmail.com | JA0054-JA0055 |
| 37-5 | Exhibit E, a letter from R. Gray to E. Balogh dated October 9, 2012 regarding the email address briansethparker@gmail.com | JA0056-JA0058 |
| 37-6 | Exhibit F, a letter from H. Hogan toN. Cardozo dated October 3, 2012 | JA0059-JA0061 |
| 37-7 | Exhibit G, an email between R. Gray and E. Camino-Castro dated October 14, 2012 regarding the email address limcas2002@yahoo.com | JA0062-JA0064 |
| 37-8 | Exhibit H, a letter from H. Hogan to L. Veselka dated October 13, 2012 | JA0065-JA0067 |
| 37-9 | Exhibit I, a letter from L. Veselka to H. Hogan dated October 17, 2012 | JA0068-JA0072 |
| 37-10 | Exhibit J, a letter from R. Gray to C. Nguyen dated September 28, 2012 regarding the email address kevinjonheller@gmail.com | JA0073-JA0074 |
| 37-11 | Exhibit K, a letter from R. Gray to B. Jacobsen dated September 28, 2012 regarding the email address faisal_baki@hotmail.com | JA0075-JA0076 |

| 37-12 | Exhibit L, a letter from H. Hogan toM. Hofmann dated October 12, 2012 | JA0077-JA0079 |
|---|---|---|
| 37-13 | Exhibit M, a letter from N. Cardozo to H. Hogan and R. Gray dated October 17, 2012 | JA0080-JA0081 |
| 38 | Declaration of Alexander Marx | JA0082-JA0083 |
| 38-1 | Exhibit 1, an email dated August 1, 2008 from D. Beltman toP. Fajardo and S. Donziger, with the subject "Plan de Trabajo-Texpet Cleanup" | JA0084-JA0086 |
| 38-2 | Exhibit 2, a copy of Chevron's subpoena to Microsoft Corporation | JA0087-JA0093 |
| 38-3 | Exhibit 3, copies ofthree subpoenas served on Yahoo! by Friedman, Kaplan, Seiler & Adelman, LLP, counsel for S. Donziger | JA0094-JA0098 |
| 38-4 | Exhibit 4, a letter from Yahoo! Inc. to Friedman, Kaplan, Seiler & Adelman LLP, counsel for S. Donziger, dated December 7, 2010 | JA0099-JA0102 |
| 38-5 | Exhibit 5, a letter from Yahoo! Inc. to Friedman, Kaplan, Seiler & Adelman LLP, counsel for S. Donziger, dated December 20, 2010 | JA0103-JA0104 |
| 38-6 | Exhibit 6, letter from Yahoo! Inc. to Friedman, Kaplan, Seiler & Adelman LLP, counsel for S. Donziger, dated January 7, 2011 | JA0105-JA0106 |
| 38-7 | Exhibit 7, a report titled "Yahoo Account Management Tool" associated with the email account "documents2010@ymail.com" and dated January 24, 2011 | JA0107-JA0110 |
| 38-8 | Exhibit 8, a transcript of September 25, 2012 proceedings in *Chevron Corp. v. Donziger*, 11 Civ. 691 LAK (S.D.N.Y.) | JA0111-JA0142 |
| 38-9 | Exhibit 9, a copy of Microsoft's Online Privacy Statement | JA0143-JA0418 |
| 39 | Declaration of Alexander Marx | JA0149-JA0151 |
| 39-1 | Exhibit 1, email exchange dated May 17, 2010 among the Lago Agrio Plaintiffs' U.S. lawyers, subject "Re: Colorado Disclosures" | JA0152-JA0154 |

| 39-2 | Exhibit 2, a copy of Chevron's subpoena to Microsoft Corporation | JA0155-JA0161 |
|---|---|---|
| 39-3 | Exhibit 3, an email from S. Tegel to S. Donziger and others dated April 22, 2008, with the subject "Re: wsj letter" | JA0162-JA0169 |
| 39-4 | Exhibit 4, an email from S. Tegel to S. Donziger dated April 22, 2008, with the subject "IBD Draft" | JA0170-JA0171 |
| 39-5 | Exhibit 5, an email from S. Tegel to S. Donziger dated May 28, 2008, with the subject "release pasted only (in case other version is slow in arriving)" | JA0172-JA0175 |
| 39-6 | Exhibit 6, an email from P. Fajardo toM. Yepez, S. Donziger and others dated August 5, 2008, with the subject "CITA" | JA0176-JA0179 |
| 39-7 | Exhibit 7, an email from P. Fajardo toM. Yepez and S. Donziger, with the subject "Re: Corte suprema" | JA0180-JA0181 |
| 39-8 | Exhibit 8, an email from S. Donziger to M. Yepez dated February 14, 2007, with the subject "Re: Tareas" | JA0182-JA0187 |
| 39-9 | Exhibit 9, an email from L. de Heredia to S. Donziger dated October 16, 2007, with the subject "Volunteers are here" | JA0188-JA0189 |
| 39-10 | Exhibit 10, copies of three subpoenas served on Yahoo! by Friedman, Kaplan, Seiler & Adelman, LLP, counsel for S. Donziger | JA0190-JA0194 |
| 39-11 | Exhibit 11, an email from A. Guerra to S. Donziger dated September 5, 2010, with the subject "Saludos de Quito" | JA0195-JA0198 |
| 39-12 | Exhibit 12, a copy of a web page displaying search results for the term "Simeon Tegel," conducted using the Google search engine | JA0199-JA0201 |
| 39-13 | Exhibit 13, an email from S. Donziger to M. Yepez and others dated September 7, 2009, with the subject "note Charles James menciona Callejas abajo en la entrevista" | JA0202-JA0205 |
| 39-14 | Exhibit 14, a copy of Microsoft's Online Privacy Statement | JA0206-JA0211 |

| 41 | Order to Show Cause | JA0212-JA0213 |
| 42-1 | Supplemental Declaration of Michelle Harrison | JA0214-JA0215 |
| 42-2 | Declaration of John Doe #2 | JA0216-JA0217 |
| 44 | Memorandum and Order | JA0218-JA0224 |
| 46 | Redacted Declaration of Nathan Cardozo | JA0225-JA0233 |
| 50 | Memorandum and Opinion | JA0234-JA0245 |
| 53-1 | Declaration of John Doe | JA0246-JA0247 |
| 55 | Notice of Appeal | JA0248-JA0251 |
| 57 | Order | JA0252-JA0255 |
| 59 | Amended Notice of Appeal | JA0256-JA0259 |

Dated: October 31, 2013          By:  /s/ Nathan D. Cardozo__
                                      Nathan D. Cardozo
                                      nate@eff.org
                                      Cindy Cohn
                                      ELECTRONIC FRONTIER
                                      FOUNDATION
                                      815 Eddy Street
                                      San Francisco, CA 94109
                                      Tel: (415) 436-9333

                                      Richard Herz
                                      rick@earthrights.org
                                      Michelle Harrison
                                      Marco Simons
                                      EARTHRIGHTS
                                      INTERNATIONAL
                                      1612 K Street NW, Suite 401
                                      Washington, DC 20006
                                      Tel: (202) 466-5188

                                      *Counsel for Non-Party John Doe*
                                      *Movants/Appellants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

            Plaintiffs,

    -against-

                                       Case No. 1:12-mc-65 GLS/CFH

                                       Hon. Gary L. Sharpe

STEVEN DONZIGER, *et al.*,

            Defendants.

---

**NOTICE OF MOTION OF NON-PARTY JOHN DOE MOVANTS TO QUASH SUBPOENAS TO MICROSOFT, INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO QUASH**

## NOTICE OF MOTION

TO PLAINTIFF CHEVRON CORP. AND ALL COUNSEL OF RECORD:

**NOTICE IS HEREBY GIVEN** that the Non-Party John Doe Movants hereby move the District Court for the Northern District of New York to quash the subpoena served by Plaintiff Chevron Corporation on or around September 18, 2012 to non-party company Microsoft in the District Court for the Northern District of New York.  The subpoena seeks identity and email usage information associated with 30 Hotmail addresses.  The subpoena was issued in support of a civil action filed in the District Court for the Southern District of New York on February 1, 2011 captioned *Chevron Corp. v. Donziger, et al.*, Case No. 11-cv-0691 (LAK). A date and time at which this motion will be heard are to be determined.

As discussed in the memorandum below, Chevron's subpoena should be quashed because it violates the constitutional rights of anonymity and freedom of association of non-party online users.  This motion, made pursuant to Federal Rule of Civil Procedure 45(c) and the New York Civil Practice Law and Rules §§ 2304 and 3103, is based on this notice, the attached memorandum of points and authorities, all accompanying declarations and exhibits, and on such oral argument as may be received by this Court.  The Non-Party John Doe Movants respectfully request that this Court grant this motion and quash the subpoena issued by Chevron in its entirety.

1

DATED:  October 22, 2012                Respectfully submitted,

                                        _____/s/ Peter Henner_____
                                        Peter Henner, Esq.
                                        Bar Roll No. 101956
                                        P.O. Box 326
                                        Clarksville, NY 12041-0326
                                        Tel. (518) 768-8232
                                        Fax (518) 768-8235
                                        Email: peter@peterhenner.com

                                        Cindy A. Cohn, Esq.
                                        Marcia Hofmann, Esq.
                                        (*pro hac vice* admission pending)
                                        Nathan Cardozo, Esq.
                                        ELECTRONIC FRONTIER FOUNDATION
                                        454 Shotwell Street
                                        San Francisco, CA 94110
                                        Telephone:  (415) 436-9333
                                        Facsimile:   (415) 436-9993

                                        Marco Simons (SBN 237314)
                                        marco@earthrights.org
                                        EARTHRIGHTS INTERNATIONAL
                                        1612 K Street NW, Suite 401
                                        Washington, DC 20006
                                        Telephone: (202) 466-5188

                                        *Counsel For Non-Party John Doe Movants*

JA0003

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

        Plaintiffs,

   -against-

                           Case No. 1:12-mc-65 GLS/CFH

                           Hon. Gary L. Sharpe

STEVEN DONZIGER, *et al.*,

        Defendants.

---

**DECLARATION OF SETH SCHOEN IN SUPPORT OF MOTION OF NON-PARTY**
**JOHN DOE MOVANTS TO QUASH SUBPOENAS TO MICROSOFT, INC. SEEKING**
**IDENTITY AND EMAIL USAGE INFORMATION**

I, Seth Schoen, declare as follows:

1.     I am a Senior Staff Technologist with the Electronic Frontier Foundation in San Francisco, California, and I make this declaration on my own personal knowledge. I have worked with computers professionally for over a decade and have testified about communications systems in three courts and before the United States Sentencing Commission.

2.     The purpose of this declaration is to provide a general introduction to IP addresses, the use of IP addresses to track location, and how that information could be used to associate a person with others.

### Introduction to Internet Protocol Addresses

3.     An Internet Protocol address (or "IP address") is a numeric value used to identify the network location of a computer or set of computers on the Internet. Every computer on the Internet needs to have an IP address in order to communicate with other computers on the Internet. Internet routers use the IP address to decide where to send communications

a particular computer user.[1]  The address is normally written as four numbers from 0 to 255 separated by dots.[2]  For example, one of the web servers operated by the Electronic Frontier Foundation uses the address 64.147.188.11, while the District Court for the Northern District of California's web server uses 206.18.146.127, while the District Court for the Northern District of New York's web server uses 199.107.21.60.

4.      IP addresses are allocated to Internet service providers (ISPs) in blocks of consecutive addresses out of a worldwide pool of around four billion possible addresses through geographically based non-profit organizations known as regional Internet registries.[3] ISPs can further delegate these addresses to smaller entities such as businesses, Internet cafés, or smaller ISPs.[4]  ISPs can also assign an IP address directly to an individual computer.  This assignment process is frequently automated and the assignment can be short- or relatively long-term.[5]

5.      Because IP addresses are allocated in this way, they can convey approximate information about a computer's location, how the computer is connected to the Internet, and what individual or entity is using that computer to connect.

6.      Individual users connect using different IP addresses depending on where they are. Multiple users who are using the same local-area network can share a single IP address (most often when they use a shared router or wireless connection) and hence appear to connect to the Internet through the same IP address, whether at different times or at the same time.[6]  If users of the same local-area network are *not* sharing a single IP address,

---

[1]  Eric A. Hall, *Internet Core Protocols: The Definitive Guide*, 37-40 (O'Reilly and Associates,
[2]  *See* Radia Perlman, *Interconnections Second Edition,* 199 (Addison Wesley Longman, 2000). This declaration uses "Internet Protocol address" to refer to addresses using version 4 of the Internet Protocol ("IPv4"), which has been extensively used worldwide since 1980. Due to exhaustion of the pool of distinct IPv4 addresses, the Internet is now in the course of switching to version 6, which uses significantly longer addresses.
[3]  *See* American Registry for Internet Numbers, "Internet Number Resource Distribution," https://www.arin.net/knowledge/distribution.pdf (last visited Oct. 22, 2012).
[4]  Hall, *supra* note 1, at 40-41.
[5]  *See* IP address, http://en.wikipedia.org/w/index.php?title=IP_address&oldid=518867856 (last visited Oct. 22, 2012).
[6]  *See* Yinglian Xie *et al.*, "How Dynamic Are IP Addresses?", in *Proceedings of the 2007 Conference on Applications, Technologies, Architectures, and Protocols for Computer*

2

JA0005

and instead have distinct addresses, their IP addresses will generally be numerically adjacent (with the beginning portion of the address identical, and only the final portion different).[7]

7.  An IP address may identify the network through which a network-enabled device (such as a desktop computer, laptop computer, tablet or smartphone) is accessing the Internet. When a portable device moves from an Internet connection on one network (the network connection at one's home, for example) to an Internet connection on another network (a local coffee shop), the IP address associated with the portable device changes to reflect that the device is connected to that particular network.  This change is normally carried out completely automatically and is transparent to the user.[8]

8.  Many host computers of websites, including the operators of popular web-based e-mail services like Yahoo! Mail, Gmail, and Microsoft Hotmail, maintain logs that list the IP address of visitors along with date and time information.  Websites that utilize a log-in feature typically maintain a log of IP addresses and other data associated with the particular user who logged in, such as the date and time of log-in and the duration of time the user visited the website.  If a user accesses the website with a portable device from different locations, then the log data about that user will include a variety of different IP addresses.  Because of the way they were assigned, these different IP addresses will reflect the location and movement of the device and its owner.

---

*Communications*, https://research.microsoft.com/pubs/63680/sigcomm07-onefile.pdf (last visited Oct. 22, 2012); Jeff Tyson, "How Network Address Translation Works," http://computer.howstuffworks.com/nat.htm/printable (last visited Oct. 22, 2012).

[7]  *See* "Subnetwork," http://en.wikipedia.org/w/index.php?title=Subnetwork&oldid= 517971549 (last visited Oct. 22, 2012); "Classless Inter-Domain Routing," http://en.wikipedia.org/w/index.php?title=Classless_Inter-Domain_Routing&oldid= 518823902 (last visited Oct. 22, 2012).

[8]  Today, the automatic assignment of a new address would be handled by the Dynamic Host Configuration Protocol (DHCP). "Dynamic Host Configuration Protocol," http://en.wikipedia.org/w/index.php?title=Dynamic_Host_Configuration_Protocol&oldid =519194559 (last visited Oct. 22, 2012).

JA0006

## Using IP Addresses and Associated Information
## to Determine Location

9.      A large amount of data accumulated over a lengthy period of time that includes IP addresses and dates and times of usage sessions—as one might get from a heavily trafficked and frequently used web service such as an email provider—can readily present a detailed picture of a person's movements from one location to another, especially if that person is an avid laptop or tablet user.

10.     For instance, a laptop will receive a different IP address when it connects to the Internet from different locations.[9] If a laptop's owner uses the machine from her workplace in the morning, a café in the afternoon, and her home in the evening, she will present at least three different IP addresses over the course of a single day. A traveler who brings a laptop to a different country and goes online there will receive an IP address unrelated to the IP address he used at home.

11.     The WHOIS service, which can be accessed through web sites such as http://www.domaintools.com, is a public database that permits a user to find out to whom a regional Internet registry has allocated a block of IP addresses.  A user can input a numerical IP address and obtain the registry's information about the assignee of that IP address, which might be an ISP or other entity.  When IP addresses have been allocated directly to an organization that makes use of them, WHOIS can sometimes associate an IP address with an exact physical location. For example, inputting the IP address 156.128.118.200 into WHOIS shows that the number is associated with the Administrative Office of the U.S. Courts, which is located at One Columbus Circle NE, Washington D.C.  On most occasions, however, WHOIS will only associate an IP address with an Internet service provider's office, which is often in the same region as its subscribers or users but does not reveal their exact locations.

12.     WHOIS records and other information sources provide geographic information about where ISPs operate and where they use particular ranges of IP addresses.  This means that servers located in California typically have IP addresses traceable to California, servers

---

[9]   *See* University of Illinois Campus Information Technologies and Educational Services, "Network Access While Traveling," http://www.cites.illinois.edu/network/access/travel.html (last accessed Oct. 22, 2012).

JA0007

located in New York typically have IP addresses traceable to New York, and servers in Ecuador typically have IP addresses traceable to Ecuador. This geographic location information is generally publicly available. For instance, the IP address 199.83.220.233 is easily traceable to San Francisco through free websites available to the public such as www.geobytes.com. Even when location information is not publicly available, a subpoena to an ISP can generally elicit the specific geographic location for a particular IP address.

13.     Where that is the case, IP address records can still be used in the service of pinpointing a person's location and movements, particularly in the context of litigation where parties can exercise subpoena power. Internet service providers typically maintain records of the physical addresses associated with a given subscriber, for both billing and service purposes, and typically also record historical information about which subscriber used a particular IP address. Once the a litigant has a list of IP addresses, it can subpoena subscriber information from the corresponding ISPs for the specific IP addresses and develop a detailed picture of a person's location and movements from that subscriber information.

14.     An IP address may reflect the place where a person accesses a certain Internet service. This information might demonstrate that a person accessed the Internet from a certain physical location, like a building or even particular organization's office. (The IP address ranges used by particular organizations are not necessarily published, but it could sometimes be possible to determine or recognize them on the strength of other records that incidentally reveal them, or via subpoena.)

### Using IP Addresses and Associated Information to Determine Associations With Other People

15.     A large amount of data accumulated over a lengthy period of time that includes IP addresses and dates and times of usage sessions—as one might get from a heavily trafficked web service such as an email provider—can reveal a person's physical proximity to other Internet users who may share the same IP address. This information could be used to map a person's associates.

16.     If Internet usage records showed that two individuals were accessing the Internet from

5

the same IP address (or numerically proximate IP addresses) on a particular day and time, this would tend to show that they were accessing the same Internet network at the same time. This would strongly suggest they were in the same physical location at the same time and could create a reasonable inference that they met with one another.

## Consequences of Disclosure of Long-Term IP Address Records

17. Chevron seeks a nine-year span of IP logs associated with 101 email accounts. If it were made available to Chevron, this information would tell Chevron when the targeted individuals were in the United States or abroad. It would tend to show when they where in a particular town, and when they were at home or at work. It could be used to determine when they visited an office of a particular organization, and when each email account holder was in the same place at the same time as other individuals whose IP addresses have been revealed, potentially meeting with each other.

18. The information Chevron seeks can also reveal intensely personal details about the account holders' lives. A habitual e-mail user might check a given e-mail service multiple times per day, and a long-term view of data about this use could evince quite significant facts relating to work habits, personal relationships, and changes in someone's employment or living situation. For example, if the IP logs show that a person signed into his email account from an IP address associated with another person's home, that information suggests he visited that home. If he signs into his email account using that same IP address late at night and again the following morning, it creates a reasonable inference that he spent that night at that home and may have an intimate relationship with that person who lives there. If he repeats this pattern over time, it might suggest that relationship is a serious one.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed on October 22, 2012.

Seth Schoen

6

JA0009

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

                  Plaintiffs,

    -against-

                                        Case No. 1:12-mc-65

                                        Hon. Gary L. Sharpe

STEVEN DONZIGER, *et al.*,

                        Defendants.

## DECLARATION OF JOHN DOE (OWNER OF SIMEONTEGEL@HOTMAIL.COM) IN SUPPORT OF MOTION OF NON-PARTY JOHN DOE MOVANTS TO QUASH SUBPOENA TO MICROSOFT INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION

Using my email address, simeontegel@hotmail.com, instead of my actual name, in order to protect my identity pursuant to my rights under the First Amendment and New York law, I declare as follows:

1.    I am the owner of the email account simeontegel@hotmail.com. I have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein.

2.    I am providing this declaration under my email address because I wish to protect my rights to free speech and participation in associational activities. I also wish to avoid making moot these very issues, which I have raised in this motion. A true and correct copy of my actual signature for this document resides with my attorneys.

3.    On September 12, 2012, I received notice from Microsoft of a subpoena issued in relation to the *Chevron, Corp. v. Donziger et al.*, Case No. 11-cv-0691 (LAK) (S.D.N.Y.) for identifying and email usage information associated with my Hotmail address. I am not a defendant in that case. On September 17, 2012, I received a notice from Google of another

JA0010

subpoena in the same case issued in the District Court for the Northern District of California seeking information from Google about a Gmail address of mine. I am now moving to quash the subpoena issued to Microsoft for information associated with my Hotmail account. I am separately moving to quash the subpoena seeking my Gmail account information in the District Court for the Northern District of California, as well.

4.     I am a full-time journalist. I worked for a non-profit advocacy organization from 2005 to 2008, but prior to and after that period, I worked as a professional journalist. My articles are frequently published in a number of prominent international media outlets.

5.     I was involved in an advocacy campaign concerning the environmental impact of Chevron's former oil concession in the Amazon for less than three years, ending in 2008. I was never directly involved in the litigation against Chevron in Ecuador, but performed advocacy on behalf of the communities affected by the activities giving rise to that litigation.

6.     I have had my Hotmail email address since at least 1999 and I have used it as my primary address ever since.

7.     I almost never used my Hotmail address in connection with my advocacy work concerning Chevron. I had a separate address for correspondence related to that campaign.

8.     Keeping my Hotmail account and location information private is very important to me for personal and professional reasons. I am a professional journalist and maintaining journalistic confidentiality regarding my communications has been, and continues to be, an important part of my job.

9.     I have used my Hotmail account to engage in personal and professional communications for approximately thirteen years. It is important to me that Chevron not have access to my email usage information and locations during that time period.

10.    As a journalist based in Latin America, I work on many stories where my personal security, and that of my confidential sources, is an issue of great concern.

JA0011

11.  Had I known that my email usage information and location would be revealed, my political activity at the time I was assisting with the advocacy campaign related to Chevron would have been chilled.

12.  I am no longer active in the advocacy campaign and have not been for some time, but should Chevron gain access to my private email usage records, it would intimidate me and deter me from engaging in activism or litigation against Chevron in the future.

13.  Should Chevron gain access to my account information, it would chill my activity more generally as well, knowing that personal information about my email use and location could be revealed concerning any activity that I might engage in. Because privacy and confidentiality is of the utmost importance in my line of work, and my sources rightfully expect our communications will remain confidential, my use of my email account will be chilled if Microsoft releases my account information to Chevron. My participation in future political and activism campaigns will also be chilled should this information be released.

14.  I feel harassed by Chevron's attempt to obtain my email usage records and fear further harassment should Chevron gain access to the details of my past involvement in the advocacy campaign against Chevron.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 22, 2012.

SIMEONTEGEL@HOTMAIL.COM

3

JA0012

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

CHEVRON CORPORATION,

     Plaintiff,

  -against-

STEVEN DONZIGER, et al.,

     Defendants.

-------------------------------------------------------x

    Case No. 1:12-MC-65 GLS/CFH

**CHEVRON CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION
TO MOTION OF NON-PARTY JOHN DOE MOVANTS TO QUASH SUBPOENAS
TO MICROSOFT, INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ....................................................................................... 1

II.  BACKGROUND ........................................................................................ 3

III. ARGUMENT .............................................................................................. 7

   A.   The Does Lack Standing to Challenge the Subpoena as a Whole and
        May Challenge Its Application Only to the Accounts that They Own. ...... 7

   B.   The Subpoena Makes Reasonable Requests that Courts Routinely Grant. .... 8

        1.   Courts Routinely Require Production of the Information that
             Chevron Seeks. ................................................................................. 8

        2.   The Subpoenaed Information Will Materially Support Chevron's
             Claims in the RICO Action. ............................................................ 10

        3.   The Subpoena Is Not Overbroad ...................................................... 11

   C.   The Subpoena Accords with First Amendment Standards. ...................... 13

        1.   Compliance with the Subpoena Will Not Infringe Any Right to
             Anonymity. ....................................................................................... 13

             a.   The Right to Anonymity Does Not Apply Here. ................. 13

             b.   Chevron's Interest in Disclosure Outweighs Any Claimed
                  Right to Anonymity. ............................................................ 15

        2.   Compliance with the Subpoena Will Not Infringe Any Right of
             Association ........................................................................................ 21

IV.  CONCLUSION ......................................................................................... 23

i

JA0014

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AF Holdings LLC v. Doe*,
No. 12-cv-02416-WHA, 2012 U.S. Dist. LEXIS 75806 (N.D. Cal. May 31,
2012) ........................................................................................................................ 8

*Arista Records LLC v. Does 1-16*,
Civ. No. 1:08-CV-765 (GS/RFT), 2009 WL 414060 (N.D.N.Y. Feb. 18, 2009) .................. 16

*Arista Records v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) ................................................................................ 16

*Boyle v. United States*,
556 U.S. 938 (2009) ............................................................................................ 11

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ............................................................................................ 14

*Chevron Corp. v. Champ*,
Nos. 1:10-mc 27, 1:10-mc 28, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010) .................. 17

*Chevron Corp. v. Donziger*,
768 F. Supp. 2d 581 (S.D.N.Y. Mar. 7, 2011) .................................................... 17

*Chevron Corp. v. Donziger*,
871 F. Supp. 2d 229 (S.D.N.Y. May 14, 2012) ........................................... 15, 17

*Chevron Corp. v. Naranjo*,
667 F.3d 232 (2d Cir. 2012) ................................................................................ 17

*Chevron Corp. v. Page*,
No. RWT-11-1942 (D. Md. Aug. 31, 2011) ........................................................ 17

*Chevron Corp. v. Salazar*,
No. 11 Civ. 3718 (LAK), 2011 WL 2207555 (S.D.N.Y. June 2, 2011) ........................ 8, 9

*Columbia Ins. Co. v. Seescandy.com*,
185 F.R.D. 573 (N.D. Cal. 1999) ........................................................................ 13

*Doe I v. Individuals*,
561 F. Supp. 2d 249 (D. Conn. 2008) ................................................................. 19

*Doe v. 2TheMart.com*,
140 F. Supp. 2d 1088 (W.D. Wash. 2001) .......................................................... 20

*Doe v. SEC*,
No. 11-mc-80184 CRB (NJV), 2011 WL 4593181 (N.D. Cal. Oct. 4, 2011) .................. 9, 19

*Griffin v. Maryland*,
19 A.3d 415 (Md. 2011) ...................................................................................... 11

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003) ............................................................................................ 14

JA0015

*In re Anonymous Online Speakers,*
   661 F.3d 1168 (9th Cir. 2011) ............................................................... 15

*In re Chevron Corp.,*
   633 F.3d 153 (3d Cir. 2011) .................................................................. 17

*In re Chevron Corp.,*
   No. 10 MC 00002 (LAK) (S.D.N.Y. Dec. 27, 2010) ............................... 3

*In re Chevron Corp.,*
   No. 10-cv-1146-IEG(WMC), 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010) ...................... 17

*In re Chevron Corp.,*
   Nos. 1:10-mc-00021-JCH-LFG (D.N.M. Sept. 2, 2010) ............................ 3

*In re Grand Jury Proceedings,*
   776 F.2d 1099 (2d Cir. 1985) ................................................................. 22

*In re Jean-Baptiste,*
   No. M 11-188, 1985 WL 1863 (S.D.N.Y. July 5, 1985) ...................... 15

*In re Roebers,*
   No. 12-mc-80145-RS (LB) 2012 WL 2862122 (N.D. Cal. July 11, 2012) ............... 8

*In re United States,*
   830 F. Supp. 2d 114 (E.D. Va. 2011) ..................................................... 20

*John Wiley & Sons, Inc. v. Does 1-35,*
   12 Civ. 2968 (RWS), 2012 U.S. Dist. LEXIS 182741 (S.D.N.Y. Dec. 28, 2012) ............ 8, 16

*Langford v. Chrysler Motors Corp.,*
   513 F.2d 1121 (2d Cir. 1975) ................................................................. 7

*Libaire v. Kaplan,*
   760 F. Supp. 2d 288 (E.D.N.Y. 2011) ................................................. 13

*London v. Does 1-4,*
   279 F. App'x 513 (9th Cir. 2008) .......................................................... 8

*Malmberg v. United States,*
   No. 5:06-cv-1042 (FJS/GHL), 2010 WL 1186573 (N.D.N.Y. Mar. 24, 2010) .............. 8

*McIntyre v. Ohio Elections Comm'n,*
   514 U.S. 334 (1995) ......................................................................... 13, 14

*McMann v. SEC,*
   87 F.2d 377 (2d Cir. 1937) .................................................................... 12

*N.Y. State Nat'l Organization for Women v. Terry,*
   886 F.2d 1339 (2d Cir. 1989) .......................................................... 21, 22

*Next Phase Distrib., Inc. v. Does 1-138,*
   No. 11 Civ. 9706 (KBF), 2012 WL 691830 (S.D.N.Y. Mar. 1, 2012) .................... 16

*Nova Prods., Inc. v. Kisma Video, Inc.,*
   220 F.R.D. 238 (S.D.N.Y. 2004) ......................................................... 7, 12

*People v. Clevenstine,*
   891 N.Y.S.2d 511 (N.Y. App. Div. 2009) .............................................. 11

JA0016

*Schoolcraft v. City of New York*,
No. 10 Civ. 6005 RWS, 2012 WL 2161596 (S.D.N.Y. June 14, 2012) ................................ 13

*Snider v. Lugli*,
CV 10-4026 JFB AKT, 2011 WL 5401860 (E.D.N.Y. Nov. 4, 2011) .................................. 13

*Sony Music Entm't Inc. v. Does 1-40*,
326 F. Supp. 2d 556 (S.D.N.Y. 2004) ....................................................................... 15, 16, 19

*United States ex rel. Sasaki v. N.Y. Univ. Med. Ctr.*,
No. 05 Civ. 6163, 2011 U.S. Dist. LEXIS 95059 (S.D.N.Y. Aug. 23, 2011) ...................... 12

*United States v. IBM*,
83 F.R.D. 99 (S.D.N.Y. 1979) ............................................................................................. 12

*United States v. Konstantakakos*,
121 F. App'x 902 (2d Cir. 2005) ......................................................................................... 14

*United States v. Sattar*,
395 F. Supp. 2d 79 (S.D.N.Y. 2005) .................................................................................... 15

*Xcentric Ventures, LLC v. Karsen, Ltd.*,
No. 11-cv-01055-PHX-FJM, 2012 U.S. Dist. LEXIS 121888 (D. Ariz. Aug. 28,
2012) ....................................................................................................................................... 9

## Rules

Fed. R. Civ. P. 26 ............................................................................................................................ 2

Fed. R. Civ. P. 26(b) ..................................................................................................................... 10

Fed. R. Civ. P. 26(b)(1) ................................................................................................................ 10

Fed. R. Civ. P. 45 ......................................................................................................................... 10

Fed. R. Evid. 803(6) ...................................................................................................................... 11

Fed. R. Evid. 901(a) ...................................................................................................................... 19

## Treatises

9A Charles Alan Wright, Arthur R. Miller, et al.,
Federal Practice and Procedure § 2035 ............................................................................. 7, 13

JA0017

# I.  INTRODUCTION

The subpoena the movants seek to quash requests basic identifying and login information for several email accounts.  Courts routinely allow production of such information—particularly where, as here, that information directly supports a legal claim.  Because Chevron's underlying claims and factual allegations have withstood a motion to dismiss and have already been evaluated by the Court in the context of summary judgment—and because each account at issue was used in furtherance of the fraud giving rise to those claims—the motion to quash should be denied.

The context of this motion is Chevron's claim that a group of U.S. plaintiffs' lawyers obtained a $19 billion judgment against Chevron in Ecuador through pervasive fraud involving the illicit sharing of draft documents and other ex parte communications (the "Ecuador litigation").  Courts throughout the United States have, in applying the crime-fraud exception to authorize discovery by Chevron, concluded that the evidence demonstrates that the plaintiffs' lawyers' efforts to prosecute that case likely have been tainted by fraud.

The subpoena now at issue was served on Microsoft Corporation on September 19, 2012, in connection with Chevron's suit under the Racketeer Influenced and Corrupt Organizations Act and New York law (the "RICO action"), in order to obtain information relevant to the core claims that Chevron has asserted.  Each of the individual email account owners who bring this motion was intimately involved with the fraud alleged in that action.  These purportedly anonymous "John Does" managed legal and public relations strategies that furthered that fraud, helped the plaintiffs' attorneys tout a fraudulent "independent" expert report in the Ecuadorian court, and arranged meetings with key Ecuadorian political figures that helped fix the judgment against Chevron.

JA0018

As an initial matter, under settled law the Does lack standing to quash the request for information as to accounts that they do not own.  Here, the owners of the majority of the email accounts have not objected to the disclosure of information by Microsoft, making the Does' attempt to quash the subpoena in its entirety particularly inappropriate.

And even as to the email accounts that the Does claim to own, the subpoenaed information will provide evidence about the structure and management of the RICO defendants' fraudulent enterprise, will confirm that many of the defendants' fraudulent acts occurred in the United States (thus rebutting the defendants' jurisdictional and extraterritoriality arguments), and is reasonably calculated to establish how major acts of fraud (such as the creation of the fraudulent expert report and the ghostwriting of the Ecuadorian court judgment itself) were perpetrated.  Because those facts are relevant to claims in the RICO action and are overcome by no privilege, Chevron is entitled to the subpoenaed information.  Fed. R. Civ. P. 26.

The Does, moreover, are incorrect that compliance with the subpoena would violate their First Amendment rights to anonymous speech or association.  The subpoena seeks specific, narrow information that courts routinely direct email providers to disclose.  Moreover, the Does are not anonymous in any meaningful sense.  They have freely disclosed their connection to the email accounts at issue, and the First Amendment does not protect the Does' efforts to support a fraudulent scheme.

At bottom, this motion is nothing more than the latest effort to delay and impede Chevron's legitimate discovery and keep hidden details of the fraud perpetrated by the RICO defendants.  The arguments asserted here are no more substantive than the similar "First Amendment" arguments that the defendants and their allies asserted to try to prevent Chevron from obtaining outtakes of the documentary Crude.  But in that instance, once the Court pierced

JA0019

the flawed claims that the requests were overbroad and invasive, the outtakes "sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct." *In re Chevron Corp.*, No. 1:10-mc-00021-JCH-LFG, slip op. 3-4 (D.N.M. Sept. 2, 2010), Dkt. 77. Chevron respectfully requests that the Court similarly deny this effort to prevent relevant discovery.

## II.     BACKGROUND

The presiding Judge is well aware of the background of the Ecuador litigation and RICO action. As the Court knows, to support its claims in the RICO action, Chevron has pursued discovery to uncover evidence of the fraud committed by the plaintiffs' attorneys in the Ecuador litigation (collectively with their clients, the "LAPs"). The LAPs have continually obstructed that effort. *See, e.g.*, Order at 1-2, *In re Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y. Dec. 27, 2010), Dkt. 151 (describing special master's report that Donziger was continually "unresponsive" in his deposition and that his answers were "self[-]serving"—and that they remained so despite repeated instructions and orders striking Donziger's answers); Order at 2, *In re Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y. signed Jan. 21, 2011), Dkt. 171 (noting Donziger's failure to produce information about an email account containing "documents of obvious possible relevance"); RICO Dkt. 31-21at 145:8-10[1] (testimony by one of the LAPs' experts that Donziger affirmatively interceded to try to convince him not to testify in the RICO action); Ex. 1 at 1[2]

---

[1]  Unless otherwise specified, citations herein to "Dkt." refer to the docket for case number 1:12-MC-65 GLS/CFH (N.D.N.Y.). Citations herein to "RICO Dkt." refer to the docket for case number 11 Civ. 691 (LAK) (S.D.N.Y.).

[2]  Unless otherwise specified, "Ex." refers to exhibits to the Declaration of Alexander Marx, filed concurrently herewith.

JA0020

(Donziger describing discovery strategy thus:  to "fight hard on all fronts all the time and concede nothing, buy as much time as possible").

Because the LAPs have consistently obstructed discovery, Chevron has been forced to painstakingly uncover information that the LAPs have concealed.  The subpoena at issue here is part of those efforts, and seeks information about email accounts identified principally through the review of documents recovered from an image of Donziger's hard drive.  Ex. 2.  Specifically, the subpoena seeks information about the users of several email accounts, as well as IP logs and IP address information.  *See id*. (Subpoena at 2).  Discovery of such information is critical because the LAPs used email accounts to share documents to further their fraudulent scheme.  For example, to plan for the secret ghostwriting of the purportedly independent expert's report, Donziger and his primary Ecuadorian counterpart, Pablo Fajardo, set up an email account on which they loaded information that each could access.  To hide the fraudulent nature of that information, Fajardo told Donziger "not [to] insert any names in the document," but instead to use the code names "Lagarto 2" and "Lagarto 3."  RICO Dkt. 402-13 (Champion Decl. Ex. 2315); RICO Dkt. 398 ¶ 141.

The Does responsible for the pending motion claim to own only three of the 30 email accounts listed in the subpoena:  simeontegel@hotmail.com, mey_1802@hotmail.com, and lupitadeheredia@hotmail.com.  *See* Memorandum Supporting Motion to Quash ("Mem.") at 3; Dkt. 2-2 ¶ 3.  The Does do not claim that they are authorized to represent any other account holders listed in the subpoena.  *See* Mem. 3.

Chevron believes that the owners of these accounts are, respectively, Simeon Tegel, Maria Eugenia Yepez, and Lupita de Heredia.  Chevron seeks information about these accounts because—although Chevron has not named these Does as defendants—the evidence Chevron has

JA0021

obtained shows that these accounts were used to help the LAPs further their fraudulent enterprise, and that each Doe has been intimately involved in the LAPs' fraudulent enterprise.

Simeontegel@hotmail.com is apparently an email account of Simeon Tegel, who was from 2005 to 2008 the Communications Director of Amazon Watch, an entity funded and directed by Steven Donziger to facilitate the LAPs' fraudulent scheme. *See* RICO Dkt. 283 ¶ 18(f) (naming Amazon Watch a non-party co-conspirator in the RICO action and describing how it contributed to the RICO defendants' fraudulent scheme). Tegel publicized and distributed the fraudulent Cabrera report and helped Donziger further the LAPs' fraud by writing false letters to news entities. Those letters trumpeted the LAPs' baseless claim that TexPet's "remediation . . . [w]as a sham as confirmed by laboratory samples provided by a court-appointed expert and by Chevron itself," Ex. 3, and praised Cabrera's qualifications and independence, Ex. 4. These and other activities were all part of a public relations campaign to legitimate a fraudulent judgment against Chevron. *See, e.g.*, Ex. 5.

Mey_1802@hotmail.com is apparently an email account of Maria Eugenia Yepez. Yepez worked as a strategist and liaison for Donziger and the LAPs. She set up meetings between the LAPs' attorneys and Ecuadorian political figures, including the President of the Supreme Court, Ex. 6; Ex. 7, and officials of the Ministry of Health, Ex. 8. Those meetings helped fix the judgment for the LAPs.

Lupitadeheredia@hotmail.com is apparently an email account of Lupita de Heredia. Heredia worked closely with Donziger on press releases, media contacts, and media appearances that furthered the scheme against Chevron. She was so enmeshed in the LAPs' activities that she gave assignments to the LAPs' interns. Ex. 9.

JA0022

The remaining email accounts listed in the subpoena were also apparently created by people who were as or more involved in the RICO defendants' fraud.  Those accounts generally fall into four categories:

- <u>Accounts Used by the LAPs' Legal Team Personnel</u>.  These include muerteenlaselva@hotmail.com; julprieto@hotmail.com; juanpasaenz@hotmail.com; alex_anchundia2007@hotmail.com; gabrielitaep@hotmail.com; duruti@hotmail.com; Monica_pareja@hotmail.com; renatog85@hotmail.com; and criscadena@hotmail.com.

- <u>Accounts Used by FDA Selva Viva Personnel</u>.  These include gaer69chzpr@hotmail.com; donaldmoncayo@hotmail.com; erikatorres_19@hotmail.com; hannagoanna@hotmail.com; maryeji20@hotmail.com; pirancha@hotmail.com; nick_aussie@hotmail.com; selvaviva2004@hotmail.com; and hjploro@hotmail.com.

- <u>Accounts Used by Cabrera and his Associates</u>.  These include ingracabrerav@hotmail.com; rcabrerav@hotmail.com; cristobalvillao@hotmail.com; and aulestiajuan@hotmail.com.

- <u>Accounts Used by Ecuador Officials who had Dealings with the LAPs</u>.  These include patriciogarcia_2009@hotmail.com; albertoguerrab@hotmail.com;  and osimonc@hotmail.com.

The remaining two addresses are an address set up by Pablo Fajardo to facilitate the fraudulent ghostwriting of the Cabrera report (examen_pericial@hotmail.com) and an address that was apparently used by Dr. Luis Alberto Villacreces Carvajal, a technical expert employed by the LAPs (luisvillacreces@hotmail.com).[3]

Importantly, each of these accounts appears to have been owned by an employee or agent of the RICO defendants or their co-conspirators, or has been identified as being directly involved in the fraud.

---

[3]  The account faisal_baki@hotmail.com has been dropped from Chevron's subpoena, and thus is not included here.  Declaration of Rebecca Gray ("Gray Decl.") ¶ 20, Ex. K.

6

For each account, Chevron seeks to confirm identifying information about the user, and to obtain IP log and address information.  Ex. 2 (Subpoena at 2).  Donziger himself served similar subpoenas on email provider Yahoo!—seeking *his own* user and IP information—in discovery proceedings in the RICO action.  *See* Ex. 10.  The subpoena seeks information generated since the Ecuador litigation was filed in 2003.  Ex. 2 (Subpoena at 2).  That information will support Chevron's RICO claims.  *See* Part III.B.2., *infra*.

In each of its meet-and-confer sessions with subpoenaed individuals or their counsel, Chevron has offered to limit this timeframe further, to the period that each individual worked with the LAPs.  *E.g.*, Gray Decl. Ex. E & ¶ 16.  The Does, however, have been largely unwilling to disclose the precise date ranges that they worked with the LAPs, through meet-and-confer sessions or in their motion papers:  Indeed, two of the moving Does have not even provided declarations to this Court.  The Does have provided a single declaration representing that "John Doe" worked with the LAPs during one time period, but not stating with the particularity the duration of that work or confirming whether he worked with the LAPs at other times.  Dkt. 2-4 (Declaration of "John Doe" (Simeon Tegel)).

## III.    ARGUMENT

### A.    The Does Lack Standing to Challenge the Subpoena as a Whole and May Challenge Its Application Only to the Accounts that They Own.

A litigant lacks standing to challenge a subpoena issued to a third party, unless the litigant possesses a personal right or privilege regarding the documents sought.  *Langford v. Chrysler Motors Corp.,* 513 F.2d 1121, 1126 (2d Cir. 1975).  Nor may a litigant challenge a subpoena based on the alleged rights of others when those others do not challenge the subpoena.  *See Nova Prods., Inc. v. Kisma Video, Inc.*, 220 F.R.D. 238, 241 (S.D.N.Y. 2004); 9A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2035 (note 8 and accompanying text).

7

The Does claim to own only three of the 30 email accounts identified in the subpoena to Microsoft. *See* Mem. 3; Dkt. 2-2 ¶ 3. The Does do not identify any right or privilege that they may have as to the remaining accounts. And the other account holders have chosen not to object to Chevron's requests or have resolved their concerns about the subpoena with Chevron. The Does therefore lack standing to challenge the subpoena's application to the accounts that they do not own, and their motion to quash must be limited to the three accounts that they do own. *See, e.g.*, *Malmberg v. United States*, No. 5:06-cv-1042 (FJS/GHL), 2010 WL 1186573, at *1 (N.D.N.Y. Mar. 24, 2010); *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 2207555, at *2 n.11 (S.D.N.Y. June 2, 2011). In the cases the Does rely upon, in contrast, the party opposing the subpoena suffered injury in fact or was itself subpoenaed. The Does' request to quash the subpoena in its entirety (*see, e.g.*, Mem. 19-20) must be denied, and their request must be confined to accounts they own.

**B.    The Subpoena Makes Reasonable Requests that Courts Routinely Grant.**

**1.    Courts Routinely Require Production of the Information that Chevron Seeks.**

For each of the Does' accounts, Chevron seeks only two categories of information: (1) user identification information, and (2) usage information such as IP logs and IP address information. *See* Ex. 2 (Subpoena at 2). Such information is routinely sought from email service providers in civil discovery. *See, e.g.*, *In re Roebers*, No. 12-mc-80145-RS (LB) 2012 WL 2862122, at *3 (N.D. Cal. July 11, 2012) ("Internet service providers and operators of communications systems are generally familiar with this type of discovery request."). And courts consistently uphold subpoenas seeking such information. *See, e.g.*, *London v. Does 1-4*, 279 F. App'x 513, 514-15 (9th Cir. 2008) (affirming denial of motion to quash subpoena on Yahoo! seeking documents disclosing IP address from which email accounts were created); *John Wiley &*

JA0025

*Sons, Inc. v. Does 1-35*, 12 Civ. 2968 (RWS), 2012 U.S. Dist. LEXIS 182741 (S.D.N.Y. Dec. 28, 2012) (denying motion to quash subpoena served on defendant's internet service provider); *AF Holdings LLC v. Doe*, No. 12-cv-02416-WHA, 2012 U.S. Dist. LEXIS 75806, at *2-3 (N.D. Cal. May 31, 2012) (granting early discovery of IP log, for purpose of determining identity of allegedly infringing IP address holder); *Xcentric Ventures, LLC v. Karsen, Ltd.*, No. 11-cv-01055-PHX-FJM, 2012 U.S. Dist. LEXIS 121888, at *1-3 (D. Ariz. Aug. 28, 2012) (denying motion to quash subpoena seeking discovery of IP address information from Google).  Critically, the subpoena does not seek the contents of email communications.  *See Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 WL 4593181, at *4 (N.D. Cal. Oct. 4, 2011) ("addressing information" is less protected than the content of communications).

Chevron is entitled to the subpoenaed information even though the account owners listed in the Microsoft subpoena are non-parties.  Each of those account owners was an employee of the LAPs, is an attorney of a RICO defendant, is a co-conspirator, or was otherwise an agent of the LAPs.  Each account owner is therefore similarly situated to the defendants in cases in which a court has upheld a subpoena seeking identifying information and IP login information from the defendants themselves.  *Cf. Chevron Corp. v. Salazar*, No. 11 CV 03718 (LAK) (JCF), Dkt. 180 at 25 (S.D.N.Y. Aug. 3, 2011) ("Courts have repeatedly found that employers have control over their employees" and can be required to produce documents in their employees' possession.); *Chevron Corp. v. Salazar*, No. 11 CV 03718 (LAK) (JCF), Dkt. 101 at 3 (S.D.N.Y. Aug. 3, 2011) ("[L]awyers are agents for their clients.").  The law requiring defendants to comply with a subpoena therefore applies fully to the non-party account owners listed in the subpoena here.

JA0026

## 2. The Subpoenaed Information Will Materially Support Chevron's Claims in the RICO Action.

The information that Chevron seeks, moreover, is well within the bounds of information that it is entitled to pursue in the RICO action. The Federal Rules provide that a party is entitled to discover information "that is relevant to [its] claim[s]" and "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).[4] Information concerning the Does' accounts is directly and materially relevant to Chevron's claims.

As summarized above, each Doe was involved in the LAPs' scheme against Chevron.[5] The subpoenaed information about the Does' accounts will directly and materially support Chevron's RICO action claims in several ways.

First, the subpoenaed information will show whether certain account holders had access to the RICO defendants' internal documents and data. The RICO defendants and their affiliates established email accounts to store and exchange documents in furtherance of the fraud. RICO Dkt. 402-13 (Champion Decl. Ex. 2315); RICO Dkt. 398 ¶ 141. Such accounts were used to plan the ghostwritten "independent" expert report. *Id.* Whoever wrote the $19 billion judgment, moreover, had access to the RICO defendants' unfiled documents. Information about who had such access—and when they may have accessed those documents—will provide information

---

[4] *See also* Fed. R. Civ. P. 45, 1946 advisory committee's note (a subpoena has "the same scope as provided in Rule 26(b)"); 1970 advisory committee's note ("[T]he scope of discovery through a subpoena is the same as that applicable to . . . the other discovery rules.").

[5] The Does' Memorandum does not once directly describe their connection to the RICO defendants. The Does instead draw attention elsewhere—for example, with a straw man argument related to an email account *that is not before the Court* (the account of Jon Heller). *See* Mem. 4, 13, 18. But it is undisputed that Chevron withdrew its request regarding that account shortly after Mr. Heller reached out to Chevron about it. *See* Gray Decl. ¶ 19. The Does' unwillingness to acknowledge the true nature of their association with the LAPs stems, no doubt, from the fact that each of the Does was intimately involved in the conduct at issue in the RICO action.

JA0027

about how those documents came to be filed as the work of the "independent" court expert and how some of that information was found verbatim in the $19 billion judgment itself.  *See* Ex. 2; RICO Dkt. 550 at 27-30.

Second, IP information will prove that substantial portions of the RICO predicate acts originated in the United States.  That is critical because—although the RICO defendants' scheme was designed by U.S. lawyers, carried out largely in the United States, and directed at a U.S. victim—the RICO defendants have contended that Chevron's complaint seeks an extraterritorial application of RICO.  RICO Dkt. 243 at 2-5.

Third, identifying information about the owners of the accounts—which were used to further the various RICO predicate acts of extortion, wire fraud, and money laundering—will provide evidence regarding the structure and management of the RICO enterprise.  That evidence is essential to a RICO claim.  *See Boyle v. United States*, 556 U.S. 938, 951 (2009).

Fourth, although Chevron likely knows the Does' identities, Chevron remains entitled to regularly collected business records to substantiate those identities at trial.  *See, e.g.*, Fed. R. Evid. 803(6); *see also, e.g.*, *Griffin v. Maryland*, 19 A.3d 415, 421 (Md. 2011) (describing need for guarantees of authenticity before admitting internet evidence); *People v. Clevenstine*, 891 N.Y.S.2d 511, 514 (N.Y. App. Div. 2009) (same).  Chevron is entitled to evidence that will show the jury who the relevant account users are.  The subpoenaed documents will provide Chevron with the needed evidence.

### 3.    The Subpoena Is Not Overbroad.

The Does contend that the subpoena is overbroad because it seeks information about 30 email accounts over the course of nine years and because much of the information sought is irrelevant to Chevron's claims.  Mem. 20.  Elsewhere, the Does add complaints about two subpoenas that were served on email providers who were not subject to the subpoena before this

11

Court.  Mem. 12, 18.  The Does even complain about a non-Doe account holder who Chevron has

removed from its subpoena.  *See* Mem. 4, 13, 18; Gray Decl. ¶ 19 & Ex. J.  But, as already

explained, the Does possess standing to challenge the subpoena only as to the three accounts that

they own.  *See* Part III.A., *supra*. As a result, their arguments as to other email account owners are

not properly before this Court.

The overbreadth cases cited by the Does (*see* Mem. at 19) do not allow them to depart

from well-settled principles of standing.  Indeed, in each of those cases the party claiming

overbreadth possessed standing to make that challenge.  *See McMann v. SEC*, 87 F.2d 377, 378

(2d Cir. 1937) (injunction against disclosure of stock account records sought by account holder);

*United States v. IBM*, 83 F.R.D. 99 (S.D.N.Y. 1979) (motion to quash brought by the subpoenaed

party); *United States ex rel. Sasaki v. N.Y. Univ. Med. Ctr.*, No. 05 Civ. 6163, 2011 U.S. Dist.

LEXIS 95059, at *4-5 (S.D.N.Y. Aug. 23, 2011) (motion to compel opposed by subpoenaed

litigant).  The Does cite no case in which a recipient of a subpoena was allowed standing to

challenge the subpoena as to another party.  Each of those cases accords with the settled rule that

a litigant may not challenge a subpoena based on the alleged rights of others.  *See, e.g.*, *Nova

Prods.*, 220 F.R.D. at 241.

Nor is there any force to the argument that the subpoena is overbroad as applied to the

Does.  The subpoena only seeks information that remains in Microsoft's custody or control since

the Ecuador litigation began in 2003.  Ex. 2 (Subpoena at 2).  Chevron has also made clear that it

is willing to narrow its requests to ensure that the subpoena yields only relevant information.

*E.g.*, Gray Decl. Exs. C, D, E, L.  Chevron has agreed, for example, to tailor the time ranges for

its request to ensure that the information produced covers only the time periods during which the

JA0029

Does associated with the LAPs. *Id.* The Does, however, have not provided sworn evidence regarding the appropriate time periods.

"[T]he party seeking to quash [a] subpoena bears the burden of demonstrating that the subpoena is overbroad, duplicative, or unduly burdensome." *Schoolcraft v. City of New York*, No. 10 Civ. 6005 RWS, 2012 WL 2161596, at *2 (S.D.N.Y. June 14, 2012), *reconsideration denied*, 2012 WL 2958176 (S.D.N.Y. July 20, 2012); *see also Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011) (same); *Snider v. Lugli*, CV 10-4026 JFB AKT, 2011 WL 5401860 (E.D.N.Y. Nov. 4, 2011) (same); 9A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2459 (3d ed.) (note 7.1 accompanying text). Here, however, the Does have failed to provide unequivocal sworn testimony supporting their assertion that certain time periods are *ir*relevant with regard to their email addresses, and have refused Chevron's offer through meet and confer to limit the time period of the subpoena. *See* Gray Decl. Ex. M. As a result, they fail to meet their burden to establish that the subpoena is overbroad. *See Schoolcraft*, 2012 WL 2161596, at *2, *13.

## C. The Subpoena Accords with First Amendment Standards.

The Does next contend that the subpoena violates their First Amendment rights to anonymity and to association. Mem. 7-19. This argument also has no merit.

### 1. Compliance with the Subpoena Will Not Infringe Any Right to Anonymity.

#### a. The Right to Anonymity Does Not Apply Here.

The First Amendment protects anonymity when it will provide "a shield from the tyranny of the majority," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), or will "foster open communication and robust debate" by eliminating the burdens of others "knowing all the facts about one's identity," *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999). Those rationales for protecting anonymity disappear where, as here, a speaker has

JA0030

exposed—indeed, publicized—his identity or his identity is otherwise publicly known. In those circumstances, the speaker simply has not made the protected "decision to remain anonymous." *McIntyre*, 514 U.S. at 342.

In this case, accordingly, the Microsoft subpoena does not affect the Does' right to anonymous speech because Tegel, Yepez, and Heredia—the Does—are not anonymous. That is of their own doing: Tegel, Heredia, and Yepez used their names or initials when creating the addresses associated with their email accounts. And they have long publicized their use of these particular email addresses and their association with the LAPs. Tegel signed emails and wrote letters to news outlets using his name. Exs. 3, 5. Indeed, a Google search of "Simeon Tegel" returns, as its second result, Tegel's personal website, which prominently lists his Hotmail address. Ex. 12. Heredia gave assignments to the LAPs' interns. Ex. 9. And Yepez participated in radio interviews about her involvement in the LAPs' public relations efforts. Ex. 13. Through their very public activities, the Does have affirmatively chosen *not* "to remain anonymous." *McIntyre*, 514 U.S. at 342. The long-public nature of their activities, moreover, belies any claim that the Does need protection from a "danger" of having their association with the LAPs "exposed." Because the Does advertised their identities and involvement with the LAPs, there simply is no basis for their artificial claim to anonymity.

More fundamentally, although the Does cast their association with the LAPs as one of political speech or advocacy, Mem. 7, 12, 14, 15, the record is clear that they in fact provided significant assistance to the LAPs' fraudulent enterprise. *See* Part II, *supra*. The First Amendment does not protect fraudulent activity or associations that further a conspiracy. *See, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003); *McIntyre*, 514 U.S. at 357; *Branzburg v. Hayes*, 408 U.S. 665, 697 (1972) (declining to afford First

JA0031

Amendment protection to the "concealment of crime"); *United States v. Konstantakakos*, 121 F.

App'x 902, 905 (2d Cir. 2005) ("[I]t has long been established that the First Amendment does not

shield knowingly false statements made as part of a scheme to defraud."); *United States v. Sattar*,

395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005) (the First Amendment "lends no protection to

participation in a conspiracy, even if such participation is through speech"); *In re Jean-Baptiste*,

No. M 11-188, 1985 WL 1863, at *1 (S.D.N.Y. July 5, 1985) (same).  The Court should reject the

Does' effort to keep illicit activities concealed.

> **b.** **Chevron's Interest in Disclosure Outweighs Any Claimed Right to Anonymity.**

Even if the Does had any claim to anonymity, which they do not, Chevron's interest in

discovering the limited subpoenaed information would outweigh it.

When ruling on a motion to quash that seeks to preserve the movant's anonymity, a court

must balance the need for disclosure against First Amendment interests.  *See Sony Music Entm't*

*Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 564-65 (S.D.N.Y. 2004) (Chin, J.).  Because the First

Amendment does not protect the Does' efforts to further fraudulent activity or to aid a conspiracy,

this Court should apply "the lowest bar that courts have used" in considering whether to order

disclosure of an anonymous speaker's identity:  it should consider whether "the claim for which

the plaintiff seeks the disclosure" meets "the motion to dismiss or good faith standard."  *In re*

*Anonymous Online Speakers*, 661 F.3d 1168, 1175 (9th Cir. 2011) (discussing the standards

applied across circuits—including within the Second Circuit—to evaluate different First

Amendment anonymity claims).  Here, the RICO defendants' motion to dismiss Chevron's claims

has already been denied in relevant part (*see Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229

(S.D.N.Y. May 14, 2012) (Westlaw version)) and the Court has found that there is no genuine

dispute of material fact with respect to many of Chevron's core allegations regarding the RICO

15

defendants' fraud and misconduct in the Ecuador litigation (*see* RICO Dkt. 550)—conclusively showing that Chevron meets the low disclosure standard.

Even if this Court were to apply the higher "prima facie standard"—used, for example, by the Southern District of New York in *Sony Music Entm't Inc. v. Does 1-40*—Chevron would meet that standard as well. When ruling on a motion to quash that seeks to preserve the movant's anonymity, courts in the Second Circuit weigh "the need for disclosure against First Amendment interests" by considering: (1) the prima facie strength of the plaintiff's claims of injury; (2) the specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) the plaintiff's need for the information; and (5) the movant's expectation of privacy in the subpoenaed information. 326 F. Supp. 2d at 564-65; *see Arista Records v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (endorsing *Sony Music* test). Applying that analysis, courts in this Circuit have denied motions to quash subpoenas that sought discovery of identifying information where the balancing of these factors overall led to the conclusion that the objecting party was not entitled to protection. *See, e.g., John Wiley & Sons, Inc. v. Does 1-35*, No: 1:12-cv-02968-RWS, 2012 U.S. Dist. LEXIS 182741 (S.D.N.Y. Dec. 28, 2012) (Sweet, J.); *Arista Records LLC v. Does 1-16*, Civ. No. 1:08-CV-765 (GTS/RFT), 2009 WL 414060, at *6 (N.D.N.Y. Feb. 18, 2009), *aff'd*, 604 F.3d 110 (2d Cir. 2010); *see also Next Phase Distrib., Inc. v. Does 1-138*, No. 11 Civ. 9706 (KBF), 2012 WL 691830 (S.D.N.Y. Mar. 1, 2012) (denying motion to quash subpoena seeking IP login information related to times and dates that the subscriber allegedly downloaded a copyrighted film).[6]

---

[6] The *Sony Music* test rests on several considerations: that anonymous speech does not enjoy absolute protection, *see* 326 F. Supp. 2d at 562; that such speech enjoys especially scant protection when the objecting litigant seeks to use anonymity to conceal misconduct, *see id.* at

16

Here, these factors both separately and collectively support disclosure.

*First*, Chevron has made a strong showing of a prima facie claim of actionable harm. The Second Circuit has held that this factor may be satisfied by a well-pleaded complaint and a supporting exhibit and declaration. *Arista Records LLC*, 604 F.3d at 123. Chevron has gone well beyond that showing. In denying the LAPs' motion to dismiss and in finding that evidence that the Ecuador litigation was "tainted by fraud" was "uncontradicted" on summary judgment, the Court has concluded that Chevron has made at least a prima facie showing of actionable harm. *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012); RICO Dkt. 550. Indeed, *seven* federal courts have determined that the RICO defendants committed fraud sufficient to pierce the protection against discovery of attorney-client privileged documents.[7] Although the movants contend that Chevron must establish a prima facie case against each of them personally,

---

562-63, 565-66 and that information to support a legitimate legal claim has considerable value, *see id.* at 564-66. Here, where there is clear evidence that the so-called "Does" assisted the Defendants' fraudulent scheme, the same governing considerations apply whether the litigant moving to quash is a party or non-party.

[7] *See In re Chevron Corp.*, 633 F.3d 153, 166, 168 (3d Cir. 2011) (holding that Chevron had made a "prima facie showing of a fraud that satisfies the first element of the showing necessary to apply the crime-fraud exception to the attorney-client privilege" and remanding for *in camera* review); *In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925, at *14, *16 (S.D. Fla. June 12, 2012) (granting Chevron's motion for discovery of information "pertain[ing] to a large scale fraud upon an American corporation"); *Chevron Corp. v. Page*, No. RWT-11-1942, Oral Arg. Tr. 73:7-9, 73:25-74:10 (D. Md. Aug. 31, 2011) (applying crime-fraud exception to attorney-client privilege); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011), *rev'd on other grounds sub nom.*, *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012) ("There is ample evidence of fraud in the Ecuadorian proceedings."); *In re Chevron Corp.*, No. 10-cv-1146-IEG(WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010) (applying crime-fraud exception); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, slip op. 3-4 (D.N.M. Sept. 2, 2010) (noting evidence of the "inappropriate, unethical and perhaps illegal conduct" by LAPs' attorneys); *Chevron Corp. v. Champ*, Nos. 1:10-mc 27, 1:10-mc 28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010) (applying crime-fraud exception because "what has blatantly occurred in this matter would in fact be considered fraud by any court.").

JA0034

there is no reasonable dispute that each acted as an agent or employee of the RICO defendants or their co-conspirators.

*Second*, Chevron has made a narrow and specific discovery request concerning the Does. Chevron has sought specific account usage and user documents that will "lead to identifying information" (*Sony Music*, 326 F. Supp. 2d at 566) that will assist Chevron's efforts to establish where the Does were located when RICO predicate acts took place, to learn details about the structure and management of the RICO enterprise, and to uncover further use of computers in connection with the fraudulent "independent" expert report and ghostwritten $19 billion judgment. *See* RICO Dkt. 402-13 (Champion Decl. Ex. 2315); RICO Dkt. 398 ¶ 141; RICO Dkt. 550 at 27-30. Chevron has not sought a broad swath of information—such as the *contents* of the Does' emails—but has instead served narrow requests that have withstood frequent judicial scrutiny. *See* Part III.B.1., *supra*. And the movants have not submitted any sworn evidence affirming that there is a period of time when they were *not* working with the LAPs.

*Third*, Chevron has been unable to obtain the specific information sought in the subpoenas through other means. Chevron has pursued multiple discovery actions to obtain information about the relationships between the RICO defendants and non-parties, and the relevant interactions between the two groups. Despite those efforts, Donziger, the LAPs, and their agents and co-conspirators have repeatedly prevented Chevron from accessing much of that evidence. *See* Part II, *supra* (summarizing some of the efforts to evade and obstruct discovery). Given that obstruction, the subpoenas here are the best calculated means—and are, indeed, necessary—to allow Chevron to obtain the information that the LAPs have continually concealed. At most, the Does suggest that Chevron should seek these facts from the RICO defendants themselves. But computer users do not often record IP login information, much less the login information of the

18

computers of those who work with them.  In fact, in this very case, Donziger was forced to

subpoena Yahoo! to obtain access to the exact kind of information Chevron seeks *about his own*

*account*.  *See* Part II, *supra*.  Seeking this information from Microsoft is not only the most direct

way to proceed; it is the best way to ensure that the information has sufficient indicia of reliability

to make it admissible.  *See* Fed. R. Evid. 901(a).

  *Fourth*, the subpoenaed information is important to Chevron's claims in the RICO action.

Chevron already has obtained thousands of emails sent to and from the RICO defendants and

those associated with them, including the Does.  These emails provide evidence of fraud,

extortion, and other misconduct.  As explained above, the identities of the email account users

involved—and the location from which those users operated—will help Chevron establish where

the Does were located when RICO predicate acts took place, to learn details about the structure

and management of the RICO enterprise, and to obtain details about the fraudulent expert report

and judgment.  *See* Part III.B.2., *supra*.

  *Fifth*, the Does have only a "minimal expectation of privacy" in the subpoenaed material.

*Sony Music*, 326 F. Supp. 2d at 566.  The Does used their own names or initials in the email

addresses associated with their accounts.  And they did so using an email service (Microsoft

Hotmail) that warns users that their identifying information will not be kept private if it is

subpoenaed.  Ex. 14.  That warning—particularly when coupled with the Does' efforts to

publicize their identities and actions—renders the Does' privacy interest "minimal" at best, *Doe I*

*v. Individuals*, 561 F. Supp. 2d 249, 254 (D. Conn. 2008) (finding "minimal" expectation of

privacy based on a similar internet service provider warning), and is readily overcome by the need

for disclosure.  *See also Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 WL 4593181, at *4

(N.D. Cal. Oct. 4, 2011) (noting that courts "routinely reject the argument that subscribers have a

JA0036

privacy interest in their account information" and rejecting motion to quash subpoena that "d[id] not seek the content of any of Movant's communications but rather 'addressing information' that will allow the SEC to identify Movant"); *In re United States*, 830 F. Supp. 2d 114, 131-33 (E.D. Va. 2011) (holding that petitioners had no expectation of locational privacy in IP logs when they voluntarily transmitted their IP addresses to Twitter).

Because all factors weigh strongly in favor of disclosure, the Does' "right to remain anonymous"—if it could even be said to apply here—must "give way to [Chevron's] right to use the judicial process to pursue" its claims. *Sony Music*, 326 F. Supp. 2d at 567.

The Does ask this Court to apply a four-part standard articulated by a judge in the Western District of Washington in *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088 (W.D. Wash. 2001). The *2TheMart.com* test looks to whether: (1) the subpoena was issued in good faith and not for an improper purpose; (2) the information sought relates to a core claim; (3) the identifying information is directly and materially relevant to that claim; and (4) information sufficient to establish that claim is unavailable from any other source. *2TheMart.com*, 140 F. Supp. 2d at 1095.[8] But application of the *2TheMart* standard does not change the result here. As noted above, in this case the subpoenaed information relates to a core claim, the subpoenaed information is directly and materially relevant to that claim, and Chevron has shown that it cannot obtain that information from another source. Chevron therefore satisfies the second, third, and fourth *2TheMart.com* factors. And, in seeking the subpoenaed information, Chevron has acted in good faith: Chevron has well-supported RICO claims, the accounts at issue were used by persons

---

[8] The Does are wrong to contend that, to obtain disclosure, a plaintiff "must show" that it prevails on all four *2TheMart.com* factors. Mem. 13. To the contrary, the court in *2TheMart.com* described its test as an overall balancing analysis of several factors, not four elements that must all be met. *See 2TheMart.com*, 140 F. Supp. 2d at 1095-97.

JA0037

who were involved in the RICO defendants' illicit enterprise, and Chevron has been willing to work with the Does to tailor its request to uncover only relevant information. This is more than enough to support the subpoenas under *2TheMart.com*.

Indeed, the Ninth Circuit has described the *2TheMart.com* standard as "fall[ing] somewhere between the motion to dismiss and the prima facie standards" in the extent to which it favors disclosure. *Anonymous Online Speakers*, 661 F.3d at 1176. That description apparently rests on the fact that—unlike the prima facie standard set forth in *Sony Music*—*2TheMart.com* does not focus on whether a plaintiff has established a prima facie case, but instead merely *balances* whether the subpoena was "issued in *good faith*" (a clearly lower bar) against other factors. Because Chevron satisfies the higher prima facie standard, it *a fortiori* satisfies the *2TheMart.com* standard. Thus, under even the Does' inapplicable standard, the subpoenaed information must be disclosed.

### 2. Compliance with the Subpoena Will Not Infringe Any Right of Association.

The Does also cannot avoid enforcement of the subpoena based on a claimed infringement of their freedom of association, because they cannot "ma[ke] a *prima facie* showing that disclosure would infringe" their associational rights. *N.Y. State Nat'l Organization for Women v. Terry*, 886 F.2d 1339, 1354 (2d Cir. 1989).

To begin with—and as explained above—the Does have disclosed their identities. The Does, moreover, have freely and publicly associated themselves and their identities with the LAPs and their lawsuit against Chevron. The genie has left the bottle: Nothing about *re*-disclosure of the Does' identities could hamper their associational freedom.

Indeed, if disclosure could have harmed the Does at all, that (self-inflicted) harm would have already occurred. Yet the Does do not identify any harm that has ever hampered their associational freedom. The Does have long publicized their association with the LAPs and were

21

open about their identities during that association.  *See* Part II, *supra*.  Yet the Does do not show that their open involvement with the LAPs caused them to face harassment, threats, or anything else that chilled their speech.  *See* Dkt. 2-2, *passim*.  The absence of such harm stands in stark contrast to the baseless speculation set forth in the declaration by "John Doe" Simeon Tegel.  Tegel states that he "believes his use of his email account to communicate with his sources would be chilled if Chevron obtained details about his account" and that he "would be intimidated and deterred from engaging in activism or litigation against Chevron in the future" if Microsoft complies with the subpoena. Mem. 4.  That speculation, however, is inexplicable in light of Tegel's long public association with the LAPs (he worked for the Donziger-funded, RICO defendant co-conspirator Amazon Watch from 2005 to 2008), which has apparently never caused him such harms.  *See, e.g.*, Ex. 5.  Even if Tegel had experienced such harms, of course, they would not be protected by invoking the freedom of association here:  He unmasked himself and forfeited any right to conceal his identity.

Even if the Does could make a prima facie showing of potential harm, moreover, they still cannot overcome Chevron's compelling interest in the subpoenaed material under the governing legal standards.  *See Terry*, 886 F.2d at 1355; *In re Grand Jury Proceedings*, 776 F.2d 1099, 1103 (2d Cir. 1985).  First, there is a substantial relationship between that interest and the subpoenaed information. *See* Part III.B.2, *supra* (discussing how the subpoenaed information will support Chevron's claims).  Second, Chevron cannot obtain the material other than by subpoenaing Microsoft.  *See* Part III.C.1.b., *supra* (discussing the third *Sony Music* factor).  And third, Chevron's request does not unnecessarily affect protected rights.  Chevron has made a significant showing that the LAPs committed massive fraud and that the Does worked with them to further

JA0039

that fraud. The First Amendment does not protect fraud or associations that further a conspiracy. *See* Part III.C.1.a., *supra* (collecting authorities).

Indeed, the Does seem to concede the compelling need for disclosure, acknowledging that "[t]he government may well have a compelling interest in making sure that parties to litigation receive the information they need to properly litigate their cases in the interest of the fair administration of justice." Mem. 18. Chevron is entitled to disclosure.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to quash should be denied.

Dated:  January 15, 2013

Respectfully submitted,

By:   s/ Randy M. Mastro
      ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
      Randy M. Mastro
      GIBSON, DUNN & CRUTCHER LLP
      200 Park Avenue
      New York, New York 10166-0913
      Telephone:  212.351.4000
      Facsimile:  212.351.4035
      rmastro@gibsondunn.com

      Howard S. Hogan
      GIBSON, DUNN & CRUTCHER LLP
      1050 Connecticut Avenue, N.W.
      Washington, D.C. 20036-5306
      Telephone:  202.955.8500
      Facsimile:  202.530.9550
      hhogan@gibsondunn.com

      Paul DerOhannesian II
      DEROHANNESIAN &
      DEROHANNESIAN
      677 Broadway Suite 202
      Albany, New York 12207
      Telephone:  518.465.6420
      Facsimile:  518.427.0614
      paul@derolaw.com

JA0040

*Attorneys for Chevron Corporation*

101397310.20

JA0041

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                  :
CHEVRON CORPORATION,                              :
                                                  :
                         Plaintiff,               :
                                                  :
        -against-                                 :     Case No. 1:12-MC-65 GLS/CFH
                                                  :
STEVEN DONZIGER, et al.,                          :
                                                  :
                         Defendants.              :
                                                  :
                                                  :
-------------------------------------------------------x

## DECLARATION OF REBECCA GRAY ON BEHALF OF CHEVRON CORPORATION IN OPPOSITION TO MOTIONS TO QUASH A SUBPOENA TO MICROSOFT CORPORATION

I, Rebecca Gray, declare:

1.       I am an attorney licensed to practice law in the State of Maryland and the District of Columbia.  I am an associate in the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Chevron Corporation ("Chevron") in the above-captioned matter.  I make this declaration, based on personal knowledge, on behalf of Chevron in opposition to two separate motions to quash Chevron Corporation's subpoena to Microsoft Corporation (Dkts. 1 and 2).

2.       Attached hereto as **"Exhibit A"** is a true and correct transcription of a voice message from Larry R. Veselka, counsel for certain Defendants in the above-captioned proceeding, which was received by my colleague, Christopher M. Joralemon, on Tuesday, October 2, 2012.  In his message, Mr. Veselka indicates that he is "passing . . . on" a request from "counsel for some of the folks on the Google, Microsoft, Yahoo subpoenas . . . about trying to get an extension of the return date on those" and further notes that "it would be some convenience of getting all three of them at the same time."

3.       Attached hereto as **"Exhibit B"** is a true and correct copy of an email from my colleague, Howard S. Hogan, to Mr. Veselka on Wednesday, October 3, 2012.  In his email, Mr.

JA0042

Hogan confirms receipt of Mr. Veselka's voice message and states that Chevron is "generally amenable to extensions upon reasonable request. If you would like an extension on behalf of any clients of yours that are registered holders of accounts listed in the subpoenas, please let me know which accounts are at issue and the basis for your extension request and I will respond promptly. Should counsel for any other account holders desire an extension, please have them contact me directly."

4.      I am informed and believe that Mr. Veselka did not send any response to Mr. Hogan's October 3 email before Defendants' motion to quash Chevron's subpoenas to Google Inc. and Yahoo! Inc. was filed with the United States District Court for the Northern District of California on October 5, 2012.

5.      On September 24, 2012, I spoke by telephone with Laura Belanger regarding Chevron's subpoena to Google. During that conversation, Ms. Belanger confirmed that she is the owner of belanger.laura@gmail.com, and I confirmed that the subpoena does not request email content.

6.      On September 29, 2012, I spoke by telephone with Joseph Mutti regarding Chevron's subpoena to Google. During that conversation, Mr. Mutti confirmed that he is the owner of josephmutti@gmail.com, and I confirmed that the subpoena does not request email content.

7.      On October 4, 2012, I spoke with Mark A. Robertson regarding Chevron's subpoena to Google. During that conversation, Mr. Robertson represented that he is counsel for the owner of john.wotowicz@gmail.com and asked about the date range of Chevron's requests to Google. I confirmed that Chevron would be willing to narrow the date range requested in the subpoena based on his client's representations as to the relevant date range so long as those representations were not in conflict with evidence already in Chevron's possession.

8.      Attached hereto as **"Exhibit C"** is a true and correct copy of a letter I received from Mr. Robertson on October 12, 2012, which says, "thank you for your willingness to limit the scope of Chevron's document request to Google related to john.wotowicz@gmail.com." The

JA0043

letter continues: "As we discussed, Mr. Wotowicz is the only person who has had access to this account and he does not believe the e-mail account has ever been accessed by anyone other than himself. Mr. Wotowicz had contact with Donziger and investigated funding from sometime in July 2009 to sometime in May 2010 and did not deal with Donziger or the investigation of funding outside that time period. Accordingly, you have agreed to limit the document request to Google regarding john.wotowicz@gmail.com to that time period. Mr. Wotowicz consents to the production of documents responsive to Chevron's document request (B) to the extent that request (B) is limited to July 1, 2009 through May 31, 2010."

9.      Attached hereto as **"Exhibit D"** is a true and correct copy of a letter I sent to Ms. Nguyen, of Google, on October 15, 2012, to "advise [Google] that Chevron has reached agreement with the owner of john.wotowicz@gmail.com." The letter states that "Chevron is dropping document request (A) for john.wotowicz@gmail.com" and further notes that "the time period covered by document request (B) should be limited to July 1, 2009, through May 31, 2010, for john.wotowicz@gmail.com."

10.     On October 4, 2012, I spoke with Ethan A. Balogh regarding Chevron's subpoena to Google. During that conversation, Mr. Balogh represented that he is counsel for the owner of briansethparker@gmail.com and asked about the date range of Chevron's requests to Google. I confirmed that Chevron would be willing to narrow the date range requested in the subpoena based on his client's representations as to the relevant date range.

11.     Attached hereto as **"Exhibit E"** is a true and correct copy of a letter I sent to Mr. Balogh on October 9, 2012, which states that "Chevron's subpoena seeks information about the briansethparker@gmail.com email account as it was (or is) related to the activities and events at issue in *Chevron Corp. v. Donziger* . . . [a]ccordingly, we are willing to withdraw category (A) of Chevron's document requests if Mr. Parker confirms in writing that he created this account and maintained exclusive control over [it] from the time that it was created to the present . . . [f]urther . . . the scope of category (B) can be limited to the dates relevant to Mr. Parker's communications with the defendants and non-party co-conspirators named in the *Chevron Corp.*

JA0044

*v. Donziger* case."

12.     Attached hereto as **"Exhibit F"** is a true and correct copy of a letter dated October 3, 2012, from Mr. Hogan to Nathan Cardozo, counsel for several owners of email accounts listed on Chevron's subpoenas to Google and Yahoo! Inc.  In the letter, Mr. Hogan states that "Chevron's subpoena seeks identifying information for the users of email accounts that have been identified through discovery, and seeks routine information about the dates and times that those email accounts were accessed.  As is clear from the face of the subpoenas, they do not seek information about the contents or recipients of particular emails."

13.     Attached hereto as **"Exhibit G"** is a true and correct copy of an email exchange between myself and Edison Camino-Castro, who appears to be the owner of limcas2002@yahoo.com.  In Mr. Camino-Castro's initial October 9, 2012, email, he states that he is "willing and ready to cooperate with you, should you require my information, data, documents and testimony."  In my October 14, 2012, response email, I state that "Chevron's subpoena to Yahoo only seeks information directly from Yahoo, not from you.  The subpoena asks Yahoo to provide us with user account information and IP logs . . . but not the content of any emails sent using those email addresses."

14.     Attached hereto as **"Exhibit H"** is a true and correct copy of a letter Mr. Hogan sent to Mr. Veselka on October 13, 2012, which states that "Chevron's subpoenas . . . include routine requests for user account information and IP logs . . . [and] do not call for the production of email content or internet searches.  Further, Chevron's document requests apply only to responsive information available as of the date of the request.  As a result, the claims raised in your motion to quash are unfounded.  We suggest again that you withdraw your motion to quash, given that it is based on an incorrect reading of the subpoena.  We remain willing to discuss the specific date ranges that you believe should be applied for each of the email accounts."

15.     Attached hereto as **"Exhibit I"** is a true and correct copy of a letter Mr. Veselka sent to Mr. Hogan on October 17, 2012, in which Mr. Veselka states that Defendants will not withdraw their motion.

JA0045

16.     On October 30, 2012, Mr. Hogan and I spoke by telephone with Marcia Hofmann and Nathan Cardozo, counsel for several owners of email accounts listed on Chevron's subpoenas to Google and Yahoo! Inc.  During that conversation, Ms. Hofmann and Mr. Cardozo represented that they had become counsel for John Rodgers and Laura Belanger, who had previously represented themselves *pro se*.  Mr. Hogan and I confirmed Chevron's willingness to withdraw its request for identity information for any account owner who confirms in writing his or her identity and exclusive control over the account at issue.  We also confirmed Chevron's willingness to narrow the timeframe of its request for computer usage and IP log information for any account owner who confirms the timeframe during which he or she was in communication with the Defendants.

17.     On October 31, 2012, Mr. Hogan and I spoke by telephone with counsel for the Defendants.  During that conversation, Mr. Hogan and I confirmed Chevron's willingness to withdraw its request for identity information for any of the Defendants who confirms in writing that he or she has maintained exclusive control over the account at issue.

18.     On November 5, 2012, Mr. Hogan and I again spoke by telephone with Ms. Hofmann and Mr. Cardozo, counsel for John Rodgers and Laura Belanger.  Mr. Hogan and I confirmed Chevron's previous offer to withdraw its request for identity information for the accounts held by Mr. Rodgers and Ms. Belanger.  We also confirmed Chevron's willingness to narrow the timeframe of its request for computer usage and IP log information with respect to Mr. Rodgers and Ms. Belanger's email accounts in light of the sworn statements filed by Mr. Rodgers and Ms. Belanger in connection with prior motions to quash regarding the time frame of their work with the Defendants, subject to minor correction.

19.     Chevron formally withdrew the request contained in its subpoena to Google for information concerning the email address kevinjonheller@gmail.com.  Attached hereto as **"Exhibit J"** is a true and correct copy of a letter I sent to Chi Nguyen, of Google, on September 28, 2012, stating that "Chevron is dropping its request for information regarding the address kevinjonheller@gmail.com.  There is no further need to gather or preserve such information."

JA0046

20.     Chevron formally withdrew the request contained in its subpoena to Microsoft for information concerning the email address faisal_baki@hotmail.com.  Attached hereto as **"Exhibit K"** is a true and correct copy of a letter I sent to Brien Jacobsen, of Microsoft, on September 28, 2012, stating that "Chevron is dropping its request for information regarding the address faisal_baki@hotmail.com.  There is no further need to gather or preserve such information."

21.     Attached hereto as **"Exhibit L"** is a true and correct copy of a letter from Mr. Hogan to Ms. Hoffman on October 12, 2012.  In the letter, Mr. Hogan confirms that "Chevron's subpoena does not call for the production of email content" and describes specific ways in which Chevron is willing to narrow the scope of its requests.

22.     Attached hereto as **"Exhibit M"** is a true and correct copy of a letter from Mr. Cardozo to Mr. Hogan and myself on October 17, 2012.  In the letter, Mr. Cardozo states that "We have conferred with our clients regarding your offer to narrow the scope of the subpoenas . . . .  None has agreed."


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed this 15 day of January, 2013, in Olney, MD.


_____
                Rebecca Gray

JA0047

# EXHIBIT A

JA0048

**Voice Message**

Date:  Tuesday, October 2, 2012
Time:  6:35 PM
From:  (713) 221-2300
To:  Christopher Joralemon


      Chris, Larry Veselka.

      We've been contacted by counsel for some of the folks on the Google, Microsoft, Yahoo subpoenas and asked about the ability of the dealings with y'all about trying to get an extension of the return date on those.  So, I'm calling you about that.  What they have said is they had wanted to see if we could get a return date of the 22nd, it would make, it would be some convenience of getting all three of them at the same time.  So, I'm passing that on.  Give me a call if you can.  I would ask in that sense to have it where you would do it for everybody's return date so that it applies to everybody, for us as well as them, and our—Werdegar, if they're doing anything, which I'll find out.

      Also would like to know where you are on the privilege logs and the number of depositions, so, if you get a chance, give me a call.  Oh, I think you may have said you're going to be out on depositions, today, weren't you?

      So I've left you the message, call me when you can.  Bye.

# EXHIBIT B

JA0050

**Gray, Rebecca**

| | |
|---|---|
| **From:** | Hogan, Howard S. |
| **Sent:** | Wednesday, October 03, 2012 4:44 PM |
| **To:** | lveselka@skv.com |
| **Cc:** | Joralemon, Christopher M.; Gray, Rebecca |
| **Subject:** | Chevron v. Donziger, et al., No. 11-civ-0691 (S.D.N.Y.) |

I write in response to your voicemail to Chris Joralemon of last night regarding the subpoenas Chevron served on Google, Yahoo and Microsoft regarding email account information.  We are in communication with a number of account holders already, and are generally amenable to extensions upon reasonable request.  If you would like an extension on behalf of any clients of yours that are registered holders of accounts listed in the subpoenas, please let me know which accounts are at issue and the basis for your extension request and I will respond promptly.  Should counsel for any other account holders desire an extension, please have them contact me directly.

**Howard S. Hogan**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3640 • Fax +1 202.530.9550
HHogan@gibsondunn.com • www.gibsondunn.com

1

JA0051

# EXHIBIT C

JA0052



**Mark A. Robertson**
*Partner*

666 Fifth Avenue, 31st Floor • New York, New York 10103-3198
*mrobertson@fulbright.com • Direct: 212 318 3304 • Main: 212 318 3000 • Facsimile: 212 318 3400*

October 12, 2012

**VIA E-MAIL: RGray@gibsondunn.com**

Rebecca Gray, Esq.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

Re:    Chevron v. Donziger: Google Subpoena related to john.wotowicz@gmail.com

Dear Rebecca:

Thank you for speaking with me and thank you for your willingness to limit the scope of Chevron's document request to Google related to john.wotowicz@gmail.com.

We represent John Wotowicz related to the inclusion of john.wotowicz@gmail.com in Chevron's subpoena to Google. As we discussed, Mr. Wotowicz is the only person who has had access to this account and he does not believe the e-mail account has ever been accessed by anyone other than himself.

Mr. Wotowicz had contact with Donziger and investigated funding from sometime in July 2009 to sometime in May 2010 and did not deal with Donziger or the investigation of funding outside that time period. Accordingly, you have agreed to limit the document request to Google regarding john.wotowicz@gmail.com to that time period. Mr. Wotowicz consents to the production of documents responsive to Chevron's document request (B) to the extent that request (B) is limited to July 1, 2009 through May 31, 2010.

Sincerely,

Mark A. Robertson

MAR/pc

77990849.1

AUSTIN • BEIJING • DALLAS • DENVER • DUBAI • HONG KONG • HOUSTON • LONDON • LOS ANGELES • MINNEAPOLIS
MUNICH • NEW YORK • PITTSBURGH-SOUTHPOINTE • RIYADH • SAN ANTONIO • ST. LOUIS • WASHINGTON DC
*www.fulbright.com*

JA0053

# EXHIBIT D

JA0054

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Rebecca Gray
Direct: 202.887.3616
rgray@gibsondunn.com

October 15, 2012

<u>VIA ELECTRONIC MAIL</u>

Chi Nguyen
Google, Inc.
1600 Ampitheatre Parkway
Mountain View, CA 94043

Re: Subpoena in *Chevron Corp. v. Donziger, et al.*, Case No. 11 Civ. 0691 (S.D.N.Y.)

Dear Ms. Nguyen:

I write to advise you that Chevron has reached agreement with the owner of john.wotowicz@gmail.com regarding the above-referenced subpoena. As a result, Chevron is modifying its request for information regarding that specific address.

Please note that Chevron is dropping document request (A) for john.wotowicz@gmail.com. Please also note that the time period covered by document request (B) should be limited to July 1, 2009, through May 31, 2010, for john.wotowicz@gmail.com.

I enclose a letter from counsel confirming that the owner of john.wotowicz@gmail.com has consented to the production of documents responsive to the subpoena as modified by this letter.

Should you have any questions, please contact me at 202.887.3616 or rgray@gibsondunn.com.

Sincerely,

Rebecca Gray

Enclosure

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

# EXHIBIT E

JA0056

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Rebecca Gray
Direct: 202.887.3616
rgray@gibsondunn.com

October 9, 2012

<u>VIA ELECTRONIC MAIL</u>

Ethan A. Balogh, Esq.
Coleman & Balogh LLP
774 Montgomery Street, Fifth Floor
San Francisco, CA 94111
eab@colemanbalogh.com

Re:   <u>Subpoena to Google in *Chevron Corp. v. Donziger*, No. 11 civ. 0691 (S.D.N.Y.)</u>

Dear Ethan:

As we discussed on the telephone, Chevron's subpoena seeks information about the briansethparker@gmail.com email account as it was (or is) related to the activities and events at issue in *Chevron Corp. v. Donziger*, No. 11 civ. 0691 (S.D.N.Y.). Accordingly, we are willing to withdraw category (A) of Chevron's document requests if Mr. Parker confirms in writing that he created this account and maintained exclusive control over the account in question from the time that it was created to the present (*i.e.*, that he did not provide the account credentials to anyone else for their use).

Further, as we discussed, the scope of category (B) can be limited to the dates relevant to Mr. Parker's communications with the defendants and non-party co-conspirators named in the *Chevron Corp. v. Donziger* case. Our understanding of Mr. Parker's prior testimony is that he worked with the defendants and non-party co-conspirators from February 1, 2009, through November 30, 2010. If Mr. Parker is able to confirm in writing that he is not currently working with the defendants or non-party co-conspirators, and that February 1, 2009, through November 30, 2010, is the only range of dates in which he used briansethparker@gmail.com to communicate with the defendants and non-party co-conspirators, then we are willing to limit the scope of the subpoena to those dates. If Mr. Parker cannot make such a representation, then we will be happy to discuss what additional date ranges should be included in the subpoena, or whether there are other adjustments to the scope of the subpoena that are appropriate.

Once we reach an understanding regarding scope, we will notify Google and Mr. Parker will need to indicate his agreement to the modified terms of the subpoena by completing Google's consent procedure through his account.

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

JA0057

# GIBSON DUNN

Ethan A. Balogh, Esq.
October 9, 2012
Page 2

We appreciate your willingness to meet and confer about this subpoena. Please feel free to call if you would like to discuss further.

Sincerely,

Rebecca Gray

101382597.1

# EXHIBIT F

JA0059

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Howard S. Hogan
Direct: +1 202.887.3640
Fax: +1 202.530.9550
HHogan@gibsondunn.com

Client: 19624-00020

October 3, 2012

VIA E-MAIL

Nathan Cardozo
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Re:   Chevron's Subpoenas to Google, Yahoo, and Microsoft in *Chevron v. Donziger, et al.*, No. 11-civ-0691 (S.D.N.Y.)

Dear Mr. Cardozo:

I write in response to your letter of October 2, 2012 to my colleague, Rebecca Gray. We appreciate your attempt to provide a written summary of your position, but a number of issues require clarification.

Based on the statements in your letter, you may not be aware that the matter underlying this subpoena is a RICO case involving a $19 billion conspiracy to extort Chevron using a fraudulently obtained court judgment in Ecuador. Evidence Chevron already has obtained from the plaintiffs' attorneys and consultants involved in the fraud, including email and other electronic documents, has established that the conspirators used multiple alias email accounts and the email accounts of affiliates and proxies to help them carry out and conceal their fraud. Chevron's Amended Complaint in the underlying action details just some of the evidence that was available as of the time of filing as to defendants' repeated instances of ghostwriting and other frauds facilitated by the use of email.[1] Other evidence that we have obtained through discovery (including evidence unearthed since the Amended Complaint was filed) indicates that secret email accounts have also been used to facilitate this fraud, and discovery into this activity continues.

Chevron's subpoena seeks identifying information for the users of email accounts that have been identified through discovery, and seeks routine information about the dates and times that those email accounts were accessed. As is clear from the face of the subpoenas, they do not seek information about the contents or recipients of particular emails. Obtaining basic identifying information and internet access information about email accounts that are associated with the RICO defendants' fraudulent scheme is reasonably calculated to assist

---

[1]   A copy of the Amended Complaint is available at <http://chevronecuadortrial.com/>. You can also watch a summary of video evidence of the fraud at <http://www.youtube.com/texacoecuador>.

# GIBSON DUNN

Nathan Cardozo
October 3, 2012
Page 2

Chevron in determining what additional discovery is required from the RICO defendants or third parties.

Moreover, as Ms. Gray has made clear, Chevron is willing to discuss reasonable limitations to those requests that affect your clients. Indeed, we have already extended the response deadline for each account you have identified as belonging to your clients to allow us to work with you to address any concerns about scope. We also have already concluded successful negotiations with other account holders and their counsel regarding the scope of the subpoenas as to their specific email addresses. And we continue to engage in productive discussions with the owners of other accounts. To the extent the Electronic Frontier Foundation (EFF) has an attorney-client relationship with additional account holders, we would be happy to discuss with you in good faith the scope and timing of the response to the subpoena with respect to those accounts. You have to date refused to identify all the email accounts that you claim to represent, and Chevron cannot engage in negotiations with you regarding discovery related to parties you are not authorized to represent, including those who we know have affirmatively chosen other counsel.

With regard to timing, Chevron provided the account owners with more than sufficient time to assert their rights with respect to these subpoenas—our initial response date provided approximately four weeks for notification and response (far longer than the customary two weeks). While we are willing to accommodate reasonable extensions, Chevron's ability to do so is limited by upcoming discovery deadlines in the RICO case. The deadline for service of new party discovery in the underlying action is December 1, 2012, and the information we expect to obtain from this subpoena is likely to require follow up discovery and implicate that deadline.

Accordingly, I reiterate Ms. Gray's request that you please identify all email accounts for which the owners have specifically authorized you to represent them. Regarding the six accounts that you have identified as held by your clients, and for which Chevron has extended the response deadline to October 22, we will be in touch shortly regarding the basis for our subpoenas and possible limitations.

Sincerely,

Howard S. Hogan
Howard S. Hogan

HSH/ppm
101378798.1

JA0061

# EXHIBIT G

JA0062

**Gray, Rebecca**

| | |
|---|---|
| **From:** | Gray, Rebecca |
| **Sent:** | Sunday, October 14, 2012 2:44 PM |
| **To:** | 'Edison CAMINO-CASTRO' |
| **Cc:** | Hogan, Howard S.; 'john.hays@haysowens.com' |
| **Subject:** | RE: Subpoena Edison Camino |

Dear Mr. Castro,

Chevron's subpoena to Yahoo only seeks information directly from Yahoo, not from you. The subpoena asks Yahoo to provide us with user account information and IP logs for the specific email addresses listed, but not the content of any emails sent using those email addresses. If you have no objection to Yahoo producing this limited information for limcas2002@yahoo.com, then all you need to do is let Yahoo know by responding to the email notice that you received from Yahoo and stating that you do not object to production of the requested information. Please confirm that is what you are doing, either by including RGray@gibsondunn.com on your email to Yahoo, or by forwarding your e-mail to Yahoo directly to me. Thank you for your willingness to cooperate.

Sincerely,

Rebecca

**Rebecca Gray**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3616 • Fax +1 202.530.9644
RGray@gibsondunn.com • www.gibsondunn.com

**From:** Edison CAMINO-CASTRO [mailto:limcas2002@yahoo.com]
**Sent:** Tuesday, October 09, 2012 1:59 PM
**To:** Gray, Rebecca
**Cc:** Southwell, Alexander H.
**Subject:** Subpoena Edison Camino

Dear Mrs. Rebecca Gray:

You have requested my YAHOO information through a California Court. Mr. Alexander H. Southwell requested last year the same information (September 13, 2011).

I am willing and ready to cooperate with you, should you require my information, data, documents and testimony.

I do not know and have no experience in the judicial systems and laws of USA. I am Ecuadorian citizen, living and working in Ecuador. I have knowledge and experience in the judicial systems and laws of Ecuador.

JA0063

To make contact with you and discuss the delivery of information, data, documents and testimony, it is going to be necessary to hire an attorney who is currently working in Quito.

May I recommend a lawyer for you to start your business contacts, he knows me since I have been involved in the environmental lawsuit, as Perito (witness expert). Here is his name and address:

**Dr. Adolfo Callejas Ribadeneira**. Ecuadorian lawyer based in Quito. Currently local lawyer for Chevron in the environmental lawsuit.
His address: Rumipamba Ave. 706. Quito. Telephone: 5932 2268221; 5932 2268222; 5932 2268086.


Best regards,

Edison CAMINO-CASTRO

593 999684349

JA0064

# EXHIBIT H

JA0065

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Howard S. Hogan
Direct: +1 202.887.3640
Fax: +1 202.530.9550
HHogan@gibsondunn.com

October 13, 2012

VIA ELECTRONIC MAIL

Larry R. Veselka, Esq.
Smyser Kaplan & Veselka, LLP
Bank of America Center
700 Louisiana, Suite 2300
Houston, Texas 77002

Re:     Subpoenas to Google and Yahoo! in *Chevron Corp. v. Donziger*,
        No. 11-civ-0691 (S.D.N.Y.)

Dear Larry:

This letter follows up on our recent discussions.  On October 3, 2012, I sent you an email letting you know that Chevron was amenable to extending the deadline for response to the subpoenas served on Google and Yahoo! in order to try to narrow the scope of the information requested with respect to account users that you represent.

Because you did not respond to that email, we were surprised to learn that you filed a motion to quash on Friday, October 5, 2012.

As I said in my October 9 voicemail, and again when we spoke earlier this week, your motion is based on a flawed reading of Chevron's subpoenas.  Chevron's subpoenas seek information from the email service providers regarding specific email accounts connected with the activities and events at issue in *Chevron Corp. v. Donziger*, No. 11-civ-0691 (S.D.N.Y.).  These subpoenas include routine requests for user account information and IP logs.  The subpoenas, moreover, do not call for the production of email content or internet searches.  Further, Chevron's document requests apply only to responsive information available as of the date of the request.  As a result, the claims raised in your motion to quash are unfounded.

We suggest again that you withdraw your motion to quash, given that it is based on an incorrect reading of the subpoena.  We remain willing to discuss the specific date ranges that you believe should be applied for each of the email accounts.  Please let me know whether you are willing to withdraw the currently pending motion by no later than 5:00 p.m. Eastern on Wednesday, October 17.

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

JA0066

# GIBSON DUNN

Larry R. Veselka, Esq.
October 13, 2012
Page 2


Sincerely,

Howard S. Hogan

HSH/rg

JA0067

# EXHIBIT I

# SMYSER KAPLAN & VESELKA, L.L.P.

BANK OF AMERICA CENTER
700 LOUISIANA  SUITE 2300  HOUSTON, TEXAS 77002
TELEPHONE 713.221.2300  FACSIMILE 713.221.2320

Direct Dial Number:
(713) 221-2325

Author's E-mail Address:
lveselka@skv.com

October 17, 2012

Howard S. Hogan
GIBSON, DUNN, CRUTCHER, LLP
1050 Connecticut Avenue, NM.W.
Washington, DC  20036-5306

Re:  *Subpoenas to Google and Yahoo and Microsoft In Chevron Corp. v. Donziger
No. 11-civ-0691 (S.D.N.Y)*

Dear Mr. Hogan:

Your letter of October 13, 2012 regarding our recent discussions about the above-referenced subpoenas contains numerous statements with which I disagree. I discuss below only those issues necessary to attempt to resolve the matter cooperatively.

This matter began with Chevron's issuance and service of the subject Google and Yahoo subpoenas on September 7, 2012 and of the subject Microsoft subpoena on September 10, 2012, without complying with the prior notice to all parties required by Federal Rule of Civil Procedure 45. When we pointed that out to Chevron by letter dated September 17, 2012, Chevron's counsel compounded the violation of the prior notice requirement by re-serving the same subpoenas on September 19, 2012, the same date that Chevron's counsel dismissively notified Defendants of that action. *See* Randy Mastro letter of September 18, 2012 attached. Re-serving these subpoenas on the same date as the "notice" likely does not even comply with the letter of the rule, but it certainly violates the spirit and intent of the Rule to allow Defendants time to seek Court intervention before service. Indeed, the subpoenas, although served that day, some 9-12 days later than the original service dates, called for responses and production on the original return dates – October 5 for the Google and Yahoo subpoenas and October 8 for the Microsoft subpoenas – a mere 16 to 19 days from the new service date.

Notwithstanding that history, Defendants did not reply to Mr. Mastro's letter so cavalierly dismissing failure to comply with Rule 45. Instead, we attempted to resolve the matter by professional cooperation. I called the Chevron counsel designated as the point man for conferring about discovery matters and left a voicemail on October 2, 2012 requesting that Chevron extend the return dates on the subpoenas until October 22, 2012 for all account holders whose information Chevron was seeking from the Internet Service Providers.

384807.1

Howard S. Hogan
GIBSON, DUNN, CRUTCHER, LLP
October 17, 2012
Page 2

_____

You responded by voicemail and email on October 3, 2012.  Your email did not agree to extend the date for all account holders.  Instead, you offered (two days before the return date for the Google and Yahoo subpoenas) only to consider an extension for "any clients of yours that are registered holders" and requested that I identify the accounts and the "basis for your extension request…."

In light of that exchange, you should not have been surprised when we filed our motion to quash on the return date of October 5, 2012, as you purport to have been in your letter of October 13, 2012.  Your letter also claims that your October 3, 2012 email addressed your potential willingness "to try to narrow the scope of the information requested."  Your email included no reference to narrowing the scope, only potential extension of the return date for identified account holders.

Having forced us to file the motion to quash on October 5, 2012, Chevron then later that same day unilaterally extended the return dates to October 22, 2012, as I had requested initially.

You then contacted me to discuss our motion to quash.  We discussed the matter on October 10.  We explained how we thought that the definitions used and the description of the data requested went beyond the material permissible under federal law.  We also questioned how Chevron felt it relevant to this case to seek data after February 14, 2011, the date of the Ecuadorian judgment, since Chevron was objecting to producing documents to the Donziger Defendants after that date as irrelevant.  In our conversation, we asked you to propose in writing limitations to (a) the definitions and descriptions of the data being sought and (b) time frame covered for us to see if we could resolve the motion.  I understood that you said that you would consider doing so.  Your letter of October 13, 2012 does neither.  It merely regurgitates your earlier denial and does not attempt to clarify, much less limit, the overly broad and improperly defined subpoena.

We would still like to resolve the matter without involving the Court if you will propose language limiting the scope and time frame of the data requested.  Otherwise, we respectfully decline your request that we withdraw the motion.

Sincerely,

Larry R. Veselka / by permission

cc:   Chris Joralemon
      Matthew Werdegar

JA0070

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Randy M. Mastro
Direct: 212.351.3825
Fax: 212.351.5219
RMastro@gibsondunn.com

Client: T 19624-00020

September 18, 2012

<u>VIA EMAIL</u>

Craig Smyser
Smyser Kaplan & Veselka, LLP
700 Louisiana, Suite 2300
Houston, TX 77002

Re: *Chevron Corp. v. Donziger, et al.*, Case No. 11 Civ. 0691 (LAK)

Dear Mr. Smyser:

I write as counsel for Chevron Corporation ("Chevron") in response to your letter of yesterday regarding service of third-party document subpoenas. Your complaints are either unfounded, inconsequential, or both.

Your complaint about lack of notice concerning the subpoena to Andrew Woods is simply wrong. Prior to its service on the witness, all counsel of record were provided prior notice by email (attaching a copy of the subpoena) from my colleague, Anne Champion, sent at 1:57 PM EDT on Friday, September 14. We also contacted counsel for Mr. Woods at Keker & Van Nest that same day prior to service to ask whether they wanted to accept service of the subpoena before sending a process server. We understand from the process server that the subpoena was served on Saturday, September 15. Because all or the vast majority of the potentially responsive documents to that subpoena should have already been collected and reviewed in response to Chevron's subpoena to Mr. Woods from the Count 9 action, the two-week return date should be more than sufficient, but that is an issue to be addressed, if necessary, with Mr. Woods' counsel, not you.

Your complaint about lack of notice concerning the subpoenas to email service providers Google, Yahoo, and Microsoft is of no consequence. You received notice by email (attaching copies of the subpoenas) from my colleague, Rebecca Gray, yesterday morning at 7:13 AM EDT. And as you are undoubtedly now aware, the return dates on those document subpoenas are far out, October 5, 2012 for both Google and Yahoo, and October 8 for Microsoft. While we do not believe defendants have been prejudiced in any way from proceeding in this manner, in an abundance of caution, and to eliminate any issue whatsoever, we are immediately re-serving these subpoenas on the email service providers, Microsoft, Google, and Yahoo, and advising them by letter that we are amenable to affording them more time to respond to the re-served subpoenas if they need it.

It is obvious from your latest letter that you intend to continue your "obstruct and delay" tactics and to interpose any objection, no matter how meritless or frivolous, to try to block Chevron's discovery efforts here. This much is also evident from your demand that Chevron afford you 10

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

JA0071

# GIBSON DUNN

September 17, 2012
Page 2

days' prior notice of subpoenas, which is nowhere required under any federal rule. We do not believe that Rule 45 requires any special protocol or timing for the provision of notice of a third-party subpoena. Rule 45 simply requires that notice of a document subpoena be provided to the parties "before it is served." Fed. R. Civ. P. 45(b)(1). Defendants have now received such notice for all of these subpoenas served by Chevron to date.

Sincerely,

Randy M. Mastro

cc: All Counsel of Record

# EXHIBIT J

JA0073

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Rebecca Gray
Direct: +1 202.887.3616
Fax: +1 202.530.9644
RGray@gibsondunn.com

September 28, 2012

VIA ELECTRONIC MAIL

Chi Nguyen
Google, Inc.
1600 Ampitheatre Parkway
Mountain View, CA  94043

Re:   Subpoena in *Chevron Corp. v. Donziger, et al.*, Case No. 11 Civ. 0691 (S.D.N.Y.)
      Google Internal Reference No. 257121

Dear Madam:

I write as counsel for Chevron Corporation ("Chevron"), regarding the subpoena that Chevron served on Google, Inc., on September 19, 2012, in the above-referenced action.

Please note that Chevron is dropping its request for information regarding the address kevinjonheller@gmail.com.  There is no further need to gather or preserve such information.

Should you have any questions, please contact me at 202.887.3616 or rgray@gibsondunn.com.

Sincerely,

Rebecca Gray

RG/ama

101376331.1

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

# EXHIBIT K

JA0075

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Rebecca Gray
Direct: +1 202.887.3616
Fax: +1 202.530.9644
RGray@gibsondunn.com

September 28, 2012

VIA ELECTRONIC MAIL

Brien Jacobsen
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399
brienj@microsoft.com

Re:     Subpoena in *Chevron Corp. v. Donziger, et al.*, Case No. 11 Civ. 0691 (S.D.N.Y.)

Dear Mr. Jacobsen:

I write as counsel for Chevron Corporation ("Chevron"), regarding the subpoena that Chevron served on Google, Inc., on September 19, 2012, in the above-referenced action.

Please note that Chevron is dropping its request for information regarding the address faisal_baki@hotmail.com. There is no further need to gather or preserve such information.

Should you have any questions, please contact me at 202.887.3616 or rgray@gibsondunn.com.

Sincerely,

Rebecca Gray

RG/ama

101376350.1

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

JA0076

# EXHIBIT L

JA0077

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Howard S. Hogan
Direct: +1 202.887.3640
Fax: +1 202.530.9550
HHogan@gibsondunn.com

October 12, 2012

VIA ELECTRONIC MAIL

Marcia Hofmann, Esq.
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA  94110

Re:   Subpoenas to Google, Yahoo!, and Microsoft in *Chevron Corp. v. Donziger*,
No. 11-civ-0691 (S.D.N.Y.)

Dear Marcia:

I write to confirm the substance of our conversation Wednesday afternoon regarding the
above-referenced subpoenas.

As I mentioned when we spoke, Chevron's subpoenas seek information from the email
service providers regarding specific email accounts connected with the activities and events
at issue in *Chevron Corp. v. Donziger*, No. 11-civ-0691 (S.D.N.Y.).  As we noted, these
subpoenas involve standard requests for user account information and IP logs.  Chevron's
subpoena does not call for the production of email content, and does not call for the
production of IP logs or other account access information for any email addresses other than
those that are listed on the subpoenas themselves.  Further, Chevron's document requests
apply only to responsive information available as of the date of the request.  As we
discussed, Chevron also is willing to narrow even these limited requests if the owners of the
accounts in question can provide certain information to us directly.

First, we are willing to withdraw category (A) of Chevron's document requests for any
account owner who confirms in writing that he or she (1) created the account at issue and (2)
has maintained exclusive control over the account in question from the time that it was
created to the present (*i.e.*, that he or she is confident that no one else accessed or otherwise
made use of the email account).  As you suggested, we would also be willing to withdraw
category (A) for specific accounts if the document(s) that would be produced in response to
category (A) have previously been produced to us in other contexts.

Second, for those account holders who are not themselves defendants or named non-party co-
conspirators in the *Chevron Corp. v. Donziger* case, we would be willing to limit the scope
of category (B) of Chevron's document requests to those periods of time during which the

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

JA0078

**GIBSON DUNN**

Marcia Hofmann, Esq.
October 12, 2012
Page 2

account holder was in communication with the defendants and non-party co-conspirators named in the underlying proceeding. If any of your clients are able to confirm in writing that their work for, and communication with, the defendants and non-party co-conspirators was limited to specific date ranges, then we would be willing to limit the scope of the subpoena to those dates so long as that representation is not inconsistent with other evidence that we already have in our possession.

As I told you when we spoke, we have been engaged in active negotiations with counsel for a number of the account owners covered by these subpoenas and have reached, or are currently in the midst of concluding, agreements along these same lines that will allow production to proceed.

You indicated that you would confer with your clients regarding our offer to narrow the scope of the above-referenced subpoenas. In the meantime, please feel free to contact me with any questions or concerns.

Sincerely,

Howard

Howard S. Hogan

HSH/rg

# EXHIBIT M

JA0080



**ELECTRONIC FRONTIER FOUNDATION**
Protecting Rights and Promoting Freedom on the Electronic Frontier

October 17, 2012

Howard S. Hogan
Rebecca Gray
1050 Connecticut Ave, N.W.
Washington, DC 20036
HHogan@gibsondunn.com
RGray@gibsondunn.com

<u>VIA EMAIL</u>

        Re:    Chevron's Subpoenas to Google, Yahoo, and Microsoft in *Chevron v. Donziger, et al.*, No. 11-civ-0691 (S.D.N.Y.)

Dear Howard and Rebecca:

      We are in receipt of your letter of October 12, 2012 confirming the substance of our conversation on October 10. Thank you for stating your position in writing to the three providers copied on this letter. We would like to further clarify that you confirmed verbally to us that Chevron does not expect to receive any email header data in response to the above-referenced subpoenas.

      We have conferred with our clients regarding your offer to narrow the scope of the subpoenas if our clients confirm certain information in writing. None has agreed. As such, we intend to move to quash all three subpoenas on Monday, October 22, 2012.

      Sincerely,

Nathan Cardozo

cc:    Einat Clarke (eclarke@google.com)
       Brien Jacobsen (brienj@microsoft.com)
       Christopher Madsen (cmadsen@yahoo-inc.com)

454 Shotwell Street • San Francisco, CA 94110 USA
+1 415 436 9333 • +1 415 436 9993 • www.eff.org • information@eff.org

JA0081

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                           :

CHEVRON CORPORATION,           :

            Plaintiff,        :

      -against-           :    Case No. 1:12-MC-65 GLS/CFH

STEVEN DONZIGER, et al.,        :

          Defendants.    :

                           :
-------------------------------------------------------x

## DECLARATION OF ALEXANDER T. MARX ON BEHALF OF CHEVRON CORPORATION IN OPPOSITION TO THE RICO DEFENDANTS' MOTION TO QUASH SUBPOENAS TO MICROSOFT CORPORATION

I, Alexander T. Marx, declare:

1.     I am an attorney duly admitted to the State Bar of New York and an associate at the law firm of Gibson, Dunn & Crutcher LLP, attorneys of record for Chevron Corporation in the above-captioned action. I am over the age of eighteen years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration. Each of the exhibits identified below is a true and correct copy of the respective document as it is maintained in the files of Gibson, Dunn & Crutcher LLP in the normal course of business.

2.     Attached hereto as "Exhibit 1" is a true and correct copy of an email dated August 1, 2008 from D. Beltman to P. Fajardo and S. Donziger, with the subject "Plan de Trabajo -- Texpet Cleanup," produced by Stratus and bearing Bates number STRATUS-NATIVE063668.

3.     Attached hereto as "Exhibit 2" is a true and correct copy of the subpoena to Microsoft Corporation issued by Chevron Corporation, dated September 10, 2012.

4.     Attached hereto as "Exhibit 3" are true and correct copies of three subpoenas on Yahoo! Inc. by Friedman, Kaplan, Seiler & Adelman LLP, counsel for S. Donziger, respectively dated November 29, 2010, December 9, 2010, and January 3, 2011.

5.      Attached hereto as "Exhibit 4" is a true and correct copy of a letter from Yahoo! Inc. to Friedman, Kaplan, Seiler & Adelman LLP, counsel for S. Donziger, dated December 7, 2010.

6.      Attached hereto as "Exhibit 5" is a true and correct copy of a letter from Yahoo! Inc. to Friedman, Kaplan, Seiler & Adelman LLP, counsel for S. Donziger, dated December 20, 2010.

7.      Attached hereto as "Exhibit 6" is a true and correct copy of a letter from Yahoo! Inc. to Friedman, Kaplan, Seiler & Adelman LLP, counsel for S. Donziger, dated January 7, 2011.

8.      Attached hereto as "Exhibit 7" is a true and correct copy of a report titled "Yahoo! Account Management Tool," associated with the email account "documents2010@ymail.com," and dated January 24, 2011.

9.      Attached hereto as "Exhibit 8" is a true and correct copy of a transcript of September 25, 2012 proceedings in *Chevron Corp. v. Donziger*, 11 Civ. 691 LAK (S.D.N.Y.).

10.      Attached hereto as "Exhibit 9" is a true and correct copy of Microsoft Corporation's Online Privacy Statement, downloaded from the Internet on January 9, 2013.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed this 15 day of January, 2013, in Los Angeles, California.


_____
Alexander T. Marx

2

JA0083

# EXHIBIT 1

| From: | Doug Beltman <dbeltman@stratus consulting.com> |
|---|---|
| Sent: | Friday, August 1, 2008 4:27 PM |
| To: | Pablo Fajardo Mendoza <pafabibi@gmail.com>; STEVEN DONZIGER <sdonziger@gmail.com> |
| Subject: | Plan de Trabajo -- Texpet cleanup |

Pablo y Steven:

Una de nuestras tareas para los comentarios sobre el informe de Cabrera en el Plan de Trabajo es conducir un análisis técnico de si la limpieza de Texpet en los años 90 se conformó con los requisitos técnicos para la limpieza. Cabrera menciona ya que el trabajo de Texpet no limpió realmente las piscinas, y la idea de este análisis era determinar si podríamos criticar más la limpieza de Texpet para no conformarse con los requisitos técnicos. Repasé cuidadosamente los requisitos técnicos para la limpieza en los cuales se especifican:

- El contrato del mayo de 1995 para ejecutar el trabajo y el lanzamiento remediadores de obligaciones, de la responsabilidad, y de demandas

- La Declaración del Trabajo de marzo de 1995 para la limpieza que se añade al contrato

- El Plan de Actuación Remediador (RAP) del agosto de 1995 escrito por un contratista de Texpet y aprobado por ROE.

Comparé los requisitos técnicos contenidos en esos documentos contra la descripción de la remediación y los resultados de la prueba que se describen en el informe 2000 de Woodward Clyde.

Aunque haya algunas ambigüedades de la lengua y de cuestiones legales potenciales (tales como contradicciones evidentes entre la declaración del marzo de 1995 del trabajo y el RAP), no encontré ninguna casos clara donde Texpet no cumplió las condiciones requeridas en la limpieza. La excepción muy grande, por supuesto, es que el muestreo durante las inspecciones judiciales y por Cabrera demostrado que las piscinas "limpiados" de hecho todavía están contaminados- sin embargo, el muestreo hecho por la poste-limpieza de Woodward Clyde demostró las piscinas para estar de acuerdo con los requisitos de contrato. Esta discrepancia importante alocución ya por Cabrera en su informe. Hay también la edición que el RAP está en conflicto con leyes del Ecuadorian, pero otra vez yo no hice evalúa eso aquí.

Por lo tanto, no tengo ninguna comentarios a prepararse en este aspecto del informe de Cabrera.

ENGLISH:

Pablo y Steven:

One of our tasks for the comments on the Cabrera Report in the Plan de Trabajo is to conduct a technical analysis of whether the Texpet cleanup in the 1990s complied with the technical requirements for the cleanup. Cabrera already points out that the Texpet work did not actually clean up the pits, and the idea of this analysis was to determine if we could further criticize the Texpet cleanup for not complying with the technical requirements.

I carefully reviewed the technical requirements for the cleanup that are specified in:

-The May 1995 contract for implementing remedial work and release from obligations, liability, and claims
-The March 1995 Statement of Work for the cleanup that is appended to the contract
-The August 1995 Remedial Action Plan (RAP) written by a Texpet contractor and approved by ROE.

I compared the technical requirements contained in those documents against the description of the remediation and the testing results that are described in the 2000 Woodward Clyde report.

JA0085

Although there are some ambiguities of language and potential legal issues (such as apparent contradictions between the March 1995 Statement of Work and the RAP), I did not find any clear instances where Texpet did not meet the conditions required in the cleanup. The very large exception, of course, is that sampling during the Judicial Inspections and by Cabrera showed that the "cleaned" pits are in fact still contaminated – however, the sampling done by Woodward Clyde post-cleanup showed the pits to be in compliance with the contract requirements. This important discrepancy has already been addressed by Cabrera in his report. There is also the issue that the RAP conflicts with Ecuadorian laws, but again I didn't evaluate that here.

Therefore, I do not have any comments to prepare on this aspect of the Cabrera report.

================
Douglas Beltman
Executive Vice President
Stratus Consulting Inc.
303.381.8000
303.381.8200 (fax)
www.stratusconsulting.com

# EXHIBIT 2

JA0087

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Northern District of New York

| | |
|---|---|
| CHEVRON CORP. | ) |
| _Plaintiff_ | ) |
| v. | ) |
| STEVEN DONZIGER, et al., | ) |
| _Defendant_ | ) |

Civil Action No.  11 Civ. 0691 (LAK)

(If the action is pending in another district, state where:
Southern District of New York      )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Microsoft Registered Agent, Corporation Service Company, 80 State Street, Albany, NY 12207

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

| Place:  GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166-0193 c/o Alex Marx | Date and Time:<br><br>10/08/2012 9:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  _09/10/2012_

| CLERK OF COURT | | |
|---|---|---|
| _____<br>_Signature of Clerk or Deputy Clerk_ | OR | _Rachel Brook_<br>_____<br>_Attorney's signature_ |

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_  _Chevron Corporation_ _____ , who issues or requests this subpoena, are:

Rachel Brook, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193
Telephone:  (212)351-2609, rbrook@gibsondunn.com

JA0088

Civil Action No.  11 Civ. 0691 (LAK)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____      _____
                                                      *Server's signature*

                                                      _____
                                                      *Printed name and title*

                                                      _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# SCHEDULE A

## DEFINITIONS

  1.  "DOCUMENT" has the full meaning ascribed to it in Rule 34 of the Federal Rules of Civil Procedure and Rule 26.3 of the Local Rules for the United States District Court for the Southern District of New York and shall include all originals of any nature whatsoever and all non-identical copies thereof, whether different from the originals by reason of any notation made on such copies or otherwise, including but not limited to all writings in any form, notes, memoranda, manuals, reports, records, correspondence, drawings, graphs, charts, photographs, phone records, data compilations of whatever nature (including those from which information can be obtained or translated if necessary), audio tapes, electronic mail messages, and electronic data (including any exchange of information between computers, all information stored in an electronic form or computer database, and all forms and formats of storage).

  2.  "RELATED TO," "RELATING TO," "IN RELATION TO," "REGARDING" and "CONCERNING" means in relation to, related to, consisting of, referring to, reflecting, concerning, discussing, evidencing, commenting on, describing, constituting, supporting, contradicting or having any logical or factual connection with the matter identified, in whole or in part.

## INSTRUCTIONS

  1.  These requests are governed by Rules 26 and 45 of the Federal Rules of Civil Procedure and any applicable law and Local Rule.

  2.  You are requested to produce all DOCUMENTS and things described below at Gibson, Dunn & Crutcher, LLP, c/o Alex Marx, 200 Park Avenue, New York, NY 10166-0193, on or before October 8, 2012.

  3.  In answering and responding to these document requests, you are requested to produce all DOCUMENTS that are in your possession, custody, or control, or that are in the possession, custody, or control of your principals, agents, employees, attorneys, representatives, insurers, and any other persons or entities, acting on your behalf.

  4.  If any of the information or DOCUMENTS supplied in response to these document requests does not come from your records, please specify the source of the DOCUMENTS.

  5.  If you refuse to produce any requested DOCUMENT under a claim of attorney-client privilege, work product privilege, or any other privilege or protection, it is requested that you submit for each DOCUMENT withheld a written statement that: specifies the privilege or other asserted basis for withholding the DOCUMENT; summarizes the substance of the DOCUMENT; identifies the person or entity who prepared the DOCUMENT and any persons or entities to which the DOCUMENT was sent or disclosed; and specifies the dates on which the DOCUMENT was prepared, transmitted, or received.

JA0091

6. The time period covered by these document requests runs from 2003 to the present. This is a continuing request. Any DOCUMENT obtained or located after the date of production that would have been produced had it been available or had its existence been known at that time should be produced immediately.

7. If an objection is made to any numbered request, or any subpart thereof, state with specificity all grounds for the objection.

8. All responsive and potentially responsive documents and tangible things should be preserved and maintained pending the outcome of this matter.

## DOCUMENTS REQUESTED

All DOCUMENTS RELATED TO (A) the identity of the user of the following email addresses, including but not limited to DOCUMENTS that provide all names, mailing addresses, phone numbers, billing information, date of account creation, account information and all other identifying information associated with the email address under any and all names, aliases, identities or designations RELATED TO the email address; and (B) the usage of the following email addresses, including but not limited to DOCUMENTS that provide IP logs, IP address information at time of registration and subsequent usage, computer usage logs, or other means of recording information concerning the email or Internet usage of the email address.

1. Examen_pericial@hotmail.com

2. muerteenlaselva@hotmail.com

3. ingracabrerav@hotmail.com

4. rcabrerav@hotmail.com

5. cristobalvillao@hotmail.com

6. luisvillacreces@hotmail.com

7. julprieto@hotmail.com

8. juanpasaenz@hotmail.com

9. gaer69chzpr@hotmail.com

10. donaldmoncayo@hotmail.com

11. alex_anchundia2007@hotmail.com

12. erikatorres_19@hotmail.com

13. gabrielitaep@hotmail.com

14. hannagoanna@hotmail.com

2

JA0092

15. duruti@hotmail.com

16. aulestiajuan@hotmail.com

17. maryelji20@hotmail.com

18. mey_1802@hotmail.com

19. monica_pareja@hotmail.com

20. pirancha@hotmail.com

21. nick_aussie@hotmail.com

22. renatog85@hotmail.com

23. selvaviva2004@hotmail.com

24. simeontegel@hotmail.com

25. patriciogarcia_2009@hotmail.com

26. criscadena@hotmail.com

27. albertoguerrab@hotmail.com

28. faisal_baki@hotmail.com

29. Hjploro@hotmail.com

30. osimonc@hotmail.com

JA0093

# EXHIBIT 3

JA0094

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

| In re Application of Chevron Corporation, et al | |
|---|---|
| *Plaintiff* | ) |
| v. | ) Civil Action No. **10-MC-0002** |
| | ) |
| *Defendant* | ) (If the action is pending in another district, state where:  ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Yahoo! Inc.
   (c/o Registered Agent CT Corporation System, 111 Eighth Avenue, New York, New York 10011)

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Documents adequate to permit the account holder of "documents2010@ymail.com" to access the e-mail stored in the account. The account password would satisfy this request.
   This request is made with the consent of the account holder/subscriber, Steven R. Donziger (the account was created by Mr. Donziger's assistant, Andrew M. Woods, who also consents to this request).

| Place: Friedman Kaplan Seiler & Adelman LLP | Date and Time: |
|---|---|
| 1633 Broadway, 46th Floor | |
| New York, New York 10019 | 12/03/2010 9:00 am |

   ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

   The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   11/29/2010

| CLERK OF COURT | |
|---|---|
| _____ | OR _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Steven R. Donziger
_____ , who issues or requests this subpoena, are:

Bruce S. Kaplan, Friedman Kaplan Seiler & Adelman LLP, 1633 Broadway, 46th Floor, NY, NY 10019

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | |
|---|---|
| In re Chevron Corporation _____ *Plaintiff* | ) ) |
| v. | ) Civil Action No.   10-MC-0002 |
| _____ *Defendant* | ) ) (If the action is pending in another district, state where: ) )   Southern District of New York        ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Yahoo! Inc.
    Custodian of Records, Legal Department, 701 1st Avenue, Sunnyvale, CA 94089

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: The contents, including all e-mail, of the account "documents2010@ymail.com"

        This request is made with the consent of the account holder/subscriber, Steven R. Donziger (the account was created by Mr. Donziger's assistant, Andrew M. Woods, who also consents to this request).

| Place: Friedman Kaplan Seiler & Adelman LLP 1633 Broadway, 46th Floor New York, NY 10019 | Date and Time: 12/16/2010 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

        The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  __12/09/2010__

        *CLERK OF COURT*

                                    OR    _Bruce S Kaplan /TMK_
_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    __Steven R. Donziger__
_____ , who issues or requests this subpoena, are:

Bruce S. Kaplan, Friedman Kaplan Seiler & Adelman LLP, 1633 Broadway, 46th Floor, NY, NY 10019

JA0096

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | | |
|---|---|---|
| In re Chevron Corporation | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No. 10-MC-0002 |
| | ) | |
| | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | Southern District of New York ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Yahoo! Inc.
    Custodian of Records, Legal Department, 701 1st Avenue, Sunnyvale, CA 94089

    ☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: The documents identified in the attached "Exhibit A."

    This request is made with the consent of the account holder/subscriber, Steven R. Donziger (the account was created by Mr. Donziger's assistant, Andrew M. Woods, who also consents to this request).

| Place: Friedman Kaplan Seiler & Adelman LLP | Date and Time: |
|---|---|
|     1633 Broadway, 46th Floor | |
|     New York, NY 10019 | 01/07/2011 9:00 am |

    ☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |
| | |

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   01/03/2011

        _CLERK OF COURT_
                                   OR

    _Signature of Clerk or Deputy Clerk_                _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_   Steven R. Donziger
                                  , who issues or requests this subpoena, are:

Bruce S. Kaplan, Friedman Kaplan Seiler & Adelman LLP, 1633 Broadway, 46th Floor, NY, NY 10019 (FAX: 212-833-1250) (EMAIL: bkaplan@fklaw.com)

JA0097

## EXHIBIT A

1. All documents identifying IP addresses associated with attempts to access the account "documents2010@ymail.com".

2. All documents providing any information about attempts (whether successful or unsuccessful) to gain access to the account "documents2010@ymail.com". This would include, but is not limited to, documents identifying the dates and times of such attempts and/or the location (whether by IP address or otherwise) of the attempts.

3. All documents reflecting any information provided to Yahoo! when the account "documents2010@ymail.com" was created. This would include, but is not limited to, documents reflecting any information provided by the user of the account. It would also include documents that reflect the time and date of the account creation, and the location (whether by IP address or otherwise) of the user who created the account.

4. All documents reflecting information about transactional activity associated with the account "documents2010@ymail.com." This would include, but is not limited to, documents reflecting the time(s) that the account is accessed, and the nature of activity in the account (such as transmission or receipt of e-mails).

# EXHIBIT 4

JA0099



December 7, 2010

*Via Facsimile and U.S. Mail*
212-373-7901

Bruce Kaplan, Esq.
Friedman Kaplan Seller & Adelman LLP,
1633 Broadway, 46 Floor
New York, NY  10019

Re:    *In re: Application of Chevron Corporation, et al.*
       <u>*United States District Court, Southern District of New York, case no. 10-MC-*</u>
       <u>*0002*</u>
       (Internal Reference No. 167122)

Dear Mr. Kaplan:

Yahoo! Inc. ("Yahoo!") is in receipt of a subpoena dated November 29, 2010 issued in the above-referenced matter.

As we understand it, you are seeking data relating to a Yahoo! subscriber.  Yahoo! is a resident of California and the vast majority of documents and information regarding its business is retrievable from its headquarters in Sunnyvale, California.  Our understanding of Rule 45 of the Federal Rules of Civil Procedure is that a subpoena for production of documents should be issued from the court in the district where the production is to be made.  As such, your subpoena should be issued from the U.S. District Court for the Northern District of California.

Subpoenas must be personally served or sent by certified mail or express delivery to Yahoo! at 701 First Avenue, Sunnyvale, California, 94089, to the attention of the Yahoo! Custodian of Records.

Please be advised that Yahoo! does not have access to user passwords.  Password information is encrypted for the safety and security of the user account.  As such, we are unable to provide user passwords for production in response to your request.

To the extent that the subpoena may be requesting email content for the Yahoo! subscriber identified in the subpoena, please be advised that pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. §2701, *et seq.*, Yahoo! is prohibited from disclosing the contents of electronic communications absent certain exceptions.  18 U.S.C. § 2702(b).  As courts have repeatedly recognized, this statute has no exception for civil discovery.  *See, e.g., O'Grady v. Superior Court*, 2006 Cal. App. LEXIS 802, *2-3 (Ct. App. Cal. May 26, 2006) (no SCA exception for disclosure of communications pursuant to civil discovery subpoenas); *In re: Subpoena Duces Tecum to AOL, LLC*, 550 F.Supp.2d 606, 609-612 (E.D. Va. 2008).



JA0100

The primary exception under which disclosure is permitted is subscriber consent. Accordingly, if you seek to compel lawful disclosure from Yahoo!, we suggest you obtain consent of the subscriber in question. 18 U.S.C. § 2702(b)(3). Upon receipt of your confirmation that the subscriber identified in your request will consent to Yahoo!'s disclosure of the email or other content stored in his account, Yahoo! will provide you with its Consent to Search and Account Verification ("CSAV") form, which requires the subscriber to (1) provide information used by Yahoo! to verify their identity as the account holder; (2) identify the individual(s) to whom Yahoo! should send the requested documents after they have been collected and; (3) define the scope of Yahoo!'s disclosure.

Please note that with regard to email content, Yahoo! only maintains and has access to the contents a user retains in his or her email account.

Additionally, please be advised that upon receipt of a subpoena or other legal process, Yahoo! preserves the requested information and sends notice to the user indicating that the subpoena was issued requesting information regarding their account. It is Yahoo!'s policy that if a user objects to the production of the requested information by filing a Motion to Quash (or other legally proper objection) with the Court, Yahoo! will not produce any responsive documents until the court has ruled on the motion or objection.

At this time, Yahoo! does not have any documents responsive to the subpoena.

By this letter, Yahoo! does not waive any objection to further proceedings in this matter.

Please contact me if you have any questions.

Sincerely,

Christian Lee
Legal Assistant
408-349-8511


Enclosure

JA0101

**Consent to Search**

I, _____, the account holder of the email address,
_____, understand that my email communications are being sought in
connection with a subpoena.  I hereby grant my consent to authorize the following law firm:
_____, to receive, review, copy, and
otherwise obtain access to all information of any kind held by Yahoo! relating to my email
communications maintained by Yahoo! relating to me or my email address.

In connection with this authority to release information, I do hereby agree to hold harmless and do
forever hold harmless Yahoo! for the disclosure of such information and do forever waive on my
behalf, and on behalf of my heirs and assigns, any and all claims resulting from Yahoo!'s
disclosure of any information relating to my account pursuant to this authorization.

I acknowledge that this Consent to Search is not complete until I send an email from my account,
_____, to notice-user@yahoo-inc.com verifying that this account
belongs to me.

# EXHIBIT 5

JA0103



December 20, 2010

*Via U.S. Mail*

Bruce Kaplan, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway, 46th Floor
New York, NY 10019

      Re:    ***In re: Chevron Corporation, case no. 10MC0002***
              ***United States District Court, Northern District of California***
              (Internal Reference No. 168264)

Dear Mr. Kaplan:

Yahoo! Inc. ("Yahoo!") is in receipt of a subpoena dated December 9, 2010 issued in the above-referenced matter.

At this time, Yahoo! does not have any documents responsive to your request.

Please note that with regard to email content, Yahoo! only maintains and has access to the contents a user retains in his or her email account.

By this letter, Yahoo! does not waive any objection to further proceedings in this matter.

Please contact me if you have any questions.

Sincerely,

Christian Lee
Legal Assistant
408-349-8511



701 First Avenue • Sunnyvale, CA 94089 • phone 408 349-3300 • fax 408 349-3301    **yahoo.com**

JA0104

# EXHIBIT 6



January 7, 2011

*Via Facsimile and U.S. Mail*
212-833-1250

Bruce S. Kaplan, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway, 46th Floor
New York, NY 10019-6708

> **Re:** ***In re Chevron Corporation***
> ***<u>United States District Court for the Northern District of California (Pending in</u>***
> ***<u>Southern District of New York), Case # 10-MC-0002</u>***
> (Internal Reference No.169381)

Dear Mr. Kaplan:

Yahoo! Inc. ("Yahoo!") is in receipt of a Subpoena dated January 3, 2011 issued in the above-referenced matter.

This letter is to advise you that on January 7, 2011, Yahoo! sent an email notification to the user named in the subpoena indicating that a subpoena dated January 3, 2011 was issued. Yahoo! will wait for a period of 15 days after the email notice was sent before producing responsive documents to the subpoenaing party or will produce on the date specified in the subpoena, whichever is later. If the user objects to the production of the requested information by filing a Motion to Quash (or other legally proper objection) with the Court, Yahoo! will not produce any responsive documents until the court has ruled on the motion or objection. If no objections are lodged, Yahoo! will produce responsive documents on January 24, 2011.

By this letter, Yahoo! does not waive any objection to further proceedings in this matter.

Please contact me if you have any questions.

Sincerely,

Svetlana Shatnenko
Paralegal
408-349-1099



# EXHIBIT 7

JA0107

# YAHOO! ACCOUNT MANAGEMENT TOOL

| | |
|---|---|
| Login Name: | **documents2010@ymail.com** |
| GUID: | **5H3QSY4HBFIX4NV5D75J7EQNM4** |
| Yahoo Mail Name: | **documents2010@ymail.com** |
| Registration IP address: | **67.243.11.39** |
| Account Created (reg): | **Sun Jan 03 20:38:14 2010 GMT** |
| Other Identities: | **documents2010@ymail.com (Yahoo! Mail)** |
| Full Name | **Mr Not Applicable** |
| Address1: | |
| Address2: | |
| City: | |
| State, territory or province: | |
| Country: | **United States** |
| Zip/Postal Code: | **94583** |
| Phone: | |
| Time Zone: | |
| Birthday: | ▬▬ ▬ ▬ |
| Gender: | **Male** |
| Occupation: | |
| Business Name: | |
| Business Address: | |
| Business City: | |
| Business State: | |
| Business Country: | **us** |
| Business Zip: | |
| Business Phone: | |
| Business Email: | |
| Additional IP Addresses: | **Sun Jan 03 20:38:14 2010 GMT  67.243.11.39** |
| Account Status: | **Active** |

JA0108

Search for            documents2010@ymail.com
Date Range            07-Jan-2010 00:00:00 / 05-Jan-2011 23:59:59
Total Results                                18

| Yahoo ID | IP Address | Login Time |
|---|---|---|
| documents2010@ymail.com | 67.243.11.39 | Tue 15:41:31 (GMT) 27-Apr-2010 |
| documents2010@ymail.com | 69.204.232.104 | Mon 19:23:10 (GMT) 15-Mar-2010 |
| documents2010@ymail.com | 69.204.232.104 | Thu 18:11:37 (GMT) 11-Mar-2010 |
| documents2010@ymail.com | 69.204.232.104 | Mon 15:24:40 (GMT) 08-Mar-2010 |
| documents2010@ymail.com | 67.243.11.39 | Mon 00:25:05 (GMT) 08-Mar-2010 |
| documents2010@ymail.com | 67.243.11.39 | Wed 22:13:40 (GMT) 03-Mar-2010 |
| documents2010@ymail.com | 69.204.232.104 | Thu 18:01:04 (GMT) 04-Feb-2010 |
| documents2010@ymail.com | 67.243.11.39 | Mon 12:48:09 (GMT) 25-Jan-2010 |
| documents2010@ymail.com | 67.243.11.39 | Fri 15:38:23 (GMT) 22-Jan-2010 |
| documents2010@ymail.com | 69.204.232.104 | Thu 21:54:46 (GMT) 21-Jan-2010 |
| documents2010@ymail.com | 69.204.232.104 | Thu 19:17:30 (GMT) 21-Jan-2010 |
| documents2010@ymail.com | 67.243.11.39 | Wed 05:31:13 (GMT) 20-Jan-2010 |
| documents2010@ymail.com | 69.204.232.104 | Sat 21:09:29 (GMT) 16-Jan-2010 |
| documents2010@ymail.com | 69.204.232.104 | Wed 20:12:13 (GMT) 13-Jan-2010 |
| documents2010@ymail.com | 69.204.232.104 | Wed 18:30:33 (GMT) 13-Jan-2010 |
| documents2010@ymail.com | 69.204.232.104 | Wed 18:20:55 (GMT) 13-Jan-2010 |
| documents2010@ymail.com | 69.204.232.104 | Mon 23:41:20 (GMT) 11-Jan-2010 |
| documents2010@ymail.com | 24.129.41.67 | Sat 14:03:28 (GMT) 09-Jan-2010 |

JA0109

Search for          documents2010@ymail.com
Date Range          07-Dec-2009 00:00:00 / 05-Dec-2010 23:59:59
Total Results                          22

Yahoo ID              IP Address          Login Time
documents2010@ymail.c 67.243.11.39       Tue 15:41:31 (GMT) 27-Apr-2010
documents2010@ymail.c 69.204.232.104     Mon 19:23:10 (GMT) 15-Mar-2010
documents2010@ymail.c 69.204.232.104     Thu 18:11:37 (GMT) 11-Mar-2010
documents2010@ymail.c 69.204.232.104     Mon 15:24:40 (GMT) 08-Mar-2010
documents2010@ymail.c 67.243.11.39       Mon 00:25:05 (GMT) 08-Mar-2010
documents2010@ymail.c 67.243.11.39       Wed 22:13:40 (GMT) 03-Mar-2010
documents2010@ymail.c 69.204.232.104     Thu 18:01:04 (GMT) 04-Feb-2010
documents2010@ymail.c 67.243.11.39       Mon 12:48:09 (GMT) 25-Jan-2010
documents2010@ymail.c 67.243.11.39       Fri 15:38:23 (GMT) 22-Jan-2010
documents2010@ymail.c 69.204.232.104     Thu 21:54:46 (GMT) 21-Jan-2010
documents2010@ymail.c 69.204.232.104     Thu 19:17:30 (GMT) 21-Jan-2010
documents2010@ymail.c 67.243.11.39       Wed 05:31:13 (GMT) 20-Jan-2010
documents2010@ymail.c 69.204.232.104     Sat 21:09:29 (GMT) 16-Jan-2010
documents2010@ymail.c 69.204.232.104     Wed 20:12:13 (GMT) 13-Jan-2010
documents2010@ymail.c 69.204.232.104     Wed 18:30:33 (GMT) 13-Jan-2010
documents2010@ymail.c 69.204.232.104     Wed 18:20:55 (GMT) 13-Jan-2010
documents2010@ymail.c 69.204.232.104     Mon 23:41:20 (GMT) 11-Jan-2010
documents2010@ymail.c 24.129.41.67       Sat 14:03:28 (GMT) 09-Jan-2010
documents2010@ymail.c 69.204.232.104     Wed 20:05:57 (GMT) 06-Jan-2010
documents2010@ymail.c 67.243.11.39       Wed 18:48:43 (GMT) 06-Jan-2010
documents2010@ymail.c 69.204.232.104     Tue 14:25:47 (GMT) 05-Jan-2010
documents2010@ymail.c 67.243.11.39       Sun 23:48:18 (GMT) 03-Jan-2010

JA0110

# EXHIBIT 8

# In The Matter Of:

*CHEVRON CORP v*
*STEVEN DONZIGER, ET AL*

---

*September 25, 2012*

---

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File C9PDCHEM.txt
**Min-U-Script® with Word Index**

```
C9pdchem        Conference        Page 1
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  CHEVRON CORPORATION,
 4                Plaintiff,
 5         v.                    11 Civ. 691 (LAK)
 6  STEVEN DONZIGER, et al.,
 7                Defendants.
 8  ------------------------------x
 9                       September 25, 2012
                            11:20 a.m.
10
    Before:
11
               HON. LEWIS A. KAPLAN
12
                                District Judge
13
               APPEARANCES
14
    GIBSON DUNN & CRUTCHER
15       Attorneys for Plaintiff
    BY:  RANDY MASTRO
16       LAUREN ELLIOT
         PETER SELEY
17       ANNE CHAMPION
         BILL W. THOMSON
18       RICHARD MARK
19
    GOMEZ LLC
20       Attorneys for Hugo Geraldo Cammacho and
         Javier Piaguaje
21  BY:  JULIO C. GOMEZ
           - and -
22  SMYSER KAPLAN & VESELKA, LLP
    BY:  GARLAND "Land" D. MURPHY IV
23
    LEADER & BERKON
24       Attorneys for Non-Party
         Patton Boggs LLP
25  BY:  JAMES K. LEADER
```

```
C9pdchem        Conference        Page 2
 1             APPEARANCES CONTINUED
 2           - also present -
 3  PATTON BOGGS LLP
        Non-Party Respondent
 4  BY:  ERIC WESTENBERGER
        EDWARD YENNOCK
 5       JONATHAN PECK
 6                   oOo
 7         THE CLERK:  Chevron against Donziger.
 8      Counsel for plaintiff Chevron, are you ready?
 9      MR. MASTRO:  I'm ready, your Honor.
10      THE CLERK:  Counsel for defendants Cammacho and
11  Piaguaje, are you ready?
12      MR. MURPHY:  Yes, your Honor.  We are ready.
13      MR. GOMEZ:  Yes, your Honor.
14      THE CLERK:  And counsel for Patton Boggs, are you
15  ready?
16      MR. LEADER:  Yes, we are.
17      THE COURT:  Mr. Leader, right?
18      MR. LEADER:  Yes.  Good morning, your Honor.
19      THE COURT:  Long time no see.
20      MR. LEADER:  Yes, sir.
21      THE COURT:  Nice to see you again.
22      MR. LEADER:  Thank you, your Honor.  Nice to see you
23  as well.
24         Could I have just one housekeeping matter before we
25  start the formal proceeding?
```

```
C9pdchem        Conference        Page 3
 1      THE COURT:  Yes.
 2      MR. LEADER:  I would like to introduce to the Court
 3  the managing partner of Patton Boggs Ed Newberry.  Obviously,
 4  his law firm has a substantial interest in today's proceedings
 5  and he wanted to be here.
 6      THE COURT:  I gather.  He will be more than welcome.
 7      MR. LEADER:  Thank you.
 8      THE COURT:  Also on the subject of housekeeping, since
 9  this was scheduled, I drew a 34-defendant indictment in which I
10  have to have an initial appearance at 2:30.  So we are going to
11  go until the lunch break and then we will resume, depending on
12  what I'm told about whether it is really feasible to go for a
13  half hour or so before that starts, either right after the
14  lunch break and then break again or resume after that
15  conference, which will probably be done by about 3, if we are
16  not done by then.
17      MR. LEADER:  Your Honor, I have a religious problem
18  after 2 or 3 o'clock.
19      THE COURT:  Well, OK.  So we will do the best we can
20  and just continue on another day.
21      MR. LEADER:  I would appreciate that, your Honor.
22      THE COURT:  All right.  Now, before we get started
23  this morning, I think it is useful to put what we are doing in
24  context.
25         I'm not going to dress the general background of the
```

```
C9pdchem        Conference        Page 4
 1  litigation.  Everybody here knows it and, God knows, it has
 2  been written about enough.  But I do want to make a few points
 3  within the narrative.
 4         First of all, we are concerned today with a subpoena
 5  duces tecum served on Patton Boggs, which has not appeared in
 6  this case in this court, but it is involved in litigation
 7  between Chevron and the Lago Agrio plaintiffs on behalf of the
 8  latter and, in addition, it has been the plaintiff and is the
 9  plaintiff in a number of lawsuits against Chevron on its own
10  behalf.  I think one of those remains pending, though I am not
11  absolutely certain.  In addition, Patton Boggs is named as a
12  co-conspirator in an amended complaint in this case.
13         Secondly, the crux of the dispute over the subpoena is
14  essentially twofold.  The first part of it is whether the
15  documents sought are all or substantially all protected from
16  disclosure by attorney-client privilege or the work product
17  doctrine and whether compliance with the subpoena or, for that
18  matter, even production of a privilege log would be unduly
19  burdensome.  For reasons already discussed in my
20  August 24th decision, the privilege and work product claims in
21  some respects cannot properly be evaluated without a privilege
22  log.
23         Thirdly, there are substantial disputes, at least in
24  number, as to the proper scope of the subpoena considered
25  without regard to questions of privilege and burden.  Patton
```

1 Boggs has served 186 pages of objections to the 52
2 specifications of the subpoena. It would be most sensible to
3 resolve those issues before definitively addressing the
4 privilege and, in some respects, the burden claims, as the
5 resolution of the specific objections in the 186 pages could
6 well alter the breadth of the material sought, affect the
7 alleged burden, and focus the subpoena on the most important
8 matters.
9      With that in mind, I am going to try to deal with the
10 objections to the subpoena in this framework.
11      First, Patton Boggs has interposed close to 37 pages
12 of general objections and objections to definitions and
13 instructions in the subpoena. With two exceptions, I don't
14 think oral argument will be helpful to me in ruling on those
15 objections. I am going to rule on them shortly. We are not
16 going to deal with them today, except for general objections 8
17 and 9, which address contentions by Patton Boggs that it should
18 not be obliged to collect, produce or log documents from
19 attorneys and professionals working fewer than 50 hours on the
20 Chevron litigation and, in some respects, from legal
21 secretaries.
22      Secondly, there is one respect in which we will
23 address burden questions. To the extent there are claims of
24 undue burden that are enumerated in the 186 pages and that are
25 unique to individual subpoena specifications, as distinguished

1 from a claim that the overall burden of complying with the
2 subpoena would be undue, I intend to resolve them.
3      Third, it ought to be clear that at least to a very
4 substantial degree, and possibly -- well, strike "and
5 possibly" -- what we are really talking about here is, in the
6 first instance, and today, in major part, is how extensive the
7 privilege log needs to be and on the basis of how extensive a
8 search.
9      Fourthly, it ought to be plainly understood that I'm
10 approaching this, first and foremost, with Rule 26(b)(2)(C) in
11 mind. That gives district courts discretion to limit the
12 extent of discovery, even of relevant matters, for several
13 reasons. One of them is that its burden or expense outweighs
14 its likely benefit, considering the needs of the case, the
15 amount in controversy, the parties' resources, the importance
16 of the issues at stake, and the importance of the discovery in
17 resolving the issues.
18      Unless I otherwise indicate, the rulings that I make
19 should be understood as practical judgments about the
20 appropriate scope of the subpoena in light of these
21 considerations in the present posture of the case, rather than
22 rulings as to relevance as a purely legal matter of the
23 material sought.
24      Fifth, I understand that the specifications, that at
25 the moment might seem to go beyond what seems productive,

1 might, after any production that ultimately is ordered has been
2 made, appear in a different light. To the extent that I may
3 modify or limit the scope of or sustain objections to
4 individual specifications today, those rulings will be without
5 prejudice to the plaintiff later seeking to require broader
6 compliance in light of production that's actually made. It
7 should be clear, however, that I do not intend to order further
8 production likely, and no such request should be made or likely
9 would be granted unless there is a very convincing reason.
10      If it is at all possible, we should do this enterprise
11 once -- not more than once.
12      Finally, I'm commencing this process of attempting to
13 hear argument on the objections to individual specifications in
14 the hope that it's going to be efficient and helpful. I must
15 say that given the manner in which the parties -- and I mean
16 "the parties" -- and the lawyers for the parties -- and I mean
17 "for the parties" -- have behaved thus far in this and related
18 litigation, I really have substantial doubt that we're going to
19 get anyplace worth getting by this process. If I come to the
20 conclusion that this is not efficient, or not helpful, I'm
21 going to terminate these arguments, and I'll rule on the
22 objections without oral argument. I do not intend the oral
23 argument to add to the confusion and waste of time. I hope to
24 cut through it.
25      With that in mind, let's proceed. And we'll start

1 with general objection 8, which is on page 7 of the Patton
2 Boggs responses and objections to the subpoena.
3      As I understand it, the fundamental dispute here is
4 that Patton Boggs proposes to collect documents, which, as I
5 understand it in the present posture, means a log for privilege
6 in the main, only from attorneys and professionals who have
7 worked 50 or fewer hours -- or I misstated that slightly -- who
8 have worked less than 50 hours on the Chevron litigation. The
9 plaintiff, as I understand it, doesn't accept that limitation,
10 at least without a list of who would be excluded by it.
11      Is that a fair statement of where you two are?
12      MR. MASTRO: Your Honor, actually, we've agreed to the
13 50-hour limit, and we've received a list that we are reviewing.
14      THE COURT: Bless you. We will move on.
15      I take it, Mr. Leader, that is correct; is that right?
16      MR. LEADER: Yes, your Honor.
17      THE COURT: All right.
18      MR. MASTRO: Progress already, your Honor.
19      THE COURT: Well, this is -- I won't say. We'll move
20 on to general objection number 9, which has to do with
21 documents from legal secretaries.
22      What Patton Boggs' objection is is that it does not
23 wish to collect electronic documents of legal secretaries that
24 primarily used and relied on Patton Boggs' firm-wide document
25 management computer applications.

Case 1:12-mc-00065-lk-CFH-2 Document 138-8 Filed 02/01/13 Page 45 of 264
Case 1:11-cv-00691-LAK-JCF Document 138-8 Filed 02/01/13 Page 5 of 264

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

1   What's the problem, Mr. Mastro?
2   MR. MASTRO: Your Honor, again, I think we have
3   reached the point of substantial agreement.
4   All we have asked is that they confirm that the
5   secretaries on this matter have not maintained documents
6   separately in some fashion or data separately from the firm's
7   server, and as long as we have that confirmation -- and they
8   have thus been confirming that -- which ultimately they don't
9   have to serve secretaries.
10   THE COURT: Is that agreed, Mr. Leader?
11   MR. LEADER: Yes, your Honor.
12   THE COURT: OK. That takes care of that.
13   You see, we're already up to page 37.
14   Document request number 1. Where are we on this?
15   MS. YOUNG: Your Honor, I can speak to that. Alyssa
16   Young with Patton Boggs.
17   Patton Boggs has agreed to provide a retainer
18   agreement with its clients redacted of any privileged
19   communications or work product. It was unclear in the
20   meet-and-confer what other documents Chevron is looking for,
21   but that is what Patton Boggs has agreed to produce at this
22   point.
23   THE COURT: Mr. Mastro, what else do you want? And
24   why?
25   MR. MASTRO: Sure. Your Honor, we believe that the

1   retention agreement redacted will not cover the entirety of the
2   scope of the request. We're concerned about the scope of
3   Patton Boggs' authority to represent or act on behalf of the
4   LAPs. We think it is relevant to the fraud and conspiracy
5   claims. We think there are serious questions about whether
6   Patton Boggs has properly, even acting on behalf of the LAPs,
7   are they really acting more on behalf of itself, other law
8   firms and financiers? And, therefore, we think that it's
9   important in that regard to know whether they are properly
10   authorized.
11   It also goes directly to personal jurisdiction issues
12   and whether agents of the LAPs have been acting on their behalf
13   in New York and that Patton Boggs is an appropriate agent.
14   We think this goes to really, you know, the heart of
15   the RICO conspiracy and the fraud claims, whether persons are
16   acting with or without authority and what they're doing. So we
17   think it is not just the retention to deal with, your Honor, it
18   is also the other exchanges that have occurred about what
19   they're authorized to do or not authorized to do and by whom.
20   And your Honor will recall that this became an
21   important issue at an earlier point in time even before the
22   RICO case about whether certain of the lawyers who have been
23   running around the world supposedly acting on behalf of,
24   quote-unquote, indigenous people are really authorized to act
25   on their behalf. We even know those people, where they get

1   their authority from, and how they have been exercising it.
2   So we think that the scope of potentially relevant
3   documents is broader than just a redacted retention agreement.
4   So we think they probably have had other exchanges on this very
5   subject of Mr. Fajardo, Mr. Donziger. It would be interesting
6   to see if they had any exchanges with their so-called clients.
7   I think we have a right to get those documents to see if they
8   even exist and if they've ever even had any communication with
9   their clients.
10   So we think it is definitely broader, your Honor, than
11   just a redacted retention agreement.
12   THE COURT: Ms. Young.
13   MS. YOUNG: What Mr. Mastro has just described goes
14   exactly to how Patton Boggs conducts this litigation, what
15   interactions it has with various parties related to the
16   litigation, and basically how the work is divided up and done.
17   That goes right to the heart of privileged work product
18   materials, and, frankly, they have very little to do with this
19   case and more to do with trying to invade Patton Boggs' files
20   to understand how its strategy works.
21   MR. MASTRO: Your Honor, may I add one thing?
22   THE COURT: Briefly.
23   MR. MASTRO: Yes. This again -- and I think this is
24   going to come up time and time again -- really goes to a
25   logging issue and whether they should have to collect the

1   documents. And if they think that they are privileged, put
2   them on a log and we have already, you know, to try to bridge
3   the gap here, agreed to categorical logging in the fashion that
4   they requested.
5   So, really, the objection here doesn't go to the
6   relevance of the information, it goes to whether they are going
7   to have a valid privilege claim, and that should be logged and
8   in a categorical log. And if there are rulings later on
9   whether they have a privilege there and whether there is an in
10   camera review, the documents will be there for production or
11   for your Honor to review.
12   THE COURT: Suppose, Ms. Young, that this request were
13   modified on the basis I indicated before, that is to say,
14   without prejudice, to read all documents discussing,
15   conferring, or evidencing your authority; doesn't that solve
16   the problem you claim exists?
17   MS. YOUNG: Does your Honor mean to exclude work
18   product and other documents in which Patton Boggs analyzed
19   Chevron's allegations that it had acted outside of its
20   authority?
21   THE COURT: No.
22   MS. YOUNG: Without that limitation, I believe the
23   request would still be impermissibly broad and likely to get at
24   documents that are subject to privilege.
25   THE COURT: Yes. But you understand that I'm not

| C9pdchem | Conference | Page 13 |
|---|---|---|

1 passing on privilege questions today. So on that basis I'm
2 going to modify it without prejudice, as I indicated, and then
3 otherwise overrule the objection; that is, I overrule the
4 objection to the request as modified.
5     OK. Number 2, which I gather the parties have already
6 agreed in one respect is modified by striking the words "actual
7 or potential."
8     MR. MASTRO: Correct, your Honor.
9     THE COURT: OK. What is the essence of the dispute?
10     MR. MASTRO: Well, your Honor, we are seeking
11 documents in which Patton Boggs was involved in the preparation
12 of briefs, motions, pleadings in connection with the Lago Agrio
13 litigation or the Lago Agrio appeal. The relevance of it, your
14 Honor, we think goes to the heart of the case. Patton Boggs is
15 a named co-conspirator, and we have argued that, and provided
16 evidence to the Court, that the manner in which the judgment
17 was procured and the ways in which the judgment was written
18 reflect that it was in fact ghostwritten and there was
19 involvement on the plaintiff's side, including the plaintiffs'
20 lawyers, in that process. Patton Boggs actually played an
21 integral role in the briefing -- the final briefing, called the
22 alegato, and differences between that final briefing and the
23 judgment and the changes in the earlier drafts that show up
24 nevertheless in the final judgment, meaning the work product of
25 the plaintiffs that was never submitted to the Court, that

| C9pdchem | Conference | Page 14 |
|---|---|---|

1 Patton Boggs edited and knows wasn't submitted to the Court,
2 nevertheless shows up in the judgment.
3     Your Honor, we think that their role then in trying to
4 style those briefs what it knew or didn't know in the drafting
5 process --
6     THE COURT: I'm sorry. I'm confused. The argument is
7 that if you get at their drafts, the drafts may provide
8 evidence that there is a remarkable similarity between drafts
9 that were not filed and portions of the judgment; is that about
10 it?
11     MR. MASTRO: That's not the entirety of it, but, yes,
12 that is a major part of it.
13     THE COURT: That is part of it.
14     MR. MASTRO: Their involvement in the drafting -- and
15 they were involved in the redrafting of the final brief, the
16 final statement of the case that's submitted to the Court, so
17 it is referred to as the closing argument, those rewrote that
18 brief. The draft contained literally whole sections of
19 material that Patton Boggs took out of the final product that
20 was submitted to the Court that nevertheless somehow show up
21 almost word for word in the judgment.
22     THE COURT: Yeah, I got that. But you tell me you
23 know that now.
24     MR. MASTRO: We know those pieces. These are the
25 documents about their involvement in the preparation of

| C9pdchem | Conference | Page 15 |
|---|---|---|

1 drafting. There are -- and subsequent motions about cleansing
2 the -- I'm sorry. We know that they made certain choices to
3 take things out. We want the documents that reflect their
4 involvement, how that came about, what choices were made to try
5 and show what wasn't part of the court record, what was part of
6 the court record, and their knowledge of what was not actually
7 submitted on the record but nevertheless must have made it to
8 the Court anyway.
9     Number two. They are also the party that drafted what
10 we call the cleansing memo or motion. That's the one where
11 they made application to the Court in mid-2010 to say to the
12 Court, on the eve of the Stratus documents coming out, Patton
13 Boggs does the drafting of the submission that was made by the
14 LAPs in Ecuador to permit them to put in cleansing experts to
15 try and paper over and cleanse the Cabrera fraud. So we want
16 to see their documents on that process, what they knew, what
17 their colleagues knew, the admissions that they were making.
18 We do have some documents in this regard, your Honor, but we
19 don't have their internal documents, and we don't necessarily
20 have all of the communications. It was by tooth and nail and
21 only production of the hard drive that we got what we did from
22 Donziger.
23     So we don't certainly think we have the full universe
24 that tells that story, the story of coming on the case --
25 knowing the case was falling apart because the Cabrera fraud

| C9pdchem | Conference | Page 16 |
|---|---|---|

1 was about to be revealed, Patton Boggs coming on the case and
2 drafting a critically important document to be submitted to the
3 Ecuadorian Court to be able to put in these so-called cleansing
4 experts, who turned out to be just derivative of Cabrera to try
5 to paper it over.
6     So for both of those reasons, both in the judgments,
7 ghostwriting fraud, and in the context of this really, you
8 know, fraud on the process to try and paper over Cabrera as the
9 fraud was unraveling, Patton Boggs was there at the heart of
10 it. And we want to see their documents that reflect their
11 preparation, their involvement, what they knew, what other
12 people knew, and what they were saying about these things as
13 they did them.
14     THE COURT: What about the appeal?
15     MR. MASTRO: Yes. Well, your Honor, that's important,
16 too, because, you know, we don't have transparency into the
17 process since the Donziger documents only go up to a point in
18 early February. We don't have transparency about the
19 judgment's aftermath. Yet there have been many questions
20 raised about the motions that were submitted. Patton Boggs, we
21 believe, participated in the preparation of them to try and fix
22 problems in the judgment, anticipating attacks later. They win
23 the case --
24     THE COURT: My question was what about the appeal?
25 Documents relating to submissions --

C9pdchem      Conference      Page 17

1   MR. MASTRO: And on the appeal, your Honor, questions
2 about the composition of the panel and how the appellate panel
3 went about doing its work, because the trial judge who issues
4 the judgment is also the judge who basically oversees who was
5 on the appellate panel. And there are a lot of issues about
6 the continue manipulation and ghostwriting that occurred even
7 after that, and we need to see -- it will actually be our first
8 chance to see the role of the plaintiffs' team in how there
9 were modifications to the judgment and then how the appellate
10 process worked and the role they played in helping to craft or
11 cause the crafting of the appellate opinion. We have had no
12 transparency there.
13   THE COURT: Ms. Young or Mr. Leader?
14   MS. YOUNG: I would like to point out that the request
15 is actually directed to all documents related to Patton Boggs'
16 involvement in the preparation of any brief, any motion, any
17 pleading in connection with the Lago Agrio litigation.
18   Mr. Master just spoke to two or three examples of
19 specific documents that were filed, and, in fact, Patton Boggs
20 requested such a list from them during the meet-and-confer. It
21 is still obvious that we had privilege issues with this
22 document request. And, of course, Patton Boggs denies the
23 allegations put forth by Mr. Mastro and --
24   THE COURT: OK. Look, in the interest of not having
25 this repeated every time -- and I don't mean to be unkind -- I

C9pdchem      Conference      Page 18

1 know, as well as you do, that there are privilege issues that
2 I'm not ruling on today, and what we're talking about today is
3 the scope. So let's just save the time of talking about the
4 privilege issues, except to the extent, if we ever get to an
5 appropriate point, where we did some appropriate narrowing that
6 might in one degree or another reduce or minimize any questions
7 about privilege. OK?
8   MS. YOUNG: OK. Understood.
9   Also, to the extent that Mr. Mastro is asking for
10 documents that aren't in the court record, he can certainly --
11 he is certainly aware of the court record in Ecuador and
12 doesn't need Patton Boggs' documents to show that.
13   THE COURT: No. But he is not asking you to produce
14 documents from the court record in Ecuador. He is asking you
15 to produce documents related to Patton Boggs' involvement in
16 the preparation of various documents, which is a separate
17 matter.
18   MS. YOUNG: Understood. And that goes to virtually
19 everything that Patton Boggs did in the course of the
20 Ecuadorian litigation.
21   THE COURT: Now, Patton Boggs' involvement dates to
22 exactly when?
23   MS. YOUNG: Early 2010.
24   THE COURT: Mr. Mastro, when in your submission does
25 the risk of Cabrera being discredited emerge?

C9pdchem      Conference      Page 19

1   MR. MASTRO: Your Honor, it emerges starkly in
2 May 2010 and really continues thereafter.
3   Patton Boggs, under a draft retention agreement that
4 we saw, says they are to be primarily responsible for U.S. and
5 non-Ecuadorian litigation. Yet, it appears that from May 2010
6 on they were integrally involved in the key briefing in
7 Ecuador, the cleansing expert request relating to the final
8 alegato and the judgment, and then subsequently, post-judgment
9 and on appeal, it appears that they were involved including
10 even moving for clarification on the fraud issue to try and
11 improve their prospects in enforcement later when they had won.
12 Apparently in Ecuador you can make motions when you win to say
13 I would like even better language in my opinions.
14   THE COURT: It has been known to happen in America,
15 too.
16   MR. MASTRO: It can't happen quite so transparently,
17 your Honor. I don't think that I could move to appeal a
18 complete victory because I wanted some little better language
19 in an opinion. But in any event, I'm just saying that it's
20 really, you know, the beginning of May 2010 on that it appears
21 Patton Boggs took over in substantial respects briefing and
22 engineering the strategy, too. The first 1782 was filed in
23 late 2009 in this case.
24   THE COURT: Hold on a second while I look something
25 up.

C9pdchem      Conference      Page 20

1   (Pause)
2   All right. So we are talking here about the time
3 period from early 2010 until whatever ultimately the cutoff is.
4   Now, you've identified, Mr. Mastro, the alegato.
5 You've identified what else specifically?
6   MR. MASTRO: Your Honor, I identified the cleansing
7 motion, to be able to submit cleansing expert reports, which
8 was filed in mid-2010. I've identified the alegato, which I
9 believe was filed in December of 2010, and I've identified the
10 post-judgment motion practice, the appellate briefing, and the
11 post-appellate decision motion practice, all which went to
12 trying to manipulate or change the language.
13   And I would just add one thing, your Honor. This is
14 going to come up again and again, so I am really trying to cut
15 through things. They're going to repeatedly raise we should
16 have provided them a list of what we know --
17   THE COURT: Let's deal with it if, as, and when we get
18 it. OK?
19   MR. MASTRO: No problem. But they raised it here,
20 too, that we should give them a list. They know which list --
21   THE COURT: OK. Again, without prejudice, as I've
22 indicated -- and I'm going to stop repeating that -- we're
23 going to modify this, at least temporarily, to documents
24 relating to Patton Boggs' involvement in the preparation of the
25 alegato, the so-called cleansing motion, as defined by

| C9pdchem        Conference        Page 21 | C9pdchem        Conference        Page 23 |

**Page 21**

1 Mr. Mastro, and any post-judgment motion or avocation, and
2 otherwise the objection is going to be sustained for the time
3 being.
4    OK. Number 3. Have you reached agreement on this, I
5 hope?
6    MS. YOUNG: I think the only disagreement remaining on
7 this is whether Patton Boggs can create one travel log, or
8 Chevron has demanded a separate log, signed under penalty of
9 perjury, by each Patton Boggs' attorney who traveled to Ecuador
10 identifying -- and they're asking for a whole host of
11 information -- meetings, start and end times, locations,
12 attendees, photographs, video recordings.
13    I think what we offered to do was to put forth a
14 single log identifying Patton Boggs' lawyers who traveled to
15 Ecuador in connection with the Chevron litigation, dates of
16 travel, and cities or towns visited.
17    THE COURT: Mr. Mastro.
18    MR. MASTRO: I think, your Honor, the only area of
19 disagreement at this point is what that log would look like.
20 We wanted not only arrival and departure dates and the
21 identification of the Patton Boggs' lawyers but who they met
22 with, who were at these meetings. Were they meeting with a
23 judge? Were they meeting with others in Ecuador? And if they
24 are able to provide it, the basic durations of the meetings.
25    So we think it's a positive step that they will

**Page 22**

1 identify when they went to Ecuador and who from Patton Boggs
2 went there, but we want to know who they met with and for how
3 long. It seems to me that that's the key information that we
4 are entitled to as well in trying to determine what they were
5 doing.
6    THE COURT: What about that, Ms. Young?
7    MS. YOUNG: I think it's-- Chevron wants to know did
8 we meet with a judge, did we -- you know, in keeping with their
9 allegations that we did any improper activity, I think we can
10 certainly respond to that that we did not.
11    THE COURT: I would rather imagine that most parties
12 accused of misconduct are perfectly prepared in discovery to
13 say you don't need discovery, we didn't do it, and you should
14 just accept our word for it. So we're not going down that
15 course of an approach.
16    And, furthermore, as I'm sure you know, the crime
17 fraud exception doesn't even require misconduct by the attorney
18 in order to pierce the privilege, if indeed there is such a
19 privilege, with respect to anything here.
20    And so I'll go along with the one log concept, and the
21 log is to contain the identity of each attorney, the arrival
22 and departure dates of each trip, and with respect to each
23 meeting relating to the case in any way the dates and times and
24 durations and participants.
25    OK. Number 4. Mr. Mastro, how do you justify this?

**Page 23**

1    MR. MASTRO: Your Honor, here we're seeking documents
2 relating to travel to certain countries where we're already
3 aware, or have reason to believe, might be subjects of
4 enforcement actions. There have already been enforcement
5 actions filed in Brazil and Canada.
6    To us, your Honor, this goes to an essential part of
7 the conspiracy that Patton Boggs came on to the case to
8 execute. This is the Invictus enforcement strategy. This is
9 the extortion shakedown pressure strategy. This is -- these
10 are the documents that relate to the travel that goes to the
11 very heart of that. So we think its relevance to the RICO and
12 fraud case are evident, and we think we are entitled to get
13 them.
14    Patton Boggs objects in its entirety. Some of these
15 things in the travel records wouldn't be subject to any kind of
16 privilege claim anyway, but to the extent they have a privilege
17 claim, they put it on the categorical log. But they've just
18 object categorically to this, and we think it is clearly
19 relevant and we are entitled to see it.
20    THE COURT: I am going to sustain that objection.
21    Number 5. Ms. Young, these people are asserting
22 jurisdictional objections in the case of the two who have
23 appeared. It seems relevant more broadly than that. Why
24 shouldn't you produce this?
25    MS. YOUNG: Your Honor, we have asked Chevron to -- we

**Page 24**

1 have agreed that we will perform a reasonable search for these
2 documents, and we've suggested ways in which to go about doing
3 that.
4    Searching a set of e-mails, you know, dealing with
5 other people's travel, it's difficult to come up with a search
6 that would potentially target those documents. I think -- the
7 example that Chevron has used is if there is an internal
8 communication at Patton Boggs referring to Pablo Fajardo coming
9 to the United States for a meeting, that's what they are
10 looking for, and we have suggested that we come up with some
11 search terms that might be designed to get at that information.
12    The problem is that Chevron has been unwilling to
13 engage in that discussion on what it will accept as a
14 reasonable search for these types of documents.
15    THE COURT: These are two separate questions. One
16 question is whether the request is appropriate. The second
17 question is, given the respondent's obligation to make a
18 reasonable search, what is a reasonable search?
19    I overrule the objection. Now, the parties are going
20 to have to work it out, or if you can't, the Court will decide
21 what a reasonable search is.
22    I understand there are always problems in designing
23 search terms and the like, and in electronic discovery, as in
24 all other things in life, perfection, desirable as it may be,
25 is not always achievable.

| C9pdchem | Conference | Page 25 |

1      OK. Number 6.
2      I see that that follows, unless I hear good reason to
3 the contrary, the ruling I made with respect to number 4. Any
4 reason why not, Mr. Mastro?
5      MR. MASTRO: Your Honor, I think it would be
6 controlled by your ruling on number 4, but when it comes to
7 documents relating to the enforcement actions, I would like to
8 be heard more on that, as opposed to the travel documents, and
9 then we will come to those later requests.
10      THE COURT: Then we will deal with it then.
11      MR. MASTRO: Thank you, your Honor.
12      THE COURT: Number 7 has been withdrawn by Chevron.
13 What remains in dispute as to this?
14      MS. YOUNG: Patton Boggs has agreed to produce power
15 of attorney documents. I'm not sure what else is at issue.
16      THE COURT: Including drafts?
17      MS. YOUNG: Drafts would -- we would have the same
18 problem with work product, but I believe we could log those.
19      MR. MASTRO: OK.
20      THE COURT: OK. So the objection is overruled,
21 except, of course, that identical -- well, what about this?
22 Let me raise the question.
23      Shouldn't this exclude or should it exclude identical
24 copies of documents that were produced -- actually produced in
25 the 1782 case against Mr. Donziger?

| C9pdchem | Conference | Page 26 |

1      MS. YOUNG: We don't currently have that production so
2 Chevron would need to identify those for us.
3      MR. MASTRO: Well, your Honor, we don't have a problem
4 with that. So, you know, but it is not clear to us in terms of
5 burden and everything else, you know, should we give them
6 everything in the Donziger production that relates to this
7 issue? Is that how they --
8      THE COURT: This is really, I guess, silly.
9      MR. MASTRO: Right. I don't want to --
10      THE COURT: Because, obviously, I mean, Mr. Donziger
11 represents these people and you are working -- not you, Leader
12 & Berkon, but you Patton Boggs are working hand and glove with
13 the Keker firm, or at least that's the only logical assumption
14 to draw, and so I will just overrule the objection. You are
15 perfectly able to find out what was in these things.
16      Number 9.
17      (Pause)
18      Anybody wish to address it?
19      MR. MASTRO: Your Honor, again, we think this goes to
20 the heart of the RICO claim because these documents potentially
21 relate to membership in the conspiracy, its scope, its
22 structure, the motives of individuals and their interests,
23 including the Patton Boggs firm which recruited certain of the
24 funders, including Burford. The Patton Boggs firm, which has a
25 contingency arrangement that should generate over 400 million

| C9pdchem | Conference | Page 27 |

1 as a result if they were able to collect on the entirety of
2 that judgment for that firm. And it goes to, you know, the
3 individuals or financiers who were recruited to either join the
4 conspiracy as active participants or, in some cases, including
5 Burford and Joe Kohn, who backed out at some point -- Joe Kohn,
6 as we say, with noise. So we think that this really will be
7 highly relevant to the RICO conspiracy and its scope, structure
8 and membership.
9      THE COURT: Is there any dispute that Patton Boggs has
10 a contingent fee arrangement and has a nine-figure benefit to
11 be gained if and to the extent the judgment is collected?
12      MR. MASTRO: There is not, your Honor.
13      THE COURT: You are not in a position to answer that.
14      MR. MASTRO: Sorry, your Honor.
15      (Pause)
16      MS. YOUNG: Excuse me, your Honor. I just need to
17 confer with my client.
18      THE COURT: I understand.
19      (Pause)
20      MR. MASTRO: Your Honor, could I add just one more
21 thing while she is conferring?
22      THE COURT: No. Let's do one thing at a time.
23      MR. MASTRO: No problem, your Honor.
24      (Pause)
25      MS. YOUNG: Your Honor, Patton Boggs is not

| C9pdchem | Conference | Page 28 |

1 comfortable with discussing the financial arrangements relating
2 to its potential payment from this litigation.
3      THE COURT: Well, I mean, you may have your choice
4 between getting comfortable with it or producing all the
5 documents about it.
6      MS. YOUNG: We've agreed to produce the retainer
7 agreement, and I believe it will be redacted of sensitive
8 financial information.
9      THE COURT: Well, that's your version. I don't see
10 any basis for that redaction.
11      MS. YOUNG: The --
12      THE COURT: So maybe you can persuade me.
13      MS. YOUNG: The funding arrangements as it relates to
14 Patton Boggs, that has no bearing on the RICO litigation.
15      THE COURT: It has to do with motive, doesn't it?
16      MS. YOUNG: Patton Boggs isn't a defendant in the RICO
17 litigation.
18      THE COURT: It is an alleged co-conspirator, isn't it?
19 Right in the complaint.
20      MS. YOUNG: Understood, your Honor.
21      (Pause)
22      At a minimum, your Honor, Patton Boggs requests a
23 protective order, a confidentiality order so that the
24 information relating to its payment or potential payment is not
25 disclosed outside of this litigation.

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

1    THE COURT: Any problem with that, Mr. Mastro?
2    MR. MASTRO: Your Honor, there has already been
3    disclosures with no protective order that give that amount.  I
4    don't have any problem with a protective order, that I won't
5    reveal what they say they'll get out of the litigation.
6    MS. YOUNG: Your Honor, if the plaintiffs already have
7    this information, why does it need to come from Patton Boggs
8    again?
9    THE COURT: Do you know that the United States
10   government takes the position that terrorists who have been
11   held in certain foreign countries, as reported by every media
12   outlet in the world, are in the position where the government
13   will not confirm nor deny which foreign countries even though
14   everybody in the world knows it?  Do you understand that?  And
15   the reason it doesn't is because they don't want to be bound by
16   the admission, which is why you don't want to be bound by the
17   admission.  But the admission is relevant in the lawsuit.  And
18   for them to say somebody else said that Patton Boggs' interest
19   is X is different from Patton Boggs saying it or producing the
20   documents.
21   Now, let's use this time productively.  Is there any
22   problem with a protective order of the standard garden variety
23   form that would enable them in the first instance to designate
24   that piece of information as for use in this litigation only
25   and would not restrict you, Mr. Mastro, as in all other cases,

1    if you have that information from someplace else, using it?
2    MR. MASTRO: And I said, it will be fine with me, your
3    Honor.
4    THE COURT: OK.  So that solves that problem, right,
5    Ms. Young?
6    MS. YOUNG: Understood, your Honor.  Yes.
7    THE COURT: OK.  Now, what about the limitation to
8    executed funding agreements?
9    MR. MASTRO: Your Honor, the reason why it shouldn't
10   be limited to executed funding agreements is because part of
11   the fraud -- part of the third-party fraud is that
12   misrepresentations by Patton Boggs and others on the
13   plaintiff's team were made to induce people to fund the
14   litigation.  In some cases they decided not to, because they
15   concluded not to.  In other cases they decided to and later
16   withdrew, apparently because they considered themselves to have
17   been defrauded.  So we think we should be able to get documents
18   that go to their efforts to induce funders as well as the
19   funding agreements themselves.
20   THE COURT: And how is that relevant to whether they
21   did what you claim they have done to Chevron?
22   MR. MASTRO: Because, your Honor, take a Burford as an
23   example.  We believe that since Burford cut off its funding --
24   and of the limited documents we have seen, we have seen that
25   they are now in some controversy -- we hope the discovery from

1    Patton Boggs will show why Burford stopped funding.  But it did
2    provide millions in seed capital at Patton Boggs' behest, based
3    on representations like those in Invictus about the so-called
4    merit of what they were going to try to do, that, you know,
5    funded the enterprise, kept the scheme going, gave them the
6    lifeblood capital they needed.  And if those parties -- some of
7    those parties -- I can't say whether that is going to be the
8    case for Burford, but we think we have a good faith basis
9    arising from the discovery, and of others, you know, were
10   induced to fund, to keep this thing going, the scheme going,
11   and later came to realize they had been hoodwinked.  That's
12   third-party fraud.  That's extremely relevant to the RICO.  So
13   we believe we're entitled to those documents.
14   THE COURT: Ms. Young.
15   MS. YOUNG: I think that's pure speculation as to why
16   somebody stopped providing funding or continued.  And, again,
17   the fact of someone funding or not funding, we are OK with
18   disclosing that.  You know, the discussions back and forth
19   touching on the merits of the case or anything else we think
20   should be off limits.
21   THE COURT: Well, why?  It is not exactly privileged,
22   is it, even if there is a privilege?
23   MS. YOUNG: Well, there may be work product revealed
24   in those discussions, yes, about strategy, about planning,
25   about --

1    THE COURT: Which may very well blow even the work
2    product protection.
3    MS. YOUNG: I believe --
4    THE COURT: Because you are dealing with an adverse
5    party at arms' length.
6    MS. YOUNG: Well, I think it is actually the opposite,
7    that they have a common interest in the litigation if they're
8    funding it.
9    THE COURT: Maybe not if they are pulling out.  Maybe
10   not if they say no.  Maybe not until they decide to fund it.
11   MS. YOUNG: It is a collateral issue.  It is
12   speculative.  If we're trying to reduce the scope of the
13   subpoena, you know, I don't think there is any meaningful
14   information that's going to come out of that inquiry.
15   THE COURT: I am going to come back to that one.  I
16   will think about that a little more.
17   Number 10.
18   MS. YOUNG: 10 is the identical problem.  It just
19   lists names.
20   THE COURT: Is that right?
21   MR. MASTRO: These are all parties we believe that are
22   related to funding issues.  Your Honor, if I may suggest one
23   other thing that might help you resolve 9 and 10?
24   From the documents we have seen, that we have been
25   able to obtain in discovery, we see the breakdown between the

C9pdchem       Conference       Page 33

1  plaintiffs and Burford, and we have seen from the plaintiff's
2  side some hostile exchanges with Burford when Burford withdrew
3  its funding. There must be Burford letters to the plaintiffs,
4  and we believe they will show exactly what we need to prove,
5  third-party fraud and --
6       THE COURT: Yes. But you haven't persuaded me yet
7  that evidence that third-party investors were snookered, if
8  indeed that's the case, is particularly probative of anything
9  in this case.
10       MR. MASTRO: But, your Honor, it is critically
11  important, because without that money -- without that seed
12  money from Burford, we think the documents will show Patton
13  Boggs never would have gotten involved in this case and not
14  gotten the seed money, because they had a mixed-fee contingency
15  fee arrangement.
16       THE COURT: Without the word processor, they couldn't
17  have gotten involved either and we are not examining IBM.
18       MR. MASTRO: No. But, your Honor, I do believe this
19  is actually critically important, because it was the going out
20  and obtaining of funders, sometimes who became co-conspirators,
21  sometimes who later felt they were duped and were part of a
22  third-party fraud, it was the only reason they could sustain
23  the action they way they did and litigate all around the world
24  and bring in the Patton Boggses of the world and the many
25  national firms --

C9pdchem       Conference       Page 34

1       THE COURT: This is true of every law school that
2  would have accepted anybody of Patton Boggs as a student.
3  Without that, they wouldn't be here.
4       MR. MASTRO: Your Honor, as an essential part of the
5  scheme, part the RICO scheme was to defraud -- to either get
6  co-conspirators or to defraud them into investing and thereby
7  be able to support the ability to try to extort Chevron not
8  only by continuing the Lago Agrio litigation but the
9  litigations around the country. and the common law fraud claim
10  that has been sustained was one of defrauding third parties to
11  the detriment of Chevron. If we are correct that the documents
12  will show Burford, maybe Kohn, others felt that they had been
13  defrauded at certain points into funding, that was integral to
14  the LAPs being able to continue their effort to extort Chevron.
15       THE COURT: Thank you.
16       I'm sustaining, for the time being anyway, the
17  objections to 9 and 10, save that Patton Boggs will produce
18  executed funding agreements.
19       11. Are you guys capable of agreeing as to whether
20  Andres Snaider is a lawyer or not?
21       MR. MASTRO: Your Honor, he apparently at times in his
22  life was a lawyer but we do not believe he is functioning as a
23  lawyer more recently and certainly not in the capacities in
24  which he participated in this case. In his more recent life he
25  hasn't been, to our understanding, practicing law.

C9pdchem       Conference       Page 35

1       THE COURT: And why are you entitled to all documents
2  relating to him?
3       MR. MASTRO: He is a person who both participated in
4  helping them arrange funding and also served as a consultant --
5  as we understand it, a consultant to the LAPs on the foreign
6  enforcement or Invictus strategy.
7       THE COURT: Sustained.
8       MR. MASTRO: Your Honor, may I just ask one more
9  question?
10       THE COURT: Yes.
11       MR. MASTRO: In terms of the limited production on 9
12  and 10, I would strongly implore your Honor that if there are
13  exchanges with Burford that would reflect that Burford backed
14  out of the funding agreement because they felt they were
15  defrauded, that that would be highly relevant.
16       THE COURT: Nobody is stopping you from taking
17  Burford's deposition and let's see where that goes, if you
18  decide to do it.
19       MR. MASTRO: All right. We will, your Honor. We
20  will.
21       THE COURT: Number 12.
22       MS. YOUNG: Number 12. Nextant is, I believe, under
23  Snaider's company.
24       THE COURT: Is that right, Mr. --
25       MS. YOUNG: We have the same objection.

C9pdchem       Conference       Page 36

1       THE COURT: -- Mr. Mastro?
2       MR. MASTRO: Nextant is his company.
3       THE COURT: Sustained.
4       13.
5       (Pause)
6       Anybody have anything to say?
7       MR. MASTRO: Well, your Honor, the relevance of the
8  documents, I think your Honor --
9       THE COURT: I'm fully appreciative of why you want to
10  see them.
11       MR. MASTRO: Right.
12       THE COURT: Which is not the same thing as relevance.
13       MR. MASTRO: I understand, your Honor.
14       But since at the heart of the conspiracy it was the
15  RICO defendants colluding with government officials to procure
16  a thumb on the scale of fraudulent judgment in Ecuador, the
17  communications with the government officials we believe are
18  highly relevant. We don't see how they could be privileged.
19  We don't see how there could be a sovereign immunity question.
20  And, you know, we therefore think that they should have to
21  produce those documents.
22       THE COURT: Ms. Young.
23       MR. MASTRO: To the extent they have a privilege
24  claim, they can put it on a categorical log.
25       THE COURT: I don't understand that point.

| C9pdchem | Conference | Page 37 |
|---|---|---|

1   MS. YOUNG: I just want to clarify that the sovereign
2 immunity objection relates to a completely separate
3 representation of Patton Boggs for the Republic of Ecuador, and
4 although in the meet-and-confer I believe Chevron loosely
5 stated it wasn't really interested in that, they haven't
6 committed to narrowing the scope of the request. So that
7 really relates to things separate from the litigation.
8   THE COURT: Can you enlighten me? Because I take it
9 that since the document request is for documents regarding
10 Chevron for the Chevron litigations, it would be hard to
11 imagine if there were a separate representation in an unrelated
12 litigation, or representation of the Republic of Ecuador, that
13 you would have any responsive documents in connection with that
14 representation; isn't that right?
15   MS. YOUNG: Understood. I mean, if it's related to
16 the Chevron litigation --
17   THE COURT: Or to Chevron.
18   MS. YOUNG: As we -- with that limitation, yes, we
19 understand, and we'll respond as we've indicated.
20   THE COURT: So that limitation is in fact not a
21 limitation, it is the scope of the question in the first place.
22   And so I take it, then, that there is no sovereign
23 immunity objection, right?
24   MS. YOUNG: Correct.
25   THE COURT: OK. Now, with that established, is there

| C9pdchem | Conference | Page 38 |
|---|---|---|

1 any further reason why there is anything to sustain here? That
2 resolves the objection subject --
3   MS. YOUNG: That resolves the objection subject to the
4 privilege log.
5   THE COURT: OK. So the objection is overruled.
6   Number 14. This, I take it, is the specific question
7 that underlay the earlier much more general request that we
8 talked about for quite some time. Right?
9   MR. MASTRO: Yes, your Honor.
10   THE COURT: OK. Any reason why I shouldn't overrule
11 this?
12   MS. YOUNG: Your Honor, this request relates to --
13 it's so overbroad and it relates to any official communication,
14 order, statement, ruling, report, judgment, sentencia, escrito,
15 providencia, edict, or other writing issued by the Lago Agrio
16 Court, and also includes the appeal.
17   THE COURT: Yes. So?
18   MS. YOUNG: So, again, this goes to -- we've asked
19 Chevron to specify and in particular orders or rulings or
20 judgments that they're interested in rather than pretty much
21 everything related to the Lago Agrio litigation.
22   THE COURT: Yes. But it is not everything related to
23 the Lago Agrio litigation. It relates to the writing of court
24 documents issued by those courts. I mean, I, of course, I say
25 "writing," there are more words, but it all amounts to that.

| C9pdchem | Conference | Page 39 |
|---|---|---|

1   MS. YOUNG: Right. And the only allegations that
2 Chevron has made relate to the judgment, the Cabrera motion,
3 and, I think, the appeal. If they're willing to limit it to
4 those items, I believe we would be prepared to respond.
5   THE COURT: Do you have a lot of these documents
6 relating to other --
7   MS. YOUNG: No. But what we do have are a lot of
8 documents relating to Patton Boggs' analysis of Chevron's
9 allegations in that regard. So every time Chevron --
10   THE COURT: Just let me stay with your point and then
11 I'll let you go on.
12   But you're saying if they had flagged two or three or
13 four specific documents, because those are the ones they know
14 about -- there may or may not be others -- and your problem is
15 with your analysis of those. And the way you propose to solve
16 that problem is have them tell you the ones they suspect are
17 problematic, which they've already told you. You know what
18 those are because that's what you are giving right back to them.
19 And the point of their request is to find out if there are
20 others that they don't know about yet, and you want me to cut
21 that out.
22   MS. YOUNG: Well, as drafted, this would also get to
23 all of Patton Boggs' work done in connection with Chevron's
24 allegations. If there is a way to carve that out so that we
25 don't have to log every single time that Patton Boggs weighed

| C9pdchem | Conference | Page 40 |
|---|---|---|

1 in or analyzed an allegation, that would be helpful.
2   THE COURT: OK. Mr. Mastro, what about that?
3   MS. YOUNG: I just want to clarify also, it is not as
4 if we've identified documents that do relate to advance
5 knowledge of the judgment or anything like that. We don't
6 believe that those exist at all.
7   MR. MASTRO: Right --
8   THE COURT: I mean, you know, the fact is if you limit
9 that specifically to the judgment, I don't know one way or
10 another, but I certainly have seen documents in this case in
11 which, if memory serves, it was Mr. Fajardo saying to
12 Mr. Donziger he knew exactly what the judge was going to do
13 about either terminating judicial inspections or whom he was
14 going to appoint as the global expert, etc., etc., there surely
15 are documents. Now, I don't know if Patton Boggs has them and
16 so forth, but there are such documents that have emerged at one
17 point or another. I haven't seen many but there are some.
18   Mr. Mastro.
19   MR. MASTRO: Yes. Correct, your Honor. But I don't
20 think the fact that we've been so diligent in discovery that we
21 have a sense of some of them now, I'm not a soothsayer. I'm
22 shocked at how many we are already aware of.
23   I think that this is a pretty straightforward,
24 targeted request -- the writing, drafting of orders, opinions,
25 decisions by anyone in the Lago-related team. So they are the

1 ones who will know that. I was able to say "several" because
2 of what we've been fortunate enough to be able to learn, but
3 they're going to know whether there are more. There could well
4 be more. And I shouldn't have to tell them what my (1)
5 suspicions are or what else I may have done as a matter of my
6 own work product to know. OK? They should know, and produce.
7        THE COURT: That objection is overruled.
8        MS. YOUNG: Your Honor, may I just clarify?
9        THE COURT: Yeah. Sure.
10        MS. YOUNG: Are you expecting, in response to Request
11 Number 14, that Patton Boggs will need to log all of its
12 internal communications relating to Chevron's allegations, as
13 opposed to documents evidencing the, you know, ghostwriting or
14 advance knowledge?
15        THE COURT: I'm expecting you to comply with this as
16 written.
17        MS. YOUNG: I believe as written it would seek
18 documents that are purely Patton Boggs' analysis and not
19 evidence of some other fraud. Patton Boggs has spent a
20 considerable amount of time analyzing Chevron's allegations
21 relating to ghostwriting and advance knowledge of things.
22        THE COURT: I'm not elaborating on what I've said.
23 Number 15. What the heck does this got to do with
24 anything, Mr. Mastro?
25        MR. MASTRO: Well, your Honor, it goes to affirmative

1 defenses that have been raised in this case.
2        THE COURT: What the affirmative defense?
3        MR. MASTRO: Well, they raised affirmative defenses
4 relating to fraud where they accuse Chevron and its
5 predecessors of having engaged in fraudulent activity in
6 connection with the remediation.
7        THE COURT: What pleading are you referring to? And
8 I'm also -- you know, let's suppose it is there. We'll then go
9 on to the question of what difference it makes.
10        MR. MASTRO: Well, obviously, your Honor, we don't
11 think there was any fraud or failure to perform, so we wanted
12 to see if they've got any beef there.
13        THE COURT: OK. On the subject of where is the beef,
14 what pleading and what defense?
15        MR. MASTRO: They are pulling it up now, your Honor.
16 That was one of the affirmative defenses that they alleged
17 alleging fraud.
18        (Pause)
19        Well, we will pull it up for your Honor and give it to
20 you.
21        THE COURT: Do you want to come back to that?
22        MR. MASTRO: Yes. We will, your Honor.
23        THE COURT: All right. Number 16. I take it the
24 criminal case is defined as the Veiga and Pallares; is that
25 right, Pallares?

1        MR. MASTRO: Yes. Just one other thing, your Honor,
2 just on 15, just to close the loop, and we will come back to
3 their affirmative defense.
4        It is also the case that among our allegations is the
5 Lago Agrio litigation was itself a fraudulent act or an attempt
6 to get around the settlement and release agreements that would
7 have precluded it. So I just wanted to put that on the record,
8 your Honor, as to why it would be relevant to that.
9        THE COURT: We are all indebted to you for that.
10        MR. MASTRO: Thank you, your Honor.
11        THE COURT: Number 16. This is the two criminal cases
12 that we were all dealing with at the beginning of all the
13 1782s, right?
14        MR. MASTRO: Yes, your Honor.
15        THE COURT: OK. So where are we on this?
16        MR. MASTRO: Your Honor, it's those criminal cases and
17 any attempts to initiate criminal investigations, that those
18 ones obviously led to prosecution that later had to be dropped,
19 and we think they are clearly relevant to the case. It was
20 part of their scheme to get these Chevron --
21        THE COURT: This all began before Patton Boggs was on
22 the job, right?
23        MR. MASTRO: It did, your Honor, but Patton Boggs was
24 on the job when the criminal charges got dropped against the
25 lawyers in Ecuador and may well have documents reflecting the

1 back and forth on that. I think that it was widely recognized
2 that on the LAPs-related team that the pendency of those
3 criminal charges reflected poorly on justice in Ecuador, and we
4 believe that there will be relevant documents there. The
5 exchanges that Patton Boggs had with others about those cases,
6 or any other investigations that -- the criminal investigation
7 that the LAPs were trying to get initiated against Chevron
8 there.
9        THE COURT: Ms. Young.
10        MS. YOUNG: Patton Boggs was not involved in any
11 effort to encourage prosecution of Chevron's attorneys in
12 Ecuador, and Chevron knows that because it has Mr. Donziger's
13 files.
14        You know, to the extent that Patton Boggs --
15        THE COURT: Well, then you won't have many documents,
16 right?
17        MS. YOUNG: True. Although, you know, again, Patton
18 Boggs had discussions about the criminal proceedings with its
19 co-counsel and internally, and I don't see any reason why
20 Patton Boggs should be burdened with reviewing and logging
21 those documents where they are not relevant to these
22 proceedings.
23        THE COURT: What would you do differently if this
24 request were in the case in the subpoena than you would do if
25 it were not in terms of searching and things like that -- in

| C9pdchem | Conference | Page 45 |
|---|---|---|

1 terms of searching?

2      MS. YOUNG: In terms of searching, I think we would
3 probably need to do a search for "criminal," using language
4 around "criminal," the word "criminal."

5      THE COURT: And the incremental cost of sticking that
6 one-word search term in there is what?

7      MS. YOUNG: We don't have a figure on the incremental
8 cost of that figure alone.

9      THE COURT: Right. But it's got to be essentially de
10 minimis, right? And so the difference is that if I leave it
11 in, you're going to get a certain number of hits that you
12 wouldn't otherwise have gotten, and then, presumably, somebody
13 is going to have to look at the hits and may have to schedule
14 it.

15      Mr. Mastro, why should I conclude that the likelihood
16 that doing that will lead to anything of significance is
17 sufficiently likely to go to the trouble?

18      MR. MASTRO: Two reasons, your Honor. I don't think
19 that it's much of a burden at all, since they claim such a
20 limited universe.

21      Two --

22      THE COURT: Well, it depends on how many hits.

23      MR. MASTRO: Two, your Honor, it seems to me it's
24 extremely relevant. I didn't say, as Ms. Young implied, that
25 Patton Boggs was involved in the inception of trying to get

| C9pdchem | Conference | Page 46 |
|---|---|---|

1 them prosecuted. I said to the Court that Patton Boggs was on
2 the scene in an important role in the overarching litigation
3 when the decisions were made to drop the criminal charges, so
4 they likely had communications with their colleagues.

5      THE COURT: Right. I understand that.

6      Now, to hit a home run in this, what you would need to
7 find -- and I don't suggest it exists, I don't know one way or
8 the other -- what you would need to find is the document in
9 which somebody who was involved earlier says to Patton Boggs
10 this was a put-up job, the fix was in in Ecuador -- and, again,
11 I'm not saying that's the case, but you would have to hit that
12 kind of a long ball, and it wouldn't reflect adversely on
13 Patton Boggs -- just a second -- if in fact, as you seem to
14 assume, they said, My God, stop it.

15      Isn't it much more likely that if we go down this path
16 what happens is, putting aside all the work product issues and
17 so forth, you come up with documents in which, whether on
18 recommendation of Patton Boggs or otherwise, a conclusion is
19 reached that it would be really nice if these things went away
20 because they were getting killed in the 1782 cases because of
21 the criminal prosecutions in Ecuador, certainly on timing, and
22 probably more broadly in some respects, and this is an
23 unnecessary and unhelpful distraction in the United States?
24 Isn't that the more likely place it comes out?

25      MR. MASTRO: Even if that's where it came out, your

| C9pdchem | Conference | Page 47 |
|---|---|---|

1 Honor, what's the logical import of that? Criminal charges
2 were pending. The government prosecutor was already pursuing
3 criminal charges. It means that Patton Boggs is telling the
4 LAPs, who have such a cozy relationship with the government,
5 can't you see if you can make this go away. And they go to the
6 government and somehow make it go away. That's extremely
7 relevant.

8      And, your Honor, the premise of the question was
9 that's not necessarily something that reflects poorly on Patton
10 Boggs. The discovery is to go after the RICO defendants. Now,
11 they are a co-conspirator.

12      THE COURT: I understand.

13      MR. MASTRO: So we think it goes to the heart of the
14 case and the kind of things that went on in Ecuador, and that
15 the very limited burden -- they don't suggest a huge number of
16 hits. We never heard about any kind of huge number of hits.
17 We heard they don't think they have anything or much on this
18 subject. But if we get hits, even of the type your Honor
19 describes, hugely relevant to us.

20      THE COURT: Ms. Young, what about Mr. Mastro's last
21 point?

22      MS. YOUNG: Well, first of all, the two attorneys were
23 1782 parties, and, therefore, I do believe a large number of
24 hits will result from this type of search. And it just adds to
25 the burden of -- while, in and of itself it may be a small

| C9pdchem | Conference | Page 48 |
|---|---|---|

1 number, it adds to the overall burden in responding to the
2 subpoena.

3      THE COURT: Everything adds to the overall burden.
4 That is true in a nine-document case.

5      MS. YOUNG: Right. With respect to whether -- I mean,
6 if you will assume that Patton Boggs had some say or control in
7 how the criminal proceedings unfolded in Ecuador, even if
8 Patton Boggs did say, oh, you know, these proceedings should go
9 away, that to me is not relevant to the RICO action. It
10 certainly isn't -- getting them off the hook isn't a predicate
11 act under RICO, and I just think that the burden here outweighs
12 any potential location of any relevant documents.

13      THE COURT: I am certainly not satisfied by the burden
14 argument here, because there is really no basis for me to
15 conclude that the burden would be appreciable at all, the
16 incremental burden, so that's overruled. And the objection
17 altogether is overruled.

18      I think it's, you know, a reasonably close call as to
19 relevance, but I think the likelihoods are that it may be -- it
20 is quite possibly probative of material issues in the case.
21 And so in the absence of a convincing reason not to allow it, I
22 will allow it.

23      OK. 17.

24      MR. MASTRO: Once again, your Honor, we think this
25 goes to a central element of the RICO conspiracy. The RICO

1 defendants engaged in, you know, fraudulent testing,
2 manipulative test results. They ran what they called a Selva
3 Viva lab out of a hotel room. They then used something called
4 a Havoc lab that the crew depicts Donziger running in ex parte
5 to a judge to get him to vacate an inspection order because in
6 his private documents he said it would be a disaster. And
7 there was testimony that, you know, from Stratus and Sand made
8 that they didn't even have equipment to do the tests they said
9 they did.
10      THE COURT: These were the original judicial
11 inspections, or something else?
12      MR. MASTRO: This, your Honor, includes both the
13 original judicial inspections and what the plaintiffs' team did
14 subsequently.
15      Their whole case, their whole PR campaign in this
16 Court, they've, oh, but there really was an environmental
17 disaster there. They called it Chernobyl and everything else.
18 Yet the tests they did were fraudulent; the scientific evidence
19 wasn't there. You will recall Donziger and the crew outtakes
20 talking to his own experts just after they had briefed Cabrera
21 prior to his appointment, Donziger turns to his experts after
22 they tell him the groundwater contamination evidence isn't
23 there, he says: Don't worry about it. This is Ecuador. For
24 the Court, it's all smoke and mirrors and bullshit.
25      So this is a central part of the fraud, to create the

1 fiction that there actually was evidence to support their
2 claims, when in so many respects the scientific evidence -- the
3 genuine testing, even their own testing that wasn't fraudulent,
4 showed that the environmental contamination they alleged, they
5 trumpeted to the world, and they continue to trumpet to the
6 world, was not -- the evidence was not there, and that
7 certainly there was no environmental contamination attributable
8 to Texaco 20 years before, having left the country and
9 remediated before it left. So we think we're entitled to that
10 evidence because it shows a core -- it debunks a core element
11 of their defense and proves a core element of our RICO
12 conspiracy -- the fraud, the big fraud, which was that they
13 lied about the science and there wasn't an environmental
14 disaster attributable to Texaco that occurred there in Ecuador.
15      THE COURT: Ms. Young.
16      MS. YOUNG: This request, like several others, relates
17 to events that happened well before Patton Boggs' involvement
18 in this litigation, and we believe that it is inappropriate for
19 Patton Boggs to have to even respond to these or search for
20 documents that relate to events that predate their involvement.
21      You know, Patton Boggs was not a witness to these
22 events. If anything, it learned about the allegations relating
23 to these events later.
24      THE COURT: That's the objection?
25      MS. YOUNG: Yes.

1      THE COURT: Overruled.
2      MR. MASTRO: Your Honor wanted to know where in the
3 complaint a reference is to --
4      THE COURT: Do you want to go back to that one? This
5 was number 15.
6      MR. MASTRO: Yes. Number 15, your Honor.
7      THE COURT: I thought it was not in the complaint. I
8 thought it was in a responsive pleading.
9      MR. MASTRO: It's mentioned both in the complaint and
10 in responsive pleading -- or I should say Donziger's proposed
11 responsive pleading. He alleges fraud in the remediation at
12 paragraphs 128 and 138. That's docket 561 -- 567-1. Of
13 course, we hope that he will not be permitted to do that
14 proposed amended answer and counterclaims because we have
15 opposed it on grounds of futility.
16      But we also reference it with -- remediation fraud was
17 the basis for the criminal indictments of the two Chevron
18 attorneys. We allege it as a RICO predicate, and it's in the
19 first amended complaint at paragraph 69 and paragraphs 199
20 through 213. So it is directly related to the criminal charges
21 that were brought and ultimately dismissed against the two
22 Chevron attorneys.
23      THE COURT: Let me get it in front of me.
24      (Pause)
25      What is the docket item of the amended criminal

1 complaint?
2      MR. MASTRO: The document number of the first amended
3 complaint is --
4      THE COURT: I got it. OK. Tell me the paragraphs
5 again, please.
6      MR. MASTRO: The paragraphs, your Honor, are
7 paragraphs 69 and paragraphs 199 through 213.
8      (Pause)
9      THE COURT: All right. Ms. Young, what about 15?
10      MS. YOUNG: With respect to 15, and, again, a number
11 of others, your Honor, when you ordered Mr. Donziger to respond
12 to the subpoena, your reasoning was based on the fact that the
13 proposed discovery focused on matters where Donziger was an
14 actor and a witness. Here we have the exact opposite
15 situation. We have a case where Chevron is seeking access to
16 information that Patton Boggs gathered the way attorneys
17 normally gather such information in the course of a litigation.
18      THE COURT: Yes. I'm familiar with your argument and
19 I understand what your argument is, but, with respect, you have
20 taken what I said out of context and you are attempting to
21 misapply it here.
22      What I said was that, among other things supporting a
23 deposition of Mr. Donziger under Section 1782, was that this
24 was a case that saw his knowledge as a percipient witness and a
25 principal actor, right? That was not the basis on which I

Case 1:22-mc-00065-LIB-LEW Document 38-8 Filed 07/16/13 Page 116 of 364
Case 1:22-mc-00065-LIB-LEW Document 38-8 Filed 07/16/13 Page 116 of 364

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

1 ordered discovery.  It was a factor I considered.  And it's a
2 relevant factor, all right, but it doesn't sweep the boards --
3 not even close.
4          MS. YOUNG: As we've --
5          THE COURT: I'm not finished.
6          And was all made in the context of rejecting a
7 Friedman argument that was made on behalf of Mr. Donziger.
8          Now, I do fully appreciate the broader point that you
9 are making, and I think in more than a few degrees the rulings
10 that I have made, a good many of which this morning have
11 favored you, took that into account in the equation that led me
12 to the results I came to.  But the simple fact that the
13 allegations -- excuse me, that the alleged fraud with respect
14 to the Texpet remediation and release predated Patton Boggs'
15 arrival on the scene is not a get-out-of-jail-free card on
16 discovery.  It may have learned things.  Things may have been
17 said to it that they may be protected by privilege; they may
18 not be protected by privilege.  They may be work product; they
19 may not be work product.  If they are work product, there maybe
20 be good cause shown for overcoming work product even in the
21 absence of any crime fraud exception.  Now, it just doesn't get
22 you all the way home.
23          With that said, on this one I'm going to go your way,
24 despite the fact that I'm not doing it on the basis that you
25 suggested.  It is a factor but it is only one factor.

1          The objection to 15 is sustained.
2          OK.  I think we are up to 18, are we not?  Maybe not.
3 Yes.  What happened to 17?
4          There is no 17 on the joint submission that you guys
5 gave to me.
6          MR. MASTRO: There is, your Honor.  That was the
7 fraudulent testing, your Honor.
8          THE COURT: I thought that was 16.  No, that was
9 criminal cases.
10          I see.  Page 19 has gone awry on me.  I'll find it.
11 So we are up to 18.  I found it.  OK.  What about 18?
12          MS. YOUNG: Patton Boggs has the same objection as to
13 the timing of the events that predated Patton Boggs'
14 involvement.
15          THE COURT: This one is overruled.  This is right at
16 the heart of what the plaintiff is halfway home on with respect
17 to the crime fraud exception -- or nearly halfway home, I
18 should say.
19          19.  Now, Mr. Mastro, when you say "Court experts"
20 here, I realize I could go back to the Mathison definitions,
21 but just tell me who they are.
22          MR. MASTRO: Sure, your Honor.
23          THE COURT: Is this Cabrera?  Is it Cabrera plus the
24 cleansing experts, so-called, or is it a broader universe?
25          MR. MASTRO: It refers to the experts appointed by the

1 Lago Agrio Court, including the settling experts.
2          THE COURT: Who are the settling experts?
3          MR. MASTRO: They would have been persons appointed by
4 the Court.  Each side had their own experts and then there were
5 settling experts --
6          THE COURT: This is back in the judicial inspections
7 era?
8          MR. MASTRO: Correct, your Honor.
9          We gave a long list of the people in that category, so
10 this is not one where they don't know who we're talking about.
11 So it included Cabrera and his technical team, but it also
12 included, but not necessarily limited to, if they are aware of
13 others in this category that we haven't listed, but we list the
14 20 or so persons who fell into this category.
15          THE COURT: And this is all before Patton Boggs gets
16 involved, right?
17          MR. MASTRO: Your Honor, it is before they became
18 involved that these people were doing their work, but, your
19 Honor, as you know, Patton Boggs came on the scene to deal with
20 the crisis.  So --
21          THE COURT: I understand.  The Cabrera crisis?
22          MR. MASTRO: The Cabrera crisis, that related in part
23 to the difference between the joint judicial inspections and
24 then going to a single global damage expert.  So there are
25 likely to be documents that Patton Boggs has, exchanges it had

1 with co-counsel or others, about that process, about particular
2 experts, about communications with particular experts as they
3 tried to salvage or resuscitate the fraud.
4          THE COURT: Ms. Young.
5          MS. YOUNG: This is actually a category of documents
6 that I would like to talk about with more specifics about the
7 burden on Patton Boggs.
8          First, as you just heard, there is a long list of
9 experts, and their involvement predated Patton Boggs'
10 involvement in the case.
11          We did a search -- I mean, just isolating Cabrera --
12 obviously, he is the one that has been discussed the most
13 here -- just looking at our top 22 document custodians' e-mail
14 only, there were over 33,000 documents relating to Cabrera.
15 Within Patton Boggs' document management system, there were
16 another 11,000-plus documents related to Cabrera alone.  That
17 in and of itself is a huge burden, and those documents are
18 likely to be only privileged documents, only documents where
19 Patton Boggs is analyzing and dealing with Chevron allegations.
20          So when we talk about burden and the burden of logging
21 all of these communications, even where it is a categorical
22 privilege log, it still requires a significant amount of review
23 and analysis to comply with this request.
24          THE COURT: Right.  Look, we got two questions here.
25 We got Cabrera and we got everybody else.

| C9pdchem | Conference | Page 57 |
|---|---|---|

1      Now, let's put Cabrera to one side.  Cabrera was after
2  this introductory point -- I mean, Cabrera is what this whole
3  fight has been about for a period of time.  It's moved beyond
4  it.  It's broadened.  But that was the flashpoint where this
5  really all blew up.  Right?
6      And counsel is nodding yes.
7      MS. YOUNG: Yes.
8      THE COURT: And that there should be a lot of hits on
9  Cabrera is not in the slightest surprising.
10      Given the evidence so far, it also ought not be
11  surprising that the case for telling you to do the review and
12  to proceed further with Cabrera without making a final judgment
13  on it now is pretty compelling.  But we're talking about a
14  whole bunch of other people that I never heard of before this
15  morning except in generic terms, and I don't hear you saying
16  anything about any likelihood of a lot of hits with respect to
17  them.  And I don't have any reason to think that there is any
18  particular burden problem with respect to them, because they've
19  just not been a focus of any of the litigation that's been
20  before us since 2010, I think.
21      Why is that not a perfectly reasonable view?
22      MS. YOUNG: Maybe that is an indication of the
23  relevance of these other experts.
24      THE COURT: Well, you may be right, first of all.  And
25  it may be, alternatively, that it is because Chevron hasn't

| C9pdchem | Conference | Page 59 |
|---|---|---|

1  probable cause, whether particular documents are in furtherance
2  of that fraud.
3      Now, it may well be that there are a lot in Patton
4  Boggs' files, if indeed there are any, that aren't in
5  furtherance; there may be others that are.  I can't tell even
6  how to approach that until and unless they are scheduled.
7      So at least for now I'm going to overrule that
8  objection and we'll see where we get.
9      Number 20.
10      MR. MASTRO: Yes, your Honor.
11      THE COURT: Isn't this covered by something already,
12  or perhaps not?
13      MR. MASTRO: Yes, your Honor.  I think there is
14  substantial overlap with number 14.
15      THE COURT: All right.  So why shouldn't my ruling be
16  the same on this one?
17      MR. MASTRO: It should be the same.  It includes
18  Cabrera-related submissions to the court is the only
19  difference.
20      THE COURT: OK.
21      MR. MASTRO: Thank you, your Honor.
22      THE COURT: And 21, also an overlap?
23      MR. MASTRO: It looks like -- your Honor, it has
24  overlap with 19, but it's more comprehensive about Cabrera and
25  Cabrera's team and all documents relating to Cabrera and

| C9pdchem | Conference | Page 58 |
|---|---|---|

1  figured out that there was other stuff going on with some of
2  these people.
3      Now, I've got a complaint that alleges that there was
4  corruption with this process in Ecuador, and this is a very
5  logical place to look at it; isn't it?
6      MS. YOUNG: Again, the fact that it predates Patton
7  Boggs' involvement in the litigation, you know, tells us that
8  it is likely to only involve privileged communications and a
9  large number of them, potentially.
10      THE COURT: Yes.  But you are overlooking the fact
11  that there has effectively been, as I remember it, summary
12  judgment for the proposition that there was corruption in the
13  appointment of Cabrera, that Cabrera's report was in
14  significant degrees ghostwritten by Patton Boggs' clients, and
15  it is not illogical in those circumstances for a reasonable
16  person to suspect, which I think is essentially the standard,
17  that that may have happened before the global expert framework
18  came on the scene with earlier experts.
19      Now, they don't have to prove summary judgment to get
20  over that hurdle; all they have to prove is probable cause.
21  Now, I'm not there yet.  I don't know whether we get there or
22  not.  I want to hear you guys fully on that subject.  But it's
23  not an unreasonable point of view to think it is possible that
24  we get there.
25      And then the next question is, assuming there is

| C9pdchem | Conference | Page 60 |
|---|---|---|

1  Cabrera's team and his reports.  It does appear to be, you
2  know, within the scope of your prior rulings as an overall
3  objection.
4      THE COURT: Don't you think it would have been a good
5  idea to have read through this stuff before you served the
6  subpoena?
7      MR. MASTRO: Your Honor, I think that there are some
8  requests that overlap, so my apologies for that.
9      THE COURT: All right.  The ruling is the same as on
10  19.
11      I'll probably take a closer look at those three before
12  I sign an order and may modify it slightly, but unless you hear
13  otherwise, that's the ruling.
14      22.  Uhl, Baron Rana & Associates?
15      MR. MASTRO: Your Honor, UBR was a consulting firm
16  that was working for the plaintiffs and became an integral part
17  of the Cabrera fraud because the plaintiffs basically
18  assigned --
19      THE COURT: They gave him part of the Cabrera report,
20  right?
21      MR. MASTRO: Exactly.  And they wrote it and they
22  passed him off in the Cabrera report as if he was part of
23  Cabrera's technical team when he was really on the plaintiffs'
24  payroll.
25      THE COURT: I see.

Case 1:22-mc-00065-LJL-FB4 Document 3833 Filed 07/16/13 Page 118 of 3264
Case 1:22-mc-00065-LJL-FB4 Document 3833 Filed 07/16/13 Page 118 of 3264

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

1     MR. MASTRO: So we think it is highly relevant.  They
2 are refusing to produce anything.  They have been fighting
3 tooth and nail on the 1782 in New Jersey and only produced some
4 documents there.  We are not asking them to produce the same
5 documents they produced in New Jersey, but we're trying to get
6 the UBR-related documents and we have not yet gotten a full
7 production there.
8     THE COURT: What about it, Ms. Young?
9     MS. YOUNG: First of all, Patton Boggs represents UBR
10 in the 1782 proceeding that I believe is ongoing in New Jersey.
11 You know, I think it is more appropriate, since Chevron is
12 pursuing the same discovery in that litigation, that it
13 continue to pursue it there and be bound by whatever rulings
14 are made in New Jersey.  It is entirely duplicative.
15     THE COURT: The standards are different; right?
16     MS. YOUNG: Your Honor, the standards may be
17 different, but I believe the relevant documents that they are
18 seeking is all the same.
19     THE COURT: That may be.  But if they are entitled to
20 them in one action and not in the other, the fact that the
21 standards are different matters, doesn't it?
22     MS. YOUNG: Chevron hasn't indicated what it believes
23 Patton Boggs has in its possession that it is not able to get
24 through the 1782 action.
25     THE COURT: Do you normally when you seek discovery,

1 Ms. Young, tell the other side what it is that you think you
2 can get from them that you don't otherwise have?  I would
3 answer that rhetorical question myself.  I never heard of
4 lawyers doing that.
5     MS. YOUNG: No.  But this is an unusual situation in
6 which a law firm is being subpoenaed for client documents.  I
7 think it is more appropriate for those documents to be sought
8 within the pending 1782 proceeding.
9     THE COURT: Overruled.
10     23.
11     MR. MASTRO: Well, your Honor, again I think the
12 relevance of the documents is clear.  Patton Boggs is refusing
13 to produce anything in this regard even though this was an
14 essential role it played in the conspiracy.  It came up with
15 the cleansing experts' concept and ran with it, and coordinated
16 those cleansing experts to try and whitewash the Cabrera fraud,
17 even though those cleansing experts did no independent work,
18 did not go to Ecuador independently.  The Patton Boggs'
19 coordinating consultant wrote two of their reports -- never
20 disclosed that.  And those experts were never told about the
21 lack of independence of the Cabrera report and largely
22 piggybacked on what Cabrera did, which was not done by Cabrera
23 at all, it was done by plaintiff's consultants.
24     So this is an essential part of the RICO conspiracy
25 and fraud claim that Patton Boggs engineered in every respect.

1 So we would think it is clearly relevant.  To the extent they
2 think there are privilege claims involved -- although these are
3 testifying experts, hard to imagine what the privilege claims
4 would be -- they can categorically log them.
5     THE COURT: Well, but your request is for all
6 documents relating to the work of these people.
7     MR. MASTRO: Yes, your Honor.
8     THE COURT: And that would include not just documents
9 from UBR or -- I'm sorry, not UBR but the other persons, it
10 would include Patton Boggs' internal stuff, right?
11     MR. MASTRO: Yes.  But, your Honor, we believe and we
12 hope that your Honor will ultimately rule that the whole
13 cleansing expert process, as Judge Francis already ruled in the
14 Count Nine case, was part of a crime fraud and privilege was
15 vitiated because that was part of the crime fraud.  It was the
16 coverup of the Cabrera fraud and the attempt to whitewash it.
17     So we believe there are internal communication on this
18 that will also not be privileged.  We think it is an example
19 of -- it is not simply whether it was in furtherance of a crime
20 fraud, and they didn't necessarily know that it was being used
21 to further a crime fraud.  Here they knew exactly what they
22 were doing, and they are the ones who engineered it to try to
23 cover up the Cabrera fraud and to, you know, salvage the case
24 in a way that was a transparent, in our view, fraud at the end
25 of the day.

1     So we believe that they should categorically log their
2 internal documents, and when your Honor makes a crime fraud
3 ruling or reviews those internal documents you will see that.
4 I could be quoting chapter and verse of what we already have
5 that I think establishes the whole cleansing expert process and
6 the internal deliberations they had that were a crime fraud.
7 There have been a number of documents produce out of Donziger
8 which I think go to this already.  And Patton Boggs' lawyers
9 admitting exactly what they were doing to cleanse, to try to
10 salvage the Cabrera fraud, and we think their own internal
11 documents will be even more candid on this subject.  So we
12 think this goes really to one of the hearts of the case,
13 because at the end of the day the judgment purports to rely on
14 some of these folks who themselves relied on Cabrera and did
15 nothing independent.  So this really goes to the heart of the
16 fraud in Ecuador.
17     THE COURT: Wasn't there disclosure that they did
18 nothing independent?
19     MR. MASTRO: Their reports do not -- their reports are
20 carefully crafted to give the impression that they reached
21 independent conclusions based on their own work.  There are in
22 one or two them a reference to Cabrera, but they were carefully
23 crafted, working with the Weinberg group, Patton Boggs
24 hand-picked consultants to coordinate them and a group that
25 drafted two of those reports, such that when each of those six

1 cleansing experts actually testified, some of them expressed
2 shock that Cabrera wasn't independent.  All of them admitted,
3 well, I didn't actually do anything independently.  Some of
4 them admitted they wouldn't have reached those conclusions or
5 they viewed them as hypothetical conclusions based on premises
6 that they were given, not on any independent work they did or
7 any independent data they collected.  They just used what was
8 in the Cabrera report, which was drafted by the plaintiffs and
9 with their tainted data.  So they didn't -- they weren't a
10 model of clarity admitting how little they did or that they
11 weren't relying on anybody else.
12       THE COURT: Thank you.
13       Ms. Young.
14       MS. YOUNG: Your Honor, a couple of points here.
15       One is that these so-called cleansing experts
16 certainly did disclose their reliance on the Cabrera data.
17 And, in fact, I think almost all of the listed individuals are
18 the subject of various 1782 proceedings around the country, and
19 in none of those proceedings has the Court found a crime fraud
20 exception.
21       THE COURT: Judge Francis did, right?
22       MR. MASTRO: So did the Weinberg court, your Honor,
23 D.C.
24       MS. YOUNG: As the Southern District of Ohio said in
25 the Barnthouse 1782 action --

1       THE COURT: May I have an answer to my question?
2       MS. YOUNG: I'm sorry, your Honor.
3       THE COURT: Judge Francis did, correct?
4       MS. YOUNG: I believe that finding was vacated, your
5 Honor.
6       THE COURT: By whom?
7       MS. YOUNG: According to my counsel, with the Weinberg
8 decision it was vacated.
9       THE COURT: Judge Francis didn't write the Weinberg
10 decision, did he?
11       Counsel, do you know who Judge Francis is.
12       MS. YOUNG: Yes, I do, your Honor.
13       May I confer with my client for a minute?
14       THE COURT: Yes.
15       (Pause)
16       MS. YOUNG: Your Honor, it is my understanding, after
17 conferring with counsel, that Judge Francis relied entirely on
18 your Honor's decision on crime fraud, which was vacated by the
19 Second Circuit.
20       THE COURT: I haven't rendered a decision on crime
21 fraud, and no such decision has gone to the Second Circuit, let
22 alone been vacated by it.
23       Now, Ms. Young, would you identify the three other
24 people at the table with you other than Mr. Leader?
25       MS. YOUNG: I stand corrected, your Honor.  This is

1 Eric Westenberger from Patton Boggs, Edward Yennock from Patton
2 Boggs, and Jonathan Peck from Patton Boggs.
3       THE COURT: And it was Mr. Westenberger whom you've
4 identified at page 67, lines 19 and 20 of the transcript
5 moments ago as your counsel; is that correct?
6       MS. YOUNG: I was referring to Patton Boggs, who is my
7 client.  I misspoke.
8       (Pause)
9       THE COURT: The objection is overruled.  You can at
10 least schedule the documents.  Then we'll see whether there is
11 crime fraud here.
12       All right.  I think this is a good point to break, and
13 we will resume at 2:15 on Thursday.
14       OK.  I thank you all.  This has been moving better
15 than I expected.
16       MR. MASTRO: Thank you very much, your Honor.  I
17 appreciate all the time.
18       THE COURT: Thank you.
19       MR. MASTRO: Thank you.
20       (Adjourned to 2:15 p m., Thursday, September 27, 2012)
21
22
23
24
25

# A

**ability (1)**
34:7
**able (12)**
16:3;20:7;21:24;
26:15;27:1;30:17;
32:25;34:7,14;41:1,2;
61:23
**absence (2)**
48:21;53:21
**absolutely (1)**
4:11
**accept (3)**
8:9;22:14;24:13
**accepted (1)**
34:2
**access (1)**
52:15
**According (1)**
66:7
**account (1)**
53:11
**accuse (1)**
42:4
**accused (1)**
22:12
**achievable (1)**
24:25
**act (4)**
10:3,24;43:5;48:11
**acted (1)**
12:19
**acting (5)**
10:6,7,12,16,23
**action (5)**
33:23;48:9;61:20,24;
65:25
**actions (3)**
23:4,5;25:7
**active (1)**
27:4
**activity (2)**
22:9;42:5
**actor (2)**
52:14,25
**actual (1)**
13:6
**actually (13)**
7:6;8:12;13:20;15:6;
17:7,15;25:24;32:6;
33:19;50:1;56:5;65:1,3
**add (4)**
7:23;11:21;20:13;
27:20
**addition (2)**
4:8,11
**address (3)**
5:17,23;26:18
**addressing (1)**
5:3
**adds (3)**
47:24;48:1,3
**Adjourned (1)**
67:20
**admission (3)**
29:16,17,17
**admissions (1)**
15:17
**admitted (2)**
65:2,4
**admitting (2)**
64:9;65:10
**advance (3)**
40:4;41:14,21
**adverse (1)**
32:4
**adversely (1)**
46:12
**affect (1)**
5:6
**affirmative (5)**
41:25;42:2,3,16;43:3
**aftermath (1)**
16:19
**again (18)**
3:14;9:2;11:23,24;
20:14,14,21;26:19;
29:8;31:16;38:18;
44:17;46:10;48:24;
52:5,10;58:6;62:11
**against (5)**
4:9;25:25;43:24;
44:7;51:21
**agent (1)**
10:13
**agents (1)**
10:12
**ago (1)**
67:5
**agreed (9)**
8:12;9:10,17,21;
12:3;13:6;24:1;25:14;
28:6
**agreeing (1)**
34:19
**agreement (9)**
9:3,18;10:1;11:3,11;
19:3;21:4;28:7;35:14
**agreements (5)**
30:8,10,19;34:18;
43:6
**Agrio (10)**
4:7;13:12,13;17:17;
34:8;38:15,21,23;43:5;
55:1
**alegato (5)**
13:22;19:8;20:4,8,25
**allegation (1)**
40:1
**allegations (12)**
12:19;17:23;22:9;
39:1,9,24;41:12,20;
43:4;50:22;53:13;
56:19

**allege (1)**
51:18
**alleged (5)**
5:7;28:18;42:16;
50:4;53:13
**alleges (2)**
51:11;58:3
**alleging (1)**
42:17
**allow (2)**
48:21,22
**almost (2)**
14:21;65:17
**alone (3)**
45:8;56:16;66:22
**along (1)**
22:20
**alter (1)**
5:6
**alternatively (1)**
57:25
**although (3)**
37:4;44:17;63:2
**altogether (1)**
48:17
**always (2)**
24:22,25
**Alyssa (1)**
9:15
**amended (5)**
4:12;51:14,19,25;
52:2
**America (1)**
19:14
**among (2)**
43:4;52:22
**amount (4)**
6:15;29:3;41:20;
56:22
**amounts (1)**
38:25
**analysis (4)**
39:8,15;41:18;56:23
**analyzed (2)**
12:18;40:1
**analyzing (2)**
41:20;56:19
**Andres (1)**
34:20
**anticipating (1)**
16:22
**anyplace (1)**
7:19
**apart (1)**
15:25
**apologies (1)**
60:8
**Apparently (3)**
19:12;30:16;34:21
**appeal (8)**
13:13;16:14,24;17:1;
19:9,17;38:16;39:3
**appear (2)**

7:2;60:1
**appearance (1)**
3:10
**appeared (2)**
4:5;23:23
**appears (3)**
19:5,9,20
**appellate (5)**
17:2,5,9,11;20:10
**application (1)**
15:11
**applications (1)**
8:25
**appoint (1)**
40:14
**appointed (2)**
54:25;55:3
**appointment (2)**
49:21;58:13
**appreciable (1)**
48:15
**appreciate (3)**
3:21;53:8;67:17
**appreciative (1)**
36:9
**approach (2)**
22:15;59:6
**approaching (1)**
6:10
**appropriate (7)**
6:20;10:13;18:5,5;
24:16;61:11;62:7
**area (1)**
21:18
**argued (1)**
13:15
**argument (10)**
5:14;7:13,22,23;
14:6,17;48:14;52:18,
19;53:7
**arguments (1)**
7:21
**arising (1)**
31:9
**arms' (1)**
32:5
**around (6)**
10:23;33:23;34:9;
43:6;45:4;65:18
**arrange (1)**
35:4
**arrangement (3)**
26:25;27:10;33:15
**arrangements (2)**
28:1,13
**arrival (3)**
21:20;22:21;53:15
**aside (1)**
46:16
**asserting (1)**
23:21
**assigned (1)**
60:18

**Associates (1)**
60:14
**assume (2)**
46:14;48:6
**assuming (1)**
58:25
**assumption (1)**
26:13
**attacks (1)**
16:22
**attempt (2)**
43:5;63:16
**attempting (2)**
7:12;52:20
**attempts (1)**
43:17
**attendees (1)**
21:12
**attorney (4)**
21:9;22:17,21;25:15
**attorney-client (1)**
4:16
**attorneys (7)**
5:19;8:6;44:11;
47:22;51:18,22;52:16
**attributable (2)**
50:7,14
**August (1)**
4:20
**authority (5)**
10:3,16;11:1;12:15,
20
**authorized (4)**
10:10,19,19,24
**avocation (1)**
21:1
**aware (4)**
18:11;23:3;40:22;
55:12
**away (4)**
46:19;47:5,6;48:9
**awry (1)**
54:10

# B

**back (9)**
31:18;32:15;39:18;
42:21;43:2;44:1;51:4;
54:20;55:6
**backed (2)**
27:5;35:13
**background (1)**
3:25
**ball (1)**
46:12
**Barnthouse (1)**
65:25
**Baron (1)**
60:14
**based (2)**
31:2;52:12;64:21;
65:5

**basic (1)**
21:24
**basically (3)**
11:16;17:4;60:17
**basis (9)**
6:7;12:13;13:1;
28:10;31:8;48:14;
51:17;52:25;53:24
**bearing (1)**
28:14
**became (4)**
10:20;33:20;55:17;
60:16
**beef (2)**
42:12,13
**began (1)**
43:21
**beginning (2)**
19:20;43:12
**behalf (9)**
4:7,10;10:3,6,7,12,
23,25;53:7
**behaved (1)**
7:17
**behest (1)**
31:2
**believes (1)**
61:22
**benefit (2)**
6:14;27:10
**Berkon (1)**
26:12
**best (1)**
3:19
**better (3)**
19:13,18;67:14
**beyond (2)**
6:25;57:3
**big (1)**
50:12
**Bless (1)**
8:14
**blew (1)**
57:5
**blow (1)**
32:1
**boards (1)**
53:2
**Boggs (89)**
3:3;4:5,11;5:1,11,17;
8:2,4;9:16,17,21;10:6,
13;11:14;12:18;13:11,
14,20;14:1,19;15:13;
16:1,9,20;17:19,22;
18:19;19:3,21;21:7;
22:1;23:7,14;24:8;
25:14;26:12,23,24;
27:9,25;28:14,16,22;
29:7,19;30:12;31:1;
33:13;34:2,17;37:3;
39:25;40:15;41:11,19;
43:21,23;44:5,10,14,
18,20;45:25;46:1,9,13,

18;47:3,10;48:6,8;
50:19,21;52:16;54:12;
55:15,19,25;56:7,19;
61:9,23;62:12,25;
64:23;67:1,2,2,6
**Boggs' (28)**
8:22,24;10:3;11:19;
17:15;18:12,15,21;
20:24;21:9,14,21;
29:18;31:2;39:8,23;
41:18;50:17;53:14;
54:13;56:9,15;58:7,14;
59:4;62:18;63:10;64:8
**Boggses (1)**
33:24
**both (6)**
16:6,6;35:3;49:12;
51:9
**bound (3)**
29:15,16;61:13
**Brazil (1)**
23:5
**breadth (1)**
5:6
**break (4)**
3:11,14,14;67:12
**breakdown (1)**
32:25
**bridge (1)**
12:2
**brief (3)**
14:15,18;17:16
**briefed (1)**
49:20
**briefing (6)**
13:21,21,22;19:6,21;
20:10
**Briefly (1)**
11:22
**briefs (2)**
13:12;14:4
**bring (1)**
33:24
**broad (1)**
12:23
**broadened (1)**
57:4
**broader (5)**
7:5;11:3,10;53:8;
54:24
**broadly (2)**
23:23;46:22
**brought (1)**
51:21
**bullshit (1)**
49:24
**bunch (1)**
57:14
**burden (22)**
4:25;5:4,7,23,24;6:1,
13;26:5;45:19;47:15,
25;48:1,3,11,13,15,16;
56:7,17,20,20;57:18

**burdened (1)**
44:20
**burdensome (1)**
4:19
**Burford (14)**
26:24;27:5;30:22,23;
31:1,8;33:1,2,2,3,12;
34:12;35:13,13
**Burford's (1)**
35:17

## C

**Cabrera (39)**
15:15,25;16:4,8;
18:25;39:2;49:20;
54:23,23;55:11,21,22;
56:11,14,16,25;57:1,1,
2,9,12;58:13;59:24,25;
60:17,19,22;62:16,21,
22,22;63:16,23;64:10,
14,22;65:2,8,16
**Cabrera-related (1)**
59:18
**Cabrera's (4)**
58:13;59:25;60:1,23
**call (2)**
15:10;48:18
**called (4)**
13:21;49:2,3,17
**came (8)**
15:4;23:7;31:11;
46:25;53:12;55:19;
58:18;62:14
**camera (1)**
12:10
**campaign (1)**
49:15
**can (13)**
3:19;9:15;18:10;
19:12;21:7;22:9;28:12;
36:24;37:8;47:5;62:2;
63:4;67:9
**Canada (1)**
23:5
**candid (1)**
64:11
**capable (1)**
34:19
**capacities (1)**
34:23
**capital (2)**
31:2,6
**card (1)**
53:15
**care (1)**
9:12
**carefully (2)**
64:20,22
**carve (1)**
39:24
**case (42)**
4:6,12;6:14,21;

10:22;11:19;13:14;
14:16;15:24,25;16:1,
23;19:23;22:23;23:7,
12,22;25:25;31:8,19;
33:8,9,13;34:24;40:10;
42:1,24;43:4,19;44:24;
46:11;47:14;48:4,20;
49:15;52:15;56:10;
57:11;63:14,23;64:12
**cases (9)**
27:4;29:25;30:14,15;
43:11,16;44:5;46:20;
54:9
**categorical (5)**
12:3,8;23:17;36:24;
56:21
**categorically (3)**
23:18;63:4;64:1
**category (4)**
55:9,13,14;56:5
**cause (4)**
17:11;53:20;58:20;
59:1
**central (2)**
48:25;49:25
**certain (8)**
4:11;10:22;15:2;
23:2;26:23;29:11;
34:13;45:11
**certainly (11)**
15:23;18:10,11;
22:10;34:23;40:10;
46:21;48:10,13;50:7;
65:16
**chance (1)**
17:8
**change (1)**
20:12
**changes (1)**
13:23
**chapter (1)**
64:4
**charges (6)**
43:24;44:3;46:3;
47:1,3;51:20
**Chernobyl (1)**
49:17
**Chevron (36)**
4:7,9;5:20;8:8;9:20;
21:8,15;22:7;23:25;
24:7,12;25:12;26:2;
30:21;34:7,11,14;37:4,
10,10,16,17;38:19;
39:2,9;42:4;43:20;
44:7,12;51:17,22;
52:15;56:19;57:25;
61:11,22
**Chevron's (6)**
12:19;39:8,23;41:12,
20;44:11
**choice (1)**
28:3
**choices (2)**

15:2,4
**Circuit (2)**
66:19,21
**circumstances (1)**
58:15
**cities (1)**
21:16
**claim (11)**
6:1;12:7,16;23:16,
17;26:20;30:21;34:9;
36:24;45:19;62:25
**claims (8)**
4:20;5:4,23;10:5,15;
50:2;63:2,3
**clarification (1)**
19:10
**clarify (3)**
37:1;40:3;41:8
**clarity (1)**
65:10
**cleanse (2)**
15:15;64:9
**cleansing (16)**
15:1,10,14;16:3;
19:7;20:6,7,25;54:24;
62:15,16,17;63:13;
64:5;65:1,15
**clear (4)**
6:3;7:7;26:4;62:12
**clearly (3)**
23:18;43:19;63:1
**client (4)**
27:17;62:6;66:13;
67:7
**clients (4)**
9:18;11:6,9;58:14
**close (4)**
5:11;43:2;48:18;
53:3
**closer (1)**
60:11
**closing (1)**
14:17
**co-conspirator (4)**
4:12;13:15;28:18;
47:11
**co-conspirators (2)**
33:20;34:6
**co-counsel (2)**
44:19;56:1
**collateral (1)**
32:11
**colleagues (2)**
15:17;46:4
**collect (5)**
5:18;8:4,23;11:25;
27:1
**collected (2)**
27:11;65:7
**colluding (1)**
36:15
**comfortable (1)**
28:1,4

**coming (4)**
15:12,24;16:1;24:8
**commencing (1)**
7:12
**committed (1)**
37:6
**common (2)**
32:7;34:9
**communication (4)**
11:8;24:8;38:13;
63:17
**communications (8)**
9:19;15:20;36:17;
41:12;46:4;56:2,21;
58:8
**company (2)**
35:23;36:2
**compelling (1)**
57:13
**complaint (9)**
4:12;28:19;51:3,7,9,
19;52:1,3;58:3
**complete (1)**
19:18
**completely (1)**
37:2
**compliance (2)**
4:17;7:6
**comply (2)**
41:15;56:23
**complying (1)**
6:1
**composition (1)**
17:2
**comprehensive (1)**
59:24
**computer (1)**
8:25
**concept (2)**
22:20;62:15
**concerned (2)**
4:4;10:2
**conclude (2)**
45:15;48:15
**concluded (1)**
30:15
**conclusion (2)**
7:20;46:18
**conclusions (3)**
64:21;65:4,5
**conducts (1)**
11:14
**confer (2)**
27:17;66:13
**conference (1)**
3:15
**conferring (3)**
12:15;27:21;66:17
**confidentiality (1)**
28:23
**confirm (2)**
9:4;29:13
**confirmation (1)**

**9:7**
**confirming (1)**
9:8
**confused (1)**
14:6
**confusion (1)**
7:23
**connection (6)**
13:12;17:17;21:15;
37:13;39:23;42:6
**considerable (1)**
41:20
**considerations (1)**
6:21
**considered (3)**
4:24;30:16;53:1
**considering (1)**
6:14
**conspiracy (11)**
10:4,15;23:7;26:21;
27:4,7;36:14;48:25;
50:12;62:14,24
**consultant (3)**
35:4,5;62:19
**consultants (2)**
62:23;64:24
**consulting (1)**
60:15
**contain (1)**
22:21
**contained (1)**
14:18
**contamination (3)**
49:22;50:4,7
**contentions (1)**
5:17
**context (4)**
3:24;16:7;52:20;
53:6
**contingency (2)**
26:25;33:14
**contingent (1)**
27:10
**continue (5)**
3:20;17:6;34:14;
50:5;61:13
**continued (1)**
31:16
**continues (1)**
19:2
**continuing (1)**
34:8
**contrary (1)**
25:3
**control (1)**
48:6
**controlled (1)**
25:6
**controversy (2)**
6:15;30:25
**convincing (1)**
7:9;48:21
**coordinate (1)**

**64:24**
**coordinated (1)**
62:15
**coordinating (1)**
62:19
**copies (1)**
25:24
**core (3)**
50:10,10,11
**corrected (1)**
66:25
**corruption (2)**
58:4,12
**cost (2)**
45:5,8
**counsel (5)**
57:6;66:7,11,17;67:5
**Count (1)**
63:14
**counterclaims (1)**
51:14
**countries (3)**
23:2;29:11,13
**country (3)**
34:9;50:8;65:18
**couple (1)**
65:14
**course (7)**
17:22;18:19;22:15;
25:21;38:24;51:13;
52:17
**COURT (193)**
3:1,2,6,8,19,22;4:6;
8:14,17,19;9:10,12,23;
11:12,22;12:12,21,25;
13:9,16,25;14:1,6,13,
16,20,22;15:5,6,8,11,
12;16:3,14,24;17:13,
24;18:10,11,13,14,21,
24;19:14,24;20:17,21;
21:17;22:6,11;23:20;
24:15,20;25:10,12,16,
20;26:8,10;27:9,13,18,
22;28:3,9,12,15,18;
29:1,9;30:4,7,20;31:14,
21;32:1,4,9,15,20;33:6,
16;34:1,15;35:1,7,10,
16,21,24;36:1,3,9,12,
22,25;37:8,17,20,25;
38:5,10,16,17,22,23;
39:5,10;40:2,8;41:7,9,
15,22;42:2,7,13,21,23;
43:9,11,15,21;44:9,15,
23;45:5,9,22;46:1,5;
47:12,20;48:3,13;
49:10,16,24;50:15,24;
51:1,4,7,23;52:4,9,18;
53:5;54:8,15,19,23;
55:1,2,4,6,15,21;56:4,
24;57:8,24;58:10;
59:11,15,18,20,22;
60:4,9,19,25;61:8,15,
19,25;62:9;63:5,8;

**64:17;65:12,19,21,22;**
66:1,3,6,9,14,20;67:3,
9,18
**courts (2)**
6:11;38:24
**cover (2)**
10:1;63:23
**covered (1)**
59:11
**coverup (1)**
63:16
**cozy (1)**
47:4
**craft (1)**
17:10
**crafted (2)**
64:20,23
**crafting (1)**
17:11
**create (2)**
21:7;49:25
**crew (2)**
49:4,19
**crime (13)**
22:16;53:21;54:17;
63:14,15,19,21;64:2,6;
65:19;66:18,20;67:11
**criminal (20)**
42:24;43:11,16,17,
24;44:3,6,18;45:3,4,4;
46:3,21;47:1,3;48:7;
51:17,20,25;54:9
**crisis (3)**
55:20,21,22
**critically (3)**
16:2;33:10,19
**crux (1)**
4:13
**currently (1)**
26:1
**custodians' (1)**
56:13
**cut (4)**
7:24;20:14;30:23;
39:20
**cutoff (1)**
20:3

**D**

**damage (1)**
55:24
**data (4)**
9:6;65:7,9,16
**dates (5)**
18:21;21:15,20;
22:22,23
**day (3)**
3:20;63:25;64:13
**DC (1)**
65:23
**de (1)**
45:9

**deal (6)**
5:9,16;10:17;20:17;
25:10;55:19
**dealing (4)**
24:4;32:4;43:12;
56:19
**debunks (1)**
50:10
**December (1)**
20:9
**decide (3)**
24:20;32:10;35:18
**decided (2)**
30:14,15
**decision (7)**
4:20;20:11;66:8,10,
18,20,21
**decisions (2)**
40:25;46:3
**defendant (1)**
28:16
**defendants (3)**
36:15;47:10;49:1
**defense (4)**
42:2,14;43:3;50:11
**defenses (3)**
42:1,3,16
**defined (2)**
20:25;42:24
**definitely (1)**
11:10
**definitions (2)**
5:12;54:20
**definitively (1)**
5:3
**defraud (2)**
34:5,6
**defrauded (3)**
30:17;34:13;35:15
**defrauding (1)**
34:10
**degree (2)**
6:4;18:6
**degrees (2)**
53:9;58:14
**deliberations (1)**
64:6
**demanded (1)**
21:8
**denies (1)**
17:22
**deny (1)**
29:13
**departure (2)**
21:20;22:22
**depending (1)**
3:11
**depends (1)**
45:22
**depicts (1)**
49:4
**deposition (2)**
35:17;52:23

**derivative (1)**
16:4
**described (1)**
11:13
**describes (1)**
47:19
**designate (1)**
29:23
**designed (1)**
24:11
**designing (1)**
24:22
**desirable (1)**
24:24
**despite (1)**
53:24
**determine (1)**
22:4
**detriment (1)**
34:11
**difference (4)**
42:9;45:10;55:23;
59:19
**differences (1)**
13:22
**different (5)**
7:2;29:19;61:15,17,
21
**differently (1)**
44:23
**difficult (1)**
24:5
**diligent (1)**
40:20
**directed (1)**
17:15
**directly (2)**
10:11;51:20
**disagreement (2)**
21:6,19
**disaster (3)**
49:6,17;50:14
**disclose (1)**
65:16
**disclosed (2)**
28:25;62:20
**disclosing (1)**
31:18
**disclosure (2)**
4:16;64:17
**disclosures (1)**
29:3
**discovery (15)**
6:12,16;22:12,13;
24:23;30:25;31:9;
32:25;40:20;47:10;
52:13;53:1,16;61:12,
25
**discredited (1)**
18:25
**discretion (1)**
6:11
**discussed (2)**

4:19;56:12
**discussing (2)**
12:14;28:1
**discussion (1)**
24:13
**discussions (3)**
31:18,24;44:18
**dismissed (1)**
51:21
**dispute (5)**
4:13;8:3;13:9;25:13;
27:9
**disputes (1)**
4:23
**distinguished (1)**
5:25
**distraction (1)**
46:23
**district (2)**
6:11;65:24
**divided (1)**
11:16
**docket (2)**
51:12,25
**doctrine (1)**
4:17
**document (9)**
8:24;9:14;16:2;
17:22;37:9;46:8;52:2;
56:13,15
**documents (96)**
4:15;5:18;8:4,21,23;
9:5,20;11:3,7;12:1,10,
14,18,24;13:11;14:25;
15:3,12,16,18,19;
16:10,17,25;17:15,19;
18:10,12,14,15,16;
20:23;23:1,10;24:2,6,
14;25:7,8,15,24;26:20;
28:5;29:20;30:17,24;
31:13;32:24;33:12;
34:11;35:1;36:8,21;
37:9,13;38:24;39:5,8,
13;40:4,10,15,16;
41:13,18;43:25;44:4,
15,21;46:17;48:12;
49:6;50:20;55:25;56:5,
14,16,17,18,18;59:1,
25;61:4,5,6,17;62:6,7,
12;63:6,8;64:2,3,7,11;
67:10
**done (8)**
3:15,16;11:16;30:21;
39:23;41:5;62:22,23
**Donziger (15)**
11:5;15:22;16:17;
25:25;26:6,10;40:12;
49:4,19,21;52:11,13,
23;53:7;64:7
**Donziger's (2)**
44:12;51:10
**doubt (1)**
7:18

**down (2)**
22:14;46:15
**draft (2)**
14:18;19:3
**drafted (4)**
15:9;39:22;64:25;
65:8
**drafting (6)**
14:4,14;15:1,13;
16:2;40:24
**drafts (6)**
13:23;14:7,7,8;
25:16,17
**draw (1)**
26:14
**dress (1)**
3:25
**drew (1)**
3:9
**drive (1)**
15:21
**drop (1)**
46:3
**dropped (2)**
43:18,24
**duces (1)**
4:5
**duped (1)**
33:21
**duplicative (1)**
61:14
**durations (2)**
21:24;22:24
**during (1)**
17:20

**E**

**earlier (5)**
10:21;13:23;38:7;
46:9;58:18
**early (3)**
16:18;18:23;20:3
**Ecuador (24)**
15:14;18:11,14;19:7,
12;21:9,15,23;22:1;
36:16;37:3,12;43:25;
44:3,12;46:10,21;
47:14;48:7;49:23;
50:14;58:4;62:18;
64:16
**Ecuadorian (2)**
16:3;18:20
**Ed (1)**
3:3
**edict (1)**
38:15
**edited (1)**
14:1
**Edward (1)**
67:1
**effectively (1)**
58:11

**efficient (2)**
7:14,20
**effort (2)**
34:14;44:11
**efforts (1)**
30:18
**either (5)**
3:13;27:3;33:17;
34:5;40:13
**elaborating (1)**
41:22
**electronic (2)**
8:23;24:23
**element (3)**
48:25;50:10,11
**else (12)**
9:23;20:5;25:15;
26:5;29:18;30:1;31:19;
41:5;49:11,17;56:25;
65:11
**e-mail (1)**
56:13
**e-mails (1)**
24:4
**emerge (1)**
18:25
**emerged (1)**
40:16
**emerges (1)**
19:1
**enable (1)**
29:23
**encourage (1)**
44:11
**end (3)**
21:11;63:24;64:13
**enforcement (6)**
19:11;23:4,4,8;25:7;
35:6
**engage (1)**
24:13
**engaged (2)**
42:5;49:1
**engineered (2)**
62:25;63:22
**engineering (1)**
19:22
**enlighten (1)**
37:8
**enough (2)**
4:2;41:2
**enterprise (2)**
7:10;31:5
**entirely (2)**
61:14;66:17
**entirety (4)**
10:1;14:11;23:14;
27:1
**entitled (7)**
22:4;23:12,19;31:13;
35:1;50:9;61:19
**enumerated (1)**
5:24

**environmental (4)**
49:16;50:4,7,13
**equation (1)**
53:11
**equipment (1)**
49:8
**era (1)**
55:7
**Eric (1)**
67:1
**escrito (1)**
38:14
**essence (1)**
13:9
**essential (4)**
23:6;34:4;62:14,24
**essentially (3)**
4:14;45:9;58:16
**established (1)**
37:25
**establishes (1)**
64:5
**etc (2)**
40:14,14
**evaluated (1)**
4:21
**eve (1)**
15:12
**even (27)**
4:18;6:12;10:6,21,
25;11:8,8;17:6;19:10,
13;22:17;29:13;31:22;
32:1;46:25;47:18;48:7;
49:8;50:3,19;53:3,20;
56:21;59:5;62:13,17;
64:11
**event (1)**
19:19
**events (5)**
50:17,20,22,23;
54:13
**Everybody (3)**
4:1;29:14;56:25
**evidence (11)**
13:16;14:8;33:7;
41:19;49:18,22;50:1,2,
6,10;57:10
**evidencing (2)**
12:15;41:13
**evident (1)**
23:12
**ex (1)**
49:4
**exact (1)**
52:14
**exactly (8)**
11:14;18:22;31:21;
33:4;40:12;60:21;
63:21;64:9
**examining (1)**
33:17
**example (3)**
24:7;30:23;63:18

**examples (1)**
17:18
**except (4)**
5:16;18:4;25:21;
57:15
**exception (4)**
22:17;53:21;54:17;
65:20
**exceptions (1)**
5:13
**exchanges (7)**
10:18;11:4,6;33:2;
35:13;44:5;55:25
**exclude (3)**
12:17;25:23,23
**excluded (1)**
8:10
**Excuse (2)**
27:16;53:13
**execute (1)**
23:8
**executed (3)**
30:8,10;34:18
**exercising (1)**
11:1
**exist (2)**
11:8;40:6
**exists (2)**
12:16;46:7
**expected (1)**
67:15
**expecting (2)**
41:10,15
**expense (1)**
6:13
**expert (7)**
19:7;20:7;40:14;
55:24;58:17;63:13;
64:5
**experts (22)**
15:14;16:4;49:20,21;
54:19,24,25;55:1,2,4,5;
56:2,2,9;57:23;58:18;
62:16,17,20;63:3;65:1,
15
**experts' (1)**
62:15
**expressed (1)**
65:1
**extensive (2)**
6:6,7
**extent (10)**
5:23;6:12;7:2;18:4,
9;23:16;27:11;36:23;
44:14;63:1
**extort (2)**
34:7,14
**extortion (1)**
23:9
**extremely (3)**
31:12;45:24;47:6

**F**

**fact (14)**
13:18;17:19;31:17;
37:20;40:8,20;46:13;
52:12;53:12,24;58:6,
10;61:20;65:17
**factor (4)**
53:1,2,25,25
**failure (1)**
42:11
**fair (1)**
8:11
**faith (1)**
31:8
**Fajardo (3)**
11:5;24:8;40:11
**falling (1)**
15:25
**familiar (1)**
52:18
**far (2)**
7:17;57:10
**fashion (2)**
9:6;12:3
**favored (1)**
53:11
**feasible (1)**
3:12
**February (1)**
16:18
**fee (1)**
27:10;33:15
**fell (1)**
55:14
**felt (3)**
33:21;34:12;35:14
**few (2)**
4:2;53:9
**fewer (2)**
5:19;8:7
**fiction (1)**
50:1
**Fifth (1)**
6:24
**fight (1)**
57:3
**fighting (1)**
61:2
**figure (1)**
45:7,8
**figured (1)**
58:1
**filed (6)**
14:9;17:19;19:22;
20:8,9;23:5
**files (3)**
11:19;44:13;59:4
**final (8)**
13:21,22,24;14:15,
16,19;19:7;57:12
**Finally (1)**

7:12
**financial (2)**
28:1,8
**financiers (2)**
10:8;27:3
**find (5)**
26:15;39:19;46:7,8;
54:10
**finding (1)**
66:4
**fine (1)**
30:2
**finished (1)**
53:5
**firm (7)**
3:4;26:13,23,24;
27:2;60:15;62:6
**firms (2)**
10:8;33:25
**firm's (1)**
9:6
**firm-wide (1)**
8:24
**First (15)**
4:4,14;5:11;6:6,10;
17:7;19:22;29:23;
37:21;47:22;51:19;
52:2;56:8;57:24;61:9
**fix (2)**
16:21;46:10
**flagged (1)**
39:12
**flashpoint (1)**
57:4
**focus (2)**
5:7;57:19
**focused (1)**
52:13
**folks (1)**
64:14
**follows (1)**
25:2
**foreign (3)**
29:11,13;35:5
**foremost (1)**
6:10
**form (1)**
29:23
**forth (6)**
17:23;21:13;31:18;
40:16;44:1;46:17
**fortunate (1)**
41:2
**found (2)**
54:11;65:19
**four (1)**
39:13
**Fourthly (1)**
6:9
**framework (2)**
5:10;58:17
**Francis (6)**
63:13;65:21;66:3,9,

11,17
**frankly (1)**
11:18
**fraud (48)**
10:4,15;15:15,25;
16:7,8,9;19:10;22:17;
23:12;30:11,11;31:12;
33:5;22;34:9;41:19;
42:4,11,17;49:25;
50:12,12;51:11,16;
53:13,21;54:17;56:3;
59:2;60:17;62:16,25;
63:14,15,16,20,21,23,
24;64:2,6,10,16;65:19;
66:18,21;67:11
**fraudulent (7)**
36:16;42:5;43:5;
49:1,18;50:3;54:7
**Friedman (1)**
53:7
**front (1)**
51:23
**full (2)**
15:23;61:6
**fully (3)**
36:9;53:8;58:22
**functioning (1)**
34:22
**fund (3)**
30:13;31:10;32:10
**fundamental (1)**
8:3
**funded (1)**
31:5
**funders (3)**
26:24;30:18;33:20
**funding (16)**
28:13;30:8,10,19,23;
31:1,16,17,17;32:8,22;
33:3;34:13,18;35:4,14
**further (4)**
7:7;38:1;57:12;
63:21
**furtherance (3)**
59:1,5;63:19
**furthermore (1)**
22:16
**futility (1)**
51:15

**G**

**gained (1)**
27:11
**gap (1)**
12:3
**garden (1)**
29:22
**gather (3)**
3:6;13:5;52:17
**gathered (1)**
52:16
**gave (4)**

31:5;54:5;55:9;
60:19
**general (6)**
3:25;5:12,16;8:1,20;
38:7
**generate (1)**
26:25
**generic (1)**
57:15
**genuine (1)**
50:3
**get-out-of-jail-free (1)**
53:15
**gets (1)**
55:15
**ghostwriting (1)**
16:7;17:6;41:13,21
**ghostwritten (2)**
13:18;58:14
**given (4)**
7:15;24:17;57:10;
65:6
**gives (1)**
6:11
**giving (1)**
39:18
**global (3)**
40:14;55:24;58:17
**glove (1)**
26:12
**God (2)**
4:1;46:14
**goes (19)**
10:11,14;11:13,17,
24;12:6;13:14;18:18;
23:6,10;26:19;27:2;
35:17;38:18;41:25;
47:13;48:25;64:12,15
**good (6)**
25:2;31:8;53:10,20;
60:4;67:12
**government (7)**
29:10,12;36:15,17;
47:2,4,6
**granted (1)**
7:9
**grounds (1)**
51:15
**groundwater (1)**
49:22
**group (2)**
64:23,24
**guess (1)**
26:8
**guys (3)**
34:19;54:4;58:22

**H**

**half (1)**
3:13
**halfway (2)**
54:16,17

**hand (1)**
26:12
**hand-picked (1)**
64:24
**happen (2)**
19:14,16
**happened (3)**
50:17;54:3;58:17
**happens (1)**
46:16
**hard (3)**
15:21;37:10;63:3
**Havoc (1)**
49:4
**hear (5)**
7:13;25:2;57:15;
58:22;60:12
**heard (6)**
25:8;47:16,17;56:8;
57:14;62:3
**heart (10)**
10:14;11:17;13:14;
16:9;23:11;26:20;
36:14;47:13;54:16;
64:15
**hearts (1)**
64:12
**heck (1)**
41:23
**held (1)**
29:11
**help (1)**
32:23
**helpful (4)**
5:14;7:14,20;40:1
**helping (2)**
17:10;35:4
**highly (4)**
27:7;35:15;36:18;
61:1
**hit (2)**
46:6,11
**hits (9)**
45:11,13,22;47:16,
16,18,24;57:8,16
**Hold (1)**
19:24
**home (4)**
46:6;53:22;54:16,17
**Honor (111)**
3:17,21;8:12,16,18;
9:2,11,15,25;10:17,20;
11:10,21;12:11,17;
13:8,10,14;14:3;15:18;
16:15;17:1;19:1,17;
20:6,13;21:18;23:1,6,
25;25:5,11;26:3,19;
27:12,14,16,20,23,25;
28:20,22;29:2,6;30:3,6,
9,22;32:22;33:10,18;
34:4,21;35:8,12,19;
36:7,8,13;38:9,12;
40:19;41:8,25;42:10,

15,19,22;43:1,8,10,14,
16,23;45:18,23;47:1,8,
18;48:24;49:12;51:2,6;
52:6,11;54:6,7,22;55:8,
17,19;59:10,13,21,23;
60:7,15;61:16,12,11;
63:7,11,12;64:2;65:14,
22;66:2,5,12,16,25;
67:16
**Honor's (1)**
66:18
**hoodwinked (1)**
31:11
**hook (1)**
48:10
**hope (6)**
7:14,23;21:5;30:25;
51:13;63:12
**host (1)**
21:10
**hostile (1)**
33:2
**hotel (1)**
49:3
**hour (1)**
3:13
**hours (3)**
5:19;8:7,8
**housekeeping (1)**
3:8
**huge (3)**
47:15,16;56:17
**hugely (1)**
47:19
**hurdle (1)**
58:20
**hypothetical (1)**
65:5

**I**

**IBM (1)**
33:17
**idea (1)**
60:5
**identical (3)**
25:21,23;32:18
**identification (1)**
21:21
**identified (7)**
20:4,5,6,8,9;40:4;
67:4
**identify (3)**
22:1;26:2;66:23
**identifying (2)**
21:10,14
**identity (1)**
22:21
**illogical (1)**
58:15
**imagine (3)**
22:11;37:11;63:3
**immunity (3)**

36:19;37:2,23
**impermissibly (1)**
12:23
**implied (1)**
45:24
**implore (1)**
35:12
**import (1)**
47:1
**importance (2)**
6:15,16
**important (8)**
5:7;10:9,21;16:2,15;
33:11,19;46:2
**impression (1)**
64:20
**improper (1)**
22:9
**improve (1)**
19:11
**inappropriate (1)**
50:18
**inception (1)**
45:25
**include (2)**
63:8,10
**included (2)**
55:11,12
**includes (3)**
38:16;49:12;59:17
**including (7)**
13:19;19:9;25:16;
26:23,24;27:4;55:1
**incremental (3)**
45:5,7;48:16
**indebted (1)**
43:9
**indeed (3)**
22:18;33:8;59:4
**independence (1)**
62:21
**independent (7)**
62:17;64:15,18,21;
65:2,6,7
**independently (2)**
62:18;65:3
**indicate (1)**
6:18
**indicated (5)**
12:13;13:2;20:22;
37:19;61:22
**indication (1)**
57:22
**indictment (1)**
3:9
**indictments (1)**
51:17
**indigenous (1)**
10:24
**individual (3)**
5:25;7:4,13
**individuals (3)**
26:22;27:3;65:17

**induce (2)**
30:13,18
**induced (1)**
31:10
**information (12)**
12:6;21:11;22:3;
24:11;28:8,24;29:7,24;
30:1;32:14;52:16,17
**initial (1)**
3:10
**initiate (1)**
43:17
**initiated (1)**
44:7
**inquiry (1)**
32:14
**inspection (1)**
49:5
**inspections (5)**
40:13;49:11,13;55:6,
23
**instance (2)**
6:6;29:23
**instructions (1)**
5:13
**integral (3)**
13:21;34:13;60:16
**integrally (1)**
19:6
**intend (3)**
6:2;7:7,22
**interactions (1)**
11:15
**interest (4)**
3:4;17:24;29:18;
32:7
**interested (2)**
37:5;38:20
**interesting (1)**
11:5
**interests (1)**
26:22
**internal (9)**
15:19;24:7;41:12;
63:10,17;64:2,3,6,10
**internally (1)**
44:19
**interposed (1)**
5:11
**into (5)**
16:16;34:6,13;53:11;
55:14
**introduce (1)**
3:2
**introductory (1)**
57:2
**invade (1)**
11:19
**investigation (1)**
44:6
**investigations (2)**
43:17;44:6
**investing (1)**

34:6
**investors (1)**
33:7
**Invictus (3)**
23:8;31:3;35:6
**involve (1)**
58:8
**involved (13)**
4:6;13:11;14:15;
19:6,9;33:13,17;44:10;
45:25;46:9;55:16,18;
63:2
**involvement (15)**
13:19;14:14,25;15:4;
16:11;17:16;18:15,21;
20:24;50:17,20;54:14;
56:9,10;58:7
**isolating (1)**
56:11
**issue (6)**
10:21;11:25;19:10;
25:15;26:7;32:11
**issued (2)**
38:15,24
**issues (12)**
5:3;6:16,17;10:11;
17:3,5,21;18:1,4;
32:22;46:16;48:20
**item (1)**
51:25
**items (1)**
39:4
**it's- (1)**
22:7

**J**

**Jersey (4)**
61:3,5,10,14
**job (3)**
43:22,24;46:10
**Joe (2)**
27:5,5
**join (1)**
27:3
**joint (2)**
54:4;55:23
**Jonathan (1)**
67:2
**judge (12)**
17:3,4;21:23;22:8;
40:12;49:5;63:13;
65:21;66:3,9,11,17
**judgment (22)**
13:16,17,23,24;14:2,
9,21;16:22;17:4,9;
19:8;27:2,11;36:16;
38:14;39:2;40:5,9;
57:12;58:12,19;64:13
**judgments (3)**
6:19;16:6;38:20
**judgment's (1)**
16:19

**judicial (5)**
40:13;49:10,13;55:6,
23
**jurisdiction (1)**
10:11
**jurisdictional (1)**
23:22
**justice (1)**
44:3
**justify (1)**
22:25

**K**

**keep (1)**
31:10
**keeping (1)**
22:8
**Keker (1)**
26:13
**kept (1)**
31:5
**key (2)**
19:6;22:3
**killed (1)**
46:20
**kind (4)**
23:15;46:12;47:14,
16
**knew (7)**
14:4;15:16,17;16:11,
12;40:12;63:21
**knowing (1)**
15:25
**knowledge (5)**
15:6;40:5;41:14,21;
52:24
**known (1)**
19:14
**knows (5)**
4:1,1;14:1;29:14;
44:12
**Kohn (3)**
27:5,5;34:12

**L**

**lab (2)**
49:3,4
**lack (1)**
62:21
**Lago (10)**
4:7;13:12,13;17:17;
34:8;38:15,21,23;43:5;
55:1
**Lago-related (1)**
40:25
**language (4)**
19:13,18;20:12;45:3
**LAPs (8)**
10:4,6,12;15:14;
34:14;35:5;44:7;47:4
**LAPs-related (1)**

**large (2)**
47:23;58:9
**largely (1)**
62:21
**last (1)**
47:20
**late (1)**
19:23
**later (10)**
7:5;12:8;16:22;
19:11;25:9;30:15;
31:11;33:21;43:18;
50:23
**latter (1)**
4:8
**law (6)**
3:4;10:7;34:1,9,25;
62:6
**lawsuit (1)**
29:17
**lawsuits (1)**
4:9
**lawyer (3)**
34:20,22,23
**lawyers (8)**
7:16;10:22;13:20;
21:14,21;43:25;62:4;
64:8
**lead (1)**
45:16
**LEADER (11)**
3:2,7,17,21;8:15,16;
9:10,11;17:13;26:11;
66:24
**learn (1)**
41:2
**learned (2)**
50:22;53:16
**least (7)**
4:23;6:3;8:10;20:23;
26:13;59:7;67:10
**leave (1)**
45:10
**led (2)**
43:18;53:11
**left (2)**
50:8,9
**legal (4)**
5:20;6:22;8:21,23
**length (1)**
32:5
**less (1)**
8:8
**letters (1)**
33:3
**lied (1)**
50:13
**life (3)**
24:24;34:22,24
**lifeblood (1)**
31:6
**light (3)**

6:20;7:2,6
**likelihood (2)**
45:15;57:16
**likelihoods (1)**
48:19
**likely (11)**
6:14;7:8,8;12:23;
45:17;46:4,15,24;
55:25;56:18;58:8
**limit (5)**
6:11;7:3;8:13;39:3;
40:8
**limitation (6)**
8:9;12:22;30:7;
37:18,20,21
**limited (6)**
30:10,24;35:11;
45:20;47:15;55:12
**limits (1)**
31:20
**lines (1)**
67:4
**list (9)**
8:10,13;17:20;20:16,
20,20;55:9,13;56:8
**listed (2)**
55:13;65:17
**lists (1)**
32:19
**literally (1)**
14:18
**litigate (1)**
33:23
**litigation (33)**
4:1,6;5:20;7:18;8:8;
11:14,16;13:13;17:17;
18:20;19:5;21:15;28:2,
14,17,25;29:5,24;
30:14;32:7;34:8;37:7,
12,16;38:21,23;43:5;
46:2;50:18;52:17;
57:19;58:7;61:12
**litigations (2)**
34:9;37:10
**little (4)**
11:18;19:18;32:16;
65:10
**location (1)**
48:12
**locations (1)**
21:11
**log (22)**
4:18,22;5:18;6:7;
8:5;12:2,8;21:7,8,14,
19;22:20,21;23:17;
25:18;36:24;38:4;
39:25;41:11;56:22;
63:4;64:1
**logged (1)**
12:7
**logging (4)**
11:25;12:3;44:20;
56:20

**logical (3)**
26:13;47:1;58:5
**long (5)**
9:7;22:3;46:12;55:9;
56:8
**Look (7)**
17:24;19:24;21:19;
45:13;56:24;58:5;
60:11
**looking (3)**
9:20;24:10;56:13
**looks (1)**
59:23
**loop (1)**
43:2
**loosely (1)**
37:4
**lot (6)**
17:5;39:5,7;57:8,16;
59:3
**lunch (2)**
3:11,14

**M**

**main (1)**
8:6
**maintained (1)**
9:5
**major (2)**
6:6;14:12
**makes (2)**
42:9;64:2
**making (3)**
15:17;53:9;57:12
**management (2)**
8:25;56:15
**managing (1)**
3:3
**manipulate (1)**
20:12
**manipulation (1)**
17:6
**manipulative (1)**
49:2
**manner (2)**
7:15;13:16
**many (8)**
16:19;33:24;40:17,
22;44:15;45:22;50:2;
53:10
**Master (1)**
17:18
**MASTRO (113)**
8:12,18;9:1,2,3,25;
11:13,21,23;13:8,10;
14:11,14,24;16:15;
17:1,23;18:9,24;19:1,
16;20:4,6,19;21:1,17,
18;22:25;23:1;25:4,5,
11,19;26:3,9,19;27:12,
14,20,23;29:1,2,25;
30:2,9,22;32:21;33:10,

18;34:4,21;35:3,8,11,
19;36:1,2,7,11,13,23;
38:9;40:2,7,18,19;
41:24,25;42:3,10,15,
22;43:1,10,14,16,23;
45:15,18,23;46:25;
47:13;48:24;49:12;
51:2,6,9;52:2,6;54:6,
19,22,25;55:3,8,17,22;
59:10,13,17,21,23;
60:7,15,21;61:1;62:11;
63:7,11;64:19;65:22;
67:16,19
**Mastro's (1)**
47:20
**material (4)**
5:6;6:23;14:19;
48:20
**materials (1)**
11:18
**Mathison (1)**
54:20
**matter (5)**
4:18;6:22;9:5;18:17;
41:5
**matters (4)**
5:8;6:12;52:13;
61:21
**may (36)**
7:2;11:21;14:7;19:2,
5,20;24:24;28:3;31:23;
32:1,22;35:8;39:14,14;
41:5,8;43:25;45:13;
47:25;48:19;53:16,16,
17,17,18,19;57:24,25;
58:17;59:3,5;60:12;
61:16,19;66:1,13
**maybe (8)**
28:12;32:9,9,10;
34:12;53:19;54:2;
57:22
**mean (12)**
7:15,16;12:17;17:25;
26:10;28:3;37:15;
38:24;40:8;48:5;56:11;
57:2
**meaning (1)**
13:24
**meaningful (1)**
32:13
**means (2)**
8:5;47:3
**media (1)**
29:11
**meet (1)**
22:8
**meet-and-confer (3)**
9:20;17:20;37:4
**meeting (4)**
21:22,23;22:23;24:9
**meetings (3)**
21:11,22,24
**membership (2)**

26:21;27:8
**memo (1)**
  15:10
**memory (1)**
  40:11
**mentioned (1)**
  51:9
**merit (1)**
  31:4
**merits (1)**
  31:19
**met (2)**
  21:21;22:2
**mid-2010 (2)**
  15:11;20:8
**might (6)**
  6:25;7:1;18:6;23:3;
  24:11;32:23
**million (1)**
  26:25
**millions (1)**
  31:2
**mind (3)**
  5:9;6:11;7:25
**minimis (1)**
  45:10
**minimize (1)**
  18:6
**minimum (1)**
  28:22
**minute (1)**
  66:13
**mirrors (1)**
  49:24
**misapply (1)**
  52:21
**misconduct (2)**
  22:12,17
**misrepresentations (1)**
  30:12
**misspoke (1)**
  67:7
**misstated (1)**
  8:7
**mixed-fee (1)**
  33:14
**model (1)**
  65:10
**modifications (1)**
  17:9
**modified (3)**
  12:13;13:4,6
**modify (4)**
  7:3;13:2;20:23;
  60:12
**moment (1)**
  6:25
**moments (1)**
  67:5
**money (3)**
  33:11,12,14
**more (24)**
  3:6;7:11;10:7;11:19;

23:23;25:8;27:20;
32:16;34:23,24;35:8;
38:7,25;41:3,4;46:15,
22,24;53:9;56:6;59:24;
61:11;62:7;64:11
**morning (3)**
  3:23;53:10;57:15
**most (4)**
  5:2,7;22:11;56:12
**motion (8)**
  15:10;17:16;20:7,10,
  11,25;21:1;39:2
**motions (4)**
  13:12;15:1;16:20;
  19:12
**motive (1)**
  28:15
**motives (1)**
  26:22
**move (3)**
  8:14,19;19:17
**moved (1)**
  57:3
**moving (2)**
  19:10;67:14
**much (6)**
  38:7,20;45:19;46:15;
  47:17;67:16
**must (3)**
  7:14;15:7;33:3
**myself (1)**
  62:3

## N

**nail (2)**
  15:20;61:3
**named (2)**
  4:11;13:15
**names (1)**
  32:19
**narrative (1)**
  4:3
**narrowing (2)**
  18:5;37:6
**national (1)**
  33:25
**nearly (1)**
  54:17
**necessarily (4)**
  15:19;47:9;55:12;
  63:20
**need (11)**
  17:7;18:12;22:13;
  26:2;27:16;29:7;33:4;
  41:11;45:3;46:6,8
**needed (1)**
  31:6
**needs (2)**
  6:7,14
**nevertheless (4)**
  13:24;14:2,20;15:7
**New (5)**

10:13;61:3,5,10,14
**Newberry (1)**
  3:3
**next (1)**
  58:25
**Nextant (2)**
  35:22;36:2
**nice (1)**
  46:19
**Nine (1)**
  63:14
**nine-document (1)**
  48:4
**nine-figure (1)**
  27:10
**Nobody (1)**
  35:16
**nodding (1)**
  57:6
**noise (1)**
  27:6
**none (1)**
  65:19
**non-Ecuadorian (1)**
  19:5
**nor (1)**
  29:13
**normally (2)**
  52:17;61:25
**number (35)**
  4:9,24;8:20;9:14;
  13:5;15:9;21:4;22:25;
  23:21;25:1,3,6,12;
  26:16;32:17;35:21,22;
  38:6;41:11,23;42:23;
  43:11;45:11;47:15,16,
  23;48:1;51:5,6;52:2,
  10;58:9;59:9,14;64:7

## O

**object (1)**
  23:18
**objection (25)**
  8:1,20,22;12:5;13:3,
  4;21:2;23:20;24:19;
  25:20;26:14;35:25;
  37:2,23;38:2,3,5;41:7;
  48:16;50:24;54:1,12;
  59:8;60:3;67:9
**objections (13)**
  5:1,5,10,12,15,16;
  7:3,13,22;8:2;23:22;
  34:17
**objects (1)**
  23:14
**obligation (1)**
  24:17
**obliged (1)**
  5:18
**obtain (1)**
  32:25
**obtaining (1)**

33:20
**obvious (1)**
  17:21
**Obviously (5)**
  3:3;26:10;42:10;
  43:18;56:12
**occurred (3)**
  10:18;17:6;50:14
**o'clock (1)**
  3:18
**off (4)**
  30:23;31:20;48:10;
  60:22
**offered (1)**
  21:13
**official (1)**
  38:13
**officials (2)**
  36:15,17
**Ohio (1)**
  65:24
**OK (30)**
  3:19;9:12;13:5,9;
  17:24;18:7,8;20:18,21;
  21:4;22:25;25:1,19,20;
  30:4,7;31:17;37:25;
  38:5,10;40:2;41:6;
  42:13;43:15;48:23;
  52:4;54:2,11;59:20;
  67:14
**once (3)**
  7:11,11;48:24
**one (34)**
  4:10;5:22;6:13;
  11:21;13:6;15:10;18:6;
  20:13;21:7;22:20;
  24:15;27:20,22;32:15,
  22;34:10;35:8;40:9,16;
  42:16;43:1;46:7;51:4;
  53:23,25;54:15;55:10;
  56:12;57:1;59:16;
  61:20;64:12,22;65:15
**ones (5)**
  39:13,16;41:1;43:18;
  63:22
**one-word (1)**
  45:6
**ongoing (1)**
  61:10
**only (18)**
  8:6;15:21;16:17;
  21:6,18,20;26:13;
  29:24;33:22;34:8;39:1;
  53:25;56:14,18,18;
  58:8;59:18;61:3
**opinion (2)**
  17:11;19:19
**opinions (2)**
  19:13;40:24
**opposed (3)**
  25:8;41:13;51:15
**opposite (2)**
  32:6;52:14

oral (3)
  5:14;7:22,22
**order (10)**
  7:7;22:18;28:23,23;
  29:3,4,22;38:14;49:5;
  60:12
**ordered (3)**
  7:1;52:11;53:1
**orders (2)**
  38:19;40:24
**original (2)**
  49:10,13
**others (12)**
  21:23;30:12;31:9;
  34:12;39:14,20;44:5;
  50:16;52:11;55:13;
  56:1;59:5
**otherwise (7)**
  6:18;13:3;21:2;
  45:12;46:18;60:13;
  62:2
**ought (3)**
  6:3,9;57:10
**out (22)**
  14:19;15:3,12;16:4;
  17:14;24:20;26:15;
  27:5;29:5;32:9,14;
  33:19;35:14;39:19,21,
  24;46:24,25;49:3;
  52:20;58:1;64:7
**outlet (1)**
  29:12
**outside (2)**
  12:19;28:25
**outtakes (1)**
  49:19
**outweighs (2)**
  6:13;48:11
**over (8)**
  4:13;15:15;16:5,8;
  19:21;26:25;56:14;
  58:20
**overall (4)**
  6:1;48:1,3;60:2
**overarching (1)**
  46:2
**overbroad (1)**
  38:13
**overcoming (1)**
  53:20
**overlap (4)**
  59:14,22,24;60:8
**overlooking (1)**
  58:10
**overrule (6)**
  13:3,3,24:19;26:14;
  38:10;59:7
**overruled (9)**
  25:20;38:5;41:7;
  48:16,17;51:1;54:15;
  62:9;67:9
**oversees (1)**
  17:4

**own (7)**
4:9;41:6;49:20;50:3;
55:4;64:10,21

# P

**Pablo (1)**
24:8
**page (4)**
8:1;9:13;54:10;67:4
**pages (4)**
5:1,5,11,24
**Pallares (2)**
42:24,25
**panel (3)**
17:2,2,5
**paper (3)**
15:15;16:5,8
**paragraph (1)**
51:19
**paragraphs (6)**
51:12,19;52:4,6,7,7
**part (21)**
4:14;6:6;14:12,13;
15:5,5;23:6;30:10,11;
33:21;34:4,5;43:20;
49:25;55:22;60:16,19,
22;62:24;63:14,15
**parte (1)**
49:4
**participants (2)**
22:24;27:4
**participated (3)**
16:21;34:24;35:3
**particular (5)**
38:19;56:1,2;57:18;
59:1
**particularly (1)**
33:8
**parties (13)**
7:15,16,16,17;11:15;
13:5;22:11;24:19;31:6,
7;32:21;34:10;47:23
**parties' (1)**
6:15
**partner (1)**
3:3
**party (2)**
15:9;32:5
**passed (1)**
60:22
**passing (1)**
13:1
**path (1)**
46:15
**Patton (118)**
3:3;4:5,11,25;5:11,
17;8:1,4,22,24;9:16,17,
21;10:3,6,13;11:14,19;
12:18;13:11,14,20;
14:1,19;15:12;16:1,9,
20;17:15,19,22;18:12,
15,19,21;19:3,21;

20:24;21:7,9,14,21;
22:1;23:7,14;24:8;
25:14;26:12,23,24;
27:9,25;28:14,16,22;
29:7,18,19;30:12;31:1,
2;33:12,24;34:2,17;
37:3;39:8,23,25;40:15;
41:11,18,19;43:21,23;
44:5,10,14,17,20;
45:25;46:1,9,13,18;
47:3,9;48:6,8;50:17,19,
21;52:16;53:14;54:12,
13;55:15,19,25;56:7,9,
15,19;58:6,14;59:3;
61:9,23;62:12,18,25;
63:10;64:8,23;67:1,1,2,
6
**Pause (7)**
20:1;26:17;27:15,19,
24;28:21;36:5;42:18;
51:24;52:8;66:15;67:8
**payment (3)**
28:2,24,24
**payroll (1)**
60:24
**Peck (1)**
67:2
**penalty (1)**
21:8
**pendency (1)**
44:2
**pending (3)**
4:10;47:2;62:8
**people (12)**
10:24,25;16:12;
23:21;26:11;30:13;
55:9,18;57:14;58:2;
63:6;66:24
**people's (1)**
24:5
**percipient (1)**
52:24
**perfection (1)**
24:24
**perfectly (3)**
22:12;26:15;57:21
**perform (2)**
24:1;42:11
**perhaps (1)**
59:12
**period (2)**
20:3;57:3
**perjury (1)**
21:9
**permit (1)**
15:14
**permitted (1)**
51:13
**person (2)**
35:3;58:16
**personal (1)**
10:11
**persons (4)**

10:15;55:3,14;63:9
**persuade (1)**
28:12
**persuaded (1)**
33:6
**photographs (1)**
21:12
**piece (1)**
29:24
**pieces (1)**
14:24
**pierce (1)**
22:18
**piggybacked (1)**
62:22
**place (3)**
37:21;46:24;58:5
**plainly (1)**
6:9
**plaintiff (5)**
4:8,9;7:5,8:9;54:16
**plaintiffs (8)**
4:7;13:25;29:6;33:1,
3;60:16,17;65:8
**plaintiff's (4)**
13:19;30:13;33:1;
62:23
**plaintiffs' (4)**
13:19;17:8;49:13;
60:23
**planning (1)**
31:24
**played (3)**
13:20;17:10;62:14
**pleading (6)**
17:17;42:7,14;51:8,
10,11
**pleadings (1)**
13:12
**please (1)**
52:5
**plus (1)**
54:23
**pm (1)**
67:20
**point (17)**
9:3,22;10:21;16:17;
17:14;18:5;21:19;27:5;
36:25;39:10,19;40:17;
47:21;53:8;57:2;58:23;
67:12
**points (3)**
4:2;34:13;65:14
**poorly (2)**
44:3;47:9
**portions (1)**
14:9
**position (3)**
27:13;29:10,12
**positive (1)**
21:25
**possession (1)**
61:23

**possible (2)**
7:10;58:23
**possibly (2)**
6:4,5;48:20
**post-appellate (1)**
20:11
**post-judgment (3)**
19:8;20:10;21:1
**posture (2)**
6:21;8:5
**potential (4)**
13:7;28:2,24;48:12
**potentially (4)**
11:2;24:6;26:20;
58:9
**power (1)**
25:14
**PR (1)**
49:15
**practical (1)**
6:19
**practice (2)**
20:10,11
**practicing (1)**
34:25
**precluded (1)**
43:7
**predate (1)**
50:20
**predated (3)**
53:14;54:13;56:9
**predates (1)**
58:6
**predecessors (1)**
42:5
**predicate (2)**
48:10;51:18
**prejudice (4)**
7:5;12:14;13:2;
20:21
**premise (1)**
47:8
**premises (1)**
65:5
**preparation (7)**
13:11;14:25;16:11,
21;17:16;18:16;20:24
**prepared (2)**
22:12;39:4
**present (2)**
6:21;8:5
**pressure (1)**
23:9
**presumably (1)**
45:12
**pretty (3)**
38:20;40:23;57:13
**primarily (2)**
8:24;19:4
**principal (1)**
52:25
**prior (2)**
49:21;60:2

**private (1)**
49:6
**privilege (29)**
4:16,18,20,21,25;
5:4;6:7;8:5;12:7,9,24;
13:1;17:21;18:1,4,7;
22:18,19;23:16,16;
31:22;36:23;38:4;
53:17,18;56:22;63:2,3,
14
**privileged (8)**
9:18;11:17;12:1;
31:21;36:18;56:18;
58:8;63:18
**probable (2)**
58:20;59:1
**probably (5)**
3:15;11:4;45:3;
46:22;60:11
**probative (2)**
33:8;48:20
**problem (16)**
3:17;9:1;12:16;
20:19;24:12;25:18;
26:3;27:23;29:1,4,22;
30:4;32:18;39:14,16;
57:18
**problematic (1)**
39:17
**problems (2)**
16:22;24:22
**proceed (2)**
7:25;57:12
**proceeding (2)**
61:10;62:8
**proceedings (7)**
3:4;44:18,22;48:7,8;
65:18,19
**process (12)**
7:12,19;13:20;14:5;
15:16;16:8,17;17:10;
56:1;58:4;63:13;64:5
**processor (1)**
33:16
**procure (1)**
36:15
**procured (1)**
13:17
**produce (14)**
5:18;9:21;18:13,15;
23:24;25:14;28:6;
34:17;36:21;41:6;61:2,
4;62:13;64:7
**produced (4)**
25:24,24;61:3,5
**producing (2)**
28:4;29:19
**product (16)**
4:16,20;9:19;11:17;
12:18;13:24;14:19;
25:18;31:23;32:2;41:6;
46:16;53:18,19,19,20
**production (10)**

4:18;7:1,6,8;12:10;
15:21;26:1,6;35:11;
61:7
**productive (1)**
6:25
**productively (1)**
29:21
**professionals (2)**
5:19;8:6
**Progress (1)**
8:18
**proper (1)**
4:24
**properly (3)**
4:21;10:6,9
**propose (1)**
39:15
**proposed (3)**
51:10,14;52:13
**proposes (1)**
8:4
**proposition (1)**
58:12
**prosecuted (1)**
46:1
**prosecution (2)**
43:18;44:11
**prosecutions (1)**
46:21
**prosecutor (1)**
47:2
**prospects (1)**
19:11
**protected (3)**
4:15;53:17,18
**protection (1)**
32:2
**protective (4)**
28:23;29:3,4,22
**prove (3)**
33:4;58:19,20
**proves (1)**
50:11
**provide (4)**
9:17;14:7;21:24;
31:2
**provided (2)**
13:15;20:16
**providencia (1)**
38:15
**providing (1)**
31:16
**pull (1)**
42:19
**pulling (2)**
32:9;42:15
**pure (1)**
31:15
**purely (2)**
6:22;41:18
**purports (1)**
64:13
**pursue (1)**

61:13
**pursuing (2)**
47:2;61:12
**put (10)**
3:23;12:1;15:14;
16:3;17:23;21:13;
23:17;36:24;43:7;57:1
**putting (1)**
46:16
**put-up (1)**
46:10

### Q

**quite (3)**
19:16;38:8;48:20
**quote-unquote (1)**
10:24
**quoting (1)**
64:4

### R

**raise (2)**
20:15;25:22
**raised (4)**
16:20;20:19;42:1,3
**ran (2)**
49:2;62:15
**Rana (1)**
60:14
**rather (3)**
6:21;22:11;38:20
**reached (5)**
9:3;21:4;46:19;
64:20;65:4
**read (2)**
12:14;60:5
**realize (2)**
31:11;54:20
**really (23)**
3:12;6:5;7:18;10:7,
14,24;11:24;12:5;16:7;
19:2;20:20:14;26:8;
27:6;37:5,7;46:19;
48:14;49:16;57:5;
60:23;64:12,15
**reason (12)**
7:9;23:3;25:2,4;
29:15;30:9;33:22;38:1,
10;44:19;48:21;57:17
**reasonable (7)**
24:1,14,18,18,21;
57:21;58:15
**reasonably (1)**
48:18
**reasoning (1)**
52:12
**reasons (4)**
4:19;6:13;16:6;
45:18
**recall (2)**
10:20;49:19

**received (1)**
8:13
**recent (1)**
34:24
**recently (1)**
34:23
**recognized (1)**
44:1
**recommendation (1)**
46:18
**record (7)**
15:5,6,7;18:10,11,
14;43:7
**recordings (1)**
21:12
**records (1)**
23:15
**recruited (2)**
26:23;27:3
**redacted (5)**
9:18;10:1;11:3,11;
28:7
**redaction (1)**
28:10
**redrafting (1)**
14:15
**reduce (2)**
18:6;32:12
**reference (3)**
51:3,16;64:22
**referred (1)**
14:17
**referring (3)**
24:8;42:7;67:6
**refers (1)**
54:25
**reflect (5)**
13:18;15:3;16:10;
35:13;46:12
**reflected (1)**
44:3
**reflecting (1)**
43:25
**reflects (1)**
47:9
**refusing (1)**
61:2;62:12
**regard (5)**
4:25;10:9;15:18;
39:9;62:13
**regarding (1)**
37:9
**rejecting (1)**
53:6
**relate (5)**
23:10;26:21;39:2;
40:4;50:20
**related (11)**
7:17;11:15;17:15;
18:15;32:22;37:15;
38:21,22;51:20;55:22;
56:16
**relates (8)**

26:6;28:13;37:2,7;
38:12,13,23;50:16
**relating (18)**
16:25;19:7;20:24;
22:23;23:2;25:7;28:1,
24;35:2;39:6,8;41:12,
21;42:4;50:22;56:14;
59:25;63:6
**relationship (1)**
47:4
**release (2)**
43:6;53:14
**relevance (9)**
6:22;12:6;13:13;
23:11;36:7,12;48:19;
57:23;62:12
**relevant (24)**
6:12;10:4;11:2;
23:19,23;27:7;29:17;
30:20;31:12;35:15;
36:18;43:8,19;44:4,21;
45:24;47:7,19;48:9,12;
53:2;61:1,17;63:1
**reliance (1)**
65:16
**relied (3)**
8:24;64:14;66:17
**religious (1)**
3:17
**rely (1)**
64:13
**relying (1)**
65:11
**remaining (1)**
21:6
**remains (2)**
4:10;25:13
**remarkable (1)**
14:8
**remediated (1)**
50:9
**remediation (4)**
42:6;51:11,16;53:14
**remember (1)**
58:11
**rendered (1)**
66:20
**repeated (1)**
17:25
**repeatedly (1)**
20:15
**repeating (1)**
20:22
**report (6)**
38:14;58:13;60:19,
22;62:21;65:8
**reported (1)**
29:11
**reports (6)**
20:7;60:1;62:19;
64:19,19,25
**represent (1)**
10:3

**representation (4)**
37:3,11,12,14
**representations (1)**
31:3
**represents (2)**
26:11;61:9
**Republic (1)**
37:3,12
**request (21)**
7:8;9:14;10:2;12:12,
23;13:4;17:14,22;19:7;
24:16;37:6,9;38:7,12;
39:19;40:24;41:10;
44:24;50:16;56:23;
63:5
**requested (2)**
12:4;17:20
**requests (1)**
25:9;28:22;60:8
**require (2)**
7:5;22:17
**requires (1)**
56:22
**resolution (1)**
5:5
**resolve (3)**
5:3;6:2;32:23
**resolves (2)**
38:2,3
**resolving (1)**
6:17
**resources (1)**
6:15
**respect (13)**
5:22;13:6;22:19,22;
25:3;48:5;52:10,19;
53:13;54:16;57:16,18;
62:25
**respects (6)**
4:21;5:4,20;19:21;
46:22;50:2
**respond (5)**
22:10;37:19;39:4;
50:19;52:11
**respondent's (1)**
24:17
**responding (1)**
48:1
**response (1)**
41:10
**responses (1)**
8:2
**responsible (1)**
19:4
**responsive (4)**
37:13;51:8,10,11
**restrict (1)**
29:25
**result (2)**
27:1;47:24
**results (2)**
49:2;53:12
**resume (3)**

3:11,14;67:13
**resuscitate (1)**
56:3
**retainer (2)**
9:17;28:6
**retention (5)**
10:1,17;11:3,11;19:3
**reveal (1)**
29:5
**revealed (2)**
16:1;31:23
**review (4)**
12:10,11;56:22;
57:11
**reviewing (2)**
8:13;44:20
**reviews (1)**
64:3
**rewrote (1)**
14:17
**rhetorical (1)**
62:3
**RICO (18)**
10:15,22;23:11;
26:20;27:7;28:14,16;
31:12;34:5;36:15;
47:10;48:9,11,25,25;
50:11;51:18;62:24
**right (44)**
3:13,22;8:15,17;
11:7,17;20:2;26:9;
28:19;30:4;32:20;
35:19,24;36:11;37:14,
23;38:8;39:1,18;40:7;
42:23,25;43:13,22;
44:16;45:9,10;46:5;
48:5;52:9,25;53:2;
54:15;55:16;56:24;
57:5,24;59:15;60:9,20;
61:15;63:10;65:21;
67:12
**risk (1)**
18:25
**role (6)**
13:21;14:3;17:8,10;
46:2;62:14
**room (1)**
49:3
**rule (4)**
5:15;6:10;7:21;
63:12
**ruled (1)**
63:13
**ruling (9)**
5:14;18:2;25:3,6;
38:14;59:15;60:9,13;
64:3
**rulings (8)**
6:18,22;7:4;12:8;
38:19;53:9;60:2;61:13
**run (1)**
46:6
**running (2)**

10:23;49:4

## S

**salvage (3)**
56:3;63:23;64:10
**same (10)**
25:17;35:25;36:12;
54:12;59:16,17;60:9;
61:4,12,18
**Sand (1)**
49:7
**satisfied (1)**
48:13
**save (2)**
18:3;34:17
**saw (2)**
19:4;52:24
**saying (7)**
16:12;19:19;29:19;
39:12;40:11;46:11;
57:15
**scale (1)**
36:16
**scene (4)**
46:2;53:15;55:19;
58:18
**schedule (2)**
45:13;67:10
**scheduled (2)**
3:9;59:6
**scheme (5)**
31:5,10;34:5,5;43:20
**school (1)**
34:1
**science (1)**
50:13
**scientific (2)**
49:18;50:2
**scope (13)**
4:24;6:20;7:3;10:2,
2;11:2;18:3;26:21;
27:7;32:12;37:6,21;
60:2
**search (14)**
6:8;24:1,5,11,14,18,
18,21,23;45:3,6;47:24;
50:19;56:11
**Searching (4)**
24:4;44:25;45:1,2
**second (5)**
19:24;24:16;46:13;
66:19,21
**Secondly (2)**
4:13;5:22
**secretaries (5)**
5:21;8:21,23;9:5,9
**Section (1)**
52:23
**sections (1)**
14:18
**seed (3)**
31:2;33:11,14

**seek (2)**
41:17;61:25
**seeking (5)**
7:5;13:10;23:1;
52:15;61:18
**seem (2)**
6:25;46:13
**seems (4)**
6:25;22:3;23:23;
45:23
**Selva (1)**
49:2
**sense (1)**
40:21
**sensible (1)**
5:2
**sensitive (1)**
28:7
**sentencia (1)**
38:14
**separate (6)**
18:16;21:8;24:15;
37:2,7,11
**separately (2)**
9:6,6
**September (1)**
67:20
**serious (1)**
10:5
**serve (1)**
9:9
**served (4)**
4:5;5:1;35:4;60:5
**server (1)**
9:7
**serves (1)**
40:11
**set (1)**
24:4
**settlement (1)**
43:6
**settling (3)**
55:1,2,5
**several (3)**
6:12;41:1;50:16
**shakedown (1)**
23:9
**shock (1)**
65:2
**shocked (1)**
40:22
**shortly (1)**
5:15
**show (8)**
13:23;14:20;15:5;
18:12;31:1;33:4,12;
34:12
**showed (1)**
50:4
**shown (1)**
53:20
**shows (2)**
14:2;50:10

**side (5)**
13:19;33:2;55:4;
57:1;62:1
**sign (1)**
60:12
**signed (1)**
21:8
**significance (1)**
45:16
**significant (2)**
56:22;58:14
**silly (1)**
26:8
**similarity (1)**
14:8
**simple (1)**
53:12
**simply (1)**
63:19
**single (3)**
21:14;39:25;55:24
**situation (2)**
52:15;62:5
**six (1)**
64:25
**slightest (1)**
57:9
**slightly (2)**
8:7;60:12
**small (1)**
47:25
**smoke (1)**
49:24
**Snaider (1)**
34:20
**Snaider's (1)**
35:23
**snookered (1)**
33:7
**so-called (6)**
11:6;16:3;20:25;
31:3;54:24;65:15
**solve (2)**
12:15;39:15
**solves (1)**
30:4
**somebody (4)**
29:18;31:16;45:12;
46:9
**somehow (2)**
14:20;47:6
**someone (1)**
31:17
**someplace (1)**
30:1
**sometimes (2)**
33:20,21
**soothsayer (1)**
40:21
**sorry (5)**
14:6;15:2;27:14;
63:9;66:2
**sought (4)**

4:15;5:6;6:23;62:7
**Southern (1)**
65:24
**sovereign (3)**
36:19;37:1,22
**speak (1)**
9:15
**specific (4)**
5:5;17:19;38:6;
39:13
**specifically (2)**
20:5;40:9
**specifications (5)**
5:2,25;6:24;7:4,13
**specifics (1)**
56:6
**specify (1)**
38:19
**speculation (1)**
31:15
**speculative (1)**
32:12
**spent (1)**
41:19
**spoke (1)**
17:18
**stake (1)**
6:16
**stand (1)**
66:25
**standard (2)**
29:22;58:16
**standards (3)**
61:15,16,21
**starkly (1)**
19:1
**start (2)**
7:25;21:11
**started (1)**
3:22
**starts (1)**
3:13
**stated (1)**
37:5
**statement (3)**
8:11;14:16;38:14
**States (3)**
24:9;29:9;46:23
**stay (1)**
39:10
**step (1)**
21:25
**sticking (1)**
45:5
**still (3)**
12:23;17:21;56:22
**stop (2)**
20:22;46:14
**stopped (2)**
31:1,16
**stopping (1)**
35:16
**story (2)**

15:24,24
**straightforward (1)**
40:23
**strategy (6)**
11:20;19:22;23:8,9;
31:24;35:6
**Stratus (2)**
15:12;49:7
**strike (1)**
6:4
**striking (1)**
13:6
**strongly (1)**
35:12
**structure (2)**
26:22;27:7
**student (1)**
34:2
**stuff (3)**
58:1;60:5;63:10
**style (1)**
14:4
**subject (11)**
3:8;11:5;12:24;
23:15;38:2,3;42:13;
47:18;58:22;64:11;
65:18
**subjects (1)**
23:3
**submission (3)**
15:13;18:24;54:4
**submissions (2)**
16:25;59:18
**submit (1)**
20:7
**submitted (7)**
13:25;14:1,16,20;
15:7;16:2,20
**subpoena (17)**
4:4,13,17,24;5:2,7,
10,13,25;6:2,20;8:2;
32:13;44:24;48:2;
52:12;60:6
**subpoenaed (1)**
62:6
**subsequent (1)**
15:1
**subsequently (2)**
19:8;49:14
**substantial (7)**
3:4;4:23;6:4;7:18;
9:3;19:21;59:14
**substantially (1)**
4:15
**sufficiently (1)**
45:17
**suggest (3)**
32:22;46:7;47:15
**suggested (3)**
24:2,10;53:25
**summary (2)**
58:11,19
**support (2)**

34:7;50:1
**supporting (1)**
52:22
**Suppose (2)**
12:12;42:8
**supposedly (1)**
10:23
**Sure (5)**
9:25;22:16;25:15;
41:9;54:22
**surely (1)**
40:14
**surprising (2)**
57:9,11
**suspect (2)**
39:16;58:16
**suspicions (1)**
41:5
**sustain (4)**
7:3;23:20;33:22;
38:1
**sustained (5)**
21:2;34:10;35:7;
36:3;54:1
**sustaining (1)**
34:16
**sweep (1)**
53:2
**system (1)**
56:15

**T**

**table (1)**
66:24
**tainted (1)**
65:9
**talk (2)**
56:6,20
**talked (1)**
38:8
**talking (7)**
6:5;18:2,3;20:2;
49:20;55:10;57:13
**target (1)**
24:6
**targeted (1)**
40:24
**team (9)**
17:8;30:13;40:25;
44:2;49:13;55:11;
59:25;60:1,23
**technical (2)**
55:11;60:23
**tecum (1)**
4:5
**telling (2)**
47:3;57:11
**tells (2)**
15:24;58:7
**temporarily (1)**
20:23
**term (1)**

45:6
**terminate (1)**
7:21
**terminating (1)**
40:13
**terms (8)**
24:11,23;26:4;35:11;
44:25;45:1,2;57:15
**terrorists (1)**
29:10
**test (1)**
49:2
**testified (1)**
65:1
**testifying (1)**
63:3
**testimony (1)**
49:7
**testing (4)**
49:1;50:3,3;54:7
**tests (2)**
49:8,18
**Texaco (2)**
50:8,14
**Texpet (1)**
53:14
**thereafter (1)**
19:2
**thereby (1)**
34:6
**therefore (3)**
10:8;36:20;47:23
**Third (2)**
6:3;34:10
**Thirdly (1)**
4:23
**third-party (5)**
30:11;31:12;33:5,7,
22
**though (4)**
4:10;29:13;62:13,17
**thought (3)**
51:7,8;54:8
**three (4)**
17:18;39:12;60:11;
66:23
**thumb (1)**
36:16
**Thursday (2)**
67:13,20
**thus (2)**
7:17;9:8
**times (3)**
21:11;22:23;34:21
**timing (2)**
46:21;54:13
**today (7)**
4:4;5:16;6:6;7:4;
13:1;18:2,2
**today's (1)**
3:4
**told (3)**
3:12;39:17;62:20

took (3)
14:19;19:21;53:11
**tooth (2)**
15:20;61:3
**top (1)**
56:13
**touching (1)**
31:19
**towns (1)**
21:16
**transcript (1)**
67:4
**transparency (2)**
16:16,18;17:12
**transparent (1)**
63:24
**transparently (1)**
19:16
**travel (7)**
21:7,16;23:2,10,15;
24:5;25:8
**traveled (2)**
21:9,14
**trial (1)**
17:3
**tried (1)**
56:3
**trip (1)**
22:22
**trouble (1)**
45:17
**true (3)**
34:1;44:17;48:4
**trumpet (1)**
50:5
**trumpeted (1)**
50:5
**try (13)**
5:9;12:2;15:4,15;
16:4,8,21;19:10;31:4;
34:7;62:16;63:22;64:9
**trying (9)**
11:19;14:3;20:12,14;
22:4;32:12;44:7;45:25;
61:5
**turned (1)**
16:4
**turns (1)**
49:21
**two (18)**
5:13;8:11;15:9;
17:18;23:22;24:15;
39:12;43:11;45:18,21,
23;47:22;51:17,21;
56:24;62:19;64:22,25
**twofold (1)**
4:14
**type (2)**
47:18,24
**types (1)**
24:14

**U**

**UBR (4)**
60:15;61:9;63:9,9
**UBR-related (1)**
61:6
**Uhl (1)**
60:14
**ultimately (5)**
7:1;9:8;20:3;51:21;
63:12
**unclear (1)**
9:19
**under (5)**
19:3;21:8;35:22;
48:11;52:23
**underlay (1)**
38:7
**understood (7)**
6:9,19;18:8,18;
28:20;30:6;37:15
**undue (2)**
5:24;6:2
**unduly (1)**
4:18
**unfolded (1)**
48:7
**unhelpful (1)**
46:23
**unique (1)**
5:25
**United (3)**
24:9;29:9;46:23
**universe (3)**
15:23;45:20;54:24
**unkind (1)**
17:25
**Unless (5)**
6:18;7:9;25:2;59:6;
60:12
**unnecessary (1)**
46:23
**unraveling (1)**
16:9
**unreasonable (1)**
58:23
**unrelated (1)**
37:11
**unusual (1)**
62:5
**unwilling (1)**
24:12
**up (19)**
9:13;11:16,24;13:23;
14:2,20;16:17;19:25;
20:14;24:5,10;42:15,
19;46:17;54:2,11;57:5;
62:14;63:23
**use (2)**
29:21,24
**used (5)**
8:24;24:7;49:3;

**CHEVRON CORP v**
**STEVEN DONZIGER, ET AL**

September 25, 2012

63:20;65:7
**useful (1)**
3:23
**using (2)**
30:1;45:3

## V

**vacate (1)**
49:5
**vacated (4)**
66:4,8,18,22
**valid (1)**
12:7
**variety (1)**
29:22
**various (3)**
11:15;18:16;65:18
**Veiga (1)**
42:24
**verse (1)**
64:4
**version (1)**
28:9
**victory (1)**
19:18
**video (1)**
21:12
**view (3)**
57:21;58:23;63:24
**viewed (1)**
65:5
**virtually (1)**
18:18
**visited (1)**
21:16
**vitiated (1)**
63:15
**Viva (1)**
49:3

## W

**wants (1)**
22:7
**waste (1)**
7:23
**way (10)**
22:23;33:23;39:15,
24;40:9;46:7;52:16;
53:22,23;63:24
**ways (2)**
13:17;24:2
**weighed (1)**
39:25
**Weinberg (4)**
64:23;65:22;66:7,9
**welcome (1)**
3:6
**weren't (2)**
65:9,11
**Westenberger (2)**
67:1,3

**What's (2)**
9:1;47:1
**whitewash (2)**
62:16;63:16
**whole (8)**
14:18;21:10;49:15,
15;57:2,14;63:12;64:5
**widely (1)**
44:1
**willing (1)**
39:3
**win (2)**
16:22;19:12
**wish (2)**
8:23;26:18
**withdrawn (1)**
25:12
**withdrew (2)**
30:16;33:2
**within (4)**
4:3;56:15;60:2;62:8
**without (15)**
4:21,25;7:4,22;8:10;
10:16;12:14,22;13:2;
20:21;33:11,11,16;
34:3;57:12
**witness (3)**
50:21;52:14,24
**won (1)**
19:11
**word (5)**
14:21,21;22:14;
33:16;45:4
**words (2)**
13:6;38:25
**work (24)**
4:16,20;9:19;11:16,
17;12:17;13:24;17:3;
24:20;25:18;31:23;
32:1;39:23;41:6;46:16;
53:18,19,19,20;55:18;
62:17;63:6;64:21;65:6
**worked (3)**
8:7,8;17:10
**working (5)**
5:19;26:11,12;60:16;
64:23
**works (1)**
11:20
**world (7)**
10:23;29:12,14;
33:23,24;50:5,6
**worry (1)**
49:23
**worth (1)**
7:19
**write (1)**
66:9
**writing (4)**
38:15,23,25;40:24
**written (4)**
4:2;13:17;41:16,17
**wrote (2)**

60:21;62:19

## Y

**years (1)**
50:8
**Yennock (1)**
67:1
**York (1)**
10:13
**YOUNG (92)**
9:15,16;11:12,13;
12:12,17,22;17:13,14;
18:8,18,23;21:6;22:6,
7;23:21,25;25:14,17;
26:1;27:16,25;28:6,11,
13,16,20;29:6;30:5,6;
31:14,15,23;32:3,6,11,
18;35:22,25;36:22;
37:1,15,18,24;38:3,12,
18;39:1,7,22;40:3;
41:8,10,17;44:9,10,17;
45:2,7,24;47:20,22;
48:5;50:15,16,25;52:9,
10;53:4;54:12;56:4,5;
57:7,22;58:6;61:8,9,16,
22;62:1,5;65:13,14,24;
66:2,4,7,12,16,23,25;
67:6

## 1

**1 (2)**
9:14;41:4
**10 (5)**
32:17,18,23;34:17;
35:12
**11 (1)**
34:19
**11,000-plus (1)**
56:16
**12 (2)**
35:21,22
**128 (1)**
51:12
**13 (1)**
36:4
**138 (1)**
51:12
**14 (3)**
38:6;41:11;59:14
**15 (7)**
41:23;43:2;51:5,6;
52:9,10;54:1
**16 (3)**
42:23;43:11;54:8
**17 (3)**
48:23;54:3,4
**1782 (11)**
19:22;25:25;46:20;
47:23;52:23;61:3,10,
24;62:8;65:18,25
**1782s (1)**

43:13
**18 (3)**
54:2,11,11
**186 (3)**
5:1,5,24
**19 (5)**
54:10,19;59:24;
60:10;67:4
**199 (2)**
51:19;52:7

## 2

**2 (2)**
3:18;13:5
**2:15 (2)**
67:13,20
**2:30 (1)**
3:10
**20 (4)**
50:8;55:14;59:9;
67:4
**2009 (1)**
19:23
**2010 (7)**
18:23;19:2,5,20;
20:3,9;57:20
**2012 (1)**
67:20
**21 (1)**
59:22
**213 (2)**
51:20;52:7
**22 (2)**
56:13;60:14
**23 (1)**
62:10
**24th (1)**
4:20
**26b2C (1)**
6:10
**27 (1)**
67:20

## 3

**3 (3)**
3:15,18;21:4
**33,000 (1)**
56:14
**34-defendant (1)**
3:9
**37 (2)**
5:11;9:13

## 4

**4 (3)**
22:25;25:3,6
**400 (1)**
26:25

## 5

**5 (1)**
23:21
**50 (3)**
5:19;8:7,8
**50-hour (1)**
8:13
**52 (1)**
5:1
**561 (1)**
51:12
**567-1 (1)**
51:12

## 6

**6 (1)**
25:1
**67 (1)**
67:4
**69 (2)**
51:19;52:7

## 7

**7 (2)**
8:1;25:12

## 8

**8 (2)**
5:16;8:1

## 9

**9 (6)**
5:17;8:20;26:16;
32:23;34:17;35:11

# EXHIBIT 9

JA0143



Click Here to Install Silverlight

United States Change | All Microsoft Sites

Search Microsoft.com for:

# Microsoft Online Privacy Statement

(last updated April 2012)

view the privacy statement highlights

## On This Page

⬇ Collection of Your Personal Information

⬇ Use of Your Personal Information

⬇ Sharing of Your Personal Information

⬇ Accessing Your Personal Information

⬇ Communication Preferences

⬇ Display of Advertising (Opt-Out)

⬇ Security of Your Personal Information

⬇ Collection and Use of Children's Personal Information

⬇ Use of Cookies

⬇ Use of Web Beacons

⬇ Controlling Unsolicited E-mail ("Spam")

⬇ TRUSTe Certification

⬇ Enforcement of This Privacy Statement

⬇ Changes to This Privacy Statement

⬇ How to Contact Us

We self-certify compliance with:



### Supplemental Privacy Information

- Bing
- Messenger
- Microsoft Advertising
- Microsoft Employment Candidates
- Microsoft Tag Reader
- MSN
- Office.com
- Support Services
- Windows Live
- Windows Live ID
- WindowsMedia.com
- Xbox LIVE, Games for Windows LIVE and Xbox.com

### Related Links

- FTC Privacy Initiatives
- Security at Home
- Silverlight Privacy Statement
- Trustworthy Computing



This privacy statement applies to websites and services of Microsoft that collect data and display these terms, as well as its offline product support services. It does not apply to those Microsoft sites, services and products that do not display or link to this statement or that have their own privacy statements.

Please review the Microsoft Online Privacy Statement below and also any supplemental information listed to the right for further details about particular Microsoft sites and services you use. Some products, services or features mentioned in this statement may not be available in all markets at this time. Additional information on Microsoft's commitment to protecting your privacy can be found at http://www.microsoft.com/privacy.

## Collection of Your Personal Information

We collect information as part of operating our Websites and services.

- At some Microsoft sites, we ask you to provide personal information, such as your e-mail address, name, home or work address, or telephone number. We may also collect demographic information, such as your ZIP code, age, gender, preferences, interests and favorites. If you choose to make a purchase or sign up for a paid subscription service, we will ask for additional information, such as your credit card number and billing address.

- In order to access some Microsoft services, you will be asked to sign in with an e-mail address and password, which we refer to as your Microsoft account. By signing in on one Microsoft site or service, you may be automatically signed into other Microsoft sites and services that use Microsoft account. For more information, see the Windows Live ID privacy supplement.

- We collect additional information about your interaction with Microsoft sites and services without identifying you as an individual. For example, we receive certain standard information that your browser sends to every website you visit, such as your IP address, browser type and language, access times and referring Web site addresses. We also use Web site analytics tools on our sites to retrieve information from your browser, including the site you came from, the search engine(s) and the keywords you used to find our site, the pages you view within our site, your browser add-ons, and your browser's width and height.

- We use technologies, such as cookies and web beacons (described below), to collect information about the pages you view, the links you click and other actions you take on our sites and services.

- We also deliver advertisements (see the Display of Advertising section below) and provide Web site analytics tools on non-Microsoft sites and services, and we collect information about page views on these third party sites as well.

- When you receive newsletters or promotional e-mail from Microsoft, we may use web beacons (described below), customized links or similar technologies to determine whether the e-mail has been opened and which links you click in order to provide you more focused e-mail communications or other information.

In order to offer you a more consistent and personalized experience in your interactions with Microsoft, information collected through one Microsoft service may be combined with information obtained through other Microsoft services. We may also supplement the information we collect with information obtained from other companies. For example, we may use services from other companies that enable us to derive a general geographic area based on your IP address in order to customize certain services to your geographic area.

⬆ Top of page

## Use of Your Personal Information

Microsoft collects and uses your personal information to operate and improve its sites and services. These uses include providing you with more effective customer service;

JA0144

making the sites or services easier to use by eliminating the need for you to repeatedly enter the same information; performing research and analysis aimed at improving our products, services and technologies; and displaying content and advertising that are customized to your interests and preferences. For more information about the use of information for advertising, see the Display of Advertising section below.

We also use your personal information to communicate with you. We may send certain mandatory service communications such as welcome letters, billing reminders, information on technical service issues, and security announcements. Some Microsoft services, such as Windows Live Hotmail, may send periodic member letters that are considered part of the service. Additionally, with your permission, we may also occasionally send you product surveys or promotional mailings to inform you of other products or services available from Microsoft and its affiliates, and/or share your personal information with Microsoft partners so they may send you information about their products and services. You can opt-out from receiving newsletters or promotional e-mail anytime by using this web form or by following the steps as described in the respective newsletter or promotional e-mail.

Personal information collected on Microsoft sites and services may be stored and processed in the United States or any other country in which Microsoft or its affiliates, subsidiaries or service providers maintain facilities. Microsoft abides by the U.S.-EU Safe Harbor Framework and the U.S.-Swiss Safe Harbor Framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of data from the European Economic Area, and Switzerland. To learn more about the Safe Harbor program, and to view our certification, please visit http://www.export.gov/safeharbor.

⇧ Top of page

## Sharing of Your Personal Information

Except as described in this statement, we will not disclose your personal information outside of Microsoft and its controlled subsidiaries and affiliates without your consent. Some Microsoft sites allow you to choose to share your personal information with select Microsoft partners so that they can contact you about their products, services or offers. Other sites, such as MSN instead may give you a separate choice as to whether you wish to receive communications from Microsoft about a partner's particular offering (without transferring your personal information to the third party). See the Communication Preferences section below for more information.

Some Microsoft services are co-branded by Microsoft and another company (partner). If you register to or use such a service, both a Microsoft privacy statement and the partner's privacy statement may be displayed. If so, both Microsoft and the partner will receive information you provide such as on registration forms.

Microsoft occasionally hires other companies (vendor) to provide limited services on our behalf, such as handling the processing and delivery of mailings, providing customer support, hosting websites, processing transactions, or performing statistical analysis of our services. Those service providers will be permitted to obtain only the personal information they need to deliver the service. They are required to maintain the confidentiality of the information and are prohibited from using it for any other purpose than for delivering the service to Microsoft in accordance with Microsoft's instructions and policies. However, our vendors may use aggregate data for fraud detection to help improve their services. This helps them to more accurately detect fraudulent transactions. We may access or disclose information about you, including the content of your communications, in order to: (a) comply with the law or respond to lawful requests or legal process; (b) protect the rights or property of Microsoft or our customers, including the enforcement of our agreements or policies governing your use of the services; or (c) act on a good faith belief that such access or disclosure is necessary to protect the personal safety of Microsoft employees, customers or the public. We may also disclose personal information as part of a corporate transaction such as a merger or sale of assets.

⇧ Top of page

## Accessing Your Personal Information

Some Microsoft services give you the ability to view or edit your personal information online. To help prevent your personal information from being viewed by others, you first will be required to sign in. The method(s) for accessing your personal information will depend on which sites or services you have used.

- **Microsoft.com** - You can access and update your profile on microsoft.com by visiting the Microsoft.com Profile Center.

- **Microsoft Billing and Account Services** - If you have a Microsoft Billing account, you can add to or update your information at the Microsoft Billing Web site by clicking on the "Personal Information" or "Billing Information" links.

- **Microsoft Connect** - If you are a registered user of Microsoft Connect, you can access and edit your personal information by clicking Manage Your Connect Profile at the Microsoft Connect Web site.

- **Windows Live** - If you have used Windows Live services, you can update your profile information, change your password, view the unique ID associated with your credentials, or close certain accounts by visiting Windows Live Account Services.

- **Windows Live Public Profile** - If you have created a public profile on Windows Live, you may also edit or delete information in your public profile by going to Windows Live profile.

- **Search Advertising** - If you buy search advertising through Microsoft Advertising, you can review and edit your personal information at the Microsoft adCenter Web site.

- **Microsoft Partner Programs** - If you are registered with Microsoft Partner Programs, you can review and edit your profile by clicking Manage Your Account on the Partner Program Web site.

- **Xbox** - If you are a Xbox LIVE or Xbox.com user, you can view or edit your personal information, including billing and account information, privacy settings, online safety and data sharing preferences by accessing My Xbox on the Xbox 360 console or on the Xbox.com website. For account information select My Xbox, Accounts. For other personal information settings, select My Xbox, Profile then Online Safety Settings.

- **Zune** - If you have a Zune account or a Zune Pass subscription, you can view and edit your personal information at Zune.net (sign in, access your Zune tag then My Account or through the Zune software, (sign in, access your Zune tag, then select Zune.net profile.)"

In case you cannot access personal data collected by Microsoft sites or services via the links above, these sites and services may provide you with alternative means of access to your data. In any case, you can contact Microsoft by using the web form.

⇧ Top of page

## Communication Preferences

You can stop the delivery of future promotional e-mail from Microsoft sites and services by following the specific instructions in the e-mail you receive.

Depending on the respective service, you may also have the option of proactively making choices about the receipt of promotional e-mail, telephone calls, and postal mail from particular Microsoft sites or services by visiting and signing into the following pages:

- Microsoft's Promotional Communications Manager allows you to update contact information, manage Microsoft-wide contact preferences, opt out of subscriptions, and choose whether to share your contact information with Microsoft partners. If you do not have a Microsoft account, you can manage your Microsoft email communication preferences by using this web form.

- The Microsoft.com Profile Center allows you to choose whether you wish to receive marketing communications from Microsoft.com, to select whether Microsoft may share your contact information with selected third parties, and to subscribe or unsubscribe to newsletters about our products and services.

JA0145

- The MSN & Windows Live Communications Preferences page allows you to choose whether you wish to receive marketing material from MSN or Windows Live. You may subscribe and unsubscribe to MSN Newsletters by going to the MSN Newsletters website.

- If you have an Xbox account or Xbox LIVE account, you can set your contact preferences and choose whether to share your contact information with Xbox partners by accessing My Xbox on the Xbox 360 console or on the Xbox.com website. To access these settings on the Xbox.com website, select My Xbox, Profile then Contact Preferences. On the Xbox 360 console, select My Xbox, Profile then Online Safety.

- If you are registered with Microsoft Partner Programs, you can set your contact preferences or choose to share your contact information with other Microsoft partners by clicking Manage Your Account on the Partner Program Web site.

- If you have a Zune account or a Zune Pass subscription, you can set your contact preferences and choose whether to share your contact information with Zune partners at Zune.net (sign in, access your Zune tag then My Account, Newsletter options or through the Zune software (sign in, access your Zune tag, then select Zune.net profile.)

In any case, you can inform Microsoft by using this web form about your wish to stop the delivery of future promotional e-mail. These choices do not apply to the display of online advertising: please refer to the section "Display of Advertising (Opt-out)" for information on this matter. Nor do they apply to the receipt of mandatory service communications that are considered part of certain Microsoft services, which you may receive periodically unless you cancel the service.

⇧ Top of page

## Display of Advertising (Opt-Out)

Many of our Web sites and online services are supported by advertising.

Most of the online advertisements on Microsoft sites are displayed by Microsoft Advertising. When we display online advertisements to you, we will place one or more persistent cookies on your computer in order to recognize your computer each time we display an ad to you. Because we serve advertisements on our own websites as well as those of our advertising and publisher partners, we are able to compile information over time about the types of pages, content and ads you, or others who are using your computer, visited or viewed. This information is used for many purposes, for example, it helps us try to ensure that you do not see the same advertisements over and over again. We also use this information to help select and display targeted advertisements that we believe may be of interest to you.

**You may opt-out of receiving targeted ads from Microsoft Advertising by visiting our opt-out page.** For more information about how Microsoft Advertising collects and uses information, please see the Microsoft Advertising Privacy Supplement.

We also allow third-party ad companies, including other ad networks, to display advertisements on our sites. In some cases, these third parties may also place cookies on your computer. These companies currently include, but are not limited to: 24/7 Real Media, aCerno,Inc, AdBlade, AdConion, AdFusion, Advertising.com, AppNexus, Bane Media, Brand.net, CasaleMedia, Collective Media, Fox Interactive, Interclick, Millennial, PrecisionClick, ROI Media, Social Media, SpecificMedia, TrafficMarketplace, Tribal Fusion, ValueClick, Yahoo!, YuMe, and Zumobi. These companies may offer you a way to opt-out of ad targeting based on their cookies. You may find more information by clicking on the company names above and following the links to the Web sites of each company. Many of them are also members of the Network Advertising Initiative or the Digital Advertising Alliance, which each provide a simple way to opt-out of ad targeting from participating companies.

⇧ Top of page

## Security of Your Personal Information

Microsoft is committed to protecting the security of your personal information. We use a variety of security technologies and procedures to help protect your personal information from unauthorized access, use, or disclosure. For example, we store the personal information we collect on computer systems with limited access, which are located in controlled facilities. When we transmit highly confidential information (such as a credit card number or password) over the Internet, we protect it through the use of encryption, such as the Secure Socket Layer (SSL) protocol.

If a password is used to help protect your accounts and personal information, it is your responsibility to keep your password confidential. Do not share this information with anyone. If you are sharing a computer with anyone you should always log out before leaving a site or service to protect access to your information from subsequent users.

⇧ Top of page

## Collection and Use of Children's Personal Information

Many Microsoft sites and services are intended for general audiences and do not knowingly collect any personal information from children. When a Microsoft site does collect age information, and users identify themselves as under 13, the site will either block such users from providing personal information, or will seek to obtain consent from parents for the collection, use and sharing of their children's personal information. We will not knowingly ask children under the age of 13 to provide more information than is reasonably necessary to provide our services.

Please note that if you grant consent for your child to use Microsoft services, this will include such general audience communication services as e-mail, instant messaging, and online groups, and your child will be able to communicate with, and disclose personal information to, other users of all ages. Parents can change or revoke the consent choices previously made, and review, edit or request the deletion of their children's personal information. For example, on MSN and Windows Live, parents can visit Account Services, and click on "Permission for kids." If we change this privacy statement in a way that expands the collection, use or disclosure of children's personal information to which a parent has previously consented, the parent will be notified and we will be required to obtain the parent's additional consent.

If you have an MSN Premium, MSN Plus, or MSN 9 Dial-Up account, and use MSN Client software version 9.5 or below, you can choose to set up MSN Parental Controls for the other users of that account. Please read the supplemental privacy information for MSN for further information.

We encourage you to talk with your children about communicating with strangers and disclosing personal information online. You and your child can visit our online safety resources for additional information about using the Internet safely.

⇧ Top of page

## Use of Cookies

Most Microsoft Web sites use "cookies," which are small text files placed on your hard disk by a Web server. Cookies contain information that can later be read by a Web server in the domain that issued the cookie to you.

One of the primary purposes of cookies is to store your preferences and other information on your computer in order to save you time by eliminating the need to repeatedly enter the same information and to display your personalized content and targeted advertising on your later visits to these sites. Microsoft Web sites also use cookies as described in the Display of Advertising sections of this privacy statement.

When you sign in to a site using your Microsoft account, we store your unique ID number, and the time you signed in, in an encrypted cookie on your hard disk. This cookie allows you to move from page to page at the site without having to sign in again on each page. When you sign out, these cookies are deleted from your computer. We also use cookies to improve the sign in experience. For example, your e-mail address may be stored in a cookie that will remain on your computer after you sign out. This cookie allows your e-mail address to be pre-populated, so that you will only need to type your password the next time you sign in. If you are using a public computer or do not otherwise

JA0146

want this information to be stored, you can select the appropriate radio button on the sign-in page, and this cookie will not be used.

You have the ability to accept or decline cookies. Most Web browsers automatically accept cookies, but you can usually modify your browser setting to decline cookies if you prefer. If you choose to decline cookies, you may not be able to sign in or use other interactive features of Microsoft sites and services that depend on cookies, and some advertising preferences that are dependent on cookies may not be able to be respected.

If you choose to accept cookies, you also have the ability to later delete cookies that you have accepted. For example, in Internet Explorer 8, you can delete cookies by selecting "Tools", "Delete browsing history". Then select the control box "Cookies" and click the "Delete" button. If you choose to delete cookies, any settings and preferences controlled by those cookies, including advertising preferences, will be deleted and may need to be recreated.

⇑ Top of page

## Use of Web Beacons

Microsoft Web pages may contain electronic images known as Web beacons - sometimes called single-pixel gifs - that may be used to assist in delivering cookies on our sites and allow us to count users who have visited those pages and to deliver co-branded services. We may include Web beacons in promotional e-mail messages or our newsletters in order to determine whether messages have been opened and acted upon.

Microsoft may also employ Web beacons from third parties in order to help us compile aggregated statistics regarding the effectiveness of our promotional campaigns or other operations of our sites. We prohibit Web beacons on our sites from being used by third parties to collect or access your personal information.

Finally, we may work with other companies that advertise on Microsoft sites to place Web beacons on their sites in order to allow us to develop statistics on how often clicking on an advertisement on a Microsoft site results in a purchase or other action on the advertiser's site.

⇑ Top of page

## Controlling Unsolicited E-mail ("Spam")

Microsoft is concerned about controlling unsolicited commercial e-mail, or "spam." Microsoft has a strict Anti-Spam Policy prohibiting the use of a Windows Live Hotmail or other Microsoft-provided e-mail account to send spam. Microsoft will not sell, lease or rent its e-mail subscriber lists to third parties. . While Microsoft continues to actively review and implement new technology, such as expanded filtering features, there is no technology that will totally prevent the sending and receiving of unsolicited e-mail. Using junk e-mail tools and being cautious about the sharing of your e-mail address while online will help reduce the amount of unsolicited e-mail you receive.

⇑ Top of page

## TRUSTe Certification

Microsoft has been awarded TRUSTe's Privacy Seal signifying that this privacy statement and our practices have been reviewed by TRUSTe for compliance with TRUSTe's program requirements including transparency, accountability and choice regarding the collection and use of your personal information. The TRUSTe program does not cover information that may be collected through downloadable software. TRUSTe's mission, as an independent third party, is to accelerate online trust among consumers and organizations globally through its leading online trust solutions.

⇑ Top of page

## Enforcement of This Privacy Statement

If you have questions regarding this statement, you should first contact us by using our Web form. If you do not receive acknowledgment of your inquiry or your inquiry has not been satisfactorily addressed, you should then contact TRUSTe at http://www.truste.org/consumers/watchdog_complaint.php. TRUSTe will serve as a liaison with Microsoft to resolve your concerns.

⇑ Top of page

## Changes to This Privacy Statement

We will occasionally update this privacy statement to reflect changes in our services and customer feedback. When we post changes to this Statement, we will revise the "last updated" date at the top of this statement. If there are material changes to this statement or in how Microsoft will use your personal information, we will notify you either by prominently posting a notice of such changes prior to implementing the change or by directly sending you a notification. We encourage you to periodically review this statement to be informed of how Microsoft is protecting your information.

⇑ Top of page

## How to Contact Us

For more information about our privacy practices, go to the full Microsoft Online Privacy Statement.

⁂ If you have a technical or general support question, please visit http://support.microsoft.com/ to learn more about Microsoft Support offerings.

⁂ If you suspect your Hotmail/Live account has been hacked or taken over, please visit Live Help.

⁂ If you have a Hotmail/Live password question, please visit Live Help.

⁂ For general Microsoft Privacy issues, please contact us by using our Web form.

Microsoft Privacy, Microsoft Corporation, One Microsoft Way, Redmond, Washington 98052 USA • 425-882-8080

To find the Microsoft subsidiary in your country or region, see http://www.microsoft.com/worldwide/.

Anti-Spam Policy

⇑ Top of page

Manage Your Profile  |  Contact Us

© 2012 Microsoft Corporation. All rights reserved. Contact Us | Terms of Use | Trademarks | Privacy Statement

JA0148

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                :

CHEVRON CORPORATION,          :

             Plaintiff,       :

   -against-            :   Case No. 1:12-MC-65 GLS/CFH

STEVEN DONZIGER, et al.,      :

            Defendants.    :

                                :

-------------------------------------------------------x

### DECLARATION OF ALEXANDER T. MARX ON BEHALF OF CHEVRON CORPORATION IN OPPOSITION TO THE NON-PARTY MOVANTS' MOTION TO QUASH SUBPOENAS TO MICROSOFT CORPORATION

I, Alexander T. Marx, declare:

1.      I am an attorney duly admitted to the State Bar of New York and an associate at the law firm of Gibson, Dunn & Crutcher LLP, attorneys of record for Chevron Corporation in the above-captioned action. I am over the age of eighteen years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration. Each of the exhibits identified below is a true and correct copy of the respective document as it is maintained in the files of Gibson, Dunn & Crutcher LLP in the normal course of business.

2.      Attached hereto as "Exhibit 1" is a true and correct copy of an email exchange dated May 17, 2010 among Lago Agrio Plaintiffs' U.S. lawyers, including S. Donziger to A. Wilson, I. Maazel, and J. Abady, with the subject "Re: Colorado Disclosures," produced by S. Donziger and bearing Bates number DONZ00031315.

3.      Attached hereto as "Exhibit 2" is a true and correct copy of the subpoena to Microsoft Corporation issued by Chevron Corporation, dated September 10, 2012.

4.      Attached hereto as "Exhibit 3" is a true and correct copy of an email from S. Tegel to S. Donziger and others dated April 22, 2008, with the subject "Re: wsj letter," produced by S. Donziger and bearing Bates number DONZ-HDD-0171047.

5.      Attached hereto as "Exhibit 4" is a true and correct copy of an email from S. Tegel to S. Donziger dated April 22, 2008, with the subject "IBD Draft," produced by S. Donziger and bearing Bates number DONZ-HDD-0170617.

6.      Attached hereto as "Exhibit 5" is a true and correct copy of an email from S. Tegel to S. Donziger dated May 28, 2008, with the subject "release pasted only (in case other version is slow in arriving)," produced by S. Donziger and bearing Bates number DONZ00128918.

7.      Attached hereto as "Exhibit 6" is a true and correct copy of an email from P. Fajardo to M. Yepez, S. Donziger and others dated August 5, 2008, with the subject "CITA," produced by S. Donziger and bearing Bates number DONZ-HDD-0037895, and a certified translation thereof.

8.      Attached hereto as "Exhibit 7" is a true and correct copy of an email from P. Fajardo to M. Yepez, S. Donziger and others, with the subject "Re: Corte suprema," produced by S. Donziger and bearing Bates number DONZ00047745.

9.      Attached hereto as "Exhibit 8" is a true and correct copy of an email from S. Donziger to M. Yepez dated February 14, 2007, with the subject "Re: Tareas," produced by S. Donziger and bearing Bates number DONZ-HDD-0100756, and a certified translation thereof.

10.     Attached hereto as "Exhibit 9" is a true and correct copy of an email from L. de Heredia to S. Donziger dated October 16, 2007, with the subject "Volunteers are here," produced by S. Donziger and bearing Bates number DONZ-HDD-0131188.

JA0150

14.     Attached hereto as "Exhibit 10" are true and correct copies of three subpoenas on Yahoo! Inc. by Friedman, Kaplan, Seiler & Adelman LLP, counsel for S. Donziger, respectively dated November 29, 2010, December 9, 2010, and January 3, 2011.

15.     Attached hereto as "Exhibit 11" is a true and correct copy of an email from A. Guerra to S. Donziger dated September 5, 2010, with the subject "Saludos de Quito," produced by S. Donziger and bearing Bates number DONZ00059141, and a certified translation thereof.

16.     Attached hereto as "Exhibit 12" is a true and correct copy of a web page displaying the results of an Internet search for the term "Simeon Tegel," conducted using the Google search engine on January 14, 2013.

17.     Attached hereto as "Exhibit 13" is a true and correct copy of an email from S. Donziger to M. Yepez and others dated September 7, 2009,  with the subject "note Charles James menciona Callejas abajo en la entrevista," produced by S. Donziger and bearing Bates number DONZ00066778.

18.     Attached hereto as "Exhibit 14" is a true and correct copy of Microsoft's Online Privacy Statement, downloaded from Internet on January 9, 2013.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 15 day of January, 2013, in Los Angeles, California.

_____
Alexander T. Marx

3

# EXHIBIT 1

| From: | Steven Donziger [sdonziger@donzigerandassociates.com] |
|---|---|
| Sent: | Monday, May 17, 2010 12:21 PM |
| To: | Andrew Wilson |
| Cc: | Ilann M. Maazel; Jonathan S. Abady; Westenberger, Eric; jhorowitz; Daleo, Eric; Yennock, Edward |
| Subject: | Re: Colorado Disclosures |

Should we talk about this?

Seems we have a tension b/w the strategy as outlined by Jim (fight hard on all fronts all the time and concede nothing, buy as much time as possible) and Hegerty's expectation as outlined by Jay in his email of last night that something should be turned over.

It just makes my skin crawl to give them anything... particularly in light of Jay's Rule 60 motion which as I understand is not in fact dead, at least not yet.

How to resolve this issue?


On Mon, May 17, 2010 at 12:00 PM, Andrew Wilson <awilson@ecbalaw.com> wrote:


    We need to decide now whether we are going to object to the disclosure of public documents that are responsive to the Stratus subpoenas.  I am inclined to allow those to be produced - but if others disagree, we need to write around this issue in the reply brief.

    Here is the complete section below ---

    * * *
    The second category of documents discussed at the April 27 Hearing were those materials responsive to the Stratus Subpoenas and disclosed to third parties.  While such documents are subject to production – the scope of that production is narrower than sought by Chevron.

        Chevron should be limited to the "limited" scope of its § 1782 application. See Pl. Br. 26-27.  While responsive documents concerning the Cabrera Reports shared with non-privileged third parties are subject to disclosure, there is no basis for a broad inquiry into all of the Consulting Experts' contacts with media that touch on the present case. Chevron's argument that limited public appearances by the Consulting Experts, publication of select work performed by the consulting experts, and/or public discussion of the Consulting Experts' work should operate as a global waiver of all protections otherwise adhering to the Consulting Experts' work product is contrary to the weight of authority protecting consultants.

        As a general matter, the publication of the expert reports "does not waive the protection for the underlying drafts and materials because the work-product doctrine exists not to protect a 'confidential relationship,' but rather 'to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent.'"  In re Vioxx Products Liability Litigation, MDL No. 1657, 2007 U.S. Dist. LEXIS 23164, at *14 (E.D. La. March 5, 2007) (citing Shields v. Sturm, Ruger & Co., 864 F.2d 379, 382 (5th Cir. 1989)); see also In re Trasylol Products Liability Litigation, MDL No. 08-1928, 2009 U.S. Dist. LEXIS 85553, at *87 (S.D. Fla. Aug. 12, 2009).  In Vioxx, due to public criticism and shareholder demands, Merck established a committee to investigate the conduct of its senior management in the creation of the drug Vioxx.  Id. at *3.  The committee's investigation culminated in the public release of an investigative report.  Id. at *3-4. Plaintiffs in the product liability suit ultimately sought discovery of all underlying

1A0153

documents relating to the "creation, preparation, and publication" of the report.  Id. at *4.  Just as Chevron asserts in this case, the Vioxx plaintiffs argued that, under the "fairness doctrine," publication of the final report waived any protection adhering to the underlying material.  See id. at *6-15.  There, as here, production was not justified.

Any work that the Consulting Experts performed in the realm of public relations is irrelevant to the Lago Agrio Litigation, and outside the scope of the subpoenas, for two reasons.  First, while it is understandable that Chevron would like to take discovery providing a window into Plaintiffs' public relations strategy, Plaintiffs' public relations matters are not probative as to any issue with respect to the Lago Agrio Litigation itself (or the Bilateral Investment Treaty Arbitration).

Second, even if Stratus's public relations work were somehow theoretically relevant and discoverable, no fewer than 23 of the 25 exhibits attached to Chevron's "Stratus Publicity RJN" (Dkt. 120) post-date Cabrera Report.  Insofar as the instant Section 1782 proceeding is purportedly aimed at determining the extent to which Plaintiffs influenced Mr. Cabrera's Report, whatever services Stratus provided to Plaintiffs after the release of the Cabrera Report are by definition irrelevant and outside the scope of the subpoenas.  Chevron's almost exclusive focus on statements made after the Cabrera Report betrays its alleged premise for this discovery proceeding: Chevron's efforts are not really about proving "fraud," but rather, are simply about obtaining a free shot at the confidential, undisclosed insights of Plaintiffs' litigation team.  None of the materials that post-date the Cabrera report can have anything to do with the materials that were "considered" by Cabrera.

Chevron cannot seek documents given to third parties except to the extent responsive to the subpoenas.

O. Andrew F. Wilson
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
Tel:  212-763-5000
Fax: 212-763-5001

The pages accompanying this email transmission contain information from the law firm of Emery Celli Brinckerhoff & Abady LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this email. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this e-mail in error please notify us by telephone immediately so that we can arrange for the retrieval of the email at no cost to you.

--
Steven Donziger
██████████████
212-409-8628 (fax)
██████████████

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
████████████████████

Email: sdonziger@gmail.com

# EXHIBIT 2

JA0155

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Northern District of New York

| | | |
|---|---|---|
| CHEVRON CORP. | ) | |
| _Plaintiff_ | ) | Civil Action No.  11 Civ. 0691 (LAK) |
| v. | ) | |
| STEVEN DONZIGER, et al., | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | Southern District of New York          ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Microsoft Registered Agent, Corporation Service Company, 80 State Street, Albany, NY 12207

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

| Place:  GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166-0193 c/o Alex Marx | Date and Time:<br><br>10/08/2012 9:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___09/10/2012___

CLERK OF COURT

_____         OR         _____
_Signature of Clerk or Deputy Clerk_                                    _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_  ___Chevron Corporation___
_____ , who issues or requests this subpoena, are:

Rachel Brook, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193
Telephone:  (212)351-2609, rbrook@gibsondunn.com

JA0156

Civil Action No.   11 Civ. 0691 (LAK)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

JA0157

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A

## DEFINITIONS

    1.    "DOCUMENT" has the full meaning ascribed to it in Rule 34 of the Federal Rules of Civil Procedure and Rule 26.3 of the Local Rules for the United States District Court for the Southern District of New York and shall include all originals of any nature whatsoever and all non-identical copies thereof, whether different from the originals by reason of any notation made on such copies or otherwise, including but not limited to all writings in any form, notes, memoranda, manuals, reports, records, correspondence, drawings, graphs, charts, photographs, phone records, data compilations of whatever nature (including those from which information can be obtained or translated if necessary), audio tapes, electronic mail messages, and electronic data (including any exchange of information between computers, all information stored in an electronic form or computer database, and all forms and formats of storage).

    2.    "RELATED TO," "RELATING TO," "IN RELATION TO," "REGARDING" and "CONCERNING" means in relation to, related to, consisting of, referring to, reflecting, concerning, discussing, evidencing, commenting on, describing, constituting, supporting, contradicting or having any logical or factual connection with the matter identified, in whole or in part.

## INSTRUCTIONS

    1.    These requests are governed by Rules 26 and 45 of the Federal Rules of Civil Procedure and any applicable law and Local Rule.

    2.    You are requested to produce all DOCUMENTS and things described below at Gibson, Dunn & Crutcher, LLP, c/o Alex Marx, 200 Park Avenue, New York, NY 10166-0193, on or before October 8, 2012.

    3.    In answering and responding to these document requests, you are requested to produce all DOCUMENTS that are in your possession, custody, or control, or that are in the possession, custody, or control of your principals, agents, employees, attorneys, representatives, insurers, and any other persons or entities, acting on your behalf.

    4.    If any of the information or DOCUMENTS supplied in response to these document requests does not come from your records, please specify the source of the DOCUMENTS.

    5.    If you refuse to produce any requested DOCUMENT under a claim of attorney-client privilege, work product privilege, or any other privilege or protection, it is requested that you submit for each DOCUMENT withheld a written statement that: specifies the privilege or other asserted basis for withholding the DOCUMENT; summarizes the substance of the DOCUMENT; identifies the person or entity who prepared the DOCUMENT and any persons or entities to which the DOCUMENT was sent or disclosed; and specifies the dates on which the DOCUMENT was prepared, transmitted, or received.

6.      The time period covered by these document requests runs from 2003 to the present.  This is a continuing request.  Any DOCUMENT obtained or located after the date of production that would have been produced had it been available or had its existence been known at that time should be produced immediately.

7.      If an objection is made to any numbered request, or any subpart thereof, state with specificity all grounds for the objection.

8.      All responsive and potentially responsive documents and tangible things should be preserved and maintained pending the outcome of this matter.

## DOCUMENTS REQUESTED

All DOCUMENTS RELATED TO (A) the identity of the user of the following email addresses, including but not limited to DOCUMENTS that provide all names, mailing addresses, phone numbers, billing information, date of account creation, account information and all other identifying information associated with the email address under any and all names, aliases, identities or designations RELATED TO the email address; and (B) the usage of the following email addresses, including but not limited to DOCUMENTS that provide IP logs, IP address information at time of registration and subsequent usage, computer usage logs, or other means of recording information concerning the email or Internet usage of the email address.

1.      Examen_pericial@hotmail.com

2.      muerteenlaselva@hotmail.com

3.      ingracabrerav@hotmail.com

4.      rcabrerav@hotmail.com

5.      cristobalvillao@hotmail.com

6.      luisvillacreces@hotmail.com

7.      julprieto@hotmail.com

8.      juanpasaenz@hotmail.com

9.      gaer69chzpr@hotmail.com

10.     donaldmoncayo@hotmail.com

11.     alex_anchundia2007@hotmail.com

12.     erikatorres_19@hotmail.com

13.     gabrielitaep@hotmail.com

14.     hannagoanna@hotmail.com

JA0160

15.     duruti@hotmail.com

16.     aulestiajuan@hotmail.com

17.     maryelji20@hotmail.com

18.     mey_1802@hotmail.com

19.     monica_pareja@hotmail.com

20.     pirancha@hotmail.com

21.     nick_aussie@hotmail.com

22.     renatog85@hotmail.com

23.     selvaviva2004@hotmail.com

24.     simeontegel@hotmail.com

25.     patriciogarcia_2009@hotmail.com

26.     criscadena@hotmail.com

27.     albertoguerrab@hotmail.com

28.     faisal_baki@hotmail.com

29.     Hjploro@hotmail.com

30.     osimonc@hotmail.com

JA0161

# EXHIBIT 3

| From: | Simeon Tegel [tegelsimeon@gmail.com] on behalf of Simeon Tegel [simeon@amazonwatch.org] |
| --- | --- |
| Sent: | Tuesday, April 22, 2008 1:19 PM |
| To: | Steven Donziger |
| Cc: | Kevin Koenig; Atossa Atossa Soltani; Mitch Anderson; Paul Paz y Mino |
| Subject: | Re: wsj letter |

Atossa just sent this text to WSJ letters page, with a note that because they named us and had significant factual errors, we very much hope that they will publish, and that they should keep us informed:

Your editorial "Banana Republic and Friends" tries to undermine the credibility of Amazon Watch and the legal case against Chevron in Ecuador. Let's see how accurate your facts are. The so-called "release" cited in your editorial does not apply to private claims of the type in the Ecuador litigation. Chevron's "remediation", which you laud, was a sham as confirmed by laboratory samples provided by a court-appointed expert and by Chevron itself. Pablo Fajardo, the lawyer you scorn, works under death threats and has been recognized worldwide for his personal courage. Chevron was the sole operator of the concession and as such is entirely responsible for building a system that was designed to pollute. The dismissed San Francisco case against Chevron has no connection to the Ecuador matter and involved entirely different legal claims. Ecuador's so-called "kangaroo courts" have been praised repeatedly by Chevron as transparent and impartial to avoid going to trial in the U.S. Now that the evidence is in, Chevron and the Journal suddenly can stand neither Ecuador's courts nor these basic facts. It seems the misinformation is in your editorial, not on our website.
Atossa SoltaniExecutive DirectorAmazon Watch

Simeon Tegel
Director of Communications
Amazon Watch
One Hallidie Plaza, Suite 402
San Francisco, CA 94102
Tel: + 415-487-9600
Fax: + 415-487-9612
simeon@amazonwatch.org
www.amazonwatch.org

On Apr 22, 2008, at 7:48 AM, Steven Donziger wrote:

> I would send the letter in now or you will be shut out. Deal with larger issues later -- time is of the essence. I wouldn't lengthen it or it will not get in probably.
>
> SRD

> On 4/22/08, **Kevin Koenig** <kevinkoenig@mindspring.com> wrote:
>> Steven --
>>
>> I think this is a great letter. I like the tone, that its concise, and deals only with the WSJ's inaccurate facts. But it's infuriating that the WSJ continues to just swallow CVX spin, and it's hard to unpack it all in the small amount of space of a LTE. I absolutely think a board meeting is necessary. They might not write something as a direct response, but they need to get the facts straight. I wonder whether bringing someone like Pat Doherty or someone from NYPERS would be helpful.

4/22/2008

As far as the letter goes, it might muddy it a bit, but I wonder whether we want to respond beyond their misinformation, and at least lay out:
 + that PE was the sole operator, and as such violated both Ecuadorian, U.S., and intl norms. PE is no friend to the environment, but that doesn't negate CVX responsibility.
 + that threats to Pablo and Luis are deemed grave enough for OAS-IAHCR precautionary measures in an attempt to ensure their safety
 + explicitly say that Chevron praised the transparency and impartiality of Ecuador courts FOR TEN YEARS and their petition for jurisdiction in Ecuador was granted.


Either way, lets get this in today.
Thanks,
Kevin


Original Message:
-----------------
From: Steven Donziger sdonziger@gmail.com
Date: Mon, 21 Apr 2008 19:31:01 -0400
To: simeon@amazonwatch.org, mitch@amazonwatch.org, atossa@amazonwatch.org, kevin@amazonwatch.org, paz@amazonwatch.org
Subject: Try this for ltr to WSJ


To the editor:


Your editorial "Banana Republic and Friends" tries to undermine the credibility of the legal case against Chevron in Ecuador by claiming Amazon Watch offers "one stop shopping for misinformation" in support of the plaintiffs. Let's see how accurate your facts are. The so-called "release" cited in your editorial does not apply to private claims of the type in the Ecuador litigation. Chevron's "remediation" that you laud was a sham as confirmed by laboratory samples provided by a court-appointed expert and by Chevron itself. Pablo Fajardo, the lawyer you scorn, works under death threats and has been recognized worldwide for his personal courage. The San Francisco case against Chevron that was dismissed has no connection to the Ecuador matter and involved entirely different legal claims. Ecuador's so-called "kangaroo courts" have been praised repeatedly by Chevron as transparent and impartial to avoid trial in the U.S.


Now that the evidence is in, Chevron and the Journal suddenly can't stand Ecuador's courts nor these basic facts. Sounds to us like the misinformation is in your editorial, not on our website.


Atossa Soltani


On 4/21/08, Simeon Tegel <simeon@amazonwatch.org> wrote:
>
> Primero lo primero, ie WSJ.
>
>
> Simeon Tegel
> Director of Communications
> Amazon Watch
> One Hallidie Plaza, Suite 402
> San Francisco, CA 94102
> Tel: + 415-487-9600
> Fax: + 415-487-9612

JA0164

DONZ-HDD-0171048

> simeon@amazonwatch.org
> www.amazonwatch.org
>
>
> On Apr 21, 2008, at 4:04 PM, Steven Donziger wrote:
>
> you mean ltr to WSJ or IBD?
>
> On 4/21/08, Simeon Tegel <simeon@amazonwatch.org> wrote:
> >
> > Could you let us know as soon as you hear from WSJ re your op-ed. If
> > they don't publish, we will hit them up separately; they have named us
> > afterall!
> >
> > Separately, I will draft a Letter to the Editor on Tue (unless you have
> > time to do that for us?); any suggestions for specific points to include
> > welcomed. Re ed board meeting: yes, agreed. But we can leave that request
> > until later in the week, especially if they give us little/no right of
> > reply.
> >
> >
> > Simeon
> >
> >
> >
> > Simeon Tegel
> > Director of Communications
> > Amazon Watch
> > One Hallidie Plaza, Suite 402
> > San Francisco, CA 94102
> > Tel: + 415-487-9600
> > Fax: + 415-487-9612
> > simeon@amazonwatch.org
> > www.amazonwatch.org
> >
> >
> > On Apr 21, 2008, at 11:45 AM, Steven Donziger wrote:
> >
> > did u redline this?
> >
> > On 4/21/08, Simeon Tegel <simeon@amazonwatch.org> wrote:
> > >
> > > See attached. I lost 80 words but then added 30 or so with the UN and
> > > IACHR reference. Also changed intro to simplify syntax, although I can see
> > > why you wanted it phrased the way you originally had, and made other minor
> > > stylistic suggestions. TC on.
> > >
> > > Simeon
> > >
> > >
> > >
> > >
> > >
> > >
> > >
> > >
> > >
> > > Simeon Tegel
> > > Director of Communications
> > > Amazon Watch
> > > One Hallidie Plaza, Suite 402
> > > San Francisco, CA 94102
> > > Tel: + 415-487-9600
> > > Fax: + 415-487-9612
> > > simeon@amazonwatch.org
> > > www.amazonwatch.org
> > >
> > >
> > > On Apr 21, 2008, at 9:37 AM, Steven Donziger wrote:
> > >
> > > yes, lop some shit off if u can
> > >
> > > tks
> > >

4/22/2008

JA0165

DONZ-HDD-0171049

> > >
> > > On 4/21/08, Simeon Tegel <simeon@amazonwatch.org> wrote:
> > > >
> > > > Steven,
> > > >
> > > >
> > > > The WSJ op-ed looks good to me, with a couple of minor suggestions:
> > > >
> > > >
> > > > 1. Maybe add the words "and operated" to the penultimate par, after
> > > > "designed and built"?
> > > >
> > > >
> > > > 2. In the par two thirds of the way down, about the death threats,
> > > > I'd add in a line about the public interventions from the UN and
> > > > Inter-American Commission on Human Rights.
> > > >
> > > >
> > > > No typos that I could find, although I might be able to lop off a
> > > > hundred redundant words or so, if you wanted me to do that?
> > > >
> > > >
> > > > Simeon
> > > >
> > > >
> > > >
> > > > Simeon Tegel
> > > > Director of Communications
> > > > Amazon Watch
> > > > One Hallidie Plaza, Suite 402
> > > > San Francisco, CA 94102
> > > > Tel: + 415-487-9600
> > > > Fax: + 415-487-9612
> > > > simeon@amazonwatch.org
> > > > www.amazonwatch.org
> > > >
> > > >
> > > > On Apr 20, 2008, at 3:11 PM, Steven Donziger wrote:
> > > >
> > > > Editorial for Wall Street Journal/Donziger
> > > >
> > > > That an independent, court-appointed expert recently found Chevron
> > > > faces a judgment of up to $16 billion in Ecuador for causing environmental
> > > > damage in the Amazon rainforest should come as little surprise to anyone
> > > > familiar with the underlying facts on which the claim is based. What
> > > > is odd is how the Wall Street Journal ignores these facts in praising the
> > > > pledge of Chevron General Counsel Charles James "not to succumb to
> > > > extortion" and in wondering "whose interests are served" by the legal case.
> > > > In fact, Mr. James and his employer have for years tried to
> > > > undermine the rule of law in the court systems of both the U.S. and Ecuador
> > > > to avoid liability for oil-related contamination linked to Chevron's
> > > > production practices.
> > > >
> > > > Chevron (via its predecessor company Texaco) was the exclusive
> > > > operator of a large concession in Ecuador's Amazon from 1964 to 1990.
> > > > To lower production costs, Chevron discharged roughly 18 billion
> > > > gallons of water of formation – highly saline and filled with carcinogens
> > > > such as benzene -- directly into Amazon waterways in an area where six
> > > > indigenous groups had prospered for centuries. The company also
> > > > carved about 900 open-air and unlined waste pits out of the jungle floor and
> > > > filled them with the waste byproducts of drilling, which include oil sludge
> > > > and heavy metals such as chromium, lead, and zinc. The grotesque
> > > > forms of the waste pits, some the size of a football field, can be still be
> > > > seen in the area where they leech their contents into soils and groundwater.
> > > >
> > > > These systemic practices were bad enough. But a 1989 government
> > > > study also found that Chevron was spilling 20,000 gallons of oil *per
> > > > week* in the region, or about 16 million gallons over the course of
> > > > its operation.
> > > >
> > > > Using unlined pits and dumping formation waters were considered
> > > > outdated in the U.S. by most people in the oil industry in the 1940s.
> > > > The Texas Railroad Commission banned unlined pits in 1939. Even the

JA0166

DONZ-HDD-0171050

> > > > industry-backed American Petroleum Institute in the early 1960s was warning
> > > > oil companies to re-inject the toxic water deep into underground wells.
> > > > The bottom line is that Chevron decided to employ practices in
> > > > Ecuador that it would never use in the United States.
> > > >
> > > > Today, the pristine rainforest ecosystem where Chevron built and
> > > > operated 356 wells and 22 production stations – covering an area roughly the
> > > > size of Rhode Island -- suffers from what experts fear could be one of the
> > > > worst oil-related contaminations on the planet. Several
> > > > peer-reviewed health evaluations have found skyrocketing rates of
> > > > spontaneous miscarriages and cancer in the provinces of Sucumbios and
> > > > Orellana, including childhood leukemia levels four times higher than in
> > > > other parts of Ecuador. Thousands of people are drinking water and
> > > > bathing in rivers laced with toxins multiple times daily. Soils and
> > > > groundwater around and near the waste pits contain hydrocarbons that are
> > > > hundreds, even thousands, of times over norms in the U.S. and Ecuador.
> > > >
> > > >
> > > > Given this dire situation, what is surprising is how Mr. James and
> > > > his employer have been unable to get out ahead of the problem. The
> > > > court-appointed special master who Mr. James has attacked as "biased" was
> > > > actually somebody whose salary had been paid in part by Chevron in an
> > > > earlier part of the case, when the company did not object to his
> > > > qualifications (he worked with 14 other technical specialists on the latest
> > > > report).
> > > >
> > > > The Journal also falls prey to Chevron's spin over its so-called $40
> > > > million "remediation" and subsequent legal "release". This all
> > > > sounds like a neat solution for Chevron except for one glaring defect:
> > > > the release has plain language that specifically carves out private
> > > > claims of the type currently being litigated. Our clients are not
> > > > parties to that release, and therefore are not covered by it.
> > > >
> > > > This still leaves open the question of the level of responsibility
> > > > of PetroEcuador, the state oil company that inherited Chevron's operation in
> > > > 1992. The lawsuit asserts that Chevron is 100% responsible not only
> > > > for the contamination it created during the years it operated, but also for
> > > > the contamination that has occurred by its successor company using the same
> > > > negligent system that Chevron designed in violation of legal standards.
> > > > For Chevron to try to blame the entire problem on a separate oil
> > > > company using the system it designed and built is nothing more than a folly
> > > > to distract shareholders from the extent of its potential liability, which
> > > > it has never reported in its public filings.
> > > >
> > > > The trial in Ecuador reflects a genuine legal dispute that is being
> > > > hotly litigated by both parties. Chevron has vigorously defended
> > > > itself, submitted more than 200,000 pages of documentary evidence and 52,000
> > > > chemical sampling results. Despite Chevron's strategy of delay, a
> > > > judgment should be forthcoming in several months assuming the court
> > > > exercises its inherent powers to move the matter along at a reasonable pace.
> > > > The result is not foreordained. Chevron should let the process
> > > > finish instead of attacking the rule of law in a transparent attempt to
> > > > accomplish its desired result through extrajudicial pressure.
> > > >
> > > >
> > > >
> > > > #
> > > >
> > > >
> > > > --
> > > > Steven Donziger
> > > >
> > > > 212-570-9944 (fax)
> > > >
> > > >
> > > > Steven R. Donziger
> > > > Law Offices of Steven R. Donziger, P.C.
> > > >

> > > > Email: sdonziger@gmail.com
> > > >
> > > >
> > > >
> > >

JA0167

DONZ-HDD-0171051



```
> > >
> > > --
> > > Steven Donziger
> > >
> > > 212-570-9944 (fax)
> > >
> > >
> > > Steven R. Donziger
> > > Law Offices of Steven R. Donziger, P.C.
> > >

> > > Email: sdonziger@gmail.com
> > >
> > >
> > >
> > >
> > >
> > >
> >
> >
> > --
> > Steven Donziger
> >
> > 212-570-9944 (fax)
> >
> >
> > Steven R. Donziger
> > Law Offices of Steven R. Donziger, P.C.
>

> > Email: sdonziger@gmail.com
> >
> >
> >
> >
>
>
>
> --
> Steven Donziger
>
> 212-570-9944 (fax)
>
>
> Steven R. Donziger
> Law Offices of Steven R. Donziger, P.C.
>

> Email: sdonziger@gmail.com
>
>
>
```

--
Steven Donziger

212-570-9944 (fax)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.

Email: sdonziger@gmail.com


*******************************************

JA0168

DONZ-HDD-0171052

Kevin Koenig
Northern Amazon Program Coordinator
Amazon Watch

In Quito: 593-9-79-49-041
Quito Office: 593-2-333-1348
██████████████████

kevin@amazonwatch.org
www.amazonwatch.org

--
Steven Donziger
████████████████
212-570-9944 (fax)
████████████████

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
████████████████████

Email: sdonziger@gmail.com

4/22/2008

# EXHIBIT 4

---

**From:** Simeon Tegel [tegelsimeon@gmail.com] on behalf of Simeon Tegel [simeon@amazonwatch.org]
**Sent:** Tuesday, April 22, 2008 6:00 PM
**To:** Steven Donziger
**Subject:** IBD draft

I was going to send the below to IBD, mentioning that they had named us. Short but all I have time for right now. Do you want to add anything?


Your editorial ("Ecuador Shakedown", April 17) reads as though written by Chevron's publication relations department, twisting facts and ignoring Chevron's own admission that it dumped 18 billion gallons of toxic wastewater into the Ecuadorian Amazon.
You assert the "suit was laughed out of court" in the US. In fact, the judge agreed merely that Ecuador was a more appropriate jurisdiction than the US, conditioning his decision on Chevron's acceptance that it abide by the outcome of the Ecuadorian court system. You describe Richard Cabrera as an "activist" when, in truth, he is a qualified geologist appointed by the judge in the *Aguinda vs. Texaco* litigation rather than either of the parties in the case.
The facts of the case are simple: Chevron designed, implemented and operated sub-standard technology during its three decades in Ecuador, before fleeing the country. As a result, as Chevron itself does not deny, the operation dumped 18 billion gallons of toxic wastewater directly into Amazonian waterways. Now, as peer-reviewed epidemiology studies show, cancer rates in the region are skyrocketing and Chevron refuses to help, effectively rendering meaningless its touted human rights and environmental policies.
By ignoring these key points, and unquestioningly accepting Chevron's one-eyed version of events, the Investor's Business Daily has called its own editorial independence and integrity into question.
Sincerely,
Atossa Soltani
Executive Director
Amazon Watch

Simeon Tegel
Director of Communications
Amazon Watch
One Hallidie Plaza, Suite 402
San Francisco, CA 94102
Tel: + 415-487-9600
Fax: + 415-487-9612
simeon@amazonwatch.org
www.amazonwatch.org

4/22/2008

# EXHIBIT 5

.

| | |
|---|---|
| **From:** | Simeon Tegel [simeon@amazonwatch.org] |
| **Sent:** | Wednesday, May 28, 2008 2:15 PM |
| **To:** | Steven Donziger |
| **Subject:** | release pasted only (in case other version is slow in arriving) |

FOR IMMEDIATE RELEASE: May 28, 2008

CONTACTS: Simeon Tegel: 510-962-0195; Mitch Anderson: 415-342-4783;

"Systemic" Human Rights Abuses Dominate Chevron Annual General Meeting

Chevron's Victims from Burma, Ecuador and Nigeria Travel Around the World to Confront CEO David O'Reilly at Shareholder Meeting

B-Roll and photos of Ecuador pollution available upon request.

San Ramon — In a dramatic face-to-face showdown at Chevron's annual general meeting, victims of the company's grave human rights abuses from three continents today told shareholders and senior executives that the oil major must make amends to the communities whose lives and lands it has ruined

Community representatives from Burma, Ecuador and Nigeria participated in the meeting as proxy shareholders, calling on Chevron CEO David O'Reilly to stop hiding behind lawyers and corporate greenwashing and acknowledge and their suffering.

In Burma, revenue from a Chevron pipeline props up the repressive military dictatorship while pipeline security forces have been accused of murder, rape and forced labor. In Ecuador, the company is facing a $16 billion damages payout for dumping 18 billion gallons of toxic wastewater and leaving local communities to suffer a wave of cancers. In Nigeria, Chevron is accused of massive environmental contamination and having soldiers shoot and kill peaceful protestors.

Mr. O'Reilly's response today was to label one Nigerian shooting survivor a "criminal" and to switch off the microphone of an Ecuadorian woman who lives on a site polluted and supposedly "remediated" by Texaco (now part of Chevron) and is now disfigured by a mystery skin condition.

Larry Bowoto, who was shot multiple times by Nigerian soldiers flown in by Chevron to stop a peaceful protest at the company's devastation of wetlands on which local communities depend, told the meeting survivors of the notorious 1998 shooting in the Niger Delta had been tortured by police, apparently with the company's knowledge. "We were unarmed. We were there to protest the loss of our fish, our clean drinking water and our food trees."

Mr. O'Reilly responded by labeling Mr. Bowoto a "criminal". Mr. Bowoto has never faced an legal proceedings arising from the incident and is now a plaintiff in a lawsuit against Chevron due to be heard in Federal Court in San Francisco in September.

Mercedes Jaramillo, who had traveled by days from her home on a former Texaco oil concession in the Ecuadorian Amazon, had just got two sentences into her presentation before she was cut off by Mr. O'Reilly who claimed, inaccurately, that Texaco had cleaned up the area and attempted to blame Ecuadorian company

JA0173

DONZ00128918 Page 1 of 3

PetroEcuador, despite the fact that the overwhelming majority of the pollution in the area was caused by Texaco, which only handed over the concession to PetroEcuador once it was largely exhausted.

Atossa Soltani, Executive Director of Amazon Watch, a US environmental group working on the Ecuador case, then told the meeting that Ms. Jaramillo had wanted to say that her skin condition covers most of her body. Ms. Soltani then asked Mr. O'Reilly what he wanted legacy he wanted to leave Chevron. "Chevron was the sole operator," she added, noting that Chevron designed, constructed and operated the outdated technology that caused devastating toxic contamination.

The controversy appeared to cause growing unrest among the shareholders, several of whom asked Mr. O'Reilly and the other executives why Chevron was failing to put these human rights abuses behind it, allowing its reputation and brand to continue to be tarnished.

Meanwhile, outside the meeting, more than 50 protestors donned full-body haz-mat suits and brooms in a public "clean-up" display highlighting the grave human rights and environmental violations which they say are systemic and rooted in inadequate governance at Chevron's global headquarters in San Ramon.

Emergildo Criollo, an indigenous leader from Ecuador whose two children died after drinking contaminated water and whose wife has suffered uterine cancer, said: "I felt ashamed and embarrassed for Chevron after the cut me off. They wouldn't even hear my voice."

And Omeyele Sowore, a Nigerian human rights campaigner, accused Mr. O'Reilly of being a self-appointed "sheriff", accusing innocent people of being criminals. Ms. Soltani added: "He is enjoying a $17 billion profit and were are here to remind him that there is a human toll, which his company must address. These issues are not going away and neither are we, unless and until Chevron makes amends to the families and communities it has devastated."

Investors owning more than $12 billion of Chevron shares supported a resolution filed by New York City's public pension funds, some of the largest instituional investors in the US, calling on management to explain how it assesses human rights protections in countries where it operates. The resolution thus passed the threshold needed for it be re-submitted next year.

Pat Doherty, New York City's Director of Corporate Social Responsibility told the meeting: "As long-term investors we are concerned that potentially serious liabilities such as these arising from the company's international operations run the risk of depressing long-term shareholder value. We are concerned that the company may not be properly evaluating potential environmental and hr risks in its international operations. " Calls for independent review by board of directors.

Today's confrontation comes two months after Chevron was hit with a damages assessment of between $7 billion and $16 billion in a landmark class-action environmental lawsuit in Ecuador of up to $16 billion – potentially the largest judgment in civil court history – and after a U.S. federal judge in San Francisco ordered the company to stand trial in September over the Nigerian slayings.

In light of the various human rights issues, members of San Francisco's Board of Supervisors, including Tom Ammiano, Ross Mirkarimi, and Chris Daly, are filing a resolution that condemns "… Chevron Corporation for a systematic pattern of socially irresponsible activities and complicity in human rights violations that is at odds with the values of the citizens of San Francisco, and at odds with the standards of ethical conduct those citizens expect from corporations based in the Bay Area, in our own communities as well as abroad."

The main human rights issues include:

DONZ00128918 Page 2 of 3

Nigeria: Security forces flown in and closely supervised by Chevron Nigeria shot nonviolent environmental protestors in an infamous case that will be the focus of two trials in San Francisco later this year. Two people died, several others were injured and some survivors of the attack were then tortured in a Nigerian jail. One decade after the incident, and after years of legal wrangling in American courts, Chevron management has yet to compensate the families of those killed and injured or resolve the original issues raised by the community.

Burma: Chevron's Yadana pipeline has provided revenues that have propped up the country's repressive military dictatorship, while security forces guarding the pipeline have been accused of rape, murder and forced labor. The pipeline has also had significant direct and indirect environmental impacts on the Tenassirm region, one of the largest surviving tracts of tropical rainforest in Southeast Asia, including illegal logging, fishing and poaching. Meanwhile, the pipeline has exacerbated the human rights abuses perpetrated by Burmese security forces against the region's Mon, Karen and Tavoyans indigenous peoples. Naw Musi, a Karen woman who lives in exile, will attend the shareholder's meeting.

Ecuador: Chevron faces an environmental damages claim of between $7 billion and $16 billion for causing what experts believe is the most extensive oil-related contamination on the planet. Chevron had admitted to deliberately dumping 18 billion gallons of toxic waste into Amazon waterways and abandoning almost 1,000 open-air toxic waste pits, leading to the decimation of indigenous groups. A court-appointed special master recently found 428 deaths from cancer in the region related to Chevron's oil operations. In addition, community leaders heading the lawsuit have been subject to death threats, office break-ins, and assaults that have resulted in protective measures being ordered by the Inter-American Commission on Human Rights. Community leader Luis Yanza, recently awarded the Goldman Environmental Prize, will lead a delegation of Ecuadorians that includes Emergildo Criollo, a Cofan indigenous leader.

United States: In Richmond, in the East Bay, 35,000 families live in the shadow of a Chevron refinery that spewed out three million pounds of contaminants during the last three years. Existing pollution from Chevron already causes premature death, cancer, and other health ailments. Richmond asthma rates are 5x the state level. Now Chevron wants to expand the refinery, allowing it to process both more and dirtier crude oil, despite overwhelming opposition from local residents. Most of the people who live in the area are minorities, leading to charges of environmental racism.

Concern about Chevron's apparent disregard for human rights has now spilled over to Chevron's shareholders and San Ramon staff. A source within the company has said employees at San Ramon are now increasingly preoccupied by the constant flow of negative news, particularly from Ecuador, and are waiting for CEO David O'Reilly to show leadership on the issue.

###

Simeon Tegel
Director of Communications
Amazon Watch
One Hallidie Plaza, Suite 402
San Francisco, CA 94102
Tel: + 415-487-9600
Fax: + 415-487-9612
simeon@amazonwatch.org
www.amazonwatch.org

# EXHIBIT 6

| From: | Pablo Fajardo Mendoza [pafabibi@gmail.com] |
|-------|--------------------------------------------|
| Sent: | Tuesday, August 05, 2008 1:18 PM |
| To: | Yanza; Mar?a Eugenia Y?pez Regalado; Steven Donziger |
| Subject: | APPOINTMENT |

Greetings Maria.

I think we need to have a meeting with the President of the Supreme Court of Justice, to discuss the problem with the Nueva Loja Court. I know the guy is a little or a huge son of a bitch, but I think we need to do it, if possible next week.

BB



# MERRILL CORPORATION

Merrill Communications LLC

25 West 45th Street, 8th Floor
New York, NY 10036 • (212) 840-1133

State of New York )
Estado de Nueva York

) ss:
) a saber:
County of New York )
Condado de Nueva York

### Certificate of Accuracy
### Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: March 16, 2011
Fecha: 16 de marzo de 2011

_____

Violeta Lejtman
Team Lead – Legal Translations
Merrill Brink International/Merrill Corporation
_____ [firmado] _____
Violeta Lejtman
Líder del equipo – Traducciones Legales
Merrill Brink International/Merrill Corporation

Sworn to and signed before
Jurado y firmado ante
Me, this _____ 16th _____ day of
mí, a los _____ 16 _____ días del
_____ March _____ 2011
mes de _____ marzo _____ de 2011

_____
Notary Public
Notario Público

GINA ST LAURENT
Notary Public, State of New York [firmado]
No. 01ST6146442
Qualified in New York County [sello]
Commission Expires May 15, 2014

JA0178

| | |
|---|---|
| **From:** | Pablo Fajardo Mendoza [pafabibi@gmail.com] |
| **Sent:** | Tuesday, August 05, 2008 1:18 PM |
| **To:** | Yanza; Mar?a Eugenia Y?pez Regalado; Steven Donziger |
| **Subject:** | CITA |

Saludos María.

Creo que es necesario que mantengamos una reunión con el señor Preisdente de la Corte Suprema de Justicia, para tratar el problema de la Corte de Nueva Loja. Se que el tipo es un poco o bastante Hijo de puta, pero creo que es necesario, de ser posible para la semana siguiente.


BB

1

JA0179

DONZ-HDD-0037895

# EXHIBIT 7

JA0180

.

| | |
|---|---|
| **From:** | Pablo Fajardo Mendoza [pafabibi@gmail.com] |
| **Sent:** | Friday, September 12, 2008 3:35 PM |
| **To:** | María Eugenia Yépez Regalado |
| **Cc:** | sdonziger |
| **Subject:** | Re: Corte suprema |

Buen trabaj amiga y colegas. seguimos. Yo insisto que el lunes disparemos. El mismo lunes podemos poner el escrito que menciona Julio, como parte de la presión lega y pública.

BB

El 12 de septiembre de 2008 17:28, María Eugenia Yépez Regalado <mey_1802@hotmail.com> escribió:
STEVEN

TE CUENTO QUE DESDE LAS TRES DE LA TARDE HASTA ESTE MOMEMENTO QUE ACABAMOS DE LLEGAR A LA OFICINA CON JULIO Y RENATO HEMOS ESTADO HABLANDO CON LOS MIENBROS DE LA SALA 1 DE LA CORTE SUPREMA DE JUSTICIA, DONDE CAYO EL SORTEO DE LO NUESTRO, REALMENTE FUE MUY POSITIVO ,EL SECRETARIO DE LA SALA QUE ES QUIEN A LA FINAL DARA LAS PAUTAS PARA EL PROCEDIEMINTO, NOS GARANTIZO QUE NO LO HARA PRESCRIBIR Y QUE HAY MUCHAS FORMAS DE SINTETIZAR LOS TRAMITES , EL DIA LUNES CONSEGUI LA CITA CON EL PRESIDENTE DE LA CORTE Y CON EL PRESIDENTE SDE LA SALA QUE ES EL DOCTOR CAZAREST,EXACO HA ESTADO COMO HORMIGAS EN LA CORTE QUISIERA QUE NO TE PREOCUPES TANTO CASI ESTA CONTROLADO.LO UNICO QUE ES NECESARIO Y COINCIDO ES CON LA CARTA QUE PROPONE JULIO A LA CORTE

SALUDOS

MEY

_____

Invite your mail contacts to join your friends list with Windows Live Spaces. It's easy! Try it!

# EXHIBIT 8

JA0182

| | |
|---|---|
| **From:** | Steven Donziger [sdonziger@gmail.com] |
| **Sent:** | Wednesday, February 14, 2007 5:28 PM |
| **To:** | Maria Eugenia Yepez Regalado |
| **Subject:** | Re: tasks |

That's great!!! You're the best. I'd like to speak with you tonight – where can I call you?

On 2/14/07, **Maria Eugenia Yepez Regalado** <mey_1802@hotmail.com> wrote:

ETEVEN

THIS MORNING I SPOKE WITH MARCO ESTRADA FROM THE MINISTRY OF HEALTH, HE TOLD ME THE MINISTER EXPLAINED OUR ISSUE AT THE CABINET MEETING AND THAT THE PRESIDENT TOLD HER TO URGENTLY FORM A COMMITTEE TO FOLLOW THE CASE CLOSE UP AND REPORT EVERY STEP TO HIM, THE MINISTER OF COURSE HAS ORDERED THE MINISTRY'S ATTORNEYS TO PREPARE A FORM AGREEMENT TO SIGN WITH US TOMORROW I'LL FIRM UP THE MEETING WITH THE ATTORNEYS FOR THE PURPOSE OF REVIEWING THE PROPOSAL. WITH OUR ATTORNEYS.

THE APPOINTMENT WITH THE PRESIDENT HASN'T MATERIALIZED YET, HE HAS BEEN VERY BUSY WITH THE CONGRESS MATTER, I'M BEHIND IT.

TOMORROW I'LL HAVE THE THING FOR AMBATO READY AND WE'VE SET IT WITH LUIS FOR MARCH 2, THE PRESS CONFERENCE IS INITIALLY SET FOR MONDAY, FEBRUARY 26, AS LONG AS THE ORDER COMES OUT.

I REQUESTED THE APPOINTMENTS WITH *COMERCIO* AND *LA HORA* [media outlets], IT WILL BE MATERIALIZED TOMORROW, I'VE REQUESTED THEM FOR FEBRUARY 28.

MARIA EUGENIA IS ALREADY WELL ALONG IN HER WORK AS WELL AS SILVIA.

REGARDING THE POSTERS, ON FRIDAY I'VE GOT A MEETING WITH THE PEOPLE WHO HAVE DESIGNED THEM IN ORDER TO DEFINE PICTURES AND MESSAGES.

I'LL REPORT TO YOU ON THE REST TOMORROW.

CIAO, LITTLE OGRE!

YOUR SERVANT, ISAURA

MARIA EUGENIA YEPEZ.

_____

Chat with your friends online through MSN Messenger:
http://messenger.latam.msn.com/

CERT. MERRILL VER: JD                                          DONZ-HDD-0100756

JA0183

--

Steven Donziger
212-570-4499 (land)
212-570-9944 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
245 W. 104th St., #7D
New York, New York 10025
Email: sdonziger@gmail.com

DONZ-HDD-0100757

JA0184

# MERRILL CORPORATION



Merrill Communications LLC

25 West 45th Street, 8th Floor
New York, NY 10036 • (212) 840-1133

State of New York          )
Estado de Nueva York

                           )                    ss:
                           )                    a saber:
County of New York         )
Condado de Nueva York

## Certificate of Accuracy
## Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: March 11, 2011
Fecha: 11 de marzo de 2011

_____

Violeta Lejtman
Team Lead – Legal Translations
Merrill Brink International/Merrill Corporation

_____[firmado]_____

Violeta Lejtman
Líder del equipo – Traducciones Legales
Merrill Brink International/Merrill Corporation

Sworn to and signed before
Jurado y firmado ante
Me, this _____11th_____day of
mí, a los _____11_____días del
_____March_____2011
mes de ___marzo_____de 2011

Notary Public
Notario Público

GINA ST LAURENT                [firmado]
Notary Public, State of New York
No. 01ST6146442                [sello]
Qualified in New York County
Commission Expires May 15, 2014

OFFICES IN MAJOR CITIES THROUGHOUT THE WORLD          JA0185

| From: | Steven Donziger [sdonziger@gmail.com] |
|---|---|
| Sent: | Wednesday, February 14, 2007 5:28 PM |
| To: | María Eugenia Yépez Regalado |
| Subject: | Re: tareas |

Que bueno!!! Eres la maxima.  Quiero hablar con Ud esta noche -- donde te puedo llamar?

On 2/14/07, **María Eugenia Yépez Regalado** <mey_1802@hotmail.com> wrote:

ETEVEN

ESTA MAÑANA HABLE CON MARCO ESTRADA DEL MINISTERIO DE SALUD , ME COMENTO QUE LA MINISTRA EXPUSO LO NUESTRO EN LA REUNION DE GABINETE Y QUE EL PRESIDENTE LE DIJO QUE EN FORMA URGENTE CONFORME UNA COMISIÓN QUE SIGA DE CERCA EL CASO Y QUE LE INFORMARA CADA PASO , LA MINISTRA POR SUPUESTO HA DISPUESTO A LOS ABOGADOS DEL MINISTREIO PARA QUE HAGAN UN FORMATO DE ACUERDO PARA FIRMARLO CON NOSOTROS MAÑANA CONCRETO LA REUNION CON LOS ABOGADOS A FIN DE REVISAR LA PROPUESTA.CON NUESTROS ABOGADOS .

LA CITA CON EL PRSIDENTE NO SE CONCRETA TODAVIA , EL HA ESTADO MUY OCUPADO CON EL TEMA DEL CONGRESO ,  ESTOY TRAS  DE ELLO.

MAÑANA TENGO LISTO LO DE AMBATO Y LO HEMOS FIJADO CON LUIS PARA EL 2 DE MARZO, LA RUEDAD PRENSA EN PRINCIPIO ESTA   PARA EL DIA LUNES 26 DE FEBRERO,TODA VEZ QUE SALGA LA PROVIDENCIA.

PEDI LAS CITAS CON COMERCIO Y LA HORA , MAÑANA SE CONCRETA , LAS HE PEDIDO PARA EL 28 D FEBRERO.


MARIA EGENIA YA TIENE MUY AVANZADAS SUS TAREAS AL IGUAL QUE SILVIA.

SOBRE LOS AFICHES EL VIERNES TENGO UNA REUNIÓN CON LOS QUE YA HA DISEÑADOr PARA DEFINIR FOTOGRAFIAS Y MENSAJES.

MAÑANA TE INFORMARE SOBRE EL RESTO DE COSAS.

CHAO OGRITO

TU ESCLAVA ISAURA

MARRIA EUGENIA YEPEZ.

---

Charla con tus amigos en línea mediante MSN Messenger:
http://messenger.latam.msn.com/

JA0186

DONZ-HDD-0100756

--
Steven Donziger
212-570-4499 (land)
212-570-9944 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
245 W. 104th St., #7D
New York, New York 10025
Email: sdonziger@gmail.com

JA0187

DONZ-HDD-0100757

# EXHIBIT 9

JA0188

**From:** Mª Guadalupe De Heredia [lupitadeheredia@gmail.com]
**Sent:** Tuesday, October 16, 2007 2:29 PM
**To:** Steven Donziger
**Subject:** Volunteers are here

Steven,
The law students from Colorado are here, i told them to translate the "panfleto" and they are coming back this afternoon around 3 o´clock when Joseph is going to be here.
I want to work out with them and Joseph a plan for international organisations in the US to let them know about us.
Please let me know if you have more things for them to do till you come here.
LDH

--

Mª Guadalupe De Heredia
Tel. 59399707-369
Quito- Ecuador

10/16/2007

JA0189

DONZ-HDD-0131188

# EXHIBIT 10

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | | |
|---|---|---|
| In re Application of Chevron Corporation, et al | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. **10-MC-0002** |
| | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Yahoo! Inc.
    (c/o Registered Agent CT Corporation System, 111 Eighth Avenue, New York, New York 10011)

    ☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Documents adequate to permit the account holder of "documents2010@ymail.com" to access the e-mail stored in the account. The account password would satisfy this request.
    This request is made with the consent of the account holder/subscriber, Steven R. Donziger (the account was created by Mr. Donziger's assistant, Andrew M. Woods, who also consents to this request).

| Place: Friedman Kaplan Seiler & Adelman LLP<br>1633 Broadway, 46th Floor<br>New York, New York 10019 | Date and Time:<br>12/03/2010 9:00 am |
|---|---|

    ☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   11/29/2010

| *CLERK OF COURT* | |
|---|---|
| _____<br>*Signature of Clerk or Deputy Clerk* | OR   _____<br>*Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Steven R. Donziger
_____ , who issues or requests this subpoena, are:

Bruce S. Kaplan, Friedman Kaplan Seiler & Adelman LLP, 1633 Broadway, 46th Floor, NY, NY 10019

# UNITED STATES DISTRICT COURT

for the

Northern District of California

|  |  |
|---|---|
| In re Chevron Corporation | ) |
| _____ | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| _____ | ) |
| Defendant | ) |

Civil Action No.   10-MC-0002

(If the action is pending in another district, state where:

Southern District of New York          )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Yahoo! Inc.
Custodian of Records, Legal Department, 701 1st Avenue, Sunnyvale, CA 94089

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: The contents, including all e-mail, of the account "documents2010@ymail.com"

> This request is made with the consent of the account holder/subscriber, Steven R. Donziger (the account was created by Mr. Donziger's assistant, Andrew M. Woods, who also consents to this request).

| Place: Friedman Kaplan Seiler & Adelman LLP | Date and Time: |
| 1633 Broadway, 46th Floor | |
| New York, NY 10019 | 12/16/2010 9:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
| | |
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___12/09/2010___

|  |  |  |
|---|---|---|
| *CLERK OF COURT* | | |
| | OR | *Bruce S. Kaplan* /TMK |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*     Steven R. Donziger
_____ , who issues or requests this subpoena, are:

Bruce S. Kaplan, Friedman Kaplan Seiler & Adelman LLP, 1633 Broadway, 46th Floor, NY, NY 10019

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| In re Chevron Corporation | ) | |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 10-MC-0002 |
| | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Southern District of New York ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Yahoo! Inc.
    Custodian of Records, Legal Department, 701 1st Avenue, Sunnyvale, CA 94089

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: The documents identified in the attached "Exhibit A."

This request is made with the consent of the account holder/subscriber, Steven R. Donziger (the account was created by Mr. Donziger's assistant, Andrew M. Woods, who also consents to this request).

| Place: Friedman Kaplan Seiler & Adelman LLP<br>1633 Broadway, 46th Floor<br>New York, NY 10019 | Date and Time:<br>01/07/2011 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  01/03/2011

| CLERK OF COURT | | |
|---|---|---|
| | OR | *Attorney's signature* |
| *Signature of Clerk or Deputy Clerk* | | |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  Steven R. Donziger
_____ , who issues or requests this subpoena, are:

Bruce S. Kaplan, Friedman Kaplan Seiler & Adelman LLP, 1633 Broadway, 46th Floor, NY, NY 10019 (FAX: 212-833-1250) (EMAIL: bkaplan@fklaw.com)

## EXHIBIT A

1. All documents identifying IP addresses associated with attempts to access the account "documents2010@ymail.com".

2. All documents providing any information about attempts (whether successful or unsuccessful) to gain access to the account "documents2010@ymail.com". This would include, but is not limited to, documents identifying the dates and times of such attempts and/or the location (whether by IP address or otherwise) of the attempts.

3. All documents reflecting any information provided to Yahoo! when the account "documents2010@ymail.com" was created. This would include, but is not limited to, documents reflecting any information provided by the user of the account. It would also include documents that reflect the time and date of the account creation, and the location (whether by IP address or otherwise) of the user who created the account.

4. All documents reflecting information about transactional activity associated with the account "documents2010@ymail.com." This would include, but is not limited to, documents reflecting the time(s) that the account is accessed, and the nature of activity in the account (such as transmission or receipt of e-mails).

JA0194

# EXHIBIT 11

JA0195

| From: | Alberto Guerra [albertoguerrab@hotmail.com] |
|---|---|
| Sent: | Sunday, September 05, 2010 3:07 PM |
| To: | Steven Dozinger |
| Subject: | Regards from Quito |

Dear Steven:

Alberto Guerra Bastidas here, apart from a warm greeting, I would appreciate your helping my daughter Gabriela Guerra with respect to the mechanics of obtaining her residence in the United States. She entered [the US] last October of 2009 with a tourist visa. Later, in June of 2010 she changed her status from tourist to student, so she is legal for one year until June 2011. She has an American boyfriend who for the purpose of making her legal, and for love, she says, they want to get married. Questions: is it more convenient to have the wedding in the US or in Ecuador.- With the marriage how long will it take to get the residency worked out.- What is an estimate of the cost of the procedures.- and attorney's fees. By the way, my daughter is in Chicago. I will support the matter of Pablo Fajardo so it will come out soon and well.
I have asked my daughter to write or call you on the phone, for the second case I will ask Pablo for your number.
Affectionately.

JA0196



**MERRILL CORPORATION**
Merrill Communications LLC



225 Varick Street
New York, NY 10014

| State of New York | ) | |
| Estado de Nueva York | | |
| | ) | ss: |
| | ) | a saber: |
| County of New York | ) | |
| Condado de Nueva York | | |

**Certificate of Accuracy**
**Certificado de Exactitud**

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: August 16, 2011
Fecha: 16 de agosto de 2011

_____

Violeta Lejtman
Team Lead – Legal Translations
Merrill Brink International/Merrill Corporation
_____[firmado]_____
Violeta Lejtman
Líder del equipo – Traducciones Legales
Merrill Brink International/Merrill Corporation

Sworn to and signed before
Jurado y firmado ante
Me, this _____16^{th}_____ day of
mí, a los _____16_____ días del
_____ August _____ / 2011
mes de _____ agosto _____ de 2011

_____

Notary Public
Notario Público

GINA ST LAURENT
Notary Public, State of New York [firmado]
No. 01ST6146442
Qualified in New York County [sello]
Commission Expires May 15, 20|4

JA0197

.

| | |
|---|---|
| **From:** | Alberto Guerra [albertoguerrab@hotmail.com] |
| **Sent:** | Sunday, September 05, 2010 3:07 PM |
| **To:** | Steven Dozinger |
| **Subject:** | Saludos de Quito |

Estimado Steven:

Alberto Guerra Bastidas, aparte de saludarte muy afectuosamente, te solicito tengas a bien orientar a mi hija Gabriela Guerra respecto a la mecanica para obtener su residencia en los Estados Unidos. Ella, ingreso en octubre pasado del 2009 con visa de turismo. Posteriormente, en junio del 2010 cambio su status de turista a estudiante, por lo que se encuentra legal por un año esto es hasta junio del 2011. Tiene un novio amricano mismo que a efecto de legalizarla y por amor segun señala, quiere casarse. Inquietudes: el matrimonio es conveniente hacerlo en USA o Ecuador.- Con el matrimonio en que tiempo se arregla la situacion de residencia.- Estimativamente cuanto cuesta el tramite.- y Honorarios de un abogado. A proposito mi hija se encuentra en la ciudad de Chicago. Yo apoyo para que el tema relacionado con Pablo Fajardo salga pronto y bien.
He solicitado a mi hija que te escriba o llame por telefono, para eñl segundo caso, solicitare tu numero a Pablo. Afectuosamenete.

# EXHIBIT 12

JA0199

+You   **Search**   Images   Maps   Play   YouTube   News   Gmail   Drive   Calendar   More ▾

Google

Sign in

Web    Images    Maps    Shopping    More ▾    Search tools

About 36,600 results (0.22 seconds)

**Simeon Tegel | GlobalPost**
www.globalpost.com › Home › Regions › Americas
by Simeon Tegel - in 26 Google+ circles - More by Simeon Tegel

**Simeon Tegel** is a British journalist based in Lima, Peru. He covers a broad range of themes across Latin America including politics, society, culture and sports ...

**SIMEON TEGEL**
simeontegel.com/
**Simeon Tegel** is a British journalist based in Peru. He writes about a broad range of themes across Latin America but specializes in environment and adventure.

**Simeon Tegel (SimeonTegel) on Twitter**
https://twitter.com/**SimeonTegel**
**Simeon Tegel**. @**SimeonTegel**. British freelance journalist based in Peru. Covers LatAm, specializes in environment and adventure. Writes for GlobalPost and ...

**Simeon Tegel - The Independent**
www.independent.co.uk/biography/**simeon-tegel**
by Simeon Tegel - in 26 Google+ circles - More by Simeon Tegel
**Simeon Tegel. Simeon Tegel** is a British journalist based in Lima, Peru, and covering Latin America. Visit his website at simeontegel.com. Follow **Simeon Tegel** ...

**Simeon Tegel | Pulitzer Center**
pulitzercenter.org/people/**simeon-tegel**
**Simeon Tegel** is a British journalist based in Lima, Peru. He covers a broad range of themes across Latin America, including politics, society, culture and sport ...

**Simeon Tegel | Facebook**
www.facebook.com/**simeon.tegel**
**Simeon Tegel** is on Facebook. Join Facebook to connect with **Simeon Tegel** and others you may know. Facebook gives people the power to share and makes ...

**Simeon Tegel | The Guardian**
www.guardian.co.uk/profile/**simeon-tegel**
Aug 31, 2011 – **Simeon Tegel** is a British journalist based in Lima, Peru. His writing on environmental and other issues appears in newspapers and magazines ...

Images for **simeon tegel** - Report images
   

**Simeon Tegel - chileno.co.uk**
www.chileno.co.uk/blogs/blog1.php/contributors/**simeon-tegel**
2 days ago – **Simeon Tegel** is a British journalist based in Lima, Peru. He writes about a broad range of themes across Latin America and publishes widely.

**Simeon Tegel | MinnPost**
www.minnpost.com/author/**simeon-tegel**
by Simeon Tegel - in 26 Google+ circles - More by Simeon Tegel

JA0200

By **Simeon Tegel** | 01/02/13. Backers say GMOs help ... By **Simeon Tegel** | 11/29/ 12. Brazil and Peru are ... By **Simeon Tegel** | 10/18/12. The country is set to ...

 **Simeon Tegel** - Salon.com
www.salon.com/writer/**simeon_tegel**/
by Simeon Tegel - in 26 Google+ circles - More by Simeon Tegel
As the Venezuelan president battles complications from a cancer operation, politicians angle to fill the power void. **Simeon Tegel**, GlobalPost Topics: GlobalPost, ...

Searches related to **simeon tegel**

simeon tegel **globalpost**      **contact** simeon tegel

simeon tegel **facebook**      simeon tegel **articles**

simeon tegel **variety**

Goooooooooogle ›

**1** 2 3 4 5 6 7 8 9 10      **Next**

Advanced search      Search Help      Give us feedback

Google Home      Advertising Programs      Business Solutions      Privacy & Terms
About Google

JA0201

# EXHIBIT 13

JA0202

| From: | Steven Donziger |
|---|---|
| To: | Juan Pablo Sáenz; JULIO PRIETO; Pablo Fajardo Mendoza; LUIS YANZA; Kevin Koenig; Mª Guadalupe De Heredia G.; María Eugenia Yépez Regalado |
| Sent: | Mon 9/7/2009 11:42:23 PM GMT |
| Subject: | note Charles James menciona Callejas abajo en la entrevista |

Creo que todo eso fue organizado de la oficina de Callejas; hay que llamar alla que la oficina de Callejas sea investigado por su papel corrupto y ilegal. Eso puede seguir lo cobertura alla por varias dias mas.

Lupe y MEY, siguen con las entrevistas de radio dia tras dia; cada dia revela un poca mas informacion, para que sigue todos los dias y estamos controlando las noticias. hablamos por telefono primera hora martes.

abrazos, SRD


Former Chevron GC Speaks Out On Ecuadorian Recordings

Posted by Brian Baxter
Charles James's legal career just got a little more interesting.

The former antitrust chair at Jones Day and head of the Justice Department's antitrust division was promoted to executive vice president of Chevron in April after serving as general counsel for seven years. During that time James oversaw a mammoth environmental mass torts case filed against the company by 30,000 indigenous plaintiffs in Ecuador. On Monday that case took yet another dramatic turn when Chevron announced it had obtained a series of videotaped meetings showing evidence of bribery on the part of Judge Juan Núñez, who has overseen legal proceedings in the northern Ecuadorian town of Lago Agrio since August of last year. (Judge Núñez is the fourth judge on the case.)
The Am Law Daily caught up with James to talk about the case, the videotapes, and where he sees Chevron's decade-long legal battle going next.
When did you become aware of these recordings?
The recordings came to the attention of one of our company representatives in Ecuador in early June. I received a call from Edward Scott, the vice president and general counsel of our upstream business unit, shortly thereafter.
Was there due diligence done on the tapes?
We wanted to handle this as responsibly as we could and not have a hysterical reaction. So first we went about getting interviews with [the two individuals who did the recording] and making sure we had good transcriptions of the tapes. We also did some forensic analysis. We're an energy company, not an investigator, so we had to do some due diligence before we turned this over to the appropriate authorities.
Were outside and in-house counsel involved in this process?
The interviews were conducted predominantly by outside counsel, although our method of legal organization is for us to exercise fairly close in-house oversight of outside lawyers. So in-house legal resources have been involved in this.
By outside lawyers does that mean Tim Cullen from Jones Day and Doak Bishop from King & Spalding?

JA0203

Unfortunately, this whole affair has forced us to engage quite a few lawyers. But those are among the lead lawyers, yes. Adolfo Callejas is our senior outside lawyer in Ecuador.

Chevron claims it had no prior relationship or knowledge of one of the individuals who recorded these conversations--American businessman Wayne Hansen. The company admits it has had a contractual relationship with the second, Diego Borja. Did they retain outside counsel in their interviews with Chevron?

We're not going to get into the details of their legal situations. We'll speak to ours. Borja and his family have been relocated by Chevron outside of Ecuador because of security concerns.

What's the next step in this process for Chevron? I know that a letter has been sent to the prosecutor general of Ecuador. Have you received a response?

Thus far what we have seen is wild and accusatory responses from Alexis Mera, whom I understand is the moral equivalent of White House counsel in Ecuador. We've seen a more measured response from the prosecutor general, who says he's conducting an investigation. We'll proceed to follow up and file through the judicial process our motions to disqualify the judge and annul his rulings. And then we hope that this investigation by the prosecutor general is a fair, transparent, and comprehensive one. Once we understand the findings of that inquiry, we'll contemplate our next step.

What's your response to Mera's allegations that Chevron illegally intercepted conversations without authorization?

We were disappointed that he appears to be taking a lead role with regard to this as his name comes up fairly prominent on those tapes. We'd hope that the investigation and the [Ecuadorian] government's response would be unconflicted and independent. But obviously we don't run that country. Here in the U.S., a person mentioned in an investigation probably wouldn't be one of the same people conducting it. The differences between the two [countries] seem to be becoming stark and more apparent by the day.

What about Judge Núñez's denials?

Even if you separate the bribery aspect of this, our perspective is that the whole event of the meetings with the judge was inappropriate. The meetings were not with parties to the case. And [Núñez] is talking about granting contracts for a judgment that he hasn't even entered! I can't imagine a set of ethical standards with some semblance of impartiality that would permit these kind of discussions.

Does Chevron want to get this case back to the U.S. where it was filed in 1993?

This case is going to be fought in multiple jurisdictions as it goes along. We have not asked for the case to be brought back to the U.S. We think it ought to be dismissed in Ecuador, not necessarily because of these events, but because the cause is meritless and fraught with corruption and political irregularities. These events only confirm some of the things that we've been saying about the circumstances [in Ecuador] for quite some time.

Have you ever been to Ecuador?

I have never been there and probably won't be going soon. Throughout this entire trial in Ecuador the lawyers that we've had to engage within our company and outside it have had to act with a certain kind of courage just to participate in legal proceedings. One of our principal local lawyers was indicted last year.

Would you say that the chips in Ecuador are stacked against you?

It would be easy for me to say, 'Yes,' but the reality is we recognize
that we're a company held to high standards. We try to meet those
standards. There have been cases like Bowoto where we've been completely
vindicated. Bowoto was considered the human rights case of the century
until we won it, in which case it became nothing. And we had a complete
jury verdict in our favor--in San Francisco.
Any thoughts about the documentary scheduled for release next week that
talks about a David v. Goliath-like battle going on in Ecuador involving
Chevron?
In reality this case is American plaintiffs' lawyers working in
complicity with a government. So who is Goliath in this sense is unclear
to me. As for the documentary, I haven't seen it. But I've seen clips of
plaintiffs' lawyers saying you have to play dirty in Ecuador. I'd love
to hear more about those statements.
 All interviews are condensed and edited for grammar and style.
The Am Law Daily will be talking to lead plaintiffs lawyer Steven
Donziger about his work on this case in the coming days. Check our blog
for more on the latest in Aguinda v. ChevronTexaco.
Make a comment


--
Steven Donziger
212-570-4499 (land)
212-409-8628 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
245 W. 104th St., #7D
New York, New York 10025
Email: sdonziger@gmail.com

# EXHIBIT 14



Click Here to Install Silverlight

United States **Change** | All Microsoft Sites

Search Microsoft.com for:

# Microsoft Online Privacy Statement

(last updated April 2012)

[view the privacy statement highlights](#)

**On This Page**

⇓ [Collection of Your Personal Information](#)
⇓ [Use of Your Personal Information](#)
⇓ [Sharing of Your Personal Information](#)
⇓ [Accessing Your Personal Information](#)
⇓ [Communication Preferences](#)
⇓ [Display of Advertising (Opt-Out)](#)
⇓ [Security of Your Personal Information](#)
⇓ [Collection and Use of Children's Personal Information](#)
⇓ [Use of Cookies](#)
⇓ [Use of Web Beacons](#)
⇓ [Controlling Unsolicited E-mail ("Spam")](#)
⇓ [TRUSTe Certification](#)
⇓ [Enforcement of This Privacy Statement](#)
⇓ [Changes to This Privacy Statement](#)
⇓ [How to Contact Us](#)

We self-certify compliance with:



This privacy statement applies to websites and services of Microsoft that collect data and display these terms, as well as its offline product support services. It does not apply to those Microsoft sites, services and products that do not display or link to this statement or that have their own privacy statements.

Please read the Microsoft Online Privacy Statement below and also any supplemental information listed to the right for further details about particular Microsoft sites and services you use. Some products, services or features mentioned in this statement may not be available in all markets at this time. Additional information on Microsoft's commitment to protecting your privacy can be found at [http://www.microsoft.com/privacy](http://www.microsoft.com/privacy).

**Supplemental Privacy Information**

• [Bing](#)
• [Messenger](#)
• [Microsoft Advertising](#)
• [Microsoft Employment Candidates](#)
• [Microsoft Tag Reader](#)
• [MSN](#)
• [Office.com](#)
• [Support Services](#)
• [Windows Live](#)
• [Windows Live ID](#)
• [WindowsMedia.com](#)
• [Xbox LIVE, Games for Windows LIVE and Xbox.com](#)

**Related Links**

• [FTC Privacy Initiatives](#)
• [Security at Home](#)
• [Silverlight Privacy Statement](#)
• [Trustworthy Computing](#)

## Collection of Your Personal Information

We collect information as part of operating our Websites and services.

- At some Microsoft sites, we ask you to provide personal information, such as your e-mail address, name, home or work address, or telephone number. We may also collect demographic information, such as your ZIP code, age, gender, preferences, interests and favorites. If you choose to make a purchase or sign up for a paid subscription service, we will ask for additional information, such as your credit card number and billing address.

- In order to access some Microsoft services, you will be asked to sign in with an e-mail address and password, which we refer to as your Microsoft account. By signing in on one Microsoft site or service, you may be automatically signed into other Microsoft sites and services that use Microsoft account. For more information, see the Windows Live ID privacy supplement.

- We collect additional information about your interaction with Microsoft sites and services without identifying you as an individual. For example, we receive certain standard information that your browser sends to every website you visit, such as your IP address, browser type and language, access times and referring Web site addresses. We also use Web site analytics tools on our sites to retrieve information from your browser, including the site you came from, the search engine(s) and the keywords you used to find our site, the pages you view within our site, your browser add-ons, and your browser's width and height.

- We use technologies, such as cookies and web beacons (described below), to collect information about the pages you view, the links you click and other actions you take on our sites and services.

- We also deliver advertisements (see the Display of Advertising section below) and provide Web site analytics tools on non-Microsoft sites and services, and we collect information about page views on these third party sites as well.

- When you receive newsletters or promotional e-mail from Microsoft, we may use web beacons (described below), customized links or similar technologies to determine whether the e-mail has been opened and which links you click in order to provide you more focused e-mail communications or other information.

In order to offer you a more consistent and personalized experience in your interactions with Microsoft, information collected through one Microsoft service may be combined with information obtained through other Microsoft services. We may also supplement the information we collect with information obtained from other companies. For example, we may use services from other companies that enable us to derive a general geographic area based on your IP address in order to customize certain services to your geographic area.

⇑ Top of page

## Use of Your Personal Information

Microsoft collects and uses your personal information to operate and improve its sites and services. These uses include providing you with more effective customer service;

making the sites or services easier to use by eliminating the need for you to repeatedly enter the same information; performing research and analysis aimed at improving our products, services and technologies; and displaying content and advertising that are customized to your interests and preferences. For more information about the use of information for advertising, see the Display of Advertising section below.

We also use your personal information to communicate with you. We may send certain mandatory service communications such as welcome letters, billing reminders, information on technical service issues, and security announcements. Some Microsoft services, such as Windows Live Hotmail, may send periodic member letters that are considered part of the service. Additionally, with your permission, we may also occasionally send you product surveys or promotional mailings to inform you of other products or services available from Microsoft and its affiliates, and/or share your personal information with Microsoft partners so they may send you information about their products and services. You can opt-out from receiving newsletters or promotional e-mail anytime by using this web form or by following the steps as described in the respective newsletter or promotional e-mail.

Personal information collected on Microsoft sites and services may be stored and processed in the United States or any other country in which Microsoft or its affiliates, subsidiaries or service providers maintain facilities. Microsoft abides by the U.S.-EU Safe Harbor Framework and the U.S.-Swiss Safe Harbor Framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of data from the European Economic Area, and Switzerland. To learn more about the Safe Harbor program, and to view our certification, please visit http://www.export.gov/safeharbor.

⇧ Top of page

## Sharing of Your Personal Information

Except as described in this statement, we will not disclose your personal information outside of Microsoft and its controlled subsidiaries and affiliates without your consent. Some Microsoft sites allow you to choose to share your personal information with select Microsoft partners so that they can contact you about their products, services or offers. Other sites, such as MSN instead may give you a separate choice as to whether you wish to receive communications from Microsoft about a partner's particular offering (without transferring your personal information to the third party). See the Communication Preferences section below for more information.

Some Microsoft services are co-branded by Microsoft and another company (partner). If you register to or use such a service, both a Microsoft privacy statement and the partner's privacy statement may be displayed. If so, both Microsoft and the partner will receive information you provide such as on registration forms.

Microsoft occasionally hires other companies (vendor) to provide limited services on our behalf, such as handling the processing and delivery of mailings, providing customer support, hosting websites, processing transactions, or performing statistical analysis of our services. Those service providers will be permitted to obtain only the personal information they need to deliver the service. They are required to maintain the confidentiality of the information and are prohibited from using it for any other purpose than for delivering the service to Microsoft in accordance with Microsoft's instructions and policies. However, our vendors may use aggregate data for fraud detection to help improve their services. This helps them to more accurately detect fraudulent transactions. We may access or disclose information about you, including the content of your communications, in order to: (a) comply with the law or respond to lawful requests or legal process: (b) protect the rights or property of Microsoft or our customers, including the enforcement of our agreements or policies governing your use of the services: or (c) act on a good faith belief that such access or disclosure is necessary to protect the personal safety of Microsoft employees, customers or the public. We may also disclose personal information as part of a corporate transaction such as a merger or sale of assets.

⇧ Top of page

## Accessing Your Personal Information

Some Microsoft services give you the ability to view or edit your personal information online. To help prevent your personal information from being viewed by others, you first will be required to sign in. The method(s) for accessing your personal information will depend on which sites or services you have used.

- **Microsoft.com** - You can access and update your profile on microsoft.com by visiting the Microsoft.com Profile Center.

- **Microsoft Billing and Account Services** - If you have a Microsoft Billing account, you can add to or update your information at the Microsoft Billing Web site by clicking on the "Personal Information" or "Billing Information" links.

- **Microsoft Connect** - If you are a registered user of Microsoft Connect, you can access and edit your personal information by clicking Manage Your Connect Profile at the Microsoft Connect Web site.

- **Windows Live** - If you have used Windows Live services, you can update your profile information, change your password, view the unique ID associated with your credentials, or close certain accounts by visiting Windows Live Account Services.

- **Windows Live Public Profile** - If you have created a public profile on Windows Live, you may also edit or delete information in your public profile by going to Windows Live profile.

- **Search Advertising** - If you buy search advertising through Microsoft Advertising, you can review and edit your personal information at the Microsoft adCenter Web site.

- **Microsoft Partner Programs** - If you are registered with Microsoft Partner Programs, you can review and edit your profile by clicking Manage Your Account on the Partner Program Web site.

- **Xbox** - If you are a Xbox LIVE or Xbox.com user, you can view or edit your personal information, including billing and account information, privacy settings, online safety and data sharing preferences by accessing My Xbox on the Xbox 360 console or on the Xbox.com website. For account information select My Xbox, Accounts. For other personal information settings, select My Xbox, Profile then Online Safety Settings.

- **Zune** - If you have a Zune account or a Zune Pass subscription, you can view and edit your personal information at Zune.net (sign in, access your Zune tag then My Account or through the Zune software, (sign in, access your Zune tag, then select Zune.net profile.)"

In case you cannot access personal data collected by Microsoft sites or services via the links above, these sites and services may provide you with alternative means of access to your data. In any case, you can contact Microsoft by using the web form.

⇧ Top of page

## Communication Preferences

You can stop the delivery of future promotional e-mail from Microsoft sites and services by following the specific instructions in the e-mail you receive.

Depending on the respective service, you may also have the option of proactively making choices about the receipt of promotional e-mail, telephone calls, and postal mail from particular Microsoft sites or services by visiting and signing into the following pages:

- Microsoft's Promotional Communications Manager allows you to update contact information, manage Microsoft-wide contact preferences, opt out of subscriptions, and choose whether to share your contact information with Microsoft partners. If you do not have a Microsoft account, you can manage your Microsoft email communication preferences by using this web form.

- The Microsoft.com Profile Center allows you to choose whether you wish to receive marketing communications from Microsoft.com, to select whether Microsoft may share your contact information with selected third parties, and to subscribe or unsubscribe to newsletters about our products and services.

- The MSN & Windows Live Communications Preferences page allows you to choose whether you wish to receive marketing material from MSN or Windows Live. You may subscribe and unsubscribe to MSN Newsletters by going to the MSN Newsletters website.

- If you have an Xbox.com or Xbox LIVE account, you can set your contact preferences and choose whether to share your contact information with Xbox partners by accessing My Xbox on the Xbox 360 console or on the Xbox.com website. To access these settings on the Xbox.com website, select My Xbox, Profile then Contact Preferences. On the Xbox 360 console, select My Xbox, Profile then Online Safety.

- If you are registered with Microsoft Partner Programs, you can set your contact preferences or choose to share your contact information with other Microsoft partners by clicking Manage Your Account on the Partner Program Web site.

- If you have a Zune account or a Zune Pass subscription, you can set your contact preferences and choose whether to share your contact information with Zune partners at Zune.net (sign in, access your Zune tag then My Account, Newsletter options or through the Zune software (sign in, access your Zune tag, then select Zune.net profile.)

In any case, you can inform Microsoft by using this web form about your wish to stop the delivery of future promotional e-mail. These choices do not apply to the display of online advertising: please refer to the section "Display of Advertising (Opt-out)" for information on this matter. Nor do they apply to the receipt of mandatory service communications that are considered part of certain Microsoft services, which you may receive periodically unless you cancel the service.

⇑ Top of page

## Display of Advertising (Opt-Out)

Many of our Web sites and online services are supported by advertising.

Most of the online advertisements on Microsoft sites are displayed by Microsoft Advertising. When we display online advertisements to you, we will place one or more persistent cookies on your computer in order to recognize your computer each time we display an ad to you. Because we serve advertisements on our own websites as well as those of our advertising and publisher partners, we are able to compile information over time about the types of pages, content and ads you, or others who are using your computer, visited or viewed. This information is used for many purposes, for example, it helps us try to ensure that you do not see the same advertisements over and over again. We also use this information to help select and display targeted advertisements that we believe may be of interest to you.

**You may opt-out of receiving targeted ads from Microsoft Advertising by visiting our opt-out page.** For more information about how Microsoft Advertising collects and uses information, please see the Microsoft Advertising Privacy Supplement.

We also allow third-party ad companies, including other ad networks, to display advertisements on our sites. In some cases, these third parties may also place cookies on your computer. These companies currently include, but are not limited to: 24/7 Real Media, aCerno,Inc, AdBlade, AdConion, AdFusion, Advertising.com, AppNexus, Bane Media, Brand.net, CasaleMedia, Collective Media, Fox Interactive, Interclick, Millennial, PrecisionClick, ROI Media, Social Media, SpecificMedia, TrafficMarketplace, Tribal Fusion, ValueClick, Yahoo!, YuMe, and Zumobi. These companies may offer you a way to opt-out of ad targeting based on their cookies. You may find more information by clicking on the company names above and following the links to the Web sites of each company. Many of them are also members of the Network Advertising Initiative or the Digital Advertising Alliance, which each provide a simple way to opt-out of ad targeting from participating companies.

⇑ Top of page

## Security of Your Personal Information

Microsoft is committed to protecting the security of your personal information. We use a variety of security technologies and procedures to help protect your personal information from unauthorized access, use, or disclosure. For example, we store the personal information we collect on computer systems with limited access, which are located in controlled facilities. When we transmit highly confidential information (such as a credit card number or password) over the Internet, we protect it through the use of encryption, such as the Secure Socket Layer (SSL) protocol.

If a password is used to help protect your accounts and personal information, it is your responsibility to keep your password confidential. Do not share this information with anyone. If you are sharing a computer with anyone you should always log out before leaving a site or service to protect access to your information from subsequent users.

⇑ Top of page

## Collection and Use of Children's Personal Information

Many Microsoft sites and services are intended for general audiences and do not knowingly collect any personal information from children. When a Microsoft site does collect age information, and users identify themselves as under 13, the site will either block such users from providing personal information, or will seek to obtain consent from parents for the collection, use and sharing of their children's personal information. We will not knowingly ask children under the age of 13 to provide more information than is reasonably necessary to provide our services.

Please note that if you grant consent for your child to use Microsoft services, this will include such general audience communication services as e-mail, instant messaging, and online groups, and your child will be able to communicate with, and disclose personal information to, other users of all ages. Parents can change or revoke the consent choices previously made, and review, edit or request the deletion of their children's personal information. For example, on MSN and Windows Live, parents can visit Account Services, and click on "Permission for kids." If we change this privacy statement in a way that expands the collection, use or disclosure of children's personal information to which a parent has previously consented, the parent will be notified and we will be required to obtain the parent's additional consent.

If you have an MSN Premium, MSN Plus, or MSN 9 Dial-Up account, and use MSN Client software version 9.5 or below, you can choose to set up MSN Parental Controls for the other users of that account. Please read the supplemental privacy information for MSN for further information.

We encourage you to talk with your children about communicating with strangers and disclosing personal information online. You and your child can visit our online safety resources for additional information about using the Internet safely.

⇑ Top of page

## Use of Cookies

Most Microsoft Web sites use "cookies," which are small text files placed on your hard disk by a Web server. Cookies contain information that can later be read by a Web server in the domain that issued the cookie to you.

One of the primary purposes of cookies is to store your preferences and other information on your computer in order to save you time by eliminating the need to repeatedly enter the same information and to display your personalized content and targeted advertising on your later visits to these sites. Microsoft Web sites also use cookies as described in the Display of Advertising sections of this privacy statement.

When you sign in to a site using your Microsoft account, we store your unique ID number, and the time you signed in, in an encrypted cookie on your hard disk. This cookie allows you to move from page to page at the site without having to sign in again on each page. When you sign out, these cookies are deleted from your computer. We also use cookies to improve the sign in experience. For example, your e-mail address may be stored in a cookie that will remain on your computer after you sign out. This cookie allows your e-mail address to be pre-populated, so that you will only need to type your password the next time you sign in. If you are using a public computer or do not otherwise

JA0209

want this information to be stored, you can select the appropriate radio button on the sign-in page, and this cookie will not be used.

You have the ability to accept or decline cookies. Most Web browsers automatically accept cookies, but you can usually modify your browser setting to decline cookies if you prefer. If you choose to decline cookies, you may not be able to sign in or use other interactive features of Microsoft sites and services that depend on cookies, and some advertising preferences that are dependent on cookies may not be able to be respected.

If you choose to accept cookies, you also have the ability to later delete cookies that you have accepted. For example, in Internet Explorer 8, you can delete cookies by selecting "Tools", "Delete browsing history". Then select the control box "Cookies" and click the "Delete" button. If you choose to delete cookies, any settings and preferences controlled by those cookies, including advertising preferences, will be deleted and may need to be recreated.

↑ Top of page

## Use of Web Beacons

Microsoft Web pages may contain electronic images known as Web beacons - sometimes called single-pixel gifs - that may be used to assist in delivering cookies on our sites and allow us to count users who have visited those pages and to deliver co-branded services. We may include Web beacons in promotional e-mail messages or our newsletters in order to determine whether messages have been opened and acted upon.

Microsoft may also employ Web beacons from third parties in order to help us compile aggregated statistics regarding the effectiveness of our promotional campaigns or other operations of our sites. We prohibit Web beacons on our sites from being used by third parties to collect or access your personal information.

Finally, we may work with other companies that advertise on Microsoft sites to place Web beacons on their sites in order to allow us to develop statistics on how often clicking on an advertisement on a Microsoft site results in a purchase or other action on the advertiser's site.

↑ Top of page

## Controlling Unsolicited E-mail ("Spam")

Microsoft is concerned about controlling unsolicited commercial e-mail, or "spam." Microsoft has a strict Anti-Spam Policy prohibiting the use of a Windows Live Hotmail or other Microsoft-provided e-mail account to send spam. Microsoft will not sell, lease or rent its e-mail subscriber lists to third parties. . While Microsoft continues to actively review and implement new technology, such as expanded filtering features, there is no technology that will totally prevent the sending and receiving of unsolicited e-mail. Using junk e-mail tools and being cautious about the sharing of your e-mail address while online will help reduce the amount of unsolicited e-mail you receive.

↑ Top of page

## TRUSTe Certification

Microsoft has been awarded TRUSTe's Privacy Seal signifying that this privacy statement and our practices have been reviewed by TRUSTe for compliance with TRUSTe's program requirements including transparency, accountability and choice regarding the collection and use of your personal information. The TRUSTe program does not cover information that may be collected through downloadable software. TRUSTe's mission, as an independent third party, is to accelerate online trust among consumers and organizations globally through its leading online trust solutions.

↑ Top of page

## Enforcement of This Privacy Statement

If you have questions regarding this statement, you should first contact us by using our Web form. If you do not receive acknowledgment of your inquiry or your inquiry has not been satisfactorily addressed, you should then contact TRUSTe at http://www.truste.org/consumers/watchdog_complaint.php. TRUSTe will serve as a liaison with Microsoft to resolve your concerns.

↑ Top of page

## Changes to This Privacy Statement

We will occasionally update this privacy statement to reflect changes in our services and customer feedback. When we post changes to this Statement, we will revise the "last updated" date at the top of this statement. If there are material changes to this statement or in how Microsoft will use your personal information, we will notify you either by prominently posting a notice of such changes prior to implementing the change or by directly sending you a notification. We encourage you to periodically review this statement to be informed of how Microsoft is protecting your information.

↑ Top of page

## How to Contact Us

For more information about our privacy practices, go to the full Microsoft Online Privacy Statement.

- If you have a technical or general support question, please visit http://support.microsoft.com/ to learn more about Microsoft Support offerings.

- If you suspect your Hotmail/Live account has been hacked or taken over, please visit Live Help.

- If you have a Hotmail/Live password question, please visit Live Help.

- For general Microsoft Privacy issues, please contact us by using our Web form.

Microsoft Privacy, Microsoft Corporation, One Microsoft Way, Redmond, Washington 98052 USA • 425-882-8080

To find the Microsoft subsidiary in your country or region, see http://www.microsoft.com/worldwide/.

Anti-Spam Policy

↑ Top of page

JA0210

© 2012 Microsoft Corporation. All rights reserved. Contact Us | Terms of Use | Trademarks | Privacy Statement

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                  Plaintiff,

        -against-                                1:12-MC-65 LAK/CFH

STEVEN DONZIGER, et al.,

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER TO SHOW CAUSE

LEWIS A. KAPLAN, *District Judge.*

        One of the motions to quash in this matter was filed on behalf of non-party "John Doe" movants, "John Doe" being a fictitious name.

        Federal Rule of Civil Procedure 10(a) requires that the complaint in a civil action include a caption that "name[s] all the parties." This serves several important purposes including but not limited to the proper application of the rules of former adjudication.

        Rule 10(a) does not expressly contain any such requirement with respect to motions filed by non-parties, in all likelihood because the question whether non-party movants should be identified rarely if ever arises in consequences of the fact that their identities always or nearly always are known. Nonetheless, it appears that the policies underlying Rule 10(a) apply to this motion.

        There is an additional consideration. These movants have filed a declaration for consideration on the motion that counsel has stated is that of one of her clients. The document is signed only with the alleged client's e-mail address. As identification of the owner of the e-mail address in question is an object of the subpoena that the movants seek to quash, it is impossible for the Court, or those of the parties who do not already know with certainty who owns the e-mail address with which the declaration was signed, to know who actually signed the declaration. Thus, lack of the true name of the declarant could impede prosecution of the declarant in the event that there were reason to believe that the declaration is false.

        In the circumstances, it is appropriate to consider whether Rule 10(a) and/or other provisions of the Federal Rules should be construed to require identification, at least to the Court,

2

of any person or entity that appears in a federal action. The "John Doe" movants shall show cause, on or before February 6, 2013, why they should not be required to submit to the undersigned affidavits or declarations revealing to the Court their true identities which will be filed under seal unless and until the Court otherwise orders. The Court well understands that the question whether the "John Does'" identities should be revealed to Chevron or more broadly is distinct from the question whether the Court should be so informed and does not intend to address that issue – which is implicated by the pending motion – on this order to show cause.

       SO ORDERED.

Dated:      January 23, 2013

                                Lewis A. Kaplan
                          United States District Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

          Plaintiff,

   -against-

                              Case No. 1:12-mc-00065-LK-CFH

                              Hon. Lewis A. Kaplan

STEVEN DONZIGER, *et al.*,

          Defendants.

---

**SUPPLEMENTAL DECLARATION OF MICHELLE HARRISON IN SUPPORT OF**
**MOTION OF NON-PARTY MOVANTS TO QUASH SUBPOENAS TO GOOGLE, INC.**
**AND YAHOO! INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION**

      1.     I, Michelle Harrison, have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein.

      2.     I am a law clerk with EarthRights International, counsel of record for Non-Party John Doe Movants.

      3.     EarthRights International and the Electronic Frontier Foundation represent the owners of the Microsoft email accounts simeontegel@hotmail.com, mey_1802@hotmail.com, pirancha@hotmail.com, and duruti@hotmail.com. The owner of duruti@hotmail.com joined the Non-Party John Doe Movants' motion to quash Chevron's subpoena to Microsoft on January 28, 2013.

      4.     My original declaration stated that we represent the owner of the email account lupitadeheredia@hotmail.com. In fact, that email address is not listed in Chevron's subpoena to Microsoft and therefore is not at issue in this case.

      5.     We also represent the owners of the following Google and Yahoo! email account addresses for the purpose of a separate motion to quash filed in the Northern District of

California: cortelyou@gmail.com, sayjay80@gmail.com, kevinkoenigquito@gmail.com, marialya@gmail.com, coldmtn@gmail.com, figer@gmail.com, bandawatch@gmail.com, catmongeon@gmail.com, briansethparker@gmail.com, lupitadeheredia@gmail.com, josephmutti@gmail.com, drewwoods3@gmail.com, katiafachgomez@gmail.com, tegelsimeon@gmail.com, lara_garr@gmail.com, richard.clapp@gmail.com, ampage@gmail.com, goldstein.ben@gmail.com, wilsonaguinda@gmail.com, sara.colon@gmail.com, farihahzaman@gmail.com, jeremylow@gmail.com and courtneyrwong@gmail.com, jenbilbao3@yahoo.com, kshuk22@yahoo.com, eriktmoe66@yahoo.com, drewwoods3@yahoo.com, lupitadeheredia@yahoo.com, and Lore_gamboa@yahoo.es.

6.      I contacted a number of the email addresses listed in Chevron's subpoenas. In response, some of these email addresses sent messages back informing me that the message could not be delivered, indicating these addresses are no longer in use or no longer functional for other reasons. These addresses include alex_anchundia2007@hotmail.com, luisvillacreces@hotmail.com, aulestiajuan@hotmail.com, gaer69chzpr@hotmail.com, and hjploro@hotmail.com.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 31, 2013.


_____
MICHELLE C. HARRISON

JA0215

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

                Plaintiffs,

     -against-

                                  Case No. 1:12-MC-00065-LK-CFH

                                  Hon. Lewis A. Kaplan

STEVEN DONZIGER, *et al.*,

                       Defendants.

---

### DECLARATION OF JOHN DOE #2 (OWNER OF PIRANCHA@HOTMAIL.COM) IN SUPPORT OF MOTION OF NON-PARTY JOHN DOE MOVANTS TO QUASH SUBPOENA TO MICROSOFT INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION

Using my email address, pirancha@hotmail.com, instead of my actual name, in order to protect my identity pursuant to my rights under the First Amendment and New York law, I declare as follows:

1.    I am the owner of the email account pirancha@hotmail.com. I have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein.

2.    I am providing this declaration under my email address because I wish to protect my rights to free speech and participation in associational activities. I also wish to avoid making moot these very issues, which I have raised in this motion. A true and correct copy of my actual signature for this document resides with my attorneys.

3.    In September 2012, I received notice from Microsoft of a subpoena issued in relation to the *Chevron, Corp. v. Donziger et al.*, Case No. 11-0691 (LAK) (S.D.N.Y.) for identifying and email usage information associated with my Hotmail address.  I am not a defendant in that case.  I also received notice from Google and Yahoo! about other subpoenas in the same case issued in the District Court for the Northern District of California seeking information about Gmail and Yahoo! addresses of mine.  I am now moving to quash the subpoena issued to Microsoft for information associated with my Hotmail account. I am separately moving to quash

JA0216

the subpoenas seeking my Gmail and Yahoo! account information in the District Court for the Northern District of California.

4.     I am a full-time independent journalist, as well as an environmental and human rights activist.

5.     I provided professional public relations services to environmental activists and lawyers working in the Ecuadorian Amazon from 2005 to 2010, and continue to perform these functions occasionally on a volunteer basis. My roles have included providing translation services, editing newsletters, serving as a public spokesperson, managing international press relations, planning special events, and coordinating press conferences, among other activities.

6.     I estimate that I have had my Hotmail email address since 2005. I have used my Hotmail account to engage in both personal and professional communications for approximately seven years. It is important to me that Chevron not have access to all my email usage information and locations during that time period.

7.     Keeping my Hotmail account and location information private is very important to me for personal and professional reasons. I am a professional journalist and maintaining journalistic confidentiality regarding my communications and locations has been, and continues to be, an important part of my job.

8.     During the course of my environmental and human rights activism work in Ecuador, I have been subjected to physical threats and believe that my life and family's safety have been endangered. I believe that the threats against me were due to my role in the public environmental advocacy campaign against Chevron.

9.     I feel harassed by Chevron's attempt to obtain my email usage records and feel that it violates my rights.

10.     I know other people who have been harassed because of their environmental advocacy work against Chevron.

11.     I know other people who have stopped participating in or have decided not to participate in advocacy against Chevron because they fear harassment and retribution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January **31** 2013.

Pirancha @ Hotmail.com

PIRANCHA@HOTMAIL.COM

2

JA0217

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORP.,

                            Plaintiff,

           -against-                                                        1:12-mc-65 (LAK)

STEVEN DONZIGER, et al.,

                            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM AND ORDER

Lᴇᴡɪs A. Kᴀᴘʟᴀɴ, *District Judge.*

        Three individuals or entities identified only as JOHN DOES and as the owners of three specific email addresses – simeontegal@hotmail.com, mey_1802@hotmail.com, and lupitadeheredia@hotmail.com – move to quash a subpoena served by plaintiff in aid of an action pending in the Southern District of New York[1] on Microsoft Corporation.

### Facts

        The subpoena seeks production of documents related to the identities of the users and the usage of thirty email addresses, including those allegedly owned by the three JOHN DOES. The motion is supported in part by a declaration of "JOHN DOE (OWNER OF SIMEONTEGEL@HOTMAIL.COM),"[2] which is signed in cursive writing

---

[1]      *Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK).

[2]      Dkt. 2-4.

"simeontegel@hotmail.com." A declaration of a law clerk with an organization that is providing the movants with legal representation states that "[a] copy of the declaration with the account holder's true name and signature is on file with" her office.[3] The alleged owner of the simeontegel@hotmail.com account avers that he has filed the "declaration under [his] email address because [he] wish[es] to protect [his] rights to free speech and participation in associational activities. [He] also wish[es] to avoid making moot these very issues, which [he] ha[s] raised in this motion."[4]

Chevron, for its part, believes it knows the identities of the owners of the email addresses of the three JOHN DOES on whose behalf the motion originally was made.[5] Its memorandum points out the following:

> "In this case, accordingly, the Microsoft subpoena does not affect the Does' right to anonymous speech because Tegel, Yepez, and Heredia—the Does—are not anonymous. That is of their own doing: Tegel, Heredia, and Yepez used their names or initials when creating the addresses associated with their email accounts. And they have long publicized their use of these particular email addresses and their association with the LAPs. Tegel signed emails and wrote letters to news outlets using his name. Exs. 3, 5. Indeed, a Google search of 'Simeon Tegel' returns, as its second result, Tegel's personal website, which prominently lists his Hotmail address. Ex. 12. Heredia gave assignments to the LAPs' interns. Ex. 9. And Yepez participated in radio interviews about her involvement in the LAPs' public relations

---

[3]

Dkt. 2-2, ¶ 5.

[4]

Dkt. 2-4, ¶ 2.

[5]

Movants, it should be added, have submitted a second JOHN DOE declaration with their reply papers, this one of the alleged owner of the pirancha@hotmail.com account. This email address appears to be that of Rodrigo Wampakit of Maruma, Ecuador. *See* http://chapaik.freservers.com/ (last visited Feb. 11, 2012). The Court need not consider this declaration because it was filed for the first time in reply. *See State Farm Mut. Auto Ins. Co. v. Cohan*, 409 Fed.Appx. 453, 456 (2d Cir. 2011) (affirming district court's exclusion of affidavit first filed in reply as belated); *see also Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

efforts. Ex. 13. Through their very public activities, the Does have affirmatively chosen *not* 'to remain anonymous.' *McIntyre* [*v. Ohio Elections Comm'n*], 514 U.S. [334,] 342 [(1995)]."[6]

Given the failure of the JOHN DOE movants to identify themselves in court papers, the Court issued an order to show cause "why they should not be required to submit to the undersigned affidavits or declarations revealing to the Court their true identities which will be filed under seal unless and until the Court otherwise orders."[7]

The JOHN DOE movants have responded that they should not be obliged to inform even the Court – alone, under seal – of their identities because (1) Federal Rule of Civil Procedure 10(a) does not literally require identification of the JOHN DOES in the caption,[8] (2) Chevron asserts that it knows the identities of the JOHN DOES, thus satisfying the conceded purpose of Rule 10(a) "to apprise parties of who their opponents are and to protect the public's legitimate interest in knowing the facts at issue in court proceedings,"[9] (3) there is no need to identify the JOHN DOES for purposes of applying the rules of former adjudication because no one now claims that they are

---

[6] Dkt. 35, at 14.

[7] Dkt. 41, at 2.

It added that the Court "well understands that the question whether the 'John Does' identities should be revealed to Chevron or more broadly is distinct from the question whether the Court should be so informed and does not intend to address that issue – which is implicated by the pending motion – on this order to show cause."

[8] Dkt. 43, at 1.

[9] *Id.* (quoting *Doe v. Shakur*, 164 F.R.D. 359, 360 (S.D.N.Y. 1996) (internal quotation marks omitted)).

4

trying to relitigate a matter previously decided,[10] and (4) there is no need to identify the JOHN DOES to enable a prosecution for perjury or making false statements as there is no suggestion that the declaration submitted anonymously on this motion is false.[11]

*Discussion*

The position of the JOHN DOE movants with respect to identifying themselves to the Court is entirely unpersuasive.

As an initial matter, they acknowledge that Rule 10(a) is intended "to apprise parties of who their opponents are and to protect the public's legitimate interest in knowing the facts at issue in court proceedings."[12]  Their contention that this purpose is served here because Chevron "asserts" that it knows the identities of the movants is very wide of the mark.  Asserting a belief and knowing a fact are two quite different things.  Moreover, facts typically are not proved in litigation by assertions of belief.  Evidence is required.  Thus, the first conceded purpose of Rule 10(a) is not served by proceeding anonymously where the adverse party believes that it knows the anonymous litigants' identities.  Nor is its purpose of serving the public interest.  But this is neither here nor there for purposes of the order to show cause, as that concerns only the question whether the Court should have the information.

Second, no comfort may be taken from the claim that copies of the two DOE declarations bearing the true names are in the hands of the advocacy organization that is providing

---

[10]  *Id.* at 2.

[11]  *Id.* at 3.

[12]  *Id.* at 1 (quoting *Shakur*, 164 F.R.D. at 360 (internal quotation marks omitted)).

the declarants with legal representation.   There simply is no way of knowing whether those declarations would be available should the identities of the declarants or the veracity of their allegations become important at some unpredictable future time when that information might prove pivotal for former adjudication or criminal law purposes.

Third, courts have important institutional reasons that require that they know the identities of litigants before them even where there are good reasons for litigants to proceed anonymously vis-a-vis the public.  One consideration is that our jurisdiction is limited by Article III of the Constitution to cases and controversies – actual live disputes between real adversaries. Without knowing the identities of the DOE movants, the Court simply cannot be certain that it is the true owners of these email accounts who are pressing this motion as distinguished, perhaps, from an advocacy group that wishes to use the existence of the subpoena for a broader purpose of its own. Another is the Court's obligation to "keep informed about the judge's personal and fiduciary financial interests and make a reasonable effort to keep informed about the personal financial interests of the judge's spouse and minor children residing in the judge's household" in order to discharge the judge's duty to disqualify him- or herself in appropriate circumstances.[13]  Knowing the identity of the litigants before the Court is essential to discharging that obligation.

In the last analysis, at least part of what is going on here is reasonably clear.  The JOHN DOE movants' claims that they fear that their expressive and associational activities could be chilled if their names were publicly associated with their email addresses is shaky at best in light of the email addresses they chose and the publicity they have received.  It does not take a rocket scientist to figure out, as Chevron thinks it has done, that simeontegel@hotmail.com quite likely is

---

[13]   CODE OF CONDUCT FOR UNITED STATES JUDGES Canon 3(C)(2).

6

owned by Simeon Tegel, mey_1802@hotmail.com by Maria Eugenia Yepez,[14] and lupitadeheredia@hotmail.com by Lupita (or Guadalupe) de Heredia.[15] The real concern seems to be something else altogether. As the owner of the simeontegel@hotmail.com account wrote in his "anonymous" declaration, he does not wish to acknowledge his identity because he "wish[es] to avoid making moot these very issues" – *i.e.*, the question whether internet service providers can or should be required in appropriate circumstances to identify the owners of email addresses. But, federal courts have an independent obligation to inquire as to the existence of their jurisdiction, which is non-existent where a lawsuit is moot. The wish to keep the movants' identities secret as a matter of form where they so likely are not secret in fact and thus to induce the Court to ignore what likely is the reality here is not legitimate and not defensible.

"Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities."[16] "This inherent power . . . extends . . . to a court's management of its own affairs."[17] Quite apart from the applicable provisions of the Civil Rules, the considerations discussed above and in the order to show cause make this an appropriate occasion for the use of that inherent

---

[14]

The email address has been published in unique association with Ms. Yepez's name at least at http://www.juiciocrudo.com/archivos/documento/doc_95_Correo_electronico_de_Pablo_Fajardo_%282_de_abril_2008%29.pdf (last visited Feb. 11, 2012).

[15]

Dkt. 39-9.

[16]

*Degen v. United States*, 517 U.S. 820, 823 (1996).

[17]

*Xiao Xing Ni v. Gonzales*, 494 F.3d 260, 267 (2d Cir. 2007).

7

power to ensure that the processes of this Court are not abused, that a moot controversy is not foisted upon it, and that the Court may properly discharge its obligations under the Code of Conduct.

*Conclusion*

Accordingly, the Court construes Rule 10(a) as requiring that any non-party who files an application for relief in a federal court identify him-, her-, or itself in the initial pleading or motion filed on its behalf. That initial pleading or motion shall be filed publicly in the absence of an order permitting its filing under seal. Pursuant to Federal Rules of Civil Procedure 1, 10(a), and 16(c)(2)(A), (G), (L), and (P), and the inherent power of the Court, the JOHN DOE movants, on or before February 19, 2013, shall submit to the chambers of the undersigned (1) the original, signed declarations they have filed publicly under anonymous names, and (2) an affidavit or declaration identifying each individual or entity on behalf of which the motion to quash has been made. These documents will be filed under seal unless and until the Court otherwise orders.

SO ORDERED.

Dated:          February 12, 2013

_____
Lewis A. Kaplan
United States District Judge

JA0224

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

        Plaintiff,

   -against-

                                    Case No. 1:12-mc-00065-LK-CFH

                                    Hon. Lewis A. Kaplan

STEVEN DONZIGER, *et al.*,

        Defendants.

## REDACTED DECLARATION OF NATHAN D. CARDOZO

1.     I, Nathan D. Cardozo, have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein, as ordered by the Court on February 13, 2013.

2.     I am a staff attorney with the Electronic Frontier Foundation, counsel of record for Non-Party John Doe Movants, and licensed to practice law in the State of California.

3.     EarthRights International and the Electronic Frontier Foundation represent the owners of the Microsoft email accounts simeontegel@hotmail.com, mey_1802@hotmail.com, pirancha@hotmail.com, and duruti@hotmail.com.

4.     ███████████████████████████████.

5.     ███████████████████████████████
███.

6.     █████████████████████████████████████
███.

7.     ██████████████████████████████████.

8.     Attached hereto as Exhibit A is a true and correct copy of the declaration of simentegel@hotmail.com, signed by █████████████████████.

9.     Attached hereto as Exhibit B is a true and correct copy of the declaration of pirancha@hotmail.com, signed by ██████████████████████
██████.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 19, 2013.

NATHAN D. CARDOZO

JA0226

# Exhibit A
# [Redacted]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

                Plaintiffs,

    -against-

                                      Case No. 1:12-mc-65

                                      Hon. Gary L. Sharpe

STEVEN DONZIGER, *et al.*,

                            Defendants.

---

**DECLARATION OF JOHN DOE (OWNER OF SIMEONTEGEL@HOTMAIL.COM) IN SUPPORT OF MOTION OF NON-PARTY JOHN DOE MOVANTS TO QUASH SUBPOENA TO MICROSOFT INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION**

Using my email address, simeontegel@hotmail.com, instead of my actual name, in order to protect my identity pursuant to my rights under the First Amendment and New York law, I declare as follows:

1.    I am the owner of the email account simeontegel@hotmail.com. I have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein.

2.    I am providing this declaration under my email address because I wish to protect my rights to free speech and participation in associational activities. I also wish to avoid making moot these very issues, which I have raised in this motion. A true and correct copy of my actual signature for this document resides with my attorneys.

3.    On September 12, 2012, I received notice from Microsoft of a subpoena issued in relation to the *Chevron, Corp. v. Donziger et al.*, Case No. 11-cv-0691 (LAK) (S.D.N.Y.) for identifying and email usage information associated with my Hotmail address. I am not a defendant in that case. On September 17, 2012, I received a notice from Google of another

subpoena in the same case issued in the District Court for the Northern District of California seeking information from Google about a Gmail address of mine. I am now moving to quash the subpoena issued to Microsoft for information associated with my Hotmail account. I am separately moving to quash the subpoena seeking my Gmail account information in the District Court for the Northern District of California, as well.

4.   I am a full-time journalist. I worked for a non-profit advocacy organization from 2005 to 2008, but prior to and after that period, I worked as a professional journalist. My articles are frequently published in a number of prominent international media outlets.

5.   I was involved in an advocacy campaign concerning the environmental impact of Chevron's former oil concession in the Amazon for less than three years, ending in 2008. I was never directly involved in the litigation against Chevron in Ecuador, but performed advocacy on behalf of the communities affected by the activities giving rise to that litigation.

6.   I have had my Hotmail email address since at least 1999 and I have used it as my primary address ever since.

7.   I almost never used my Hotmail address in connection with my advocacy work concerning Chevron. I had a separate address for correspondence related to that campaign.

8.   Keeping my Hotmail account and location information private is very important to me for personal and professional reasons. I am a professional journalist and maintaining journalistic confidentiality regarding my communications has been, and continues to be, an important part of my job.

9.   I have used my Hotmail account to engage in personal and professional communications for approximately thirteen years. It is important to me that Chevron not have access to my email usage information and locations during that time period.

10.   As a journalist based in Latin America, I work on many stories where my personal security, and that of my confidential sources, is an issue of great concern.

2

11.  Had I known that my email usage information and location would be revealed, my political activity at the time I was assisting with the advocacy campaign related to Chevron would have been chilled.

12.  I am no longer active in the advocacy campaign and have not been for some time, but should Chevron gain access to my private email usage records, it would intimidate me and deter me from engaging in activism or litigation against Chevron in the future.

13.  Should Chevron gain access to my account information, it would chill my activity more generally as well, knowing that personal information about my email use and location could be revealed concerning any activity that I might engage in. Because privacy and confidentiality is of the utmost importance in my line of work, and my sources rightfully expect our communications will remain confidential, my use of my email account will be chilled if Microsoft releases my account information to Chevron. My participation in future political and activism campaigns will also be chilled should this information be released.

14.  I feel harassed by Chevron's attempt to obtain my email usage records and fear further harassment should Chevron gain access to the details of my past involvement in the advocacy campaign against Chevron.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 22, 2012.

3

JA0230

# Exhibit B
# [Redacted]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CHEVRON CORP.,

       Plaintiffs,

  -against-

                                Case No. 1:12-MC-00065-LK-CFH

                                Hon. Lewis A. Kaplan

STEVEN DONZIGER, *et al.*,

                 Defendants.

**DECLARATION OF JOHN DOE #2 (OWNER OF PIRANCHA@HOTMAIL.COM) IN SUPPORT OF MOTION OF NON-PARTY JOHN DOE MOVANTS TO QUASH SUBPOENA TO MICROSOFT INC. SEEKING IDENTITY AND EMAIL USAGE INFORMATION**

Using my email address, pirancha@hotmail.com, instead of my actual name, in order to protect my identity pursuant to my rights under the First Amendment and New York law, I declare as follows:

1.   I am the owner of the email account pirancha@hotmail.com. I have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein.

2.   I am providing this declaration under my email address because I wish to protect my rights to free speech and participation in associational activities. I also wish to avoid making moot these very issues, which I have raised in this motion. A true and correct copy of my actual signature for this document resides with my attorneys.

3.   In September 2012, I received notice from Microsoft of a subpoena issued in relation to the *Chevron, Corp. v. Donziger et al.*, Case No. 11-0691 (LAK) (S.D.N.Y.) for identifying and email usage information associated with my Hotmail address. I am not a defendant in that case. I also received notice from Google and Yahoo! about other subpoenas in the same case issued in the District Court for the Northern District of California seeking information about Gmail and Yahoo! addresses of mine. I am now moving to quash the subpoena issued to Microsoft for information associated with my Hotmail account. I am separately moving to quash

JA0232

the subpoenas seeking my Gmail and Yahoo! account information in the District Court for the Northern District of California.

4.  I am a full-time independent journalist, as well as an environmental and human rights activist.

5.  I provided professional public relations services to environmental activists and lawyers working in the Ecuadorian Amazon from 2005 to 2010, and continue to perform these functions occasionally on a volunteer basis. My roles have included providing translation services, editing newsletters, serving as a public spokesperson, managing international press relations, planning special events, and coordinating press conferences, among other activities.

6.  I estimate that I have had my Hotmail email address since 2005. I have used my Hotmail account to engage in both personal and professional communications for approximately seven years. It is important to me that Chevron not have access to all my email usage information and locations during that time period.

7.  Keeping my Hotmail account and location information private is very important to me for personal and professional reasons. I am a professional journalist and maintaining journalistic confidentiality regarding my communications and locations has been, and continues to be, an important part of my job.

8.  During the course of my environmental and human rights activism work in Ecuador, I have been subjected to physical threats and believe that my life and family's safety have been endangered. I believe that the threats against me were due to my role in the public environmental advocacy campaign against Chevron.

9.  I feel harassed by Chevron's attempt to obtain my email usage records and feel that it violates my rights.

10.  I know other people who have been harassed because of their environmental advocacy work against Chevron.

11.  I know other people who have stopped participating in or have decided not to participate in advocacy against Chevron because they fear harassment and retribution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January ___ 2013.

2

JA0233

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

Plaintiff,

-against-                                          1:12-MC-65 LAK/CFH

STEVEN DONZIGER, et al.,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Randy M. Mastro
Howard S. Hogan
GIBSON, DUNN & CRUTCHER, LLP

Paul DerOhannesian, II
DEROHANNESIAN & DEROHANNESIAN

*Attorneys for Plaintiff Chevron Corporation*

John W. Keker
Jan Nielsen Little
Matthew M. Werdegar
KEKER & VAN NEST, LLP

Craig Smyser
Larry R. Veselka
SMYSER KAPLAN & VESELKA, L.L.P.

Justin W. Gray
MAYNARD, O'CONNOR, SMITH
& CATALINOTTO LLP

Marcia C. Hofmann
ELECTRONIC FRONTIER FOUNDATION

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC

Craig Smyser
Larry R. Veselka
Tyler G. Doyle
SMYSER KAPLAN & VESELKA, L.L.P.

*Attorneys for Defendants Steven Donziger, The
Law Offices of Steven Donziger, Donziger &
Associates, PLLC, Hugo Gerardo Camacho
Naranjo and Javier Piaguaje Payaguaje*

LEWIS A. KAPLAN, *District Judge.*[*]

 In 2011, an Ecuadorian court entered an $18.2 billion judgment (the "Judgment") against Chevron Corporation ("Chevron").[1]  At about the same time, Chevron brought this action against the Ecuadorian plaintiffs (referred to as the Lago Agrio plaintiffs or "LAPs") and others in the Southern District of New York (collectively, the "defendants").[2]  Chevron there alleges among other things that the Judgment is the product of fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  The RICO and, to some extent, the fraud claims rest on allegations that Steven Donziger, a New York lawyer for the Ecuadorian plaintiffs, and others based in the United States here conceived, substantially executed, largely funded, and significantly directed a scheme to extort[3] and defraud Chevron by, among other things, (1) bringing the Lago Agrio case;[4] (2) fabricating (principally in the United States) evidence for use in that lawsuit and corrupting and intimidating the Ecuadorian judiciary in order to obtain a tainted judgment;[5] (3)

---

[*]  Honorable Lewis A. Kaplan, United States District Judge, Southern District of New York, sitting by designation.

[1]  11 Civ. 0691, DI 168 (Lago Agrio Judgment).

[2]  *Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK).

[3]  Amended complaint ("Cpt.") ¶ 1 (alleging that defendants "sought to extort, defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States."); *id.* ¶ 2 ("The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it.").

[4]  *Id.* ¶ 3.

[5]  *E.g., id.* ¶ 145 ("Back in the United States, preparations were well underway for drafting Cabrera's report [the report of a supposedly independent, court-appointed expert]."); *id.* ¶

exerting pressure on Chevron to coerce it to pay money not only by means of the Lago Agrio litigation and judgment, but also by forcing it to defend against public attacks in the United States and elsewhere based on false and misleading statements;[6] (4) inducing U.S. public officials to investigate Chevron;[7] and (5) making false statements to U.S. courts and intimidating and tampering with witnesses in U.S. court proceedings to cover up their improper activities.[8]

       In connection with the Southern District action, Chevron served a subpoena issued by this Court on Microsoft Corporation ("Microsoft"). The subpoena seeks information relating to thirty email addresses. The matter is before this Court on motions by three John Does, who claim to own three of the email addresses covered by the subpoena, and the defendants to quash the subpoena.

### Facts

       The email addresses listed in the subpoena belong to non-parties who allegedly were involved directly or indirectly in the Ecuadorian litigation. The subpoena calls for the production of all documents related to (1) the identity of the users of the email addresses, including "all names, mailing addresses, phone numbers, billing information, date of account creation, account

---

151 ("While Stratus [LAP environmental consultant] was the primary coordinator of the . . . Cabrera Report, other members of the [LAP's] U.S.-based team of experts . . . also contributed to the report without attribution in the report or disclosure to Chevron."); *id.* ¶¶ 353–56; Mastro Decl. [DI 746] Ex. C (hereinafter "Guerra Decl.").

6  Cpt. ¶ 214.

7  *Id.* ("And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme."); *id.* ¶ 216.

8  *Id.* ¶¶ 273-77, 291-300, 311-16.

4

information and all other identifying information," and (2) the usage of the email addresses, including "IP logs, IP address information at the time of registration and subsequent usage, computer usage logs, or other means of recording information concerning the email or Internet usage of the email address."[9] The time period covered by the request is 2003 through September 2012.[10]

In simpler terms, Chevron is requesting that Microsoft produce documents identifying the account holders and their available personal information. Chevron seeks also the IP address associated with the creation of each account and the IP address connected with every subsequent login to each account over a nine-year period. The subpoena does *not* call for the contents of any emails sent or received by any of the thirty email addresses.

To understand the nature of the subpoenaed information, some background on Internet protocols is necessary. "An Internet Protocol address (or 'IP address') is a numeric value used to identify the network location of a computer or set of computers on the Internet. Every computer on the Internet needs to have an IP address in order to communicate with other computers on the internet."[11] "IP addresses are allocated to Internet Service Providers (ISPs) in blocks of consecutive addresses out of a worldwide pool . . . . ISPs can further delegate these addresses to smaller entities such as businesses, Internet cafes, or smaller ISPs. ISPs can also assign an IP

---

[9]

Marx Decl. [DI 38] Ex. 2.

[10]

*Id.*

[11]

Schoen Decl. [DI 2-3] at ¶ 3.  The Does submitted with their motion a declaration of Seth Schoen, a Senior Staff Technologist with the Electronic Frontier Foundation in San Francisco, California.

address directly to an individual computer."[12]  "Individual users connect [to the Internet] using

different IP addresses depending on where they are."[13]  "An IP address may identify the network

through which a network-enabled device (such as a desktop computer, laptop computer, tablet, or

smartphone) is accessing the Internet.  When a portable device moves from an Internet connection

on one network (the network connection at one's home, for example) to an Internet connection on

another network (a local coffee shop), the IP address associated with the portable device changes

to reflect that the device is connected to that particular network."[14]

   "Many host computers of websites, including popular web-based email services like

. . . Microsoft Hotmail, maintain logs that list the IP address of visitors along with the date and time

information.  Websites that utilize a log-in feature typically maintain a log of IP addresses and other

data associated with the particular user who logged in, such as the date and time of log-in and the

duration of time the user visited the website."[15]

   Through online services, "[a] user can input a numerical IP address and obtain the

registry's information about the assignee of that IP address, which might be an ISP or other entity.

When IP addresses have been allocated directly to an organization that makes use of them [the

online services] can sometimes associate an IP address with an exact physical location. . . . On most

occasions, however, [the service] will only associate an IP address with an Internet service

---

[12] *Id.* at ¶ 4.

[13] *Id.* at ¶ 6.

[14] *Id.* at ¶ 7.

[15] *Id.* at ¶ 8.

provider's office, which is often in the same region as its subscribers or users but does not reveal their exact locations."[16] These online services and other sources provide supplementary information about the geographic location "where ISP's operate and where they use particular ranges of IP addresses. . . . For instance, the IP address 199.83.220.233 is easily traceable to San Francisco . . . ."[17] Where specific information about the physical location of an IP address is lacking, a litigant who possesses a list of IP addresses "can subpoena subscriber information from the corresponding ISP's for the specific IP addresses and develop a detailed picture of a person's location and movements from that subscriber information."[18]

To summarize, if Microsoft still has and were to produce the requested information, Chevron would learn the IP address associated with every login for every account over a nine-year period. Chevron could identify the countries, states, or even cities where the users logged into the accounts, and perhaps, in some instances, could determine the actual building addresses.

Chevron would not learn who logged into the accounts. That is to say that Chevron would know who created (or purported to create) the email accounts but would not know if there was a single user or multiple users for each account. Nevertheless, the subpoenaed information might allow Chevron to infer the movements of the users over the relevant period (at a high level of generality) and might permit Chevron to make inferences about some of the users' professional and personal relationships.

---

[16]
Id. at ¶ 11.

[17]
Id. at ¶ 12.

[18]
Id. at ¶ 13.

The Southern District defendants and the Does seek to prevent Chevron from gaining access to this information. Two of the Does submitted declarations explaining that they are the owners of the email accounts Simeontegel@hotmail.com and Pirancha@hotmail.com and that they were involved in certain press-related activities in connection with the Lago Agrio litigation and its associated environmental advocacy campaign in Ecuador.[19] They are proceeding as "Does" on the theory that this protects their anonymity.[20]

In reality, Chevron believes that it knows who owns the email addresses of the Does and many others. For example, in its opposition to the Does' motion to quash, it explains that "Simeontegel@hotmail.com is apparently an email account of Simeon Tegel, who was from 2005 to 2008 the Communications Director of Amazon Watch, an entity funded and directed by Steven Donziger to facilitate the LAPs' fraudulent scheme."[21] This description of Simeon Tegel is largely consistent with the declaration submitted by the owner of Simeontegel@hotmail.com.

It is relevant also that the Does have submitted no evidence that they are U.S. citizens or otherwise have a strong connection to this country.

---

[19]
    DI 45, Exs. A, B.

[20]
    The Does each submitted declarations in connection with the motion to quash. They signed these declarations with their email addresses. The Court ordered the Does to sign their declarations in their own name and to resubmit them under seal. The Court has not shared this information with Chevron and the Does continue to proceed anonymously.

[21]
    DI 35 at 5.

8

*Parties' Arguments*

The Does have moved to quash the subpoena primarily on the grounds that disclosure of the subpoenaed information would violate their First Amendment rights to (1) anonymous speech and (2) association.[22]  They argue also that they are entitled to represent the interests of the twenty-seven non-appearing email address owners.[23]  The defendants have moved to quash, among other reasons, on privilege grounds.[24]

Chevron responds that production of the subpoenaed information would not violate any First Amendment rights,[25] that the Does lack standing to move to quash with respect to email accounts other than their own,[26] that the defendants in the Southern District action do not have standing to move to quash, and that the disclosure would not reveal privileged information.[27]  Chevron claims also that this information will assist it in prosecuting its claims in the Southern District case.[28]  For example, the locations of the logins may help Chevron determine what actions

---

[22]

DI 2-1.

[23]

DI 42 at 1–4.

[24]

DI 1 at 6–7.

[25]

DI 35 at 13–23.

[26]

*Id.* at 7–8.

[27]

DI 36 at 6–7, 14–15.

[28]

DI 35 at 10–11.

were taken in furtherance of the alleged conspiracy in the United States, which is relevant to counter

the defendants' argument that Chevron is urging an improper extraterritorial application of RICO.[29]

### Discussion

*Does' Motion to Quash*

The Does' First Amendment argument fails because they have not shown any

entitlement to First Amendment protection. In any case, they lack standing to move to quash the

subpoena on First Amendment grounds.

The First Amendment provides, in relevant part, that "Congress shall make no law

. . . abridging the freedom of speech, or . . . the right of the people peaceably to assemble." The

Supreme Court has noted that a textual analysis of the Constitution "suggests that 'the people'

protected by the [First Amendment], refers to a class of persons who are part of a national

community or who have otherwise developed sufficient connection with this country to be

considered part of that community."[30] Indeed, as early as 1904, the Supreme Court held that the

First Amendment's guarantees of freedom of speech and assembly do not apply to an excludable

alien because "[h]e does not become one of the people to whom these things are secured by our

Constitution by an attempt to enter, forbidden by law."[31] Much more recently, the D.C. Circuit

relied on this principle in affirming a district court's determination "that the interests in free speech

---

[29]

*Id.* at 11.

[30]

*United States v. Verdugo-Urquidez,* 494 U.S. 259, 265 (1990) (analyzing the extraterritorial
application of the Fourth Amendment).

[31]

*United States ex rel. Turner v. Williams,* 194 U.S. 279, 292 (1904).

and freedom of association of foreign nationals acting outside the borders, jurisdiction, and control of the United States do not fall within the interests protected by the First Amendment."[32]

In the related context of the Establishment Clause of the First Amendment, the Second Circuit upheld a U.S. taxpayer challenge to government funding of foreign religious schools on the ground that the Establishment Clause prohibited taxation for religious purposes, no matter where the money was spent.[33] In so holding, however, the Circuit court noted that it could "think of no theory under which aliens would have standing to challenge either a grant [of government aid] or a denial of aid [under the Establishment Clause of the First Amendment]."[34]

In light of these principles, and in the absence of evidence that the Does are "people to whom these things are secured by our Constitution," they do not have standing to move to quash the subpoenas on First Amendment grounds either on their own behalf or on behalf of the non-appearing owners' whose account information has been subpoenaed.

The Does nevertheless argue that they have standing to assert the positions of the owners of the twenty-seven accounts other than their own on the theory that "practical obstacles prevent [them] from asserting [First Amendment] rights on behalf of" themselves.[35] But there is neither evidence nor reason to believe that the owners of the other twenty-seven accounts would face

---

[32]

*DKT Memorial Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 283–85 (D.C. Cir. 1989).

[33]

*Lamont v. Woods*, 948 F.2d 825, 839 (2d Cir. 1991).

[34]

*Id.* at 840.

[35]

DI 42 at 2 (quoting *Sec'y of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)).

11

any practical difficulties in protecting their own interests if they were so minded. Indeed, owners of at least some of these accounts have opposed these subpoenas in the Southern District of New York and the Northern District of California.[36]

*Defendants' Motion to Quash*

A litigant's standing to object to nonparty witness subpoenas generally is limited to the assertion of claims of personal rights or privilege.[37] The Southern District defendants do not profess to own any of the email addresses and thus assert no personal rights. They do claim that disclosure of the account information and IP logs improperly would reveal privileged information related to the LAPs' legal strategy.[38] This argument fails for two reasons. First, the defendants have not identified any communications or material prepared in anticipation of litigation that would be revealed if Microsoft were to release the subpoenaed information. Second, the defendants have not provided any competent evidence indicating that the email addresses belong to any of the LAPs' lawyers or the LAPs themselves.

\*    \*    \*

---

[36]

*See, e.g., Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK) (S.D.N.Y.), DI 591, 592, 588; *Chevron Corp. v. Salazar*, 11-mc-80217-CRB (N.D. Cal.), DI 23.

[37]

*Chevron Corp. v. Aguinda Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 2207555, at \*2 n.11 (Jun. 2, 2011) (citing *Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975)).

[38]

DI 1 at 6–7.

12

The Court has considered the movants' remaining arguments and finds them to be without merit.[39]

*Conclusion*

For the foregoing reasons, the motions to quash Chevron's subpoena to Microsoft [DI 1, 2] are denied.

SO ORDERED.

Dated:    June 25, 2013

                                             _____
                                             Lewis A. Kaplan
                                             United States District Judge

---

[39] The most forcefully argued of the movants' remaining arguments is that the subpoena is over-broad. The Court is not persuaded. Most of what Chevron could learn from the subpoenaed IP logs about the Does' movements would be only at a high level of generality. The subpoena requests account activity information only from the period of the alleged fraud. That the Does claim to have been involved in that alleged fraud for limited periods of time does not mean that Chevron is not entitled to subpoena information that may prove otherwise and be relevant to its case.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

          Plaintiffs,

    -against-

                                 Case No. 1:12-MC-65 LAK/CFH

                                 Hon. Lewis A. Kaplan

STEVEN DONZIGER, *et al.*,

                    Defendants.

---

**DECLARATION OF JOHN DOE (OWNER OF SIMEONTEGEL@HOTMAIL.COM) IN**
**SUPPORT OF NON-PARTY JOHN DOES' MOTION FOR RECONSIDERATION**

Using my email addresses, simeontegel@hotmail.com, instead of my actual name, in order to protect my identity pursuant to my rights under the First Amendment and New York law, I declare as follows:

1. I am the owner of the email account simeontegel@hotmail.com. I have personal knowledge of all matters set forth in this declaration. If called upon to do so, I could and would testify to all matters set forth herein.

2. I am providing this declaration under my email address because I wish to protect my rights to free speech and participation in associational activities. I also wish to avoid making moot these very issues, which I have raised in this motion. A true and correct copy of my actual signature for this document resides with my attorneys.

3. I am, and have always been, a citizen of the United States of America. I hold a valid US passport.

4. I have spent the majority of the nine years covered by Chevron's discovery request living in the United States.

5. I have had my Hotmail email address since at least 1999 and I have used it as my primary address ever since. I use this email address to regularly communicate with other Americans, often from sensitive locations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 8, 2013.

SIMEONTEGEL@HOTMAIL.COM

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

                Plaintiffs,

    -against-

                               Case No. 1:12-mc-00065 LAK/CFH

                               Hon. Lewis A. Kaplan

STEVEN DONZIGER, *et al.*,

                    Defendants.

**NOTICE OF APPEAL**

JA0248

NOTICE is hereby given that the Non-Party John Doe Movants, owners of the Microsoft email accounts simeontegel@hotmail.com, mey_1802@hotmail.com, pirancha@hotmail.com, and duruti@hotmail.com, Movants in the above-named case, hereby appeal to the United States Court of Appeals for the Second Circuit, from the Memorandum Opinion denying the Non-Party John Doe Movants' Motion to Quash entered in this action on the 25th day of June, 2013 (ECF No. 50).

Dated this 18th day of July, 2013 at San Francisco, California.

Respectfully submitted,

_____/s/ Mitchell L. Stoltz____
Mitchell L. Stoltz, Esq.
(Bar Roll No. 517844)
Nathan Cardozo, Esq.
(*pro hac vice* pending)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Marco Simons, Esq.
marco@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188

*Counsel for Non-Party John Doe Movants*

JA0249

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2013, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

Randy M. Mastro
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

Howard S. Hogan
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

Paul DerOhannesian, II
DEROHANNESIAN & DEROHANNESIAN
677 Broadway, Suite 202
Albany, NY 12207

*Attorneys for Plaintiff Chevron Corporation*

Craig Smyser
Larry R. Veselka
SMYSER KAPLAN & VESELKA, L.L.P.
Bank of America Center
700 Louisiana Street, Suite 2300
Houston, TX 77002

John W. Keker
Jan Nielsen Little
Matthew M. Werdegar
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, CA 94111

Justin W. Gray
MAYNARD, O'CONNOR, SMITH & CATALINOTTO, LLP
6 Tower Place
Albany, NY 12203

*Attorneys for Defendants Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, Javier Piaguaje Payaguaje, and Hugo Gerardo Camacho Naranjo*

JA0250

And, I hereby certify that I have mailed by the United States Postal Service the document to the following non-CM/ECF Participants:

Microsoft Corporation
c/o Corporation Service Company
80 State Street
Albany, NY 12207
Brien Jacobsen <brienj@microsoft.com>

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 18, 2013.

Stephanie Shattuck
Legal Secretary
On behalf of:
Mitchell L. Stoltz, Esq.
(Bar Roll No. 517844)
Nathan Cardozo, Esq.
(*pro hac vice* pending)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

*Counsel for John Doe Movants*

3

JA0251

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                         Plaintiff,

         -against-                                    1:12-MC-00065-LAK-CFH

STEVEN DONZIGER, et al.,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER

LEWIS A. KAPLAN, *District Judge.*

        The "John Doe" who claims to be the owner of the email account simeontegel@hotmail.com ("Tegel") moves for reconsideration of this Court's order of June 25, 2013, which denied a motion to quash a subpoena served upon Microsoft.

        The Court adopts for purposes of this motion movant's statement of the standard governing motions for reconsideration in this District, viz:

> "Reconsideration is warranted where the moving party can show the court 'overlooked' facts or controlling law that 'might reasonably be expected to alter the conclusion reached by the court.' [citation omitted] In the Northern District of New York, a court may granted a motion for reconsideration where, among other things, new evidence not previously available comes to light, or in order to 'correct a clear error of law or prevent manifest injustice.' [citation omitted]"

The Court takes movant's several points in order.

        1.    "Tegel" first argues that the Court incorrectly assumed that none of the movants was a United States citizen, which was relevant to the question whether any of them was entitled to the First Amendment protection they claimed. He points out that he in fact is a U.S. citizen although no evidence is submitted as to any of the other movants.

        The Court did not overlook or assume anything. "Tegel," as well as the two other John Doe movants, claimed the protection of the First Amendment both on their own behalf and on behalf of the non-party recipients of the subpoena who never appeared in this Court or

moved to quash it. In order to establish that they were protected by the First Amendment, it was their burden to demonstrate that those on behalf of whom the argument was made were entitled to its protection. They failed entirely to do so. Indeed, even today, the two John Does other than "Tegel" have not claimed that they are U.S. citizens or, for that matter, that their alleged expressive and associational activities occurred or will occur in the United States.

      2.    The fact that "Tegel" is a U.S. citizen is not "new evidence not previously available." In the interest of justice, however, the Court will reconsider the motion as to him alone in light of that fact.

      3.    The claim that the Court's allegedly erroneous assumption that none of the movants was a U.S. citizen "heavily informed" its decision as to third party standing to challenge the subpoena simply is wrong. The result on that point would have been the same even if all of the movants were citizens.

      4.    The assertion that the Court based a conclusion that the three movants lacked standing to assert the alleged rights of non-party subpoena recipients only on the factual assumption that the non-parties would not face practical obstacles in asserting their own rights in view of the fact that some of them opposed subpoenas in this Court and in the Northern District of California and that the factual assumption was incorrect. But "Tegel" has this all wrong.

      First, it was the John Doe movants who had the obligation to establish their standing to assert the alleged rights of the non-party subpoena recipients.[1] The Court held that they utterly failed to do so. That alone is dispositive.

      Second, "Tegel"'s assertion that none of the non-parties challenged the subpoena either in the Southern District of New York or in the Northern District of California is misleading. Laura Belanger and John Rodgers both filed motions to quash the substantially identical Google subpoena in both districts. *Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK) (S.D.N.Y.), docket items 591, 592: *Chevron Corp. v. Salazar*, 11-MC-80237 (CRB) (N.D. Cal.), docket items

---

[1]     Indeed, movants each bore "the burden of establishing standing." *E.g., Hedges v. Obama*, Nos. 12-3176(L), 12-3644 (Con), 2013 WL 3717774, at *11 (2d Cir. July 17, 2013) (citing *Clapper v. Amnesty Int'l USA*, —— U.S. ——, ——, 133 S.Ct. 1138, 1146 (2013)). In order to establish standing, a litigant invoking the judicial power of the United States must demonstrate, *inter alia,* "an invasion of a legally protected interest." *Hedges,* 2013 WL 3717774, at *11 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). Having failed to establish that they had any legal interest protected by the First Amendment, they failed to establish the existence of Article III standing. Moreover, having failed to establish the existence of the prerequisites to third party standing, their claim to assert the alleged rights of non-party subpoena recipients failed.

18, 19. In addition, Ms. Belanger filed objections to a motion to compel compliance with the Google subpoena in *Chevron Corp. v. Salazar*, 11-MC-80217 (CRB) (N.D. Cal.), docket item 23.

5.     This leaves reconsideration of "Tegel"'s position in light of his belated claim that he is a U.S. citizen and thus enjoys the protection of the First Amendment. The Court of course recognizes that the First Amendment affords protection for anonymous speech. For reasons set forth in the supplement to this order that is being filed under seal, that protection is not implicated with respect to "Tegel."

6.     "Tegel" is correct that the First Amendment protects private association. But that protection has limited application to this motion. In the first instance, disclosing the IP addresses associated with "Tegel"'s account would not chill "Tegel"'s association with Amazon Watch because Chevron already is well aware that "Tegel" actively associated himself with Amazon Watch and its founder, Steven Donziger. Furthermore, there are multiple emails currently on the public record that evidence "Tegel"'s collaboration with Amazon Watch.[2]

The right to private association is inapplicable also because the First Amendment does not shield fraud. Chevron has submitted multiple emails from "Tegel" discussing the organization of media efforts to portray the Ecuadorian litigation as legitimate and the Cabrera report as independent.[3] As Chevron explains in its briefing, there is substantial evidence that the litigation was tainted by fraud and, relatedly, that the Cabrera report was not independent. Whether and how the defendants in that action and co-conspirators engaged in a media campaign to pressure Chevron into settling the allegedly fraudulent litigation in Ecuador is quite relevant to Chevron's RICO claims. The IP address logs are pertinent to exploring this issue.

Not all of the subpoenaed information, however, is significant. Chevron appears to allege that "Tegel" was involved in the alleged fraud only from 2005 through 2008. Disclosure of the IP address logs for the periods before 2005 and after 2008 possibly could yield relevant information, but Chevron has offered no argument why it has any compelling need for those IP logs. Allowing disclosure of the IP address information for any period other than 2005 through 2008 could intrude upon certain protected activities in which "Tegel" may have engaged.

*     *     *

Accordingly, the motion for reconsideration is granted to the extent that the Court reconsiders the order with respect to so much of the motion by which "Tegel" sought to quash the

---

[2]

DI 39-3, 4.

[3]

*See id.*

subpoena insofar as it sought information with respect to the email address
simeontegel@hotmail.com and denied in all other respects. On that limited reconsideration, the
motion to quash is granted to the extent that Microsoft shall not disclose any of the subpoenaed
information with respect to the email address simeontegel@hotmail.com other than for the years
2005 through 2008. The motion to quash is denied in all other respects.[4]

SO ORDERED.

Dated:          July 29, 2013

_____
Lewis A. Kaplan
United States District Judge

---

[4] The Court notes also that the three "John Does," including "Tegel," filed a notice of appeal
on July 18, 2013, nine days after "Tegel" moved for reconsideration. The pendency of a
motion to alter or amend a judgment under Rule 59, among other post-judgment motions,
renders a notice of appeal from the judgment premature until the motion is determined in
the district court. See FED. R. APP. P. 4(a)(4). While "Tegel"'s motion cites only N.D.N.Y.
Rule 7.1, the Court construes Appellate Rule 4(a)(4) to apply to such a motion as well. In
any case, the Court has the authority to decide the motion.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHEVRON CORP.,

                    Plaintiffs,                    Case No. 1:12-mc-00065 LAK/CFH

    -against-

                                        Hon. Lewis A. Kaplan

STEVEN DONZIGER, *et al.*,                  Second Circuit Docket No. 13-2784

                    Defendants.

## AMENDED NOTICE OF APPEAL

NOTICE is hereby given that the Non-Party John Doe Movants, owners of the Microsoft email accounts simeontegel@hotmail.com, mey_1802@hotmail.com, pirancha@hotmail.com, and duruti@hotmail.com, Movants in the above-named case, hereby amend their notice of appeal to the United States Court of Appeals for the Second Circuit, from the Memorandum Opinion denying the Non-Party John Doe Movants' Motion to Quash entered in this action on June 25, 2013 (ECF No. 50), to include the district court's Order granting in part and denying in part the Non-Party John Doe Movants' Motion to Quash entered in this action on July 29, 2013 (ECF No. 57), and the sealed Order entered July 29, 2013 (ECF No. 58, Order Filed Under Seal – Access to Movants' Counsel Only).

Dated this 16th day of August, 2013 at San Francisco, California.

Respectfully submitted,

_____/s/ Mitchell L. Stoltz___
Mitchell L. Stoltz, Esq.
(Bar Roll No. 517844)
Nathan Cardozo, Esq.
(*pro hac vice* pending)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Marco Simons, Esq.
marco@earthrights.org
EARTHRIGHTS INTERNATIONAL
1612 K Street NW, Suite 401
Washington, DC 20006
Telephone: (202) 466-5188

*Counsel for Non-Party John Doe Movants*

JA0257

# CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2013, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

Randy M. Mastro
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

Howard S. Hogan
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

Paul DerOhannesian, II
DEROHANNESIAN & DEROHANNESIAN
677 Broadway, Suite 202
Albany, NY 12207

*Attorneys for Plaintiff Chevron Corporation*

Craig Smyser
Larry R. Veselka
SMYSER KAPLAN & VESELKA, L.L.P.
Bank of America Center
700 Louisiana Street, Suite 2300
Houston, TX 77002

John W. Keker
Jan Nielsen Little
Matthew M. Werdegar
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, CA 94111

Justin W. Gray
MAYNARD, O'CONNOR, SMITH & CATALINOTTO, LLP
6 Tower Place
Albany, NY 12203

*Attorneys for Defendants Steven Donziger, The Law Offices of Steven R. Donziger, Donziger &*
*Associates, PLLC, Javier Piaguaje Payaguaje, and Hugo Gerardo Camacho Naranjo*

JA0258

And, I hereby certify that I have mailed by the United States Postal Service the document to the following non-CM/ECF Participants:

Microsoft Corporation
c/o Corporation Service Company
80 State Street
Albany, NY 12207
Brien Jacobsen <brienj@microsoft.com>

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 16, 2013.

Stephanie Shattuck
Legal Secretary
On behalf of:
Mitchell L. Stoltz, Esq.
(Bar Roll No. 517844)
Nathan Cardozo, Esq.
(*pro hac vice* pending)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

*Counsel for John Doe Movants*

3