# 13-2784-cv

## In the United States Court of Appeals
## for the Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Appellee*,

-v.-

NON-PARTY JOHN DOE SIMEONTEGEL@HOTMAIL.COM, NON-PARTY JOHN DOE MEY_1802@HOTMAIL.COM, NON-PARTY JOHN DOE PIRANCHA@HOTMAIL.COM, NON-PARTY JOHN DOE DURUTI@HOTMAIL.COM,

*Movants-Appellants*,

-v.-

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, DONZIGER & ASSOCIATES, PLLC, JAVIER PIAGUAJE, HUGO GERARDO, CAMACHO NARANJO,

*Defendants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

### RESPONSE BRIEF OF PLAINTIFF-APPELLEE
### CHEVRON CORPORATION

Randy M. Mastro                      Howard S. Hogan
GIBSON, DUNN & CRUTCHER LLP          GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue                      1050 Connecticut Avenue, N.W.
New York, NY 10166-0913              Washington, D.C. 20036-5306
Telephone: (212) 351-4000            Telephone: (202) 955-8500

*Counsel for Plaintiff-Appellee Chevron Corporation*

## CORPORATE DISCLOSURE STATEMENT

Chevron Corporation is a publicly traded company (NYSE: CVX) that has no parent company.  No publicly traded company owns 10% or more of its stock.  Texaco Petroleum Company is a fifth-tier subsidiary of Chevron Corporation, and no other publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF AUTHORITIES ........................................................... iv

PRELIMINARY STATEMENT ........................................................1

COUNTER-STATEMENT OF THE ISSUES ..........................................4

COUNTER-STATEMENT OF STANDARD OF REVIEW ..................................5

COUNTER-STATEMENT OF FACTS ...............................................5

    A.   A Group Of U.S.-Based Attorneys Obtains A Fraudulent Judgment Against Chevron In Ecuador. ...............................................6

    B.   Chevron Responds To The Fraudulent Ecuador Litigation By Bringing A RICO Action And Pursuing Discovery—Including Through The Subpoena Here ..........................................11

    C.   Some Non-Party "John Does"—Each Of Whom Was Intimately Involved In The Fraudulent Ecuador Litigation—Move To Quash The Subpoena ...................................14

    D.   The District Court Upholds Chevron's Subpoena. ...........................18

SUMMARY OF ARGUMENT ....................................................21

ARGUMENT ..................................................................22

I.   The Does Overwhelmingly Failed To Establish Their Standing To Object To The Subpoena. ....................................................23

    A.   A Litigant Invoking The Power Of A Federal Court Must Establish Standing To Do So. ...........................................23

    B.   Here, The Does Overwhelmingly Failed To Establish Standing ..........................................................25

        1.   The Majority Of The Account Owners Listed In The Subpoena Submitted No Evidence Of Their Standing. .............25

2.    None Of The Does Demonstrated That They Possess Standing To Assert The Interests Of Absent, Non-Objecting Account Owners. ....................................................26

3.    The Non-Citizen Does Lack Standing To Assert First Amendment Claims. ................................................29

4.    "Doe" Simeon Tegel Also Lacks Standing Because He Has No Injury. ..................................................34

II.    If The Court Were To Reach The Merits, It Would Still Need To Uphold The Subpoena. ..........................................35

A.    The Subpoenaed Information Is Relevant To Chevron's Substantial Legal Claims In The Rico Action. ...................35

B.    Courts Routinely Require Production Of The Information That Chevron Seeks. ............................................39

C.    The Subpoena Accords With First Amendment Standards. ..............40

1.    Compliance With The Subpoena Will Not Infringe Any Right To Anonymity. ........................................41

a.    The Right To Anonymity Does Not Apply Here. ..............41

b.    Chevron's Interest In Disclosure Outweighs Any Claimed Right To Anonymity. ............................44

2.    Compliance With The Subpoena Will Not Infringe Any Right Of Association. ........................................54

D.    The Subpoena Is Not Overbroad ....................................57

CONCLUSION ................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AF Holdings LLC v. Doe*,
  No. 12-cv-02416-WHA, 2012 U.S. Dist. LEXIS 75806
  (N.D. Cal. May 31, 2012)............................................................................39

*Application of Dow Jones & Co.*,
  842 F.2d 603 (2d Cir. 1988)......................................................................34

*Arista Records LLC v. Does 1-16*,
  Civ. No. 1:08-CV-765 (GS/RFT), 2009 WL 414060
  (N.D.N.Y. Feb. 18, 2009).........................................................................45

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ...................................................... 5, 40, 45, 46

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
  262 F.R.D. 293 (S.D.N.Y. 2009)................................................... 24, 32

*Bochese v. Town of Ponce Inlet*,
  405 F.3d 964 (11th Cir. 2005) ...................................................... 24, 25

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ...............................................................................34

*Boyle v. United States*,
  556 U.S. 938 (2009) ...............................................................................37

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ...............................................................................43

*Chevron Corp. v. Champ*,
  Nos. 1:10mc 27, 1:10mc 28, 2010 WL 3418394
  (W.D.N.C. Aug. 30, 2010) ....................................................... 5, 47

*Chevron Corp. v. Donziger*,
  11 Civ. 0691 LAK, 2013 WL 1087236
  (S.D.N.Y. Mar. 15, 2013)............................................... 8, 9, 10, 17, 37

iv

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*Chevron Corp. v. Donziger*,
 768 F. Supp. 2d 581 (S.D.N.Y. 2011) ......................................................... *passim*

*Chevron Corp. v. Donziger*,
 886 F. Supp. 2d 235 (S.D.N.Y. 2012) ............................................. 8, 9, 10, 36, 57

*Chevron Corp. v. Donziger*,
 No. 11 Civ. 0691 LAK (S.D.N.Y.) ................................................................. *passim*

*Chevron Corp. v. Donziger*,
 No. 13-16920 (Oct. 25, 2013) ..................................................................... 21, 29

*Chevron Corp. v. Donziger*,
 __ F.R.D. __, 2013 WL 5575833
 (S.D.N.Y. Oct. 10, 2013) .................................................................................11

*Chevron Corp. v. Donziger*,
 871 F. Supp. 2d 229 (S.D.N.Y. May 14, 2012) .................................... 10, 45, 46

*Chevron Corp. v. Naranjo*,
 667 F.3d 232 (2d Cir. 2012) .............................................................. 6, 7, 10, 47

*Chevron Corp. v. Page*,
 No. RWT-11-1942 (D. Md. Aug. 31, 2011) .......................................................47

*Chevron Corp. v. Salazar*,
 11-MC-80237 (CRB) (N.D. Cal. 2013) ................................................ 14, 20, 21

*Clapper v. Amnesty Int'l USA*,
 133 S. Ct. 1138 (2013) ...................................................................................24

*Columbia Ins. Co. v. Seescandy.com*,
 185 F.R.D. 573 (N.D. Cal. 1999) ....................................................................41

*DaimlerChrysler Corp. v. Cuno*,
 547 U.S. 332 (2006) .......................................................................................23

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*DKT Mem. Fund v. Agency for Int'l Dev.*,
  887 F.2d 275 (D.C. Cir. 1989) ............................................................ 29, 30, 33

*Doe I v. Individuals*,
  561 F. Supp. 2d 249 (D. Conn. 2008) ..................................................51

*Doe v. 2TheMart.com*,
  140 F. Supp. 2d 1088 (W.D. Wash. 2001) ...................................... 52, 53

*Doe v. SEC*,
  No. 11-mc-80184 CRB (NJV), 2011 WL 4593181
  (N.D. Cal. Oct. 4, 2011) .................................................................. 40, 51

*Donoghue v. Bulldog Investors Gen. P'ship*,
  696 F.3d 170 (2d Cir. 2012) ................................................................25

*Donovan v. Mehlenbacher*,
  652 F.2d 228 (2d Cir. 1981) ................................................................58

*Enterline v. Pocono Med. Ctr.*,
  751 F. Supp. 2d 782 (M.D. Pa. 2008) ..................................................28

*Estate of Ungar v. Palestinian Auth.*,
  332 F. App'x 643 (2d Cir. 2009) ...........................................................5

*Frost v. Experian & TRW, Inc.*,
  98 CIV. 2106 JGK JCP, 1999 WL 287373
  (S.D.N.Y. May 6, 1999) .......................................................................38

*Griffin v. Maryland*,
  19 A.3d 415 (Md. 2011) .......................................................................37

*Hedges v. Obama*,
  724 F.3d 170 (2d Cir. 2013) ...................................................... 23, 24, 31

*Hollingsworth v. Perry*,
  133 S. Ct. 2562 (2013) ............................................................... 23, 31

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Huth v. Haslun*,
   598 F.3d 70 (2d Cir. 2010) ...............................................................26

*Ibrahim v. Dep't of Homeland Sec'y*,
   669 F.3d 983 (9th Cir. 2012) ...........................................................33

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
   538 U.S. 600 (2003) .........................................................................43

*In re Anonymous Online Speakers*,
   661 F.3d 1168 (9th Cir. 2011) .................................................... 44, 53

*In re Chevron Corp.*,
   No. 1:10-mc-00021-JCH-LFG (D.N.M. Sept. 2, 2010) ........................... 6, 9, 47

*In re Chevron Corp.*,
   No. 10 MC 00002 (LAK) (S.D.N.Y. Dec. 27, 2010) ..........................11

*In re Chevron Corp.*,
   No. 10 MC 00002 (LAK) (S.D.N.Y. Jan. 21, 2011) ..........................11

*In re Chevron Corp.*,
   No. 11-24599-CV, 2012 WL 3636925
   (S.D. Fla. June 12, 2012) ...................................................................6

*In re Chevron Corp.*,
   633 F.3d 153 (3d Cir. 2011) .............................................................47

*In re Chevron Corp.*,
   No. 10-cv-1146-IEG(WMC), 2010 WL 3584520
   (S.D. Cal. Sept. 10, 2010) ................................................................47

*In re Grand Jury Proceedings*,
   776 F.2d 1099 (2d Cir. 1985) ...........................................................56

*In re Ind. Newspapers Inc.*,
   963 N.E.2d 534 (Ind. Ct. App. 2012) ...............................................28

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*In re Republic of Ecuador*,
  11 M.C. 73 (N.D. Fla. Aug. 8, 2011) ...................................................8

*In re Roebers*,
  No. 12-mc-80145-RS (LB) 2012 WL 2862122
  (N.D. Cal. July 11, 2012) ......................................................................39

*In re United States*,
  830 F. Supp. 2d 114 (E.D. Va. 2011)...................................................52

*In re Vivendi Univ., S.A. Sec. Litig.*,
  618 F. Supp. 2d 335 (S.D.N.Y. 2009)...................................................57

*John Wiley & Sons, Inc. v. Does 1-35*,
  12 Civ. 2968 (RWS), 2012 U.S. Dist. LEXIS 182741
  (S.D.N.Y. Dec. 28, 2012) ................................................................ 39, 45

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) .............................................................................26

*Libaire v. Kaplan*,
  760 F. Supp. 2d 288 (E.D.N.Y. 2011)...................................................58

*Linde v. Arab Bank, PLC*,
  706 F.3d 92 (2d Cir. 2013) ...................................................................57

*London v. Does 1-4*,
  279 F. App'x 513 (9th Cir. 2008)..........................................................39

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................... 24, 26, 32

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ................................................................... 41, 42, 43

*McVicker v. King*,
  266 F.R.D. 92 (W.D. Pa. 2010)............................................................28

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*N.Y. State Nat'l Org. for Women v. Terry*,
  886 F.2d 1339 (2d Cir. 1989) ....................................................... 54, 56

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ..............................................................43

*Next Phase Distrib., Inc. v. Does 1-138*,
  No. 11 Civ. 9706 (KBF), 2012 WL 691830
  (S.D.N.Y. Mar. 1, 2012)..........................................................46

*Outley v. City of New York*,
  837 F.2d 587 (2d Cir. 1988) ......................................................38

*People v. Clevenstine*,
  891 N.Y.S.2d 511 (N.Y. App. Div. 2009)........................................37

*Perry v. Schwarzenegger*,
  591 F.3d 1126 (9th Cir. 2010) ....................................................56

*Raines v. Byrd*,
  521 U.S. 811 (1997) ................................................................23

*Republic of Ecuador v. ChevronTexaco Corp.*,
  376 F. Supp. 2d 334 (S.D.N.Y. 2005)............................................7

*Rio Properties, Inc. v. Rio Int'l Interlink*,
  284 F.3d 1007 (9th Cir. 2002) ....................................................27

*Schoolcraft v. City of New York*,
  No. 10 Civ. 6005 RWS, 2012 WL 2161596
  (S.D.N.Y. June 14, 2012) .........................................................58

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ................................................................28

*Snider v. Lugli*,
  CV 10-4026 JFB AKT, 2011 WL 5401860
  (E.D.N.Y. Nov. 4, 2011) ..........................................................58

ix

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Sony Music Entm't Inc. v. Does 1-40*,
    326 F. Supp. 2d 556 (S.D.N.Y. 2004) ........................................................... *passim*

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ...................................................................................31

*Tasini v. New York Times Co., Inc.*,
    184 F. Supp. 2d 350 (S.D.N.Y. 2002) ......................................................27

*United States v. $8,440,190.00 in U.S. Currency*,
    719 F.3d 49 (1st Cir. 2013) ......................................................................32

*United States v. Sattar*,
    395 F. Supp. 2d 79 (S.D.N.Y. 2005) .......................................................43

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ............................................................... 29, 30, 32, 33

*United States ex rel. Turner v. Williams*,
    194 U.S. 279 (1904) .................................................................................29

*Univ. City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ....................................................................57

*Veiga v. World Meteorological Org.*,
    568 F. Supp. 2d 367 (S.D.N.Y. 2008) ......................................................29

*Vt. Agency of Nat. Res. v. United States*,
    529 U.S. 765 (2000) ........................................................................... 24, 25

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008) ................................................................. 5, 27

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...................................................................... 24, 25, 26

x

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Xcentric Ventures, LLC v. Karsen, Ltd.*,
No. 11-cv-01055-PHX-FJM, 2012 U.S. Dist. LEXIS 121888
(D. Ariz. Aug. 28, 2012)..................................................................39

**Statute**

18 U.S.C. § 2702.............................................................................40

**Rules**

Fed. R. Civ. P. 26...........................................................................35

Fed. R. Civ. P. 45...........................................................................35

Fed. R. Evid. 803............................................................................37

Fed. R. Evid. 901............................................................................50

S.D.N.Y. Local Civ. R. 6.3 .............................................................38

**Other Authority**

9A Charles Alan Wright, *et al.*,
Federal Practice and Procedure § 2459 (3d ed.).................................58

## PRELIMINARY STATEMENT

This appeal arises from two orders upholding a subpoena that appellee Chevron Corporation issued to Microsoft Corporation in September 2012. That subpoena requests basic identifying and login information for several email accounts. Courts routinely allow that information to be produced in litigation—particularly where, as here, that information is relevant to a legal claim. Producing such information will cause no cognizable harm: the subpoena does not request the contents of email communications, does not imperil First Amendment activity, does not affect anonymity, and does not impede any right of association. The subpoena is tailored to help Chevron prove its fraud claims in a lawsuit that is now underway against the main parties responsible for a scheme to defraud it of billions of dollars through a lawsuit in Lago Agrio, Ecuador. Indeed, the owners of 26 of the 30 accounts listed in the subpoena have not objected to the subpoena at all.

But this Court does not even need to reach the merits of the subpoena. As the district court held, the subpoena must be upheld as to 29 of the 30 accounts because none of those litigants established standing to object to the subpoena as to those accounts. Indeed, only four account owners—the purported "John Doe" appellants—objected to the subpoena at all. And the one Doe who attempted to establish his own standing failed to do so because he presented no evidence that he suffered an injury. None of the other Does marshaled competent evidence of their

own standing, and none of the Does demonstrated standing to represent any of the 26 absent, non-objecting account owners. This Court can therefore affirm the district court's orders for lack of standing alone.

This case, moreover, illustrates why standing is so important. Standing doctrine ensures that only someone with a true interest in the subject matter as a result of an injury specific to him is best suited to litigate the asserted case or controversy. Here, the Does characterize themselves as innocent third parties, environmental activists, political organizers, and so on. The record evidence shows, however, that each email account at issue was used as part of a scheme to blackmail Chevron into paying $19 billion to satisfy a judgment obtained by fraud. Indeed, the text of the alleged judgment was likely transmitted to the judge who supposedly authored it by making use of one of the email accounts at issue. The Does' only real interest stems from their desire to protect that fraud, not to assert an alleged First Amendment right.

This is why even if the Court were to reach the merits, it would need to affirm. The subpoena makes reasonable, routine, targeted requests of relevant information. Chevron made clear in meet-and-confer sessions that it is willing to narrow its subpoena to timeframes that would uncover only relevant information. The Does, however, have not provided information that would allow Chevron to conclude that that entire timeframe is *not* relevant. And in any event, as the Does

themselves acknowledge, it is unlikely that Microsoft has retained records for that entire period. Whatever records remain, though, may very well be relevant.

The subpoena, moreover, accords with First Amendment standards. The Does press their right to anonymity, but fail to acknowledge that they are not anonymous: they have publicly revealed their identities and thus have made no constitutionally protected decision to remain anonymous. This is best exemplified by the one Doe who submitted evidence of his own standing—the owner of simeontegel@hotmail.com. That "Doe" has never contested that his true identity is Simeon Tegel, who worked closely with those behind the fraudulent litigation in Ecuador. And Tegel has long publicized (and, as of this filing, continues to publicize) his identity in connection with that email account—on his public website. Other Does similarly publicized their identities. This case involves no right of anonymity.

Compliance with the subpoena would likewise have no effect on the Does' freedom of association. Although the subpoena would *confirm* the Does' identities, the Does themselves already *disclosed* those identities. Nothing about *re*-disclosing those known identities would infringe the Does' associational freedoms. The Does have submitted no evidence to the contrary. And even if they had, Chevron overcame that harm by showing a compelling interest in the subpoenaed information. Chevron's interest in evidence aimed to support its

3

strong legal claims outweighs the Does' interests in keeping concealed evidence relating to fraudulent activity.

The orders should be affirmed.

## COUNTER-STATEMENT OF THE ISSUES

1.     Did the Does establish standing to object to Chevron's subpoena requesting information about 30 email accounts when:  (a) 26 of the 30 account owners did not object to the subpoena at all; (b) of the four Does who objected, only one submitted a declaration attempting to establish his standing, and even he has shown no injury; and (c) none of the Does submitted evidence establishing standing to assert the interests of the 26 non-objecting account owners or of each other?

2.     Did the district court abuse its discretion in upholding Chevron's subpoena when:  (a) the subpoena seeks routinely produced information that is relevant to substantial legal claims; (b) Chevron has taken steps necessary to ensure that the subpoena uncovers no more information than necessary; (c) the Does failed to demonstrate that the subpoena would harm First Amendment interests; and (d) Chevron established that its compelling need for disclosure outweighed any First Amendment interests the Does may have?

## COUNTER-STATEMENT OF STANDARD OF REVIEW

This Court reviews legal questions of standing *de novo*. *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008); *Estate of Ungar v. Palestinian Auth.*, 332 F. App'x 643, 645 (2d Cir. 2009) (same standard of review of motion to quash).

Where the district court denies a motion to quash a subpoena, this Court reviews that denial, including the court's conclusions on First Amendment issues, for an abuse of discretion. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010). This Court will affirm if the district court's decision does not rest on a legal error or on a clearly erroneous factual finding. *Id.*

## COUNTER-STATEMENT OF FACTS

This matter arises from a $19 billion judgment that a group of U.S.-based lawyers manufactured against Chevron in Lago Agrio, Ecuador.[1] Courts throughout the United States have concluded that those lawyers' (the "Lago Agrio plaintiffs" or the "LAPs") efforts to obtain that judgment have been rife with fraud. *See*, *e.g.*, *Chevron Corp. v. Champ*, Nos. 1:10mc 27, 1:10mc 28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010) ("[W]hat has blatantly occurred in this

---

[1]    Except where noted, the Counter-Statement of Facts relies only on citations that were available when the orders at issue were released. The underlying trial before the Southern District of New York, however, has unearthed substantial additional evidence of fraud in the Ecuadorian proceedings.

matter would in fact be considered fraud by any court."); *In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925, at *2 (S.D. Fla. June 12, 2012) ("[M]ounds of evidence . . . suggest[ ] that the judgment [obtained in Ecuador was] . . . ghostwritten [and includes] verbatim passages that were taken from various pieces of the [plaintiffs'] lawyers' internal, unfiled, work product.").

One of the keys to uncovering evidence of that fraud has been Chevron's use of lawful process to seek evidence from third parties. *See*, *e.g.*, *In re Chevron Corp.*, Dkt. 77 at 3-4, No. 1:10-mc-00021-JCH-LFG (D.N.M. Sept. 2, 2010). Based on the information obtained from such efforts, Chevron brought suit in 2011 under the Racketeer Influenced and Corrupt Organizations Act and New York state law (the "RICO action"), contending that those plaintiffs' lawyers conspired to defraud Chevron of billions of dollars. *See Chevron Corp. v. Donziger*, No. 11 Civ. 0691 LAK (S.D.N.Y.) ("11 Civ. 0691"). The subpoena here—which was served on Microsoft Corporation on September 19, 2012—is part of Chevron's discovery effort in the RICO action. The district court upheld the subpoena.

### A.    A Group Of U.S.-Based Attorneys Obtains A Fraudulent Judgment Against Chevron In Ecuador.

Although this Court is familiar with the background of the RICO action (*see Chevron Corp. v. Naranjo*, 667 F.3d 232, 234 (2d Cir. 2012)), Chevron summarizes it to explain why it issued its subpoena.

From 1964 to 1992, Texaco Petroleum Company ("TexPet") held an interest in an oil consortium in Ecuador.  By 1976, Ecuador's state-owned oil company, Petroecuador, became the majority owner of the consortium and it has been the sole owner and operator since 1992.  *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 597 (S.D.N.Y. 2011), *injunction vacated on other grounds*, *Naranjo*, 667 F.3d 232.  In 1995, TexPet, Ecuador, and Petroecuador reached a settlement under which TexPet agreed to remediate a portion of the former consortium sites proportionate to the minority ownership interest that it had held until 1992, and Petroecuador took responsibility for remediating all remaining sites.  *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2005). In 1998, after TexPet completed its remediation under the supervision of Ecuador and independent auditors, Petroecuador and Ecuador "releas[ed], absolv[ed], and discharg[ed]" TexPet from any environmental liability arising from the consortium's activities.  *Id.* at 342 (internal quotation marks omitted).

Years after TexPet stopped operating in Ecuador and completed its remediation there, one of Chevron's subsidiaries merged with Texaco, TexPet's ultimate parent company.  Chevron thereby became an indirect shareholder of TexPet.  *See Chevron Corp*. *v. Donziger*, 768 F. Supp. 2d at 600 n.40.

In contrast to TexPet's prompt cleanup, for years Petroecuador failed to remediate the former consortium sites at all, and it compiled an abysmal

7

environmental record during two decades of later operations, including 1,415 spill events between 2000 and 2008 alone. *In re Republic of Ecuador*, 11 M.C. 73 (N.D. Fla. Aug. 8, 2011), Dkt. 16-6 at ECF page 2. This record led Ecuador's President to declare publicly that Petroecuador has "dreadful environmental management practices," *id.*, Dkt. 16-7 at ECF page 4, and the LAPs to admit that "Petro[ecuador] has inflicted more damage and many more disasters than Texaco itself," *id.*, Dkt. 16-8 at ECF page 3.

Despite the 1995 settlement and 1998 release, in 2003 a group of American and Ecuadorian plaintiffs' lawyers (the LAPs) filed suit against Chevron—but not against Petroecuador or the government of Ecuador—in Lago Agrio, Ecuador. *Chevron Corp. v. Donziger*, 768 F. Supp. 2d at 600. Over the next several years, the LAPs—led by plaintiffs' attorney Steven Donziger—pursued an elaborate scheme that included acts of fraud, collusion, and bribery to obtain an $18.2 billion judgment against Chevron. *See*, *e.g.*, *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 252-61 (S.D.N.Y. 2012); *Donziger*, 2013 WL 1087236 at *6-12; 11 Civ. 0691, Dkt. 843 at 3-11 (Feb. 21, 2013).

Several federal courts have determined that the Lago Agrio litigation has been tainted by serious fraud and malfeasance by those lawyers. For example, the LAPs pressured the then-presiding judge to appoint a supposedly impartial and independent damages expert, Richard Stalin Cabrera Vega ("Cabrera"), and then

8

secretly ghostwrote the report that the expert submitted as his own.  *Donziger*, 886

F. Supp. 2d at 256-60.  As the court in the underlying RICO action concluded:

> There is ample evidence of fraud in the Ecuadorian proceedings.  The [Lago Agrio plaintiffs], through their counsel, submitted forged expert reports . . . .  Their counsel orchestrated a scheme in which [the plaintiffs' technical consulting firm] ghost-wrote much or all of [the court-appointed expert's] supposedly independent damages assessment without, as far as the record discloses, notifying the Ecuadorian court of its involvement.  . . .  [And] [w]hen it became evident that [their fraudulent activities] . . . would be revealed through [discovery] proceedings, [the plaintiffs'] representatives undertook a scheme to [conceal that fraud].

*Donziger*, 768 F. Supp. 2d. at 636; *accord In re Chevron Corp.*, Nos. 1:10-mc-

00021, -22, slip op. 3 (D.N.M. Sept. 2, 2010) (finding that the LAPs engaged in

"corruption of the judicial process, fraud, attorney collusion with the Special

Master, inappropriate *ex parte* communications with the court, and fabrication of

reports and evidence").  That the LAPs controlled Cabrera and ghostwrote his

report has now been confirmed by one of the LAPs' former experts, Fernando

Reyes, who has described secret meetings between the LAPs' agents and Cabrera,

during which the LAPs' agents "dropped any pretense that Mr. Cabrera would act

independently," and that the plaintiffs "had already predetermined the findings of

the global assessment, that they themselves would write a report that would

support their claim . . . and would simply put Mr. Cabrera's name on it."

*Donziger*, 2013 WL 1087236, at *11 (quoting declaration of Fernando Reyes).

Chevron also uncovered evidence that agents of the LAPs secretly wrote the $18.2 billion Ecuadorian judgment itself. *See*, *e.g.*, *Donziger*, 886 F. Supp. 2d at 253-55, 286-87; *Donziger*, 2013 WL 1087236 at *8-9. Four different parts of the judgment are "virtually identical" to "internal [plaintiffs'] documents that never were part of the Ecuadorian court record." *Donziger*, 2013 WL 1087236, at *8-9. Indeed, former judge Alberto Guerra—who once presided over the Lago Agrio case—confirmed in a declaration that the LAPs drafted the judgment after bribing the issuing judge. Guerra admitted under oath that the LAPs promised him and the then-presiding Ecuadorian judge a $500,000 bribe in exchange for issuing a judgment in the plaintiffs' favor that their counsel drafted. *Id.* at *7.

The Lago Agrio proceedings and the $18.2 billion judgment issued from the Ecuador court are so tainted by fraud and corruption that the Southern District of New York issued a preliminary injunction prohibiting the Lago Agrio plaintiffs, their agents, and their co-conspirators from seeking to enforce the judgment before a trial on the merits of its enforceability could be held. *Chevron Corp. v. Donziger*, 768 F. Supp. 2d at 660. Although this Court vacated the preliminary injunction on procedural grounds, the district court's fraud findings remain undisturbed. *See Naranjo*, 667 F.3d at 247 n.17; *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 238 (S.D.N.Y. 2012).

10

**B.    Chevron Responds To The Fraudulent Ecuador Litigation By Bringing A RICO Action And Pursuing Discovery—Including Through The Subpoena Here.**

To defend itself against the fraudulent Lago Agrio proceedings and judgment, Chevron sued the LAPs in the Southern District of New York in February 2011, asserting claims under the Racketeer Influenced and Corrupt Organizations Act and state law.  Chevron sought a declaratory judgment and preliminary injunction enjoining enforcement of the Ecuadorian judgment. *Chevron Corp. v. Donziger*, No. 11 Civ. 0691, Dkt. 1 (S.D.N.Y. Feb. 1, 2011).

To support its claims in the RICO action, Chevron sought discovery to uncover evidence of the fraud committed by the LAPs.  The LAPs have obstructed that effort.  *See*, *e.g.*, *Chevron Corp. v. Donziger*, __ F.R.D. __, 2013 WL 5575833, at *35, *38 (S.D.N.Y. Oct. 10, 2013) (describing LAPs' "many baseless objections and arguments" in their attempt to avoid discovery); *In re Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y. Dec. 27, 2010), Dkt. 151 at 1-2 (noting that lead plaintiffs' attorney Steven Donziger was "unresponsive" in his deposition, that his answers were "self serving," and that his answers remained so despite repeated instructions and orders striking those answers); *In re Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y. Jan. 21, 2011), Dkt. 171 at 2 (noting Donziger's failure to produce information about an email account containing "documents of obvious possible relevance"); J.A. 153 (citing Donziger's description of his

discovery strategy as to "fight hard on all fronts all the time and concede nothing, buy as much time as possible").

Because the LAPs have obstructed discovery, Chevron has been forced to painstakingly uncover information that they have concealed. The subpoena at issue here is part of that effort.

Issued to Microsoft in 2012, the subpoena seeks information about email accounts identified principally through a review of documents recovered from an image of Donziger's hard drive. J.A. 156-61. For each account, Chevron seeks only to confirm identifying information about the user and to obtain Internet Protocol ("IP") log and address information. J.A. 160. Chevron needed to subpoena Microsoft—rather than Donziger or the individual account owners themselves—because individual account owners generally do not maintain IP login and address information. Indeed, Donziger *himself* needed to serve a similar subpoena on Yahoo! to obtain *his own* user and IP information as part of discovery in RICO action. *See* J.A. 191-93. As the Does acknowledge, the IP address information sought is typically identifiable only to an Internet Service Provider's regional office, not to a specific physical address. *See* Doe Br. 9.

The subpoenaed information is relevant to Chevron's RICO claims because it will: (1) show whether certain account holders had access to the LAPs' internal documents and data; (2) prove that substantial portions of the RICO predicate acts

12

took place in the United States; (3) provide information about the structure and management of the RICO enterprise; and (4) substantiate the identities of the accountholders in a form usable at trial. *See infra* Argument, Part II-A. Discovery of the subpoenaed information is potentially critical because one of the key issues in the case is whether the $19 billion judgment at issue was written on the computer of the judge who issued it or, as another judge in the case has testified, it was written by the LAPs and later transmitted to the judge. *See* No. 11 Civ. 0691, Dkt. 838 at 11 (S.D.N.Y.) (explaining need for corroboration of testifying judge's statements). And this was not the only occasion in which the LAPs used email accounts to share documents to further their fraudulent scheme. For example, to plan the secret ghostwriting of the purportedly independent expert's report, Donziger and his primary Ecuadorian counterpart, Pablo Fajardo, set up an email account on which they loaded information that each could access. To hide the fraudulent nature of that information, Fajardo told Donziger "not [to] insert any names in the document," but instead to use the code names "Lagarto 2" and "Lagarto 3." 11 Civ. 0691, Dkt. 402-13 (Mar. 2, 2012) (Champion Decl. Ex. 2315), Dkt. 398 ¶ 141 (Mar. 1, 2012).

The subpoena seeks information generated since the Ecuador litigation began in 2003. J.A. 160. In meet-and-confer sessions with the Does' counsel, Chevron offered to limit this timeframe to the period in which each account owner

worked with the LAPs.  *E.g.*, J.A. 46, 57-58.  The Does, however, were largely unwilling to disclose the date ranges that they worked with the LAPs.  J.A. 81.

Chevron served subpoenas on Google, Inc. and Yahoo! Inc., seeking the same type of information, at about the time it subpoenaed Microsoft.  *See Chevron Corp. v. Salazar*, 11-MC-80237 (CRB) (N.D. Cal. 2013), Dkt. 70 at 4.

### C.  Some Non-Party "John Does"—Each Of Whom Was Intimately Involved In The Fraudulent Ecuador Litigation—Move To Quash The Subpoena.

Though Microsoft did not object to Chevron's subpoena, three non-party "John Does" moved to quash the subpoena in October 2012, as did some defendants in the RICO action.[2]  Dkts. 1, 2.  The Does contended that the subpoena was overbroad, that it infringes the right to anonymity, and that it infringes the freedom of association.  Dkt. 2-1 at 7-20.  The motions were assigned to Judge Lewis A. Kaplan, the presiding judge in the RICO action, sitting by designation in the Northern District of New York.  Dkt. 27.

The Does claimed to own only 3 of the 30 email accounts listed in the subpoena:      simeontegel@hotmail.com,      mey_1802@hotmail.com,      and lupitadeheredia@hotmail.com.  Dkt. 2-1 at 3.  Chevron sought information about the first two accounts because the evidence it had obtained showed that these

---

[2]    Those defendants did not own any of the accounts at issue and have not appealed.

14

accounts were used to help the LAPs further their fraudulent enterprise and that each Doe has been intimately involved in that enterprise. (The third original Doe, the owner of lupitadeheredia@hotmail.com, dropped from the lawsuit upon realizing that that email address was not included in the subpoena. J.A. 214.)

Simeontegel@hotmail.com is apparently an email account of Simeon Tegel, who was from 2005 to 2008 the Communications Director of Amazon Watch, an entity funded and directed by Steven Donziger to facilitate the LAPs' fraudulent scheme. *See* J.A. 240. Tegel publicized and distributed the fraudulent Cabrera report and helped Donziger further the LAPs' fraud by writing false letters to news entities. Those letters trumpeted the LAPs' baseless claim that TexPet's "remediation . . . [w]as a sham as confirmed by laboratory samples provided by a court-appointed expert and by Chevron itself," J.A. 163-69, and praised Cabrera's qualifications and independence, J.A. 171. These and other activities were part of a campaign to legitimate a fraudulent judgment against Chevron. *See*, *e.g.*, J.A. 173-75. A Google search for "Simeon Tegel" easily finds Tegel's promotional website, which includes a "Contact" page featuring his email address. *See* http://www.simeontegel.com/contact.php (last visited Dec. 2, 2013); J.A. 200-01.

Mey_1802@hotmail.com is apparently an email account of Maria Eugenia Yepez. Yepez worked as a strategist and liaison for Donziger and the LAPs. She set up meetings between the LAPs and Ecuadorian political figures, including the

15

President of the Supreme Court, J.A. 177, 181, and officials of the Ministry of Health, J.A. 183. Those meetings helped fix the judgment for the LAPs.

In support of the Does' motion, the owner of simeontegel@hotmail.com provided a declaration representing that he worked with the LAPs in the past. J.A. 10-12. That declaration did not state the duration of that work. J.A. 10-12. The owner of mey_1802@hotmail.com did not submit a declaration.[3]

Chevron believes that the remaining email accounts listed in the subpoena belong to people who were as or more involved in the LAPs' fraud. As Chevron explained in the district court, those accounts generally fall into four categories: (1) accounts used by the LAPs' legal team personnel; (2) accounts used by personnel working for an Ecuadorian organization purporting to represent the LAPs or administering their funds; (3) accounts used by Cabrera and his associates; and (4) accounts used by Ecuador officials who had dealings with the LAPs. *See* J.A. 21-23. The Does have never contested these categorizations or disputed that Chevron has correctly noted which account owners worked on which aspects of the LAPs' scheme. The district court in the RICO action, moreover, has

---

[3]    The owners of two other accounts, pirancha@hotmail.com and duruti@hotmail.com, later attempted to join the motion to quash as "John Does." The owner of pirancha@hotmail.com submitted a declaration, but the district court did not consider it because it was submitted only with the Does' reply brief on the motion to quash. J.A. 216-17. The owner of duruti@hotmail.com did not submit a declaration.

16

concluded that Chevron is entitled to discovery from others who fall into these same categories. *E.g.*, 11 Civ. 0691 LAK, Dkt. 1529 at 50 (Oct. 10, 2013); 2013 WL 1087236, at *33.

In sum, only 4 of the 30 account owners joined (or tried to join) the motion to quash. Only one of those—the owner of simeontegel@hotmail.com—provided a timely declaration in support of that motion. The Does did not and do not claim that they are authorized to represent any other account holders. *See* Doe Br. 10-12.

After the Does filed their motion to quash, the district court ordered the Does to disclose their identities to the court under seal. J.A. 218-24. The court explained that it needed to know the litigants' identities because of Federal Rule of Civil Procedure 10(a)'s identification requirements and Article III standing concerns. J.A. 222. In issuing that order, the court observed that the Does' First Amendment arguments (which rested on the Does' purported anonymity) were "shaky at best" as "[i]t does not take a rocket scientist to figure out . . . that simeontegel@hotmail.com quite likely is owned by Simeon Tegel." J.A. 222. The Does made a sealed submission. Dkt. 46 (sealed). Chevron has never had access to that submission, *see*, *e.g.*, J.A. 240 n.20, including the copy that was filed with this Court under seal as part of the Does' appendix, *see* J.A. 225-33.

### D.    The District Court Upholds Chevron's Subpoena.

1.  The district court denied the Does' and the RICO defendants' motions to quash the subpoena.  *See* J.A. 234-45.

*First*, the court held that the Does had not established standing to move to quash the subpoena on First Amendment grounds.  J.A. 242-43.  Relying on Supreme Court and other federal appellate court precedent, the court explained that constitutional protections extend only to U.S. citizens or to non-citizens with sufficient connections to the United States.  J.A. 242-43.  Here, however, the Does "submitted no evidence that they are U.S. citizens or otherwise have a strong connection to this country," J.A. 240, and therefore failed to establish their entitlement to First Amendment protections, J.A. 243.  The court also concluded that the RICO defendants failed to establish their standing because they did not claim to own any of the accounts listed in the subpoena.  J.A. 244.

*Second*, the court held that, even if the Does possessed standing, they would not be able to assert standing on behalf of the many non-objecting account holders listed in the subpoena, because there is "neither evidence nor reason to believe that the" absent, non-objecting account owners "would face any practical difficulties in protecting their own interests if they were so minded."  J.A. 243-44.

18

*Finally*, the court rejected the Does' argument that the subpoena is overbroad, explaining that the subpoena requests information "only from the period of the alleged fraud." J.A. 245 n.39.

2. The Does moved for reconsideration. *See* Dkt. 53. They contended that the district court erred in "assuming" that none of them were United States citizens or residents and for "assuming" that the Does lacked standing to assert the interests of absent third parties. *Id.* at 1. The Does submitted one declaration in which the owner of simeontegel@hotmail.com declared that he is a United States citizen. J.A. 246-47.

The district court substantially denied the motion for reconsideration. *See* J.A. 252-55. The court clarified that it had not assumed that the Does were non-citizens, but rather concluded that they had not met their burden to establish their standing to assert First Amendment claims. J.A. 252-53. The court also explained that its ruling as to standing to assert interests of absent, non-objecting third parties would have been the same even if the Does were citizens, because the Does had not established the prerequisites for third-party standing. J.A. 253.

The court recognized further that the declaration regarding simeontegel@hotmail.com did not meet the standard for reconsideration. *See* J.A. 253. The court nonetheless addressed the merits of that Doe's First Amendment claims. The court ruled, under its reasoning set forth in a sealed order (unavailable

19

to Chevron), that the declarant had not established a right to anonymous speech. J.A. 254.  The court then determined that the right to private association did not apply, reasoning that disclosure of the IP addresses associated with simeontegel@hotmail would not chill his associational activities because Chevron already knew of those activities.  J.A. 254; *see also supra* Part C (detailing some of those activities).  The court ruled in the alternative that the right of association did not apply because "the First Amendment does not shield fraud."  J.A. 254.  Citing emails from simeontegel@hotmail.com showcasing Tegel's and the LAPs' use of media to legitimate the fraudulent Ecuadorian litigation and the Cabrera report, the district court concluded that the media campaign to pressure Chevron into settling the Ecuador litigation was "quite relevant to Chevron's RICO claims."  J.A. 254.  The court, however, narrowed the subpoena as to simeontegel@hotmail.com for 2005 through 2008, after determining that Chevron had alleged that he was involved in the fraud only during that period.  J.A. 254.

3. Counsel for the Does brought a virtually identical challenge in the Northern District of California, seeking to quash similar subpoenas that Chevron served on Google and Yahoo!.  *See Chevron Corp. v. Salazar*, Dkt. 70, 11-MC-80237 (CRB) (N.D. Cal. 2013).  The district court there substantially denied the motion to quash, concluding:  (1) that the account holders had no First Amendment interest at stake; (2) that they had no privacy interest in the requested information;

and (3) that the information sought is relevant to Chevron's claims. *Id.* at 11-21. The "Does" in that case sought an emergency stay of compliance with that subpoena. The Ninth Circuit substantially denied that request, and thus Google and Yahoo! have produced the subpoenaed information regarding many accounts listed in those subpoenas. *See Chevron Corp. v. Donziger*, No. 13-16920, Dkt. 10 (Oct. 25, 2013).

The Does in this case—but not the RICO defendants—appealed the district court's order denying their motion to quash and substantially denying their motion for reconsideration. *See* J.A. 248-51, 256-59.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's orders upholding the subpoena.

I.    The Does overwhelmingly failed to establish their standing to object to the subpoena. Although the subpoena requested information about 30 email accounts, 26 of the account holders did not object to the subpoena at all. Of the four account holders who did object, *none* established standing to represent the interests of the absent, non-objecting account owners. And only **one** of the Does submitted ***any evidence*** regarding his own standing. The district court modified the subpoena in response to that showing. But because the Does failed to carry their burden of establishing standing, the district court correctly concluded that it

21

lacked authority to order relief for any other account holder. The orders can be affirmed on this ground alone.

II.    If the Court were to evaluate the subpoena on the merits, it would still need to uphold the subpoena. The subpoena makes reasonable requests for relevant information to support substantial legal claims. Courts routinely uphold subpoenas seeking such information from Internet Service Providers like Microsoft. And the subpoena accords with First Amendment standards. The First Amendment right of anonymity does not apply here because the Does are not anonymous—they have publicized their identities in connection with these email addresses—and because the First Amendment does not shield fraud like that aided by the Does. Nor does the First Amendment right of association apply here. The Does have failed to identify harm to associational freedoms that would result from *re*-disclosure of identities that they already disclosed. Finally, the subpoena is not overbroad, particularly because Chevron narrowed the subpoena to produce information only from relevant time periods.

## ARGUMENT

The district court correctly concluded that none of the Does possessed standing to assert the interests of absent third parties, and that the non-citizen Does failed to establish their standing to object to Chevron's subpoena. In any event, the subpoena would have needed to be upheld because it requests relevant, routinely

produced information in keeping with First Amendment standards. The orders should be affirmed.

## I. The Does Overwhelmingly Failed To Establish Their Standing To Object To The Subpoena.

"[A]ny person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 133 S. Ct. 2562, 2661 (2013). The district court concluded that the Does failed to make that showing: all Does as to third-party standing, and the non-citizen Does as to their own standing. The court therefore concluded that—except for the lone Doe who made a competent evidentiary submission regarding his standing—it lacked authority to grant the Does relief. That conclusion was correct. And even that Doe cannot establish an injury in fact because he has openly associated with the email address in question and the defendants in the RICO action.

### A. A Litigant Invoking The Power Of A Federal Court Must Establish Standing To Do So.

Article III of the United States Constitution authorizes federal courts to decide only "Cases" and "Controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006); *see also Hedges v. Obama*, 724 F.3d 170, 188 (2d Cir. 2013). For a constitutional case or controversy to exist, the litigant invoking a federal court's jurisdiction must establish standing. *Cuno*, 547 U.S. at 342. The litigant must show that he "is the proper party to bring th[e] suit," *id.*; *Raines v.*

*Byrd*, 521 U.S. 811, 818 (1997), by demonstrating that "the constitutional . . . provision on which [his] claim rests properly can be understood as granting persons in [his] position a right to judicial relief," *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

To make that showing, that litigant bears the burden (*see Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013)) of showing: (1) that he "suffered an injury in fact"; (2) that the injury is "fairly traceable to the challenged action"; and (3) that the injury "likely . . . will be redressed by a favorable decision." *Hedges*, 724 F.3d at 188 (internal quotation marks omitted). The proof required to meet that burden differs depending on the stage of litigation. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). For a motion to quash, the party must—at least if his standing has been brought into question—present an affidavit or other similar proof to establish standing. *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 293, 300 (S.D.N.Y. 2009).

This case concerns the first element: injury in fact. An injury in fact is a harm to an interest that a federal court *has authority to vindicate*, *see Warth*, 422 U.S. at 500—that is, it must be a "*legally protected*" interest. *Vt. Agency of Nat. Res. v. United States*, 529 U.S. 765, 772 (2000) (emphasis added). Only an invasion of a "protected" interest gives rise to the "legally cognizable injury" required to establish standing. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980,

984 (11th Cir. 2005); *cf. Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170 (2d Cir. 2012).

The threshold question here, then, is whether each Doe established a "legally protected" interest (*Vt. Agency of Nat. Res.*, 529 U.S. at 772) that could give rise to a "legally cognizable injury" (*Bochese*, 405 F.3d at 980) that a federal court has authority to address. This required the Does to establish by affidavit or similar evidence that they suffered an invasion of a legally protected interest. Without this showing, the Does could not obtain relief because they failed to demonstrate that they are persons on whom the First Amendment confers protected interests. *See Warth*, 422 U.S. at 500.

## B. Here, The Does Overwhelmingly Failed To Establish Standing.

The Does—who claim to own only four of the accounts listed in the subpoena, *see* Doe Br. 4—failed to establish standing.

### 1. The Majority Of The Account Owners Listed In The Subpoena Submitted No Evidence Of Their Standing.

The vast majority of the account holders here—26 out of 30—did not object to the subpoena and did not appear in this case. J.A. 236, 241. Of the four who did object to the subpoena, only one (the owner of simeontegel@hotmail.com) offered a declaration about his standing. *See* J.A. 246-47, 253-54. The other three Does offered nothing to establish standing.

## 2.    None Of The Does Demonstrated That They Possess Standing To Assert The Interests Of Absent, Non-Objecting Account Owners.

A litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. Exceptions exist, but a litigant generally must show: (1) that there is "some hindrance to the third party's ability to protect his . . . own interests"; and (2) that there is a "close relationship between the [litigant] and the third party that would cause [the litigant] to be an effective advocate for the third party's rights." *Huth v. Haslun*, 598 F.3d 70, 75 (2d Cir. 2010); *see also Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

The Does failed to make the showing needed to represent the interests of absent, non-objecting account holders.

*First*, the Does did not establish that absent account holders—individuals like the Does—face any hindrance to asserting the claims that the Does themselves managed to assert here. The Does speculate that other account owners may not have received notice of the subpoena, might not read English, or might "find it difficult" to obtain counsel to challenge the subpoena. Doe Br. 23; *see also id.* at 3. But the Does have not marshaled any evidence of a hindrance even though they bear the burden of doing so. *See Lujan*, 504 U.S. at 561; *Huth*, 598 F.3d at 75; *see also*, *e.g.*, Doe Br. 7 (stating that "it is unclear on the record . . . how many

26

[account owners] received actual notice" but citing no evidence establishing a lack of notice).  And in this matter—in which email activity is the primary activity on which the subpoena focuses—email was the proper means to afford notice to the account holders.  *Cf. Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016-17 (9th Cir. 2002) (affirming use of email to provide service of process).

The Does also have not shown why other account owners could not overcome the same hurdles they did.  Indeed, the district court identified specific examples in which account holders have acted to challenge similar subpoenas issued to Google and Yahoo!.  J.A. 253; *cf. W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP,* 549 F.3d 100, 110 (2d Cir. 2008) (finding no hindrance where some third parties "filed parallel individual suits in [other] litigation, and others . . . proceeded as part of a class action pursuing similar claims"); *Tasini v. New York Times Co., Inc.*, 184 F. Supp. 2d 350, 357 (S.D.N.Y. 2002) (finding no hindrance where other, similarly situated non-parties brought their own claims).  The fact that similarly situated account holders have acted to assert the same rights as the Does defeats the Does' argument that the court must assume without evidence that absent account owners face obstacles protecting their own interests.  And although the Does claim that the district court erred in asserting that "owners of at least some of th[e] accounts [here] have opposed these subpoenas" in other courts, J.A. 244, *quoted at* Doe Br. 23, this too is mistaken.  As the district court observed (J.A.

244, 253-54), two accountholders filed pro se motions to quash Chevron's similar subpoena to Google, first in the Southern District of New York, 11 Civ. 0691, Dkts. 588 (Oct. 11, 2012), 591, 592 (Oct. 10, 2012), and in the Northern District of California, No. 12-mc-80237, Dkts. 18, 19 (N.D. Cal. Oct. 16, 2012); No. 11-mc-80217, Dkt. 23 (N.D. Cal. Oct. 5, 2011).

The Does also speculate that absent third parties also face a practical obstacle due to their alleged desire to remain anonymous. *See* Doe Br. 22-23. But the absent third parties could proceed as "John Does"—just as the appellants have here. *See Singleton v. Wulff*, 428 U.S. 106, 116-17 (1976) (recognizing that, to surmount "obstacles" relating to disclosure of one's identity, "[s]uit may be brought under a pseudonym, as so frequently has been done"). This case is therefore materially different from cases allowing media entities to assert standing on behalf of third parties primarily on the ground that those third parties would otherwise lose their anonymity. *See Enterline v. Pocono Med. Ctr.*, 751 F. Supp. 2d 782, 785 (M.D. Pa. 2008) (finding "hindrance" where "the commentators would first need to be identified" to assert First Amendment rights); *McVicker v. King*, 266 F.R.D. 92, 95-96 (W.D. Pa. 2010); *In re Ind. Newspapers Inc.*, 963 N.E.2d 534, 549 (Ind. Ct. App. 2012).

*Second*, the Does have made no attempt to show a "close relationship" between them and the absent account holders. Aside from using the same email

provider, the record contains no evidence of any relationship between the account owners.  That is enough to defeat their assertion of third-party standing.  Indeed, in the parallel proceeding involving Chevron's subpoenas to Google and Yahoo!, the Ninth Circuit has already determined there is no reason to relax standing.  *Chevron Corp. v. Donziger*, No. 13-16920, Dkt. 10 at 3 (Oct. 25, 2013).  This Court should reach the same conclusion.

### 3.    The Non-Citizen Does Lack Standing To Assert First Amendment Claims.

The non-citizen Does also failed to establish their standing.

Constitutional protections extend to non-resident aliens *only* when they have "substantial connections" to the United States.  *DKT Mem. Fund v. Agency for Int'l Dev.*, 887 F.2d 275, 283-85 (D.C. Cir. 1989); *Veiga v. World Meteorological Org.*, 568 F. Supp. 2d 367, 374-75 (S.D.N.Y. 2008) (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)); *see also United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904).  Applying that rule, courts have held that when a non-resident alien lacks substantial connections to the United States, he lacks standing to bring a First Amendment claim because his claim falls outside the interests protected by the Amendment.  *E.g.*, *DKT Mem. Fund*, 887 F.2d at 283-85; *Veiga*, 568 F. Supp. 2d at 374-75.  In harmony with those principles, courts have required a non-citizen litigant himself to establish that he possesses substantial connections before asserting constitutional claims.  In *Verdugo-Urquidez*, for

29

example, the Supreme Court held that a defendant could not invoke the Fourth Amendment to attack a search that United States agents conducted of his property in Mexico because, "[a]t the time of the search," the defendant "was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico." 494 U.S. at 274-75. Similarly, in *DKT Memorial Fund*, the D.C. Circuit held that non-citizen plaintiffs lacked standing to attack a policy of the United States government—even though it affected them—because they were beyond the territorial jurisdiction of the United States and "nothing" indicated that they had meaningful connections to this country. 887 F.2d at 284-85.

When the district court first ruled on the motion to quash, none of the Does had submitted evidence regarding their connections to the United States. The court modified that ruling on reconsideration as to the one Doe who made the required showing. J.A. 242-44, 252-53. The three non-citizen Does, however, failed to demonstrate that they are entitled to obtain First Amendment relief. Those Does "submitted no evidence" that they had substantial connections to this country (J.A. 240, 243) and did not even claim "that their alleged expressive and associational activities occurred or will occur in the United States." J.A. 253. The district court therefore reaffirmed its conclusion that the non-citizen Does lacked standing. *See* J.A. 253-55.

30

The non-citizen Does dispute that conclusion on three primary grounds. None has merit.

*First*, they contend that the district court imposed an improper, heightened burden by requiring them to "aver their U.S. citizenship in order to have standing." Doe Br. 27. But the district court did no such thing. Rather, it held that the Does had to meet their well-established burden to show that Article III standing requirements were satisfied by demonstrating that they had a "legally protected interest." J.A. 253 n.1; *see Hollingsworth*, 133 S. Ct. at 2661; *Hedges*, 724 F.3d at 188.[4]

*Second*, the non-citizen Does insist that the Court should conclude they have "previous significant voluntary connections" to this country because "they are environmental activists engaged in a campaign specifically targeting an American corporation who chose to use an email service located in the United States." Doe Br. 20. The Does also base their "substantial connections" on "their involvement in this American dispute with an American company and their use of a U.S.-based email service subject to U.S. law and legal process." Doe Br. 16. But the non-

---

[4]    The Does argue that Chevron somehow conceded that they possess standing. Doe Br. 16 n.6. But Chevron put the issue of standing before the district court, *see* J.A. 24-25, and, in any event, the district court had the obligation to "raise [standing] *sua sponte*," regardless of the parties' arguments on standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998).

citizen Does submitted no evidence to support these assertions, and thus failed to establish standing. *See Lujan*, 504 U.S. at 561; *United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49, 66 (1st Cir. 2013); *Aristocrat Leisure*, 262 F.R.D. at 300. Moreover, the non-citizen Does cite no authority that such attenuated connections to this country can establish standing. None of their claimed "connections" demonstrates that they entered the United States, have resided here, or have conducted any activities in—or with a strong connection to—the United States. As the district court observed, the record lacks evidence that the Does possess strong—indeed, *any*—connections to the United States. *See* J.A. 240.

Third, the Does contend that they possess the required substantial connections because others involved in this case (Chevron and Microsoft) are based in the United States, and because Microsoft holds the subpoenaed information in this country. *See* Doe Br. 24; *see also id.* at 19-20.

That argument fails because, to establish standing, the non-citizen litigant *himself* must possess substantial connections with the United States, growing out of the non-citizen's entry into this country. The Supreme Court recognized as much in *Verdugo-Urquidez*, in holding that the non-citizen defendant could not invoke the Fourth Amendment to attack a search that United States agents conducted of his property in Mexico, where his only connection was his involuntary arrest and transportation into this country. 494 U.S. at 262, 271. The

32

Does contend that that case is inapposite because the subpoenaed information here is located in this country, unlike the property at issue in *Verdugo-Urquidez*. Doe Br. 20. That misunderstands the Supreme Court's holding, which did not rest on the location of the defendant's property but instead on the fact that, "[a]t the time of the search," the defendant "was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico." *Id.* at 274-75.

The Does' position also cannot be reconciled with *DKT*, which held that non-citizen plaintiffs located outside the United States lacked standing to assert that a United States government policy violated their First Amendment rights. 887 F.2d at 283. As in *DKT*, there is no evidence of the non-citizen Does' connection to the United States.

The decision in *Ibrahim v. Department of Homeland Security*, 669 F.3d 983 (9th Cir. 2012), does not change the analysis. *Ibrahim* held that a non-citizen had established a "'significant voluntary connection' with the United States"— sufficient to bring First and Fifth Amendment claims—because she had lived in the United States for four years as a Ph.D. student and had left only briefly for a trip to her home country in support of her research. *Id.* at 997. That holding did not turn on where "information" or "property" was located, but rather on the length and character of the plaintiff's stay in the United States. *See id.* at 996. The non-

33

citizen Does produced no evidence that they have connections of a similar length or character.[5]

Because the non-citizen Does have not demonstrated that they possess standing, the district court correctly concluded that it lacked authority to rule on the merits of their claims. The orders below can be affirmed on that basis.[6]

### 4.    "Doe" Simeon Tegel Also Lacks Standing Because He Has No Injury.

Only one Doe, the owner of the simeontegel@hotmail.com account, submitted a declaration attempting to establish standing by affirming that he is a U.S. citizen. J.A. 10-12; 246-47. Yet even that Doe fails to shows that he suffered

---

[5]    The Does also rely on *Boumediene v. Bush*, 553 U.S. 723 (2008), which held that aliens detained as enemy combatants in Guantanamo Bay, Cuba, could seek habeas relief in United States courts even though the naval base was not within the *de jure* sovereignty of the United States. *Id.* at 732. The Supreme Court rested this holding on its determination that the United States exercised *de facto*—or "functional" and "practical"—sovereignty over Guantanamo. *See id.* at 754-55. The case did not hold (as the Does suggest) that non-citizens outside the sovereign territory of the United States can generally assert constitutional challenges, *see* Doe Br. 17, and the Does have never asserted that they fall within the *de facto* control of the United States.

[6]    The Does' *amicus* suggests that the Does have a "right to receive" the speech of Latin Americans. Ecuador Br. 26. But the *amicus* cites no authority for the proposition that Latin Americans in general are entitled to First Amendment protections just because U.S. citizens might receive their speech. The "right to receive speech" is "entirely derivative of the rights of [the speakers]." *Application of Dow Jones & Co.*, 842 F.2d 603, 608 (2d Cir. 1988). Where, as here, the speakers do not provide evidence of their connection to the United States, the right to receive speech is irrelevant.

an injury in fact.  His alleged injury is that he will lose his anonymity.  *See* J.A. 10-12.  Yet he has no anonymity to lose—the owner of simeontegel@hotmail.com has openly associated that address with the name "Simeon Tegel."  A Google search for that name returns Tegel's personal website, including his picture and a contact page with the email address at issue.  *See* http://www.simeontegel.com/contact.php (last visited Dec. 2, 2013); *see also* J.A. 200-01.  The Does, in fact, have never contested that Tegel is the owner of simeontegel@hotmail.com.  His claimed injury is thus illusory and cannot establish standing.

## II.    If The Court Were To Reach The Merits, It Would Still Need To Uphold The Subpoena.

Even if the Does had established standing, this Court would need to affirm the district court's orders because the subpoena makes reasonable, routine, targeted requests and accords with First Amendment standards.

### A.    The Subpoenaed Information Is Relevant To Chevron's Substantial Legal Claims In The Rico Action.

A party is entitled to discover information "that is relevant to [its] claim[s]" and "reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1); *see also* Fed. R. Civ. P. 45, 1946 advisory committee's note (a subpoena has "the same scope as provided in Rule 26(b)"); 1970 advisory committee's note ("[T]he scope of discovery through a subpoena is the same as that applicable to . . .  the other discovery rules.").

The account owners listed in the subpoena were intimately involved in the LAPs' scheme against Chevron. *See supra* Counter-Statement of Facts, Part C. The subpoenaed information about the Does' accounts will thus directly and materially support Chevron's RICO action claims in several ways.

*First*, the subpoenaed information will show whether certain account holders had access to the RICO defendants' internal documents and data. The RICO defendants and their affiliates established email accounts to store and exchange documents in furtherance of the fraud. 11 Civ. 0691, Dkt. 402-13 (Mar. 2, 2012) (Champion Decl. Ex. 2315), Dkt. 398 ¶ 141 (Mar. 1, 2012). Such accounts were used to plan the ghostwritten "independent" expert report. *Id.* Whoever wrote the $19 billion judgment, moreover, had access to the RICO defendants' unfiled documents. Evidence of who had such access—and when they may have accessed those documents—will provide information about how those documents came to be filed as the work of the "independent" court expert and how some of that information was found verbatim in the $19 billion judgment itself. *See Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 253-55 (S.D.N.Y. 2012).

*Second*, IP information can help prove that substantial portions of the RICO predicate acts originated in the United States. That is critical because—although the RICO defendants' scheme was designed by U.S. lawyers, carried out largely in the United States, and directed at a U.S. victim—the RICO defendants have

contended that Chevron's complaint seeks an extraterritorial application of RICO. 11 Civ. 0691, Dkt. 1468 at 17 (Sept. 30, 2013), Dkt. 243 at 2-5 (Mar. 30, 2011).

*Third*, identifying information about the owners of the accounts—which were used to further the various RICO predicate acts of extortion, wire fraud, and money laundering—will provide evidence regarding the structure and management of the RICO enterprise. That evidence is essential to a RICO claim. *See Boyle v. United States*, 556 U.S. 938, 951 (2009).

*Fourth*, although Chevron likely knows the account holders' identities, Chevron remains entitled to regularly collected business records to substantiate those identities at trial. *See*, *e.g.*, Fed. R. Evid. 803(6); *see also*, *e.g.*, *Griffin v. Maryland*, 19 A.3d 415, 421 (Md. 2011) (describing need for guarantees of authenticity before admitting Internet evidence); *People v. Clevenstine*, 891 N.Y.S.2d 511, 514 (N.Y. App. Div. 2009) (same).

The Does contend that the district court in the RICO action limited discovery to specific allegations. Doe Br. 6, 7 n.1. But the order the Does cite concerned only Chevron's entitlement to certain documents from one of the LAPs' law firms under the crime-fraud exception to the attorney-client privilege and work-product protections. *See Chevron Corp. v. Donziger*, 11 Civ. 0691 LAK, 2013 WL 1087236, at *1, *3, *30 (S.D.N.Y. Mar. 15, 2013). That order did not purport to alter the scope of discovery in the RICO action more broadly.

The Does also criticize Chevron for continuing to seek this information after the start of trial. Doe Br. 34. But Chevron's subpoena, issued more than a year ago (J.A. 155), was served well before the deadline for document requests in the RICO action. *See* 11 Civ. 691, Dkt. 1426 at 1 (S.D.N.Y. Sept. 12, 2013). The court in the RICO action has ample discretion, moreover, to consider such information at trial, especially because Chevron has diligently pursued it. *See Outley v. City of New York*, 837 F.2d 587, 589 (2d Cir. 1988); *Frost v. Experian & TRW, Inc.*, 98 CIV. 2106 JGK JCP, 1999 WL 287373, at *3 (S.D.N.Y. May 6, 1999) ("[C]ourts frequently exercise their discretion to permit the introduction of documents that were not produced or the testimony of witnesses that were not identified prior to the close of discovery."). As of the date this brief was filed, the district court in the RICO action has not rendered its verdict. And even if it had, any relevant evidence unearthed by the subpoena may be admissible on a motion for reconsideration as newly discovered evidence. J.A. 252; *see* S.D.N.Y. Local Civ. R. 6.3. As Judge Kaplan observed in the RICO action, "There simply is no good reason to foreclose the server of a timely subpoena—whose efforts to obtain the subpoenaed materials have been frustrated by ultimately meritless motions to quash—from seeking to compel compliance with that court process." 11 Civ. 0691, Dkt. 1426 at 1-2 (Sept. 12, 2013).

**B.    Courts Routinely Require Production Of The Information That Chevron Seeks.**

For each of the Does' accounts, Chevron seeks only two categories of information:  (1) user identification information, and (2) usage information such as IP logs and IP address information.  *See* J.A. 160.  Such information is routinely sought from email service providers in civil discovery.  *See, e.g.*, *In re Roebers*, No. 12-mc-80145-RS (LB) 2012 WL 2862122, at *3 (N.D. Cal. July 11, 2012) ("Internet service providers and operators of communications systems are generally familiar with this type of discovery request.").  And courts consistently uphold subpoenas seeking such information.  *See, e.g.*, *London v. Does 1-4*, 279 F. App'x 513, 514-15 (9th Cir. 2008) (affirming denial of motion to quash subpoena on Yahoo! seeking documents disclosing IP address from which email accounts were created); *John Wiley & Sons, Inc. v. Does 1-35*, 12 Civ. 2968 (RWS), 2012 U.S. Dist. LEXIS 182741 (S.D.N.Y. Dec. 28, 2012) (denying motion to quash subpoena served on defendant's Internet Service Provider); *AF Holdings LLC v. Doe*, No. 12-cv-02416-WHA, 2012 U.S. Dist. LEXIS 75806, at *2-3 (N.D. Cal. May 31, 2012) (granting discovery of IP log, for purpose of determining identity of allegedly infringing IP address holder); *Xcentric Ventures, LLC v. Karsen, Ltd.*, No. 11-cv-01055-PHX-FJM, 2012 U.S. Dist. LEXIS 121888, at *1-3 (D. Ariz. Aug. 28, 2012) (denying motion to quash subpoena seeking discovery of IP address information from Google).  Federal law, moreover, permits Microsoft to

39

disclose the subpoenaed information.    18 U.S.C. § 2702(c)(6).    Critically, the subpoena does not seek the contents of email communications.    J.A. 237; *see Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 WL 4593181, at *4 (N.D. Cal. Oct. 4, 2011) ("addressing information" is less protected than content of communications).

The Does nevertheless characterize Chevron's subpoena as somehow unusual because it seeks information related to persons who are not defendants in the RICO action.    *E.g.*, Doe Br. 7 n.1.    But the Does were all agents of either the defendants in the RICO action or their co-conspirators (who were named in the complaint).    Indeed, each of the account owners was an employee of the LAPs, is an attorney of a RICO defendant, is a co-conspirator, or was otherwise an agent of the LAPs.    *See* J.A. 163-73.    Each account owner is therefore similarly situated to the defendants in cases in which a court has upheld a subpoena seeking identifying information and IP login information from the defendants themselves.    *E.g.*, *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 113, 124 (2d Cir. 2010).    The law requiring defendants to comply with a subpoena therefore applies to the non-party account owners listed in the subpoena here.

## C.    The Subpoena Accords With First Amendment Standards.

The Does contend that the subpoena violates their First Amendment rights to anonymity and to association.    Doe Br. 25-46.    This argument lacks merit.

###### 1.    Compliance With The Subpoena Will Not Infringe Any Right To Anonymity.

###### a.    The Right To Anonymity Does Not Apply Here.

The First Amendment protects anonymity when it will provide "a shield from the tyranny of the majority," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), or will "foster open communication and robust debate" by eliminating the burdens of others "knowing all the facts about one's identity," *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999). Those rationales for protecting anonymity disappear where, as here, a speaker has exposed—indeed, publicized—his identity or his identity is otherwise well known. In those circumstances, the speaker has not made the protected "decision to remain anonymous." *McIntyre*, 514 U.S. at 342.

The subpoena here does not affect the Does' right to anonymous speech because the Does are not anonymous. That is of their own doing: Both Simeon Tegel and Maria Eugenia Yepez used their names or initials when creating the addresses associated with their email accounts. And they have long publicized their use of these particular email addresses and their association with the LAPs. Tegel signed emails and wrote letters to news outlets using his name. J.A. 163-69, 173-75. As mentioned, a Google search of "Simeon Tegel" returns, as its second result, Tegel's personal website, which lists his Hotmail address. J.A. 200-01. (Despite a year-long proceeding over the purported anonymity of

41

simeontegel@hotmail.com's owner, the email address remained visible on Simeon Tegel's website as of December 2, 2013.)   And Yepez participated in radio interviews about her involvement in the LAPs' public relations efforts.  J.A. 203-05.  As for the owner of the account address pirancha@hotmail.com, a Google search of his address indicates the owner to be Rodrigo Wampakit of Maruma, Ecuador.  *See* http://chapaik.freservs.com/ (last visited December 2, 2013); J.A. 219 n.5.   Through their public activities, the Does chose *not* "to remain anonymous."  *McIntyre*, 514 U.S. at 342.  The long-public nature of their activities, moreover, belies any claim that they need protection from a "danger" of having their association with the LAPs "exposed."   Because the Does advertised their identities and involvement with the LAPs, their claim to anonymity is baseless.

The Does contend that "[t]he appearance of absolute secrecy of a speaker's identity" is not necessary for a claim of anonymous speech.  Doe Br. 26-27.  Even if that were true, it is irrelevant here:  The Does have disclosed their associations with the LAPs.  By their own actions, they have not maintained secrecy regarding their identities—in "appearance" or in fact.

Moreover, although the Does attempt to re-cast their association with the LAPs as one of political speech or advocacy, Doe Br. 25-26, the Does in fact provided significant assistance to the LAPs' fraudulent enterprise.  *See supra* Counter-Statement of Facts, Part C; J.A. 22.   The district court accordingly

42

emphasized that "[w]hether and how the defendants in th[e] [Ecuador] action and co-conspirators engaged in a media campaign to pressure Chevron into settling the allegedly fraudulent litigation in Ecuador is quite relevant to Chevron's RICO claims." J.A. 254. The claim that the Does did no more than raise awareness of Amazonian pollution is, at the least, disingenuous. The First Amendment, moreover, does not protect fraudulent activity or associations that further a conspiracy. *See*, *e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003); *McIntyre*, 514 U.S. at 357; *Branzburg v. Hayes*, 408 U.S. 665, 697 (1972); *United States v. Sattar*, 395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005).

Citing the Supreme Court's decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), the Does contend that "First Amendment rights will be denied only to those who themselves ha[ve] 'a specific intent to further an unlawful aim.'" Doe Br. 29 (quoting 458 U.S. at 925); *see also id.* at 29-30. But *Claiborne Hardware* applied that specific-intent rule as a prerequisite to *imposing civil liability*: "For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." 458 U.S. at 920. Chevron has not sought to impose civil liability on the Does; it has asked only that Microsoft disclose information relating to fraudulent activity in which the Does were involved. *Claiborne Hardware* does not undercut that request.

**b.     Chevron's Interest In Disclosure Outweighs Any Claimed Right To Anonymity.**

Even if the Does had any claim to anonymity—and they do not—Chevron's interest in discovering the limited subpoenaed information would outweigh it.

When ruling on a motion to quash that seeks to preserve the movant's anonymity, a court balances the need for disclosure against First Amendment interests.  *See Sony Music Entm't Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 564-65 (S.D.N.Y. 2004) (Chin, J.).

i.  Because the First Amendment does not protect the Does' efforts to further fraudulent activity or to aid a conspiracy, this Court should apply "the lowest bar that courts have used" in considering whether to order disclosure of an anonymous speaker's identity:  it should consider whether "the claim for which the plaintiff seeks the disclosure" meets "the motion to dismiss or good faith standard."  *In re Anonymous Online Speakers*, 661 F.3d 1168, 1175 (9th Cir. 2011) (discussing the standards applied across circuits—including within the Second Circuit—to evaluate different First Amendment anonymity claims).   Here, the RICO defendants' motion to dismiss Chevron's claims was denied in relevant part (*see Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012) (Westlaw version)) and the district court in the RICO action concluded that there is no material factual dispute on many of Chevron's core allegations regarding the RICO defendants' fraud and misconduct in the Ecuador litigation.  *See* 11 Civ. 0691,

44

Dkt. 550 (July 31, 2012).   That shows that Chevron meets the low disclosure standard.

    ii.  Even if this Court were to apply the higher "prima facie standard"—used, for example, by the Southern District of New York in *Sony Music Entm't Inc. v. Does 1-40*—Chevron would meet that standard as well.  When ruling on a motion to quash that seeks to preserve the movant's anonymity under that standard, courts weigh "the need for disclosure against First Amendment interests" by considering: (1) the prima facie strength of the plaintiff's claims of injury; (2) the specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) the plaintiff's need for the information; and (5) the movant's expectation of privacy in the subpoenaed information.  326 F. Supp. 2d at 564-65; *see Arista Records v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (endorsing *Sony Music* test).  Applying that analysis, courts in this Circuit have upheld subpoenas requesting identifying information like that sought here.  *See*, *e.g.*, *John Wiley & Sons, Inc. v. Does 1-35*, No: 1:12-cv-02968-RWS, 2012 U.S. Dist. LEXIS 182741 (S.D.N.Y. Dec. 28, 2012); *Arista Records LLC v. Does 1-16*, Civ. No. 1:08-CV-765 (GTS/RFT), 2009 WL 414060, at *6 (N.D.N.Y. Feb. 18,

2009), *aff'd*, 604 F.3d 110 (2d Cir. 2010); *see also Next Phase Distrib., Inc. v. Does 1-138*, No. 11 Civ. 9706 (KBF), 2012 WL 691830 (S.D.N.Y. Mar. 1, 2012).[7]

Here, these factors all support disclosure.

*First*, Chevron has made a strong showing of a prima facie claim of actionable harm. Although this factor may be satisfied by a well-pleaded complaint and a supporting exhibit and declaration, *Arista Records LLC*, 604 F.3d at 123, Chevron has gone well beyond that showing. In denying the LAPs' motion to dismiss and in finding that evidence that the Ecuador litigation was "tainted by fraud" was "uncontradicted" on summary judgment, the court concluded that Chevron has made at least a prima facie showing of actionable harm. *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012); 11 Civ. 0691, Dkt. 550 (July 31, 2012). Indeed, seven federal courts have determined that the LAPs committed fraud sufficient to pierce the protection against discovery of attorney-

---

[7]    The *Sony Music* test rests on several considerations: that anonymous speech does not enjoy absolute protection, *see* 326 F. Supp. 2d at 562; that such speech enjoys especially scant protection when the objecting litigant seeks to use anonymity to conceal misconduct, *see id.* at 562-63, 565-66; and that information to support a legitimate legal claim has considerable value, *see id.* at 564-66. Those considerations apply here, because clear evidence shows that the Does aided the RICO defendants' fraudulent scheme and because Chevron has legitimate legal claims. Thus, the *Sony Music* test can be applied here even though the Does are non-parties.

46

client privileged documents.[8]  There is no reasonable dispute that each acted as an agent or employee of the RICO defendants or their co-conspirators.

The Does contend that "Chevron has failed to explain the purpose of its subpoena for information regarding individuals against whom it has not alleged any causes of action, much less tie the information to its burdens of proof in the RICO action against others."  Doe Br. 34.  Yet Chevron has explained in detail why it subpoenaed the information here and how that information could help it prove its claims.  *See* J.A. 27-28; *see supra* Part II-A (advancing the same arguments about the purpose of the subpoena as those advanced in the district court).  The Does have chosen to ignore Chevron's explanation.

The Does similarly insist that Chevron seeks the subpoenaed information because it "simply wants to know the identity and track the movements of non-parties who have engaged in speech that Chevron vehemently dislikes and who have associated with or supported its opponents in" the RICO action.  Doe Br. 34-

---

[8]    *In re Chevron Corp.*, 633 F.3d 153, 166, 168 (3d Cir. 2011); *In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925, at *14, *16 (S.D. Fla. June 12, 2012); *Chevron Corp. v. Page*, No. RWT-11-1942, Oral Arg. Tr. 73:7-9, 73:25-74:10 (D. Md. Aug. 31, 2011); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011), *rev'd on other grounds sub nom.*, *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012); *In re Chevron Corp.*, No. 10-cv-1146-IEG(WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, slip op. 3-4 (D.N.M. Sept. 2, 2010); *Chevron Corp. v. Champ*, Nos. 1:10-mc 27, 1:10-mc 28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010).

35.   The Does cite no evidence for that view; the Does cite only a page of Chevron's brief explaining some of the Does' involvement in the illicit RICO enterprise.  *See* J.A. 31.  Indeed, despite the Does' rhetoric that the subpoena will allow Chevron "to track their movements and associations," *e.g.*, Doe Br. 12, 39, 40, 44-45, the Does admit that the information sought is unlikely to enable Chevron to "track" anyone because Internet Service Providers like Microsoft generally "associate an IP address with an ISP's regional office," rather than a user's "physical location," *id.* at 9.  The fact that someone may be located near an ISP's regional office cannot be deemed, in the Internet age, protected "political . . . information"—let alone "intensely personal information."  *Id.* at 40.

*Second*, Chevron has made a narrow and specific discovery request concerning the Does.  Chevron sought specific account usage and user documents that will "lead to identifying information" (*Sony Music*, 326 F. Supp. 2d at 566) that will assist its efforts to establish where the Does were located when RICO predicate acts took place, to learn details about the structure and management of the RICO enterprise, and to uncover further use of computers in connection with the fraudulent "independent" expert report and ghostwritten $19 billion judgment. *See* 11 Civ. 0691, Dkts. 402-13 (Mar. 2, 2012), 398 ¶ 141 (Mar. 1, 2012), 550 at 27-30 (July 31, 2012).  Chevron has not sought a broad swath of information— such as the contents of emails—but has instead served narrow requests that have

48

withstood frequent judicial scrutiny. *See supra* Part II-B. And—with the exception of Simeon Tegel, as to whom the subpoena was narrowed—the Does did not submit any sworn evidence identifying a period of time when they were *not* working with the LAPs. The Does, moreover, admit that Microsoft likely has not maintained this information for the years that the fraud at issue here has been underway. Doe Br. 9 n.4. But whatever records remain may be relevant to proving the fraud at the heart of this action.

*Third*, Chevron has been unable to obtain the specific information sought in the subpoena through other means. Chevron has pursued multiple discovery actions to obtain information about the relationships and dealings between the LAPs and non-parties. Despite those efforts, Donziger, the LAPs, and their agents and co-conspirators have prevented Chevron from accessing much of that evidence. *See supra* Counter-Statement of Facts, Part B (summarizing LAPs' efforts to evade and obstruct discovery). Given that obstruction, the subpoena here is the best calculated means—and is, indeed, necessary—to allow Chevron to obtain the information that the LAPs have concealed.

In response, the Does suggest that Chevron should seek these facts from the RICO defendants themselves and contend that Chevron has not established that the subpoenaed information is unavailable from other sources. *See* Doe Br. 37-38. But computer users do not often record IP login information, much less the login

information of the computers of those who work with them.  In fact, in the RICO action itself, lead defendant Steven Donziger was forced to subpoena Yahoo! to obtain access such information *about his own account.  See* J.A. 191-93.  Seeking this information from Microsoft is the most direct way to proceed—and is also the best way to ensure that the information has sufficient indicia of reliability to make it admissible.  *See* Fed. R. Evid. 901(a).  Moreover, to the extent the Does invoke "the annoyance and expense of producing . . . documents," Doe Br. 37 (internal quotation marks omitted), they have no standing to do so because they do not themselves have to take any action to comply with a subpoena issued to *Microsoft*.

*Fourth*, the subpoenaed information is important to Chevron's claims in the RICO action.  Chevron already has obtained thousands of emails sent to and from the RICO defendants and those associated with them, including the Does.  These emails establish that computers were used to write the fraudulent Cabrera report and the fraudulent judgment—misconduct that is central to the case.  Moreover, identifying who logged in and out of the email accounts—and the location from which those users operated—will help Chevron establish where the Does were located when RICO predicate acts took place, to learn details about the structure and management of the RICO enterprise, and to obtain details about the fraudulent expert report and judgment.  *See supra* Part II-A.

50

The Does insist that Chevron has not established that the subpoenaed information is directly and materially relevant to a core claim, but their only argument on this score is faulting Chevron for requesting nine years of information in its subpoena. *See* Doe Br. 35-36.  As explained above, however, the nine-year period covers the relevant range for the LAPs' fraudulent activity, and Chevron has offered to limit this timeframe to the period in which each account owner worked with the LAPs. *E.g.*, J.A. 46, 57-58.  Chevron therefore does not challenge the district court's decision to narrow the subpoena as applied to Simeon Tegel, because Chevron is interested only in Tegel's involvement with the LAPs.  The Does have been largely unwilling to disclose the date ranges that they worked with the LAPs.  Chevron has thus needed to still seek information generated from when the Ecuador litigation was filed until the time the subpoena was issued.  J.A. 160.

*Fifth*, the Does have only a "minimal expectation of privacy" in the subpoenaed material. *Sony Music*, 326 F. Supp. 2d at 566.  The Does generally used their own names or initials in the email addresses associated with their accounts.  And they did so using an email service (Microsoft Hotmail) that warns users that their identifying information will not be kept private if it is subpoenaed.  J.A. 207-11.  That warning—particularly when coupled with the Does' efforts to publicize their identities and actions—renders the Does' privacy interest "minimal" at best, *Doe I v. Individuals*, 561 F. Supp. 2d 249, 254 (D. Conn. 2008) (finding

"minimal" expectation of privacy based on a similar Internet Service Provider warning), and overcome by the need for disclosure.  *See also Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 WL 4593181, at *3-4 (N.D. Cal. Oct. 4, 2011) (noting that courts "routinely reject the argument that subscribers have a privacy interest in their account information" and rejecting motion to quash subpoena that "d[id] not seek the content of any of Movant's communications but rather 'addressing information' that will allow the SEC to identify Movant"); *In re United States*, 830 F. Supp. 2d 114, 131-33 (E.D. Va. 2011) (holding that petitioners had no expectation of locational privacy in IP logs when they voluntarily transmitted their IP addresses to Twitter).

Because all factors weigh strongly in favor of disclosure, the Does' "right to remain anonymous"—if it applied here—must "give way to [Chevron's] right to use the judicial process to pursue" its claims.  *Sony Music*, 326 F. Supp. 2d at 567.

iii.  The Does ask this Court to apply a four-part standard articulated by a judge in the Western District of Washington in *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088 (W.D. Wash. 2001).  *See* Doe Br. 33-38.  The *2TheMart.com* test looks to whether:  (1) the subpoena was issued in good faith and not for an improper purpose; (2) the information sought relates to a core claim; (3) the identifying information is directly and materially relevant to that claim; and (4) information sufficient to establish that claim is unavailable from any other

source.  *2TheMart.com*, 140 F. Supp. 2d at 1095.  The Does do not explain why the *2TheMart.com* test—rather than the *Sony Music* test embraced by this Court, *see Arista Records*, 604 F.3d at 119—should apply here.  The Does also mischaracterize *2TheMart.com*.  They contend that, to obtain disclosure, a party "must show" that it prevails on all four *2TheMart.com* factors.  Doe Br. 33.  But the district court in *2TheMart.com* described its test as a balancing analysis of several factors—not four elements that must all be satisfied.  *See* 140 F. Supp. 2d at 1095-97.

In any event, applying the *2TheMart.com* standard would not change the result here.  As explained above, in this case the subpoenaed information relates to a core claim, the subpoenaed information is directly and materially relevant to that claim, and Chevron has shown that it cannot obtain that information from another source.  Chevron therefore satisfies the second, third, and fourth *2TheMart.com* factors.  And, in seeking the subpoenaed information, Chevron has acted in good faith:  Chevron has well-supported RICO claims, the accounts at issue were used by persons who were involved in the RICO defendants' illicit enterprise, and Chevron has been willing to work with the Does to tailor its request to uncover only relevant information.  This is more than enough to support the subpoena under *2TheMart.com*.

Indeed, the Ninth Circuit has described the *2TheMart.com* standard as "fall[ing] somewhere between the motion to dismiss and the prima facie standards" in the extent to which it favors disclosure. *Anonymous Online Speakers*, 661 F.3d at 1176. That description apparently rests on the fact that—unlike the prima facie standard set forth in *Sony Music*—*2TheMart.com* does not focus on whether a plaintiff has established a prima facie case, but instead *balances* whether the subpoena was "issued in *good faith*" (a lower bar) against other factors. Because Chevron satisfies the higher prima facie standard set forth in *Sony Music*, it necessarily satisfies the *2TheMart.com* standard. Thus, under even the Does' standard, the subpoenaed information must be disclosed.

### 2. Compliance With The Subpoena Will Not Infringe Any Right Of Association.

The Does also cannot avoid enforcement of the subpoena based on a claimed infringement of their freedom of association, because they cannot "ma[ke] a *prima facie* showing that disclosure would infringe" their associational rights. *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989).

To begin with—and as explained above—the Does have disclosed their identities. The Does, moreover, have freely and publicly associated themselves and their identities with the LAPs and their lawsuit against Chevron. The genie has left the bottle: Nothing about *re*-disclosure of the Does' identities could hamper their associational freedom.

Indeed, if disclosure could have harmed the Does at all, that (self-inflicted) harm would have already occurred. Yet the Does do not identify any harm that has ever hampered their associational freedom. The Does have long publicized their association with the LAPs and were open about their identities during that association. *See* J.A. 22. Yet the Does have not demonstrated that their open involvement with the LAPs caused them to face harassment, threats, or anything else that chilled their speech.

The absence of such harm contrasts with the baseless speculation set forth in the declaration by "John Doe" Simeon Tegel. He has asserted, for example, that "his use of his email account to communicate with his sources would be chilled if Chevron obtained details about his account" and that he "would be intimidated and deterred from engaging in activism or litigation against Chevron in the future" if Microsoft complies with the subpoena. Doe Br. 11. That speculation is inexplicable in light of Tegel's long public association with the LAPs (he worked for the Donziger-funded, RICO defendant co-conspirator Amazon Watch from 2005 to 2008), which has apparently never caused him such harms. *See*, *e.g.*, J.A. 173-75. Even if Tegel had experienced such harms, of course, they would not be protected by invoking the freedom of association here: He unmasked himself and

55

forfeited any right to conceal his identity.  The Does, moreover, failed to present evidence of harm for any other movant or account owner.[9]

Even if the Does could make a prima facie showing of potential harm, moreover, they still cannot overcome Chevron's compelling interest in the subpoenaed material under the governing legal standards.  *See Terry*, 886 F.2d at 1355; *In re Grand Jury Proceedings*, 776 F.2d 1099, 1103 (2d Cir. 1985).  First, there is a substantial relationship between that interest and the subpoenaed information.  *See supra* Part II-A (discussing how the subpoenaed information will support Chevron's claims).  Second, Chevron cannot obtain the material other than by subpoenaing Microsoft.  *See supra* Part II-C-1-b (discussing third *Sony Music* factor).  And third, Chevron's request does not unnecessarily affect protected rights.  Chevron has made a significant showing that the LAPs committed massive fraud and that the Does worked with them to further that fraud.  The First

---

[9]    Relying on *Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2010), the Does contend that "Chevron had the burden to demonstrate that the information sought" is "highly relevant," that the subpoena was "carefully tailored," and that the information is "otherwise unavailable."  Doe Br. 45-46 (internal quotation marks omitted).  Chevron has satisfied those criteria.  *See supra* Parts II-A, II-C-1-b.  Moreover, the Does fail to acknowledge that, under *Perry*, the *movants* were required to *first* "demonstrate a prima facie showing of arguable first amendment infringement" with evidence that the subpoena "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights."  591 F.3d at 1140 (internal alterations and quotation marks omitted).  The Does have not made that showing.

Amendment does not protect fraud or associations that further a conspiracy. *See supra* Part II-C-1-a (collecting authorities).[10]

## D.    The Subpoena Is Not Overbroad.

The Does contend that the subpoena is overbroad because it seeks information over the course of nine years. Doe Br. 47. That is incorrect. The subpoena seeks only information that remains in Microsoft's custody or control since the Ecuador litigation began in 2003 through the time the Lago Agrio judgment was issued in 2011. J.A. 160; *see*, *e.g.*, *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 243 (S.D.N.Y. 2012) (Lago Agrio litigation began in 2003); *id.* at 245 (Lago Agrio judgment issued in 2011). That information is relevant to Chevron's claims in the RICO action. *See supra* Part II-A. Chevron made clear during meet-and-confer sessions, moreover, that it would limit the timeframe as to each account upon the accountholder's confirmation of his or her own dates of

---

[10]    The Does' *amicus* contends that, because Latin American nations have an interest in data privacy, principles of comity prevent application of American law here and the subpoena should be quashed. Ecuador Br. 28. That issue is not before this Court because it was not raised below or mentioned in the Does' opening brief. *See Univ. City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001). Comity analysis is, moreover, unsuitable for appellate adjudication in the first instance because the Does bore the "burden of demonstrating that a conflict of law exists," *In re Vivendi Univ., S.A. Sec. Litig.*, 618 F. Supp. 2d 335, 341-42 (S.D.N.Y. 2009), and this Circuit's four-factor test for conducting a comity analysis (which favors American law) is not mentioned once by the Does' *amicus*, *see id.*; *Linde v. Arab Bank, PLC*, 706 F.3d 92, 111-14 (2d Cir. 2013).

involvement with the Lago Agrio litigation. J.A. 42-47, 53, 55, 57-58, 66. Although Microsoft is unlikely to have such information for the entire period (as the Does admit, Doe Br. 9 n.4), whatever is left may be relevant.

In any event, the Does had the burden of showing that the subpoena was overbroad. *Schoolcraft v. City of New York*, No. 10 Civ. 6005 RWS, 2012 WL 2161596, at \*2 (S.D.N.Y. June 14, 2012), *reconsideration denied*, 2012 WL 2958176 (S.D.N.Y. July 20, 2012); *see also Donovan v. Mehlenbacher*, 652 F.2d 228, 230 (2d Cir. 1981); *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011); *Snider v. Lugli*, CV 10-4026 JFB AKT, 2011 WL 5401860 (E.D.N.Y. Nov. 4, 2011); 9A Charles Alan Wright, *et al.*, Federal Practice and Procedure § 2459 (3d ed.) (note 7.1 and accompanying text). Only one Doe—the owner of simeontegel@hotmail.com—provided a sworn declaration clarifying the timeframe of his involvement with the Lago Agrio litigation. The court limited the timeframe as to his email account accordingly. The Does refused to provide other limiting evidence, and refused Chevron's offer through meet and confer to limit the time period of the subpoena. *See* J.A. 81. Because they did not even try to carry their burden as to other accounts, they cannot complain now.

## CONCLUSION

The orders should be affirmed.

Dated:  December 2, 2013                    Respectfully submitted,


  /s/   Randy M. Mastro

Randy M. Mastro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0913
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
rmastro@gibsondunn.com

Howard S. Hogan
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9550
hhogan@gibsondunn.com

*Counsel for Plaintiff-Appellee*
  *Chevron Corporation*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.   This brief complies with Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,993 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  December 2, 2013

/s/ Randy M. Mastro
Randy M. Mastro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0913

*Counsel for Plaintiff-Appellee*
  *Chevron Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2013, a true and correct copy of the foregoing Response Brief of Plaintiff-Appellee Chevron Corporation was served on the following counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1(h)(1) & (2):

Nathan D. Cardozo
nate@eff.org
Cindy Cohn
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Telephone: (415) 436-9333

Richard Herz
rick@earthrights.org
Michelle Harrison
Marco Simons
EARTHRIGHTS, INTERNATIONAL
1612 K Street N.W., Suite 401
Washington, D.C.  20006
Telephone:  (202) 466-5188

/s/ Randy M. Mastro
Randy M. Mastro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0913

*Counsel for Plaintiff-Appellee*
  *Chevron Corporation*